

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| GUIDEONE MUTUAL INSURANCE COMPANY | § § § | |
| Plaintiff/Counter-Defendant | § § | |
| v. | § § | |
| FIRST UNITED METHODIST CHURCH OF HEREFORD | § § § | |
| Defendant/Counter-Plaintiff | § § | CIVIL ACTION NO. 2:18-cv-00140-Z |
| v. | § § | |
| SUNNI DENISE BOENKER, Individually, and as D/B/A BOENKER & WHEELWRIGHT INSURANCE; and GUIDEONE MUTUAL INSURANCE COMPANY. | § § § § § § | |
| Defendants. | § | |

**GUIDEONE MUTUAL INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE U.S. DISTRICT COURT:

COMES NOW Plaintiff/Counter-Defendant, GuideOne Mutual Insurance Company ("GuideOne") and pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment on its claim for Declaratory Judgment.

## <u>TABLE OF CONTENTS</u>

Table of Contents ........................................................................................................2

Table of Authorities....................................................................................................3–4

I.      Factual and Procedural Background ...........................................................5–8

II.     Summary of GuideOne's Argument .........................................................8–10

III.    Summary Judgment Standard...................................................................10–11

IV.     Exhibits ..........................................................................................................11

V.      Argument and Authority..........................................................................11–21

        a.  An appraisal award may be disregarded when it is made without
            authority or is not made in substantial compliance with the Policy. ..............11–21

            i.    First United failed to comply with the terms of the Policy by
                  failing to present GuideOne with a sworn proof of loss as
                  requested or generally cooperate with GuideOne's attempts
                  to resolve the claim. ...............................................................14–17

            ii.   First United failed to comply with the terms of the Policy
                  when it prematurely and unilaterally asked the Deaf Smith
                  County District Court to appoint an umpire through an *ex
                  parte* proceeding. ...................................................................17–18

            iii.  The improperly appointed umpire issued an award going
                  beyond the scope of the differences between the parties........................19

            iv.   The improperly appointed umpire was not impartial due to
                  his financial interest in the outcome of the appraisal process.
                  ...............................................................................................20–21

VI.     Conclusion and Prayer ...............................................................................22–23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 10

*ARM Props. Mgmt. Grp. v. RSUI Indem. Co.*, 400 F. App'x 938 (5th Cir. 2010) ....................... 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 10

*Central Life Ins. Co. v. Aetna Cas. & Surety Co.*, 466 N.W.2d 257 (Iowa 1991) ....................... 20

*Delaware Underwriters v. Brock*, 211 S.W. 779 (Tex. 1919) ................................................. 20, 21

*Duffie v. United States*, 600 F.3d 362 (5th Cir. 2010) .................................................................. 11

*Fisch v. Transcontinental Ins. Co.*, 356 S.W.2d 186 (Tex. Civ. App.—Houston 1962) .............. 19

*Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986) ............................................................... 10

*Franco v. Slavonic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777 (Tex. App.—Houston [14th Dist.]

   2004, no pet.) ........................................................................................................................... 12

*Gardner v. State Farm Lloyds*, 76 S.W.3d 140 (Tex. App.—Houston [14th] 2002) .................. 20

*Gen. Star Indem. Co. v. Spring Creek Vill. Apartments Phase V, Inc.*, 152 S.W.3d 733 (Tex.

   App.—Houston [14th Dist.] 2004, no pet.) ....................................................................... 20, 21

*Hall Bros. v. Western Assurance Co.*, 133 Ala. 639 (Ala. 1902) ................................................. 21

*Hennessey v. Vanguard Ins. Co.*, 895 S.W.2d 794 (Tex. App. 1995) ...................................... 8, 13

*In re Universal Underwriters of Tex. Ins. Co.*, 345 S.W.3d 404 (Tex. 2011) .............................. 12

*Jimenez v. Liberty Ins. Corp.*, No. CV H-16-1866, 2017 WL 6368663 (S.D. Tex. Nov. 9, 2017)

   .................................................................................................................................................. 19

*Mainali Corp. v. Covington Specialty Ins. Co.*, 872 F.3d 255 (5th Cir. 2017) ...................... 12, 13

*Mattox v. Safeco Ins. Co. of Indiana*, No. 1:16-CV-1037-DAE, 2018 WL 3603102 (W.D. Tex.

   May 29, 2018) ......................................................................................................................... 13

*Nolan v. GeoVera Specialty INS. Co.*, No. 1:11-CV-207, 2012 WL 12892787 (E.D. Tex. Aug. 10, 2012).................................................................................................................... 12

*Phoenix Assur. Co., Ltd, of London, England v. Davis*, 67 F.2d 824 (5th Cir. 1933) ................. 21

*Providence Lloyds Ins. Co. v. Crystal City Ind. Sch. Dist.*, 877 S.W.2d 872 (Tex. App—San Antonio 1994, no writ) ..................................................................................................... 20

*Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211 (Tex.2003) .................................. 13

*State Farm Lloyds v. Johnson,* 290 S.W.3d 886 (Tex. 2009)...................................... 8, 12, 13, 20

*Triple S Properties Inc. v. St. Paul Surplus Lines Ins. Co.*, No. 3:08-CV-796-O, 2010 WL 3911422 (N.D. Tex. Oct. 5, 2010) ............................................................................... 19

*U.S. Pecan Trading Co. v. General Ins. Co. of Am.* No. EP-08-CV-347-DB, 2009 WL 10669396 (W.D. Tex. May 29, 2009) ..................................................................................... 20

## Statutes

28 U.S.C. §2201.......................................................................................................................... 10

## Rules

FED. R. CIV. P. 56(a) ................................................................................................................... 10

## I. Factual and Procedural Background

GuideOne filed this instant action for declaratory judgment to set aside an appraisal award that was not obtained pursuant to the terms and conditions of the applicable insurance policy. The subject policy, identified as policy number 1432-879 (the "Policy") and attached hereto as Exhibit 1, was issued to Defendant First United Methodist Church of Hereford ("First United"). The Policy's effective dates were 10/20/2016 to 10/20/2017.

On June 20, 2017, First United made a claim on the Policy for property damage caused by a hail event. GuideOne timely investigated the claim and paid $221,259.20 (actual cash value) for covered damages to First United. After accepting the payments, First United represented to GuideOne that they would be making repairs and would submit verification for the recoverable depreciation amounts. Then, on December 8, 2017, GuideOne received notice that First United was now represented by a public adjuster, Public Claims Adjusters, Inc. On January 9, 2018, GuideOne contacted the public adjuster requesting an update on the repairs. On January 24, 2018, the public adjuster firm responded:

> "Sorry for the delay, we have a new PA assigned and handling the file who's working with the church and contractor. I will send over their contact info on who's the rep now handling the case directly."

*See* Exhibit 2.

On February 2, 2018, GuideOne again contacted the public adjuster requesting an update on the repairs. The public adjuster firm responded:

> "No repairs have or will be starting anytime, probably for the next 3-4 months. We are working with the insured and contractor on price and scope errors on the adjusters estimate and will be in touch soon."

*See* Exhibit 3.

GuideOne then received a letter by fax on February 14, 2018, stating that First United disputed the value of the loss (as determined by GuideOne) and sought to invoke the appraisal clause in the Policy. First United, however, provided no information as to what it believed was the value of the loss.  On March 9, 2018, GuideOne responded to the demand for appraisal requesting that First United first comply with the Policy provisions by providing a sworn proof of loss with estimates for the damages being claimed. The requested information was never received.  On March 19, 2018, GuideOne sent follow up correspondence again requesting a proof of loss. On March 28, 2018, GuideOne received correspondence from the public adjuster firm stating:

> "The contractor Trigg Construction sent you an estimate back in Sept 2017 for roughly $550,000 and you didn't pay it. Would you like to settle the clam with a global release in the range of $ 600,000 - 700,000 to close this out?  There's a lot of missing items that are associated with this massive repair to the entire complex.  Just the OSHA, Cranes, mobilities, supervision and Federal Safety requirements alone is a significant amount of money, let alone the missing overhead and profit not included in the estimate(s).  These two items represent a fraction of repairs missing and needed on this claim. Let me know your thoughts so we can figure this out quickly, if not we genuinely have a large disagreement on the scope and total amount of the claim."

*See* Exhibit 4.

But in fact, GuideOne never received an estimate from Trigg Construction or any damages estimate on behalf of First United. This March 28, 2018 correspondence was the first mention of any information regarding what First United may have believed to be the amount of loss. Notably, the email from the public adjuster did not include any actual estimate of damages prepared by Trigg Construction.

Then on April 6, 2018, GuideOne received a copy of correspondence sent to Todd Bilbrey ("Bilbrey") from the lawyer for First United stating that he (Bilbrey) had been appointed by the Deaf Smith County District Court as the umpire for the appraisal.  *See* Exhibit 5.  A copy of the signed court order from the Deaf Smith County District Court ("the Order") was the first notice

that GuideOne received that First United was seeking appointment of an umpire from a court. GuideOne never received any notice from First United that it had filed a motion or lawsuit with the Deaf Smith County District Court involving this matter. Notice was only provided to GuideOne after an order appointing Bilbrey as the umpire had been signed. Out of an abundance of caution, and in order to comply with the Order, GuideOne designated its appraiser, Ronald Moe.

An Appraisal Award was then issued on July 18, 2018 in the amount of $731,640.25 (notably higher than the alleged damages asserted in the March 28, 2018 email from the public adjuster). *See* Exhibit 6. GuideOne's appraiser did not agree with and did not sign the Appraisal Award. *See id.*

Bilbrey then submitted an invoice for "Property Appraisal Services" in the amount of $9,320.50. *See* Exhibit 7. Bilbrey's fee was calculated as a percentage of the RCV loss assigned by the appraisal, plus an administrative fee of $175.00. Specifically, Bilbrey charged 1.25% of the Appraisal Award of $731,640.25, totaling $9,145.50.

GuideOne filed the underlying suit on July 27, 2018. *See* Dkt. No. 1. First United appeared in this suit on October 5, 2018 and then filed a counterclaim against GuideOne on October 15, 2018. *See* Dkt. Nos. 7, 11. GuideOne answered the counterclaim on November 30, 2018. *See* Dkt. No. 21. First United also sued independent agent Sunni Denise Boenker, individually, and as d/b/a Boenker & Wheelwright Insurance ("Boenker") for alleged misrepresentations regarding the Policy and for violations of the Texas Deceptive Trade Practices Act. Boenker filed a motion to dismiss First United's claims, which this Court granted on October 3, 2019. *See* Dkt. No. 46.

On May 30, 2019, First United filed a Motion to Dismiss GuideOne's declaratory judgment action for lack of subject matter jurisdiction and/or for a failure to state a claim pursuant to the Rooker-Feldman doctrine. *See* Dkt. No. 33. GuideOne filed its timely response in opposition on

June 20, 2019.  *See* Dkt. No. 37.  This Court issued its Findings, Conclusions, and Recommendation to Deny First United's Motion to Dismiss on November 1, 2019, to which First United filed its objections on November 15, 2019.  *See* Dkt. Nos. 47, 48.

Now, GuideOne files this Motion for Summary Judgment seeking entry of a declaratory judgment stating the Appraisal Award at issue in this matter does not comply with the Policy for the reasons detailed below, and seeking entry of an Order striking Bilbrey as an umpire in this appraisal of this matter, setting aside the Appraisal Award entered by Bilbrey, and for such other, further relief as this Court may deem proper and just.

## II.
## SUMMARY OF GUIDEONE'S ARGUMENT

An actual controversy has arisen between GuideOne and First United with respect to whether the Appraisal Award, which purportedly sets the amount of damages under the insurance contract, was issued in compliance with the terms of the contract. Further, GuideOne has no other adequate remedy at law. If an appraisal award is flawed it can be remedied by disregarding it. *State Farm Lloyds v. Johnson,* 290 S.W.3d 886, 895 (Tex. 2009). Texas courts recognize three situations where the results of an otherwise binding appraisal may be disregarded: (1) when the award was made without authority; (2) when the award was the result of fraud, accident or mistake; or (3) when the award was not made in substantial compliance with the terms of the contract. *Hennessey v. Vanguard Ins. Co.*, 895 S.W.2d 794, 798 (Tex. App. 1995), writ denied (Aug. 1, 1995).

The Appraisal Award issued in this matter was not made in substantial compliance with the terms of the Policy and was not made with proper authority and, therefore, should be set aside. The relevant language in the Policy states the following:

**Appraisal**

If we and you disagree on the amount of loss, either may make a written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will state the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss.

*See* Exhibit 1 at p. 57-58 ¶ E2.

GuideOne seeks a declaration that the Appraisal Award does not comply with the terms of the Policy and was made without proper authority because, despite requests, First United failed to provide a proof of loss or other evidence showing that the parties actually disagreed on the amount of loss before invoking the appraisal clause.

Moreover, GuideOne seeks a declaration that the Appraisal Award does not comply with the terms of the Policy and was made without authority because the appointment of an umpire was premature and improper.  The appraisal clause dictates that the two appraisers will select an umpire and that if they cannot agree, they, not the parties, will take up the issue with a court having jurisdiction.  The request for appraisal was premature, as no disagreement existed between the parties regarding the value of loss, so an appraiser had not yet been appointed by GuideOne.  First United ignored the Policy's relevant provisions, skipping the steps it did not care to follow and unilaterally acting to have an umpire appointed by a court.

Further, GuideOne seeks a declaration that the Appraisal Award does not comply with the terms of the Policy and was made without authority because the umpire made decisions and issued an award that went beyond the scope of the differences. Under the terms of the Policy, the umpire is to make a determination regarding the differences between the appraisers. Here the umpire

simply did his own appraisal of the entire loss.  Furthermore, he had no authority under which to enter any Appraisal Award.

Finally, GuideOne seeks a declaration that the Appraisal Award does not comply with the terms of the Policy and was made without authority because the improperly appointed umpire had a direct financial interest in the outcome of the appraisal process and, therefore, he was not a competent and impartial appraiser as required by the Policy.

Pursuant to 28 U.S.C. §2201, *et seq.*, Plaintiff GuideOne asks that this award be set aside and for a declaration that this Appraisal Award is void, was not made or achieved with proper authority and in compliance with the Policy, and is not binding as to the amount of damages, if any, in this claim.

### III.
### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute regarding a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*.  A movant is entitled to summary judgment as a matter of law if it can show, through informing the court of the basis of its motion and by identifying the relevant portions of the record, the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When "the movant bears the burden of proof on an issue, either because he is the plaintiff, or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)(emphasis in original).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of

material fact." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (internal citations omitted).

## IV.
## EXHIBITS

In support of this Motion, GuideOne offers the following exhibits:

Exhibit 1:  First United Methodist Church of Hereford's Insurance Policy;

Exhibit 2:  Email from Public Claim Adjusters, Inc. to Sharon Gross-Bryant dated 01/24/2018;

Exhibit 3:  Email from Public Claim Adjusters, Inc. to Sharon Gross-Bryant dated 02/02/2018;

Exhibit 4:  Email from Public Claim Adjusters, Inc. to Sharon Gross-Bryant dated 03/28/2018

Exhibit 5:  Letter from Todd M. Hurd to Todd Bilbrey dated 04/06/2018

Exhibit 6:  Appraisal Award

Exhibit 7:  Todd Bilbrey's Invoice

Exhibit 8:  Deposition Transcript of Michelle Brisendine

Exhibit 9:  Deposition Transcript of Roy Carlson

Exhibit 10: Deposition Transcript of Kevin Bushart

Exhibit 11: Deposition Transcript of Ronald Sorenson

Exhibit 12: Letter from Sharon Gross-Bryant to First United dated 03/09/2018

Exhibit 13: Email from Ronald Sorenson to Sharon Gross-Bryant dated 12/12/2017

Exhibit 14: Email from Michelle Brisendine to Sharon Gross-Bryant dated 11/29/2017

**V.**
**ARGUMENT AND AUTHORITY**

**A.    An appraisal award may be disregarded when it is made without authority or is not made in substantial compliance with the Policy.**

An appraisal clause is a standard, enforceable provision commonly found in insurance contracts or policies in Texas, the purpose of which is to resolve disputes regarding the amount of damages related to a covered claim. *Johnson*, 290 S.W.3d at 888-89. The effect of including an appraisal clause "is to estop one party from contesting the issue of damages in a suit on the insurance contract, leaving only the question of liability to be determined." *Franco v. Slavonic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 786 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see also Mainali Corp. v. Covington Specialty Ins. Co.*, 872 F.3d 255, 258 (5th Cir. 2017). The underpinnings supporting such clauses are that appraisal provides an efficient way for the insurer and its insured to resolve differences regarding the amount of loss through the evaluation of competing estimates by a neutral third-party umpire. *See Nolan v. GeoVera Specialty INS. Co.*, No. 1:11-CV-207, 2012 WL 12892787, at *4 (E.D. Tex. Aug. 10, 2012) (noting that the appraisal clauses are intended "to resolve insurance claim disputes in a more timely and efficient basis"); *In re Universal Underwriters of Tex. Ins. Co.*, 345 S.W.3d 404, 407 (Tex. 2011) ("Appraisals can provide a less expensive, more efficient alternative to litigation").

Appraisal clauses are "generally enforceable" in Texas. *In re Universal*, 345 S.W.3d at 406-07. Furthermore, such clauses appear "in almost every homeowners, automobile, and property policy in Texas." *Johnson*, 290 S.W.3d at 888-89. Texas courts, however, have recognized three situations where the results of an otherwise binding appraisal may be disregarded, including: (1) when the award was made without authority; (2) when the award was the result of fraud, accident or mistake; or (3) when the award was not made in substantial compliance with the

terms of the contract. *Hennessey*, 895 S.W.2d at 798; *see also Mainali*, 872 F.3d at 258.  The

Appraisal Award issued in this matter was not made in substantial compliance with the terms of

the Policy and was not made with proper authority and, therefore, should be set aside.

     The relevant language in the Policy states the following:

> **Appraisal**
>
> If we and you disagree on the amount of loss, either may make a written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will state the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss.

*See* Exhibit 1 at p. 57-58 ¶ E2.

     Texas courts apply the same rules to the interpretation of insurance policies as to any other

contract and "read all parts of each policy together and exercise caution not to isolate particular

sections or provisions from the contract as a whole." *ARM Props. Mgmt. Grp. v. RSUI Indem. Co.*,

400 F. App'x 938, 940 (5th Cir. 2010) (*quoting Provident Life & Accident Ins. Co. v. Knott*, 128

S.W.3d 211, 216 (Tex.2003)).  An appraisal clause in an insurance policy "binds the parties to

have the extent or amount of the loss determined in a particular way." *Mattox v. Safeco Ins. Co. of

Indiana*, No. 1:16-CV-1037-DAE, 2018 WL 3603102, at *3 (W.D. Tex. May 29, 2018) (quoting

*Johnson*, 290 S.W.3d 886, 895 (Tex. 2009) ("Like any other contractual provision, appraisal

clauses should be enforced")). Nevertheless, "[w]hen an appraisal award is not an honest

assessment of the loss, it may be disregarded[.]" *Johnson*, 290 S.W.3d at 895.

First United failed to properly invoke the appraisal clause or otherwise comply with the terms of the Policy by failing to provide GuideOne with a sworn proof of loss as requested. First United then further violated the Policy when it prematurely and unilaterally sought the appointment of an umpire from the Deaf Smith County District Court through an *ex parte* proceeding. Moreover, the resulting Appraisal Award is tainted by the improper scope of the appointed umpire's review and his direct financial interest in the outcome of the appraisal. Accordingly, good cause exists for disregarding the Appraisal Award, as it was made without proper authority and does not substantially comply with the Policy.

### 1. First United failed to comply with the terms of the Policy by failing to present GuideOne with a sworn proof of loss as requested or generally cooperate with GuideOne's attempts to resolve the claim.

Under the terms of the Policy, "[i]f [GuideOne] and [First United] disagree on the amount of loss, either may make a written demand for an appraisal of the loss." *See* Exhibit 1 at p. 57-58, ¶ E2 . In such an event, the appraiser for each party is required to provide an "amount of the loss" incurred. *Id.* First United was specifically required by the Policy to submit to GuideOne "a signed, sworn proof of loss containing the information we request to investigate the claim" in the event of any loss or damage. *Id.* at p. 58, ¶ 3a(7). Additionally, First United was generally required to "[c]ooperate with [Guide One] in the investigation or settlement of the claim[,]" including allowing GuideOne access to First United's records "[a]s often as reasonably required." *Id.* at p. 58, ¶¶ 3a (6), (8).

Shortly following the April 2017 hail event that forms the bases of First United's claims, a company named Trigg Construction ("Trigg") visited the church and requested permission to check First United's roof for hail damage. *See* Exhibit 8 (Deposition of Michelle Brisendine) at 10:2-15. Trigg inspected the roof and found hail damage. *See id*. at 15:20-16:7. Trigg represented

to First United's business manager that it had experience with insurance claims and, as part of the roof repair process, would assist the church obtaining money to repair the hail damaged roof from its insurance company, GuideOne. *See id.* at 16:23-17:21; *see also* Exhibit 9 (Deposition of Roy Carlson) at 9:7-13. Ultimately, First United entered into a contract with Trigg for the repair of its roof. *See id.* at 16:19-22.; *see also id.* at 8:20-9:6. First United intended to rely on Trigg to communicate with GuideOne during the roof repair process. *See* Exhibit 9 at 13:10-13; *see also* Exhibit 10 (Deposition of Kevin Bushart) at 42:10-12; Exhibit 3 at 22:8-15.

Two First United representatives could not recall seeing any written estimate from Trigg regarding the church's roof repair. *See* Exhibit 9 at 11:13-18, 12:7-13; Exhibit 8 at 24:2-5. While Kevin Bushart, testifying on behalf of First United, believes he saw an estimate from Trigg, he does not know of any sworn proof of loss presented to GuideOne on behalf of the Church. *See* Exhibit 10 at 27:5-12, 34:6-8. Notably, First United has not produced in this litigation any estimate from Trigg or any sworn proof of loss submitted (as neither exist). Mr. Bushart stated he did not believe a sworn proof of loss was required, yet acknowledges one was requested by GuideOne. *See id.* at 34:6-35:14. Mr. Bushart's testimony serves as an admission that First United did not comply with the terms of the Policy in refusing to provide GuideOne with a sworn proof of loss.

While GuideOne did receive a letter dated February 14, 2018 stating that First United disputed the value of the loss as determined by GuideOne's appraiser Ron Sorenson, the letter was silent as to what First United claimed its damages to be. GuideOne then sent a letter to First United requesting a sworn proof of loss so that it could evaluate any discrepancies and determine whether to revise the estimate prepared by Mr. Sorenson. *See* Exhibit 12 (Letter from Sharon Gross-Bryant to First United). On March 28, 2018, Mr. Sorenson confirmed to GuideOne that he had still received nothing in terms of an estimate or scope of repair from First United or its representatives.

*See* Exhibit 11 (Deposition of Ronald Sorenson) at 50:20-51:9.

First United and its representatives allege that a September 2017 "estimate" was prepared and issued by Trigg.  Mr. Sorenson confirmed that he never received an estimate from Trigg and, in fact, testified that he had received several emails from Trigg during the relevant time period stating that an estimate had not been completed. *Id.* at 52:10-19; *see also* 86:14-87:15 (noting that Mr. Sorenson, in correspondence with Dan Miller of Trigg, was informed that Trigg had not finalized an estimate regarding the claim at issue); Exhibit 13 (Email from Ronald Sorenson to Sharon Gross-Bryant); Exhibit 14 (Email from Michelle Brisendine to Sharon Gross-Bryant).  The "estimate" that was allegedly sent in September 2017 has not been produced by First United in this case.

As set forth above, the Policy provides that GuideOne may request a sworn proof of loss in order to evaluate any disputes regarding claims.  Without a sworn proof of loss to examine and compare to the estimates of its own adjuster, GuideOne was incapable of "disagreeing" with First United's claim.  The first step of the appraisal process requires the parties to have a disagreement – without such the process cannot move forward.  Here, GuideOne was not even presented the opportunity to determine whether or not it "disagreed" with any damages asserted by First United before First United proceeded to run roughshod over the remaining terms of the appraisal process. Approximate figures provided from a public adjuster firm on March 28, 2018, reflecting an "estimate" reportedly completed in September 2017, but not provided to Mr. Sorenson (or anyone else), represented the first mention of any numbers whatsoever to GuideOne regarding what First United believed was the value of its loss.

Instead of working with GuideOne to properly adjust the loss pursuant to the policy, First United went behind GuideOne's back and appeared before a judge in the Deaf Smith County District Court and had an umpire improperly appointed on April 3, 2018. First United's failure to comply with the terms of the Policy—namely in seeking to invoke the appraisal process without following the necessary progression of steps and for failing to provide GuideOne with the requested sworn proof of loss—serves as sufficient reason alone to set aside the Appraisal Award.

> **2. First United failed to comply with the terms of the Policy when it prematurely and unilaterally asked the Deaf Smith County District Court to appoint an umpire through an *ex parte* proceeding.**

As set forth above, First United did not properly invoke the appraisal clause and failed to adhere to the relevant terms of the Policy in failing to provide GuideOne with the requested sworn proof of loss related to the claim and generally failing to cooperate in efforts to amicably resolve the dispute. Further, First United violated the terms of the Policy when it improperly, prematurely, and unilaterally requested the appointment of an umpire by the Deaf Smith County District Court. Under the Policy, in such case of disagreement regarding the value of a loss (assuming for the sake of argument that GuideOne was properly notified of the dispute and provided a sworn proof of loss like it requested), the two parties would first each choose an appraiser, after which the "two appraisers will select an umpire." *See* Exhibit 1 at p. 57-58, ¶ E2. Court intervention was only necessary under the Policy if the appraisers could not come to an agreement on an umpire to resolve the dispute and presented themselves to a court with proper jurisdiction for help in selecting such an umpire. *Id*.

GuideOne was making every effort to contact First United in an attempt to resolve the dispute, merely seeking to obtain other information that First United might provide to shed further light on the extent of the damages and amount of the loss and help further evaluate the claim. In

fact, at that point, First United had not provided GuideOne any information as to what it (First United) believed the damages or loss to be. Thus, GuideOne had not yet chosen an appraiser who could have conferred with First United's appraiser in selecting an umpire because the need for an appraiser had not yet arisen – no genuine "disagreement" between the parties as to loss in value existed at that time. Accordingly, First United was not acting in compliance with the Policy when it chose to skip the "disagreement" clause, bypassing this requirement and others altogether, and moving straight to having a court select an umpire.

There was no attempt to mutually select an umpire in this matter. Instead, First United made the unilateral determination that GuideOne had breached the appraisal provision and proceeded directly to the court seeking the appointment of an umpire. At the time the Order was sought and entered, GuideOne had still not yet disagreed with First United as to the value of the property or the amount of loss, as is required by the Policy to occur before even the retention of impartial appraisers, much less seeking appointment of an umpire. Moreover, the appraisal provision clearly states that "[i]f **they** cannot agree within 15 days upon such umpire, **either may request** that selection be made by a judge ..." *See* Exhibit 1 at p. 57-58, ¶ E2 (emphasis added). "They" in this provision of the appraisal clause refers not to GuideOne or First United, but to the **appraisers**. As such, the Policy terms are clear that the parties themselves are not permitted to seek judicial appointment of an umpire.

Furthermore, the context of the *ex parte* hearing itself is a significant red flag and raises questions as to First United's motives. GuideOne was provided no notice of the hearing and did not know such a proceeding had taken place until it received a copy of the order appointing Mr. Bilbrey as umpire. Regardless of any possible ulterior motives, the fact remains First United violated the terms of the Policy when it improperly, prematurely, and unilaterally requested the

appointment of an umpire by the Deaf Smith County District Court.  Consequently, the Appraisal

Award entered by this improperly appointed umpire should be set aside as invalid.

### 3. The improperly appointed umpire issued an award going beyond the scope of the differences between the parties.

Under Texas law an umpire only has a duty to perform if the parties' two appraisers

disagree and submit their differences to him; otherwise, the umpire has no authority to act.  *See,*

*e.g.*, *Fisch v. Transcontinental Ins. Co.*, 356 S.W.2d 186, 190 (Tex. Civ. App.—Houston 1962)

(writ ref'd) ("An umpire may act to settle differences between appraisers respecting the amount of

a loss, when such differences become known to him.)" "Since the umpire's power to act is

conditioned upon a disagreement between the appraisers and the submission of their differences

[to the umpire], an award which [is] signed by only one appraiser and the umpire who had no

authority to act, is invalid." *Id*.  "An appraiser's acts in excess of the authority conferred upon him

by the appraisal agreement is not binding on the parties." *Triple S Properties Inc. v. St. Paul*

*Surplus Lines Ins. Co.*, No. 3:08-CV-796-O, 2010 WL 3911422, at *4 (N.D. Tex. Oct. 5, 2010) (

quoting *Fisch ,* 356 S.W.2d at 190); *see also Jimenez v. Liberty Ins. Corp.*, No. CV H-16-1866,

2017 WL 6368663, at *3 (S.D. Tex. Nov. 9, 2017).  Furthermore, an appraisal award is invalid

when it "is not made substantially in compliance with the requirements of the policy[.]" Id. at *5

(quoting *Fisch,* 356 S.W.2d at 190).

Here, First United violated the terms of the Policy by refusing to provide a proof of loss

when requested and by generally failing to cooperate with GuideOne.  As stated above, First

United skipped a number of steps necessary in the appraisal process in its rush to get an umpire

appointed.  As such, the umpire here had no authority to act, as any award issued by him is

necessarily not in substantial compliance with the terms of the Policy.  Therefore, the improperly

appointed umpire, Mr. Bilbrey, had no authority with which to issue a binding appraisal award

and, accordingly, the Appraisal Award entered by him in this case should be set aside.

>    **4.   The improperly appointed umpire was not impartial due to his financial interest in the outcome of the appraisal process.**

As stated above, if an appraisal is not an honest assessment of necessary repairs, the related award may be properly set aside. *Johnson,* 290 S.W.3d at 895.  The Appraisal Award here is void and should be set aside because the court appointed umpire was not impartial, as required by the Policy.  An appraiser with a financial interest in the outcome of the appraisal is not impartial. *Gen. Star Indem. Co. v. Spring Creek Vill. Apartments Phase V, Inc*., 152 S.W.3d 733, 737 (Tex. App.—Houston [14th Dist.] 2004, no pet.)(citing *Delaware Underwriters v. Brock*, 211 S.W. 779, 780-81 (Tex. 1919); *cf. Gardner v. State Farm Lloyds*, 76 S.W.3d 140, 143 (Tex. App.—Houston [14th] 2002) (in finding appraiser impartial, court noted he did not have a financial interest in the claim); *see also Central Life Ins. Co. v. Aetna Cas. & Surety Co*., 466 N.W.2d 257, 261–62 (Iowa 1991) ("The appointment of an appraiser with a concealed pecuniary interest in the outcome is a sufficient ground for voiding the award as a matter of law without a showing of prejudice.")).  As such, the umpire here, in addition to being improperly appointed without authority and not in substantial compliance with the requirements of the Policy, should be disqualified from offering a binding Appraisal Award in this case on the grounds of impartiality. *See U.S. Pecan Trading Co. v. General Ins. Co. of Am.* No. EP-08-CV-347-DB, 2009 WL 10669396, at *1 (W.D. Tex. May 29, 2009) ("An umpire acts as a third appraiser, determining the value of items about which appraisers disagree.  Accordingly, the independence of the umpire is of utmost importance.") (citing *Providence Lloyds Ins. Co. v. Crystal City Ind. Sch. Dist.*, 877 S.W.2d 872, 876 (Tex. App—San Antonio 1994, no writ).

In *Spring Creek*, the court found that, given the parties had agreed to "select a competent and impartial appraiser[,]" the fact that the appraiser had a contingent fee agreement for his services raised an issue as to his impartiality. *Id.* The requirement of competence and impartiality "'does not mean simply lack of pecuniary interest, but [also] requires the appraiser to be not biased or prejudiced.'" *Brock*, 211 S.W. at 781 (quoting *Hall Bros. v. Western Assurance Co.*, 133 Ala. 639, 640 (Ala. 1902)); *see also Phoenix Assur. Co., Ltd, of London, England v. Davis*, 67 F.2d 824, 825 (5th Cir. 1933) ("The agreement in the policy was to submit the matter to 'competent and disinterested appraisers,' which . . . excludes not merely pecuniary interest but also bias and prejudice[.]") (*citing Brock*, 211 S.W. at 780). The umpire appointed in this case had a clear bias: a pecuniary interest in the outcome of the Appraisal Award based on his contingent fee agreement. Similar to *Spring Creek*, this raises an issue as to his impartiality. Further, as in *Spring Creek*, the Policy required the parties to select a "competent and impartial appraiser." *See* Exhibit 1 at p. 58, ¶¶ 3a (6), (8). Because the appraiser, or umpire in this case, was not impartial due to his financial interest in the outcome of the appraisal process, the appraisal decision should be set aside as void. That First United sought to appoint him at an *ex parte* hearing only raises further questions as to his impartiality. Therefore, the improperly appointed umpire's pecuniary interest in the appraisal process serves as another appropriate ground for nullifying the Appraisal Award at issue in this matter.

In summary, the Appraisal Award entered in this matter should be set aside because the circumstances which led to the appraisal decision were in violation of the Policy to which First United was contractually bound. First United must comply with *all* portions of the Policy, not excising those which it finds inconvenient. Because the appraisal decision in this case was obtained in a manner not consistent with the Policy—namely that First United violated the terms

of the Policy by improperly invoking the appraisal process and in unilaterally obtaining an improper and partial umpire who reached an appraisal decision without proper authority—this Court should vacate the improperly obtained Appraisal Award.

## VI.
## CONCLUSION AND PRAYER

As set forth in this Motion, there is no genuine issue of fact as to whether the Appraisal Award was improperly obtained.  First United failed to properly invoke the appraisal clause or otherwise comply with the terms of the Policy by failing to provide GuideOne with a sworn proof of loss or to generally cooperate with GuideOne regarding the resolution of the claim dispute.  First United then further violated the Policy when it prematurely and unilaterally sought the appointment of an umpire from the Deaf Smith County District Court through a questionable *ex parte* proceeding.  Moreover, the resulting Appraisal Award is tainted by the improper scope of the appointed umpire's review, his lack of authority, and his direct financial interest in the outcome of the appraisal process. Therefore, for these reasons and those outlined above, GuideOne respectfully asks the Court for a declaration that the Appraisal Award issued in this matter does not comply with the Policy's requirements and was made without proper authority, entry of an Order striking Todd Bilbrey as an umpire in the appraisal of this matter and setting aside the Appraisal Award entered by him, and any other such relief as this Court may deem proper and just.

Respectfully submitted,

**GERMER BEAMAN & BROWN PLLC**
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Telephone: (512) 472-0288
Facsimile: (512) 472-9260

_____

R. Chad Geisler
State Bar No. 00793793
cgeisler@germer-austin.com
W. Paul Miller
State Bar No. 24068130
wpm-svc@germer-austin.com

**COUNSEL FOR PLAINTIFF/COUNTER-
DEFENDANT GUIDEONE MUTUAL
INSURANCE COMPANY**

## CERTIFICATE OF CONFERENCE

Pursuant to this Court's local rules, no conference is necessary before filing a Motion for Summary Judgment.  However, by my signature below, I certify that on December 10, 2019, the undersigned counsel conferred with Defendant's attorney Christopher Lyster via email to determine whether Defendant opposed the filing of a Motion for Leave with the Court for the purposes of filing this Motion for Summary Judgment. Defendant indicated he was not opposed to the filing of the Motion for Leave and, as such, is not opposed to the untimely filing of this Motion for Summary Judgment.

_____

W. Paul Miller

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of this document was served on all counsel of record in this case by electronic mail on this the 17th day of December, 2019.

_____

W. Paul Miller



**EXHIBIT**
**1**

1111 Ashworth Road
West Des Moines, IA 50265-3544
515.267.5000 Phone
www.guideone.com

DATE:        12/18/2017

TO:          SHARON GROSS-BRYANT

SUBJECT:     FIRST UNITED METHODIST CHURCH      POL.      1432-879

FROM:        COMMERCIAL LINES


ATTACHED IS ONE CERTIFIED COPY OF THE ABOVE INSURED'S POLICY

AS REQUESTED BY:  SHARON GROSS-BRYANT


IF WE CAN BE OF ANY FURTHER ASSISTANCE TO YOU, PLEASE LET US KNOW.

GuideOne Mutual Insurance Company • GuideOne Specialty Mutual Insurance Company • GuideOne Elite Insurance Company
GuideOne America Insurance Company • GuideOne National Insurance Company



1111 Ashworth Road
West Des Moines, IA 50265-3544
515.267.5000 Phone
www.guideone.com

This is to certify that the attached Memorandum of Policy No. 1432-879  of  the

GuideOne Mutual Insurance

issued to  FIRST UNITED METHODIST CHURCH

located at  501 MAIN ST   HEREFORD, TX  79045

is a replica representing the original policy.  The original insuring agreement was sent to the policyholder
or mortgagee.

UNDERWRITING DIVISION

STATE OF IOWA

COUNTY OF POLK

YARROW WYLDE RIVERBIRCH
Commission Number 781106
My Commission Expires
11-1-19

Sworn to before me the ___18th___ day of ___DECEMBER  2017___

NOTARY PUBLIC

My Commission Expires_____ 11-1-19

GuideOne Mutual Insurance Company • GuideOne Specialty Mutual Insurance Company • GuideOne Elite Insurance Company
GuideOne America Insurance Company • GuideOne National Insurance Company

AS-13207

NOTICE OF AMENDED DECLARATIONS

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
                                    POLICY NO. 1432-879
NAMED INSURED                       PRODUCER NAME AND ADDRESS
FIRST UNITED METHODIST CHURCH       BOENKER & WHEELWRIGHT INS
                                    5596 DAVIS BLVD STE 200
501 MAIN ST                         NORTH RICHLAND HILLS TX  76180

HEREFORD            TX    79045     42-805 (42 ) (817)514-7600 ADMIN 14-666
                                    www.BoenkerWheelwrightIns.GuideOne.com


ATTACHED IS YOUR AMENDED COMMON POLICY DECLARATIONS NO.   3 AND
ANY AMENDED COVERAGE PART DECLARATIONS EFFECTIVE 03/13/2017.  THESE
DECLARATIONS SUPERSEDE ANY PRIOR DECLARATIONS ISSUED FOR THESE
COVERAGE PARTS.  PLACE THESE WITH YOUR POLICY.


SUMMARY OF CHANGES - SEE ATTACHMENTS FOR DETAILS.

THE COMMON POLICY DECLARATIONS PAGE HAS BEEN CHANGED.

THE COMMERCIAL GENERAL LIABILITY COVERAGE PART AND ALL APPLICABLE
FORMS HAVE BEEN DELETED.

THE FOLLOWING FORMS HAVE BEEN DELETED FROM THE COMMERCIAL GENERAL
LIABILITY COVERAGE PART:
PCG7572

$ 16,651.00     PREVIOUS ANNUAL PREMIUM
$     78.00     ANNUAL PREMIUM DECREASE
                TO THIS POLICY CHANGE
$ 16,573.00     NEW ANNUAL PREMIUM

$     47.23     PRO RATED CHANGE


GuideOne Insurance             GuideOne Mutual
1111 ASHWORTH ROAD             Insurance Company
WEST DES MOINES, IOWA 50265-3538
(515) 267-5000

G0EC0094

```
              C O M M O N   P O L I C Y   D E C L A R A T I O N S
        THESE DECLARATIONS SUPERSEDE ANY PRIOR DECLARATIONS FOR THESE COVERAGE PARTS

AMENDED DECLARATIONS NO.    3 EFFECTIVE 03/13/2017
                                    POLICY NO. 1432-879
NAMED INSURED                       PRODUCER NAME AND ADDRESS
FIRST UNITED METHODIST CHURCH       BOENKER & WHEELWRIGHT INS
                                    5596 DAVIS BLVD STE 200
501 MAIN ST                         NORTH RICHLAND HILLS TX  76180

HEREFORD          TX    79045    42-805 (42 ) (817)514-7600 ADMIN 14-666
                                 WWW.BoenkerWheelwrightIns.GuideOne.com

POLICY PERIOD: FROM    10/20/2016    TO      10/20/2017
       AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
--------------------------------------------------------------------------
THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A
PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.
--------------------------------------------------------------------------
COMMERCIAL PROPERTY COVERAGE PART                        $   14,605.00
  FORMS APPLICABLE:
            SEE COMMON POLICY DECLARATIONS SUPPLEMENT
--------------------------------------------------------------------------
COMMERCIAL GENERAL LIABILITY COVERAGE PART               $    1,551.00
  FORMS APPLICABLE:
            SEE COMMON POLICY DECLARATIONS SUPPLEMENT
--------------------------------------------------------------------------
COMMERCIAL CRIME COVERAGE PART                           $      289.00
  FORMS APPLICABLE:  CRO001/1090   CRO111/0387
  PCR2611/0396   PCR4610/0396
--------------------------------------------------------------------------
COMMERCIAL INLAND MARINE COVERAGE PART                   $      128.00
  FORMS APPLICABLE:  CLO600/0115   IM100/0684
  IM664/0787   PCM411/0396
--------------------------------------------------------------------------
MECHANICAL, ELECTRICAL AND PRESSURE EQUIPMENT COVERAGE PART $    .00
COVERAGE INCLUDED IN PROPERTY - SEE FORM PCP7357
--------------------------------------------------------------------------
  FORMS APPLICABLE TO MORE THAN ONE COVERAGE PART:
            SEE COMMON POLICY DECLARATIONS SUPPLEMENT


TOTAL PREMIUM OF    $16,573.00.

COUNTERSIGNED  03/29/2017  BY _____
               (DATE)          (AUTHORIZED REPRESENTATIVE)


               ---------------------------------------


GuideOne Insurance                 GuideOne Mutual
1111 ASHWORTH ROAD                 Insurance Company
WEST DES MOINES, IOWA 50265-3538
(515) 267-5000
```

G0ECO040

```
C O M M O N   P O L I C Y   D E C L A R A T I O N S
              S U P P L E M E N T
------------------------------------------------------------------------
AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE       10/20/2016                 POLICY NO. 1432-879

NAMED INSURED   FIRST UNITED METHODIST CHURCH
------------------------------------------------------------------------
COVERAGE PART FORM SCHEDULE
------------------------------------------------------------------------


COMMERCIAL PROPERTY COVERAGE PART
  FORMS APPLICABLE:  CPO140/0706  CPO142/1005
  CPO202/0296  CPO320/1092  GCPO404/0409
  GCPO444/0409  PCP2311/0409  PCP4310/0396
  PCP4314/0409  PCP7357/0409  PCP7359/0409

COMMERCIAL GENERAL LIABILITY COVERAGE PART
  FORMS APPLICABLE:  CG0068/0509  CG0103/0606
  CG2167/1204  CG2170/0115  CG2176/0115
  GCGO404/0115  GCGO551/0203  GCG2101/0407
  GCG2810/0409  GCG5172/0409  GCG5173/0409
  GCG5174/0409  GCG5176/0409  GCG7410/0409
  PCG2510/0409  PCG7543/0203  PCG7577/0298
  PCG7599/1197  PMAN502

  FORMS APPLICABLE TO MORE THAN ONE COVERAGE PART:
  GIL4201/0409  GIL4220/0409  IL0003/0908
  IL0021/0908  IL0168/0908  IL0171/0992
  IL0275/0907  IL0288/1001  IL0952/0115
  IL0985/0115  PIL7209/0790

------------------------------------------------------------------------
15% RISK MANAGEMENT CREDIT APPLIES TO THIS POLICY
```

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **b.** 60 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and

   **c.** Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   **a.** Are safe or healthful; or

   **b.** Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

**F.  Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured. If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**G.  Unintentional Errors Or Omissions**

Failure by you to disclose all hazards existing as of the inception date of the policy shall not prejudice you with respect to the coverage afforded by this policy, provided such failure or any omission is not intentional.

**H.  Knowledge Of An Occurrence**

It is understood and agreed that knowledge of an occurrence by your agent, or any servant or employee of yours, shall not in itself constitute knowledge by you, unless an executive officer of your corporation shall have received such notice from its agent, servant or employee.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

# MUTUAL POLICY PROVISIONS

**GuideOne Mutual Insurance Company**          **GuideOne Specialty Mutual Insurance Company**

**Membership And Notice Of Annual Meeting**
Because this policy is issued by a mutual insurance company, you are a member of the Company issuing the policy while this policy is in force. While a member, you are entitled to one vote only - either in person or by proxy - at meetings of members of the Company.

The Annual Meetings at **GuideOne Mutual Insurance Company** are held at its Home Office on the fourth Thursday of January in each year, at 10:00 a.m.

The Annual Meetings of **GuideOne Specialty Mutual Insurance Company** are held at its Home Office on the third Friday of January in each year, at 2:00 p.m.

**Nonassessable Policy And Participation Clause**
This policy is nonassessable. You are not subject to contingent liability, nor liable to assessment.  As a member of the Company while this policy is in force, you shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of any dividends declared and applicable to coverages in your policy.

**Signatures**
This policy is signed at West Des Moines, Iowa on behalf of the Company by the President and Secretary of the Company.  It is countersigned, if required by law, on the Declarations by an authorized Agent of the Company.

GuideOne Mutual Insurance Company

GuideOne Specialty Mutual Insurance Company

*Jenna Clark*

President

*Jenna Clark*

President

*Andrew J. Noga*

Secretary

*Andrew J. Noga*

Secretary

Copyright 2009 GuideOne Insurance

# CALCULATION OF PREMIUM

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

     CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
     COMMERCIAL AUTOMOBILE COVERAGE PART
     COMMERCIAL GENERAL LIABILITY COVERAGE PART
     COMMERCIAL INLAND MARINE COVERAGE PART
     COMMERCIAL PROPERTY COVERAGE PART
     CRIME AND FIDELITY COVERAGE PART
     EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
     EQUIPMENT BREAKDOWN COVERAGE PART
     FARM COVERAGE PART
     LIQUOR LIABILITY COVERAGE PART
     MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
     OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
     POLLUTION LIABILITY COVERAGE PART
     PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
     RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

® ISO Properties, Inc., 2007

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

**(Broad Form)**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    **(a)** Any "nuclear reactor";

    **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

    **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2007

# TEXAS CHANGES -- DUTIES

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added to the **Duties** Condition.

We will notify the first Named Insured in writing of:

1. An initial offer to compromise or settle a claim made or "suit" brought against any insured under this coverage.  The notice will be given not later than the 10th day after the date on which the offer is made.

2. Any settlement of a claim made or "suit" brought against the insured under this coverage.  The notice will be given not later than the 30th day after the date of the settlement.

© ISO Properties, Inc., 2007

# TEXAS CHANGES — LOSS PAYMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL CRIME COVERAGE PART
> FARM COVERAGE PART — LIVESTOCK COVERAGE FORM
> FARM COVERAGE PART — MOBILE AGRICULTURAL MACHINERY
>     AND EQUIPMENT COVERAGE FORM
> COMMERCIAL INLAND MARINE COVERAGE PART

## A. LOSS PAYMENT

1. With respect to the BOILER AND MACHINERY COVERAGE PART and COMMERCIAL CRIME COVERAGE PART, the following conditions are added.

2. With respect to the COMMERCIAL INLAND MARINE COVERAGE PART, the following conditions replace Item **E.** LOSS PAYMENT in the Commercial Inland Marine Loss Conditions.

3. With respect to the FARM COVERAGE PART, the following conditions replace paragraphs **c.** and **f.** of the Loss Payment Condition:

   **a. Claims Handling**

   **(1)** Within 15 days after we receive written notice of claim, we will:

   **(a)** Acknowledge receipt of the claim.  If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgement;

   **(b)** Begin any investigation of the claim; and

   **(c)** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms.  We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

**(2)** We will notify you in writing as to whether:

**(a)** The claim or part of the claim will be paid;

**(b)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

**(c)** More information is necessary; or

**(d)** We need additional time to reach a decision.  If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in **(2)(a)** through **(2)(d)** above, within:

**(i)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

**(ii)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

Copyright,  Insurance  Services  Office,  Inc., 1992

# TEXAS CHANGES -- CANCELLATION AND NONRENEWAL PROVISIONS FOR CASUALTY LINES AND COMMERCIAL PACKAGE POLICIES

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

>COMMERCIAL GENERAL LIABILITY COVERAGE PART
>COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
>EMPLOYMENT-RELATED PRACTICES LIABILITY
>FARM COVERAGE PART -- FARM LIABILITY COVERAGE FORM
>LIQUOR LIABILITY COVERAGE PART
>POLLUTION LIABILITY COVERAGE PART
>PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This endorsement also modifies insurance provided under the following when written as part of a Commercial Package Policy:

>CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
>COMMERCIAL GENERAL LIABILITY COVERAGE PART
>COMMERCIAL INLAND MARINE COVERAGE PART
>COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
>COMMERCIAL PROPERTY COVERAGE PART
>CRIME AND FIDELITY COVERAGE PART
>EMPLOYMENT-RELATED PRACTICES LIABILITY
>EQUIPMENT BREAKDOWN COVERAGE PART
>FARM COVERAGE PART -- FARM LIABILITY COVERAGE FORM
>FARM COVERAGE PART -- LIVESTOCK COVERAGE FORM
>FARM COVERAGE PART -- MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
>GLASS COVERAGE FORM
>LIQUOR LIABILITY COVERAGE PART
>POLLUTION LIABILITY COVERAGE PART
>PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at least 10 days before the effective date of cancellation.

However if this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the notice of cancellation, as described above, will be provided to the First Named Insured 30 days before the effective date of cancellation.  We will also provide 30 days' written notice to each unit-owner to whom we issued a certificate or memorandum of insurance, by mailing or delivering the notice to each last mailing address known to us.

The permissible reasons for cancellation are as follows:

**a.** If this policy has been in effect for 60 days or less, we may cancel for any reason except, that under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**b.** If this policy has been in effect for more than 60 days, or if it is a renewal or continuation of a policy issued by us, we may cancel only for one or more of the following reasons:

**(1)** Fraud in obtaining coverage;

(2) Failure to pay premiums when due;

(3) An increase in hazard within the control of the insured which would produce an increase in rate;

(4) Loss of our reinsurance covering all or part of the risk covered by the policy; or

(5) If we have been placed in supervision, conservatorship or receivership and the cancellation is approved or directed by the supervisor, conservator or receiver.

**B.** The following condition is added and supersedes any provision to the contrary:

**NONRENEWAL**

1. We may elect not to renew this policy except, that under the provisions of the Texas Insurance Code, we may not refuse to renew this policy solely because the policyholder is an elected official.

2. This Paragraph, **2.**, applies unless the policy qualifies under Paragraph **3.** below.

   If we elect not to renew this policy, we may do so by mailing or delivering to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal, stating the reason for nonrenewal, at least 60 days before the expiration date. If notice is mailed or delivered less than 60 days before the expiration date, this policy will remain in effect until the 61st day after the date on which the notice is mailed or delivered. Earned premium for any period of coverage that extends beyond the expiration date will be computed pro rata based on the previous year's premium.

3. If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we will mail or deliver written notice of nonrenewal, at least 30 days before the expiration or anniversary date of the policy, to:

   **a.** The first Named Insured; and

   **b.** Each unit-owner to whom we issued a certificate or memorandum of insurance.

   We will mail or deliver such notice to each last mailing address known to us.

4. If notice is mailed, proof of mailing will be sufficient proof of notice.

5. The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

# TEXAS CHANGES --
# CANCELLATION AND NONRENEWAL

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL CRIME COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> FARM COVERAGE PART -- LIVESTOCK COVERAGE FORM
> FARM COVERAGE PART -- MOBILE AGRICULTURAL MACHINERY AND
>   EQUIPMENT COVERAGE FORM

**A.** The following is added to Paragraph **2.** of the **Cancellation** Common Policy Condition:

We may cancel this policy for any reason except, that under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**B.** The following condition is added:

**NONRENEWAL**

We may elect not to renew this policy except, that under the provisions of the Texas Insurance Code, we may not refuse to renew this policy solely because the policyholder is an elected official.

© ISO Properties, Inc., 2001

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> EQUIPMENT BREAKDOWN COVERAGE PART
> FARM COVERAGE PART
> STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

© Insurance Services Office, Inc., 2015

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

**SCHEDULE**

| SCHEDULE - PART I |
| --- |
| **Terrorism Premium (Certified Acts)**          $ |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):**<br><br>COMMERCIAL INLAND MARINE COVERAGE PART<br>COMMERCIAL PROPERTY COVERAGE PART<br>COMMERCIAL GENERAL LIABILITY COVERAGE PART<br><br><br>**Additional information, if any, concerning the terrorism premium:**<br><br><br><br><br><br><br><br><br> |
| **SCHEDULE - PART II** |
| **Federal share of terrorism losses**                          %      **Year:**<br>(Refer to Paragraph **B.** in this endorsement.)<br><br>**Federal share of terrorism losses**                          %      **Year:**<br>(Refer to Paragraph **B.** in this endorsement.) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

# AMENDATORY DEDUCTIBLE ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

All Coverage Parts included in this policy are subject to the following:

Except as provided in the next paragraph, if two or more coverages of this policy apply to loss or damage arising out of any one occurrence, we will pay for loss or damage that exceeds the largest single deductible of any coverage that applies to the loss or damage. We will not pay more than the actual loss or damage.

This endorsement does not apply to **CAUSES OF LOSS — EARTHQUAKE FORM.** If that form applies to this policy, its **DEDUCTIBLE** provision will apply to loss or damage caused by or resulting from **Earthquake** or **Volcanic Eruption.**

Copyright  1990 GuideOne Insurance

```
         C O M M E R C I A L   P R O P E R T Y   C O V E R A G E   P A R T
                        D E C L A R A T I O N S   P A G E
```

```
AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE       10/20/2016                  POLICY NO. 1432-879
NAMED INSURED   FIRST UNITED METHODIST CHURCH
-------------------------------------------------------------------------
DESCRIPTION OF PREMISES AND COVERAGES PROVIDED
THIS POLICY COVERS THE PROPERTY LISTED BELOW.
-------------------------------------------------------------------------
RISK NO.     001
PREMISES NO. 001  BUILDING NO. 001
CONSTRUCTION JOISTED MASONRY
OCCUPANCY    CHURCH
PREMISES ADDRESS
     501 MAIN ST

     HEREFORD              DEAF SMITH          TX  79045
                          BUILDING                    PERSONAL PROPERTY
LIMIT OF INSURANCE        $2,535,300                  $456,300
CAUSE OF LOSS FORM   SPECIAL INCLUDING THEFT   SPECIAL INCLUDING THEFT
COINSURANCE               90%                         90%
DEDUCTIBLE                $2,500                      $2,500
OPTIONAL COVERAGES        AGREED VALUE                AGREED VALUE
                          REPLACEMENT COST            REPLACEMENT COST
-------------------------------------------------------------------------
RISK NO.     001
PREMISES NO. 002  BUILDING NO. 001
CONSTRUCTION JOISTED MASONRY
OCCUPANCY    EDUCATION/FELLOWSHIP
PREMISES ADDRESS
     506 MILES ST

     HEREFORD              DEAF SMITH          TX  79045
                          BUILDING                    PERSONAL PROPERTY
LIMIT OF INSURANCE        $1,745,100                  $314,100
CAUSE OF LOSS FORM   SPECIAL INCLUDING THEFT   SPECIAL INCLUDING THEFT
COINSURANCE               90%                         90%
DEDUCTIBLE                $2,500                      $2,500
OPTIONAL COVERAGES        AGREED VALUE                AGREED VALUE
                          REPLACEMENT COST            REPLACEMENT COST
-------------------------------------------------------------------------
RISK NO.     001
PREMISES NO. 004  BUILDING NO. 001
CONSTRUCTION JOISTED MASONRY
OCCUPANCY    MCGEE BUILDING
PREMISES ADDRESS
     511 MAIN ST

     HEREFORD              DEAF SMITH          TX  79045
                          BUILDING                    PERSONAL PROPERTY
LIMIT OF INSURANCE        $754,200                    $135,720
CAUSE OF LOSS FORM   SPECIAL INCLUDING THEFT   SPECIAL INCLUDING THEFT
COINSURANCE               90%                         90%
DEDUCTIBLE                $2,500                      $2,500
OPTIONAL COVERAGES        AGREED VALUE                AGREED VALUE
                          REPLACEMENT COST            REPLACEMENT COST
                       CONTINUED ON THE NEXT PAGE
```

G0ECO066

```
C O M M E R C I A L  P R O P E R T Y  C O V E R A G E  P A R T
              D E C L A R A T I O N S  P A G E

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE      10/20/2016                POLICY NO. 1432-879
NAMED INSURED   FIRST UNITED METHODIST CHURCH
----------------------------------------------------------------------
DESCRIPTION OF PREMISES AND COVERAGES PROVIDED
----------------------------------------------------------------------
RISK NO.    002
PREMISES NO. 003  BUILDING NO. 001
CONSTRUCTION FRAME
OCCUPANCY    PARSONAGE                    CHANGE DATE 12/19/2016
PREMISES ADDRESS
     408 SUNSET DR

     HEREFORD         DEAF SMITH       TX  79045
                      BUILDING                  PERSONAL PROPERTY
LIMIT OF INSURANCE       $250,200               $45,100
CAUSE OF LOSS FORM    SPECIAL INCLUDING THEFT   SPECIAL INCLUDING THEFT
COINSURANCE              90%                     90%
DEDUCTIBLE               $2,500                  $2,500
OPTIONAL COVERAGES       AGREED VALUE            AGREED VALUE
                         REPLACEMENT COST        REPLACEMENT COST
```

03/29/2017              FILE COPY              PCP 73 00 07 89

G0EC0066

```
                C O M M E R C I A L   P R O P E R T Y   C O V E R A G E   P A R T
                            D E C L A R A T I O N S   P A G E

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE          10/20/2016                    POLICY NO. 1432-879
NAMED INSURED   FIRST UNITED METHODIST CHURCH
-------------------------------------------------------------------------
OPTIONAL COVERAGE FORMS
-------------------------------------------------------------------------

FORM CP0320/1092
MULTIPLE DEDUCTIBLE FORM
         EFFECTIVE  10/20/2016

              SCHEDULE


   PREM.      BLDG.        DEDUCTIBLE       COVERED CAUSES
   NO.        NO.                             OF LOSS
   001        001          $5000             5
   002        001          $5000             5
   003        001          $5000             5
   004        001          $5000             5

FORM GCP0404/0409
LIMITED FLOOD COVERAGE
         EFFECTIVE  10/20/2016

              SCHEDULE

$10,000        FLOOD LIMIT

COVERAGE IS RESTRICTED IN SOME FLOOD ZONES. (SEE FORM
GCP0404)
```

GDECO066

S T A T E M E N T   O F   V A L U E S

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE        10/20/2016                    POLICY NO. 1432-879

NAMED INSURED   FIRST UNITED METHODIST CHURCH

501 MAIN ST

HEREFORD           TX   79045
------------------------------------------------------------------------
INSTRUCTIONS
------------------------------------------------------------------------


1.   THE VALUES SHOWN ON THE ATTACHED PAGES MUST BE ACTUAL CASH VALUES(100%)
     OR REPLACEMENT COST VALUES(100%) AND SHOULD REFLECT THE BASIS OF
     COVERAGE FOR EACH BUILDING, PERSONAL PROPERTY OF THE INSURED OR BOTH.

2.   THE VALUES SHALL BE SUBMITTED TO THE INSURANCE COMPANY AND SUBJECT TO
     ITS ACCEPTANCE.

3.   NOTHING CONTAINED IN THESE INSTRUCTIONS SHALL BE CONSTRUED AS CHANGING
     IN ANY MANNER THE CONDITIONS OF THE POLICY.

4.   THE COMPANY MAY REQUIRE THIS STATEMENT OF VALUES TO BE SIGNED BY THE
     INSURED, OR IN THE CASE OF FIRMS, BY A PARTNER OR AN OFFICER.




     THIS "STATEMENT OF VALUES" IS FILED WITH THE DESIGNATED COMPANY
     LISTED BELOW.


     ALL VALUES SUBMITTED ARE CORRECT TO THE BEST OF MY KNOWLEDGE
     AND BELIEF.


          SIGNED_____
                 (SIGNATURE OF AUTHORIZED REPRESENTATIVE)

          TITLE  _____

          DATE   _____


GuideOne Insurance              GuideOne Mutual
1111 ASHWORTH ROAD               Insurance Company
WEST DES MOINES, IOWA 50265-3538
(515) 267-5000

```
                S T A T E M E N T   O F   V A L U E S


AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE       10/20/2016                    POLICY NO. 1432-879


NAMED INSURED   FIRST UNITED METHODIST CHURCH
------------------------------------------------------------------------
PREMISES AND DESCRIPTION OF PROPERTY          100% VALUES
------------------------------------------------------------------------
                                    ACTUAL CASH VALUE    REPLACEMENT COST


      ------------------------------------------------------------------
RISK NO.     001
PREMISES NO. 001  BUILDING NO. 001
CONSTRUCTION JOISTED MASONRY
OCCUPANCY    CHURCH
PREMISES ADDRESS
    501 MAIN ST

    HEREFORD             DEAF SMITH        TX  79045
BUILDING LIMIT                                          $2,817,000
PERSONAL PROPERTY                                         $507,000
      ------------------------------------------------------------------
RISK NO.     001
PREMISES NO. 002  BUILDING NO. 001
CONSTRUCTION JOISTED MASONRY
OCCUPANCY    EDUCATION/FELLOWSHIP
PREMISES ADDRESS
    506 MILES ST

    HEREFORD             DEAF SMITH        TX  79045
BUILDING LIMIT                                          $1,939,000
PERSONAL PROPERTY                                         $349,000
      ------------------------------------------------------------------
RISK NO.     001
PREMISES NO. 004  BUILDING NO. 001
CONSTRUCTION JOISTED MASONRY
OCCUPANCY    MCGEE BUILDING
PREMISES ADDRESS
    511 MAIN ST

    HEREFORD             DEAF SMITH        TX  79045
BUILDING LIMIT                       $838,000
PERSONAL PROPERTY                    $150,800
      ------------------------------------------------------------------
RISK NO.     002
PREMISES NO. 003  BUILDING NO. 001
CONSTRUCTION FRAME
OCCUPANCY    PARSONAGE                       CHANGE DATE 12/19/2016
PREMISES ADDRESS
    408 SUNSET DR

    HEREFORD             DEAF SMITH        TX  79045
BUILDING LIMIT                                           $278,000
PERSONAL PROPERTY                                         $50,111
```

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot.  Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

**1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

**2.** Additional Coverage -- Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

# TEXAS CHANGES

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> COMMERCIAL PROPERTY COVERAGE PART
> STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99**, the term Coverage Part is replaced by the term Policy.

**B. Legal Action Against Us**

**1.** The **Legal Action Against Us** Commercial Property Condition is replaced by the following, except as provided in **B.2.** below:

**LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**a.** There has been full compliance with all of the terms of this Coverage Part; and

**b.** The action is brought within 2 years and one day after the date on which the direct physical loss or damage occurred.

**2.** Paragraph **B.1.** above does not apply to the Legal Action Against Us loss condition in the Legal Liability Coverage Form **CP 00 40**.

**C. Appraisal**

**1.** Except as provided in **C.2.** below, the Appraisal Loss Condition in the:

> BUILDING AND PERSONAL PROPERTY COVERAGE FORM;
> CONDOMINIUM ASSOCIATION COVERAGE FORM;
> CONDOMINIUM COMMERCIAL UNIT OWNERS COVERAGE FORM;
> BUILDERS RISK COVERAGE FORM;
> EXTRA EXPENSE COVERAGE FORM;
> LEASEHOLD INTEREST COVERAGE FORM;
> TOBACCO SALES WAREHOUSES COVERAGE FORM; and
> STANDARD PROPERTY POLICY

is replaced by the following:

**APPRAISAL**

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand.  The two appraisers will select an umpire.  If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction.  Each appraiser will state the amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding as to the amount of loss.  Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

**a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

**b.** We will still retain our right to deny the claim;

**2.** The **Appraisal** Condition in the:

> BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM; and
> BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

is replaced by the following:

**APPRAISAL**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss.  In

this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense and the amount of loss.

If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

**a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

**b.** We will still retain our right to deny the claim.

**D.** The provision requiring signed, sworn proof of loss in the **Duties In The Event Of Loss Or Damage** Loss Condition is replaced by the following:

Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**E.** Under the Loss Payment Condition, the provisions pertaining to notice of our intentions and the time period for payment of claims are deleted and replaced by the following:

**1. Claims Handling**

**a.** Within 15 days after we receive written notice of claim, we will:

**(1)** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date,

method and content of the acknowledgment;

**(2)** Begin any investigation of the claim; and

**(3)** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

**b.** We will notify you in writing as to whether:

**(1)** The claim or part of the claim will be paid;

**(2)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

**(3)** More information is necessary; or

**(4)** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in **b.(1)** through **b.(4)** above, within:

**(1)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

**(2)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

**2.** We will pay for covered loss or damage within 5 business days after:

**a.** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this Coverage Part, we will make payment within 5 business days after the date you have complied with such terms.

The following paragraphs are added:

**3. Catastrophe Claims**

If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in **E.1.** and **E.2.** above are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which:

**(1)** Is declared a disaster under the Texas Disaster Act of 1975; or

**(2)** Is determined to be a catastrophe by the State Board of Insurance.

**4.** The term "business day", as used in the Loss Payment Condition, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**F.** The following is added to the **Valuation Loss** Condition:

**Chapter 862 - Subsection 862.053, Policy A Liquidated Demand.** A fire insurance policy, in case of total loss by fire of property insured, shall be held and considered to be a liquidated demand against the Company for the full amount of such policy. This subsection does not apply to personal property.

**G.** Paragraphs **d.** and **f.** of the **Mortgageholders Additional Condition** are replaced by the following:

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 91 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**f.** If this policy is cancelled, we will give the mortgageholder named in the Declarations written notice of cancellation.

If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 14 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

If you cancel the policy, we will give the mortgageholder notice of cancellation to be effective on the date stated in the notice. The date of cancellation cannot be before the 10th day after the date we mail the notice.

**H.** The following is added to Paragraph **D.1.** in the **Duties in the Event of Accident, Claim or Suit** Loss Condition in the Legal Liability Coverage Form:

We will notify the first Named Insured in writing of:

**1.** An initial offer to compromise or settle a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 10th day after the date on which the offer is made.

**2.** Any settlement of a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 30th day after the date of the settlement.

# TEXAS CHANGES —
# CANCELLATION AND NONRENEWAL

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** Paragraphs **2., 3.** and **4.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2. a.** If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we may cancel this policy by mailing or delivering written notice of cancellation, at least 30 days before the effective date of cancellation, to:

**(1)** The first Named Insured; and

**(2)** Each unit-owner to whom we issued a certificate or memorandum of insurance.

If we cancel this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

**b.** If the policy covers a risk other than the risk described in Paragraph **2.a.,** then we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 14 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

If we cancel this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

**c.** In compliance with Texas law, we will not cancel this policy solely because the policyholder is an elected official.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we will also mail or deliver notice of cancellation to each unit-owner to whom we issued a certificate or memorandum of insurance, to each last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** The notice of cancellation will also state that pro rata unearned premium, if not tendered, will be refunded on demand.

**B.** The following condition is added and applies unless Paragraph **D.** applies:

**NONRENEWAL**

**1.** If we elect not to renew this policy, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such nonrenewal.

**2.** In compliance with Texas law, we will not refuse to renew this policy solely because the policyholder is an elected official.

**3.** If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then:

Copyright, ISO Commercial Risk Services, Inc., 1995

**a.** We will mail or deliver written notice of nonrenewal, at least 30 days before the expiration or anniversary date of the policy, to the first Named Insured and to each unit-owner to whom we issued a certificate or memorandum of insurance.

**b.** We will mail or deliver such notice to each last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**C. Cancellation — One- And Two-Family Dwellings And Governmental Property**

1. Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

   If this policy is cancelled we will send the first Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund.

   The refund will be pro rata if:

   **a.** We cancel this policy; or

   **b.** The first Named Insured cancels this policy because:

      **(1)** We refused to provide additional coverage which the first Named Insured requested under the policy; or

      **(2)** We reduced or restricted coverage under the policy without the consent of the first Named Insured.

   The refund may be less than pro rata if the first Named Insured cancels this policy for a reason other than those listed in **b.(1)** and **b.(2)** above.

2. The following provisions are added to the **Cancellation** Common Policy Condition:

   **a.** If this policy has been in effect for 90 days or less and is not a renewal of a policy we issued, we may cancel coverage on one- and two-family dwellings and on governmental units for any reason.

   **b.** If this policy has been in effect for more than 90 days or is a renewal of

a policy we issued, we may cancel coverage on one- and two-family dwellings and on governmental units only for the following reasons:

   **(1)** If the first Named Insured does not pay the premium or any portion of the premium when due;

   **(2)** If the Texas Department of Insurance determines that continuation of this policy would result in violation of the Texas Insurance Code or any other law governing the business of insurance in Texas;

   **(3)** If the Named Insured submits a fraudulent claim; or

   **(4)** If there is an increase in the hazard covered by this policy that is within the control of the Named Insured and would produce an increase in the premium rate of this policy.

   **c.** If such coverage is cancelled, we will, at the request of the Named Insured, provide a written statement of the reason or reasons for such cancellation.

   **d.** In compliance with Texas law, we will not cancel such coverage solely because the policyholder is an elected official.

**D.** The following condition is added:

**NONRENEWAL — ONE- AND TW0-FAMILY DWELLINGS AND GOVERNMENTAL PROPERTY**

1. If we elect not to renew coverage on one- and two-family dwellings or on governmental units, we will mail or deliver written notice of nonrenewal to the first Named Insured and any mortgageholder shown in the Declarations, at least 30 days before the expiration date. Proof of mailing will be sufficient proof of notice.

   We will, at the request of the Named Insured, provide a written statement of the reason or reasons for such nonrenewal.

   If we fail to give the first Named Insured proper notice of our refusal to renew, the

Copyright, ISO Commercial Risk Services, Inc., 1995

first Named Insured may require us to renew the policy.

**2.** We may elect not to renew such coverage for any reason, subject to the exceptions and limitations in Paragraphs **3.** and **4.** below.

**3.** We will not refuse to renew coverage:

    **a.** Solely because the policyholder is an elected official; or

    **b.** Because of claims for losses resulting from natural causes.

**4.** **Claims That Do Not Result From Natural Causes**

    **a.** If we have previously notified you as provided in **b.** below, we may refuse to renew coverage if the Named Insured has filed under this policy, in any three-year period, three or more claims that do not result from natural causes.

    **b.** If the Named Insured has filed two such claims in a period of less than three years, we may notify the first Named Insured in writing that, if the Named Insured files a third such claim during the three year period, we may refuse to renew coverage.

    **c.** A claim does not include a claim that is filed but is not paid or payable under the policy.

Copyright,  ISO Commercial  Risk Services,  Inc., 1995

# MULTIPLE DEDUCTIBLE FORM
## (FIXED DOLLAR DEDUCTIBLES)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> BUILDING AND PERSONAL PROPERTY COVERAGE FORM
> BUILDERS' RISK COVERAGE FORM
> CONDOMINIUM ASSOCIATION COVERAGE FORM
> CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
> STANDARD PROPERTY POLICY
> TOBACCO SALES WAREHOUSES COVERAGE FORM

### SCHEDULE *

The Deductibles applicable to any one occurrence are shown below:

| Prem. No. | Bldg. No. | Deductible | Covered Causes of Loss ** |
|---|---|---|---|
| | | | |

*   Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

*   For each deductible listed in this Schedule, enter the number corresponding to the Covered Cause(s) of Loss to which that deductible applies (or enter the description):

**(1)**  All Covered Causes of Loss

**(2)**  All Covered Causes of Loss **except** Windstorm or Hail

**(3)**  All Covered Causes of Loss **except** Theft

**(4)**  All Covered Causes of Loss **except** Windstorm or Hail and Theft

**(5)**  Windstorm or Hail

**(6)**  Theft

The following is added to the DEDUCTIBLE section:

**A.**  In the event that loss or damage occurs to Covered Property at more than one building location as a result of one occurrence, the largest applicable deductible for that Covered Cause of Loss, shown in the Schedule above or in the Declarations, will apply.

**B.**  The terms of this endorsement do not apply to any Earthquake Deductible or to any Windstorm or Hail Percentage Deductible provided elsewhere in this policy.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1992

# LIMITED FLOOD COVERAGE

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY. PLEASE READ IT CAREFULLY, AS COVERAGE IS RESTRICTED IN SOME FLOOD ZONES.**

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

**SCHEDULE**

| | |
|---|---|
| **Flood Limit:** $ | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following is added under **4. Additional Coverages** of Section **A. Coverage**:

**A. Limited Flood Coverage**

We will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from flood. We will also pay your expense to remove debris of Covered Property that has been damaged, when such loss or damage is caused by or results from flood.

Flood, as used in this endorsement, means:

**1.** Surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge); or

**2.** Mudslide or mudflow which is caused by flooding as defined in **A.1.** above.

We will pay under this Additional Coverage when the loss or damage exceeds $500 and the most we will pay for the sum of all flood loss and resulting debris removal expense during each separate 12-month policy period is the Flood Limit shown in the Schedule.

All flooding in a continuous or protracted event will constitute a single flood. If a single occurrence of flood begins during one annual policy period and ends during the following annual policy period, any Flood Limit applicable to the following annual policy period will not apply to that flood loss.

This Additional Coverage does not increase the Limits of Insurance shown in the Declarations.

The coverage provided by this endorsement is primary coverage unless otherwise excluded or limited herein.

**B. Exclusions And Limitations**

**1.** In addition to the exclusions listed in the applicable Causes of Loss form and contained within the policy to which this endorsement is attached, we will not pay under this Additional Coverage for any loss or damage to Covered Property caused by or resulting from:

   **a.** Water damage from roof drainage systems, gutters or downspouts.

   **b.** Water that backs up or overflows from a sewer, drain or sump if the opening (of the sewer, drain or sump) from which the water backs up or overflows is located in:

      **(1)** The insured building; or

      **(2)** If you are a tenant, the building you rent, lease or occupy.

   **c.** Water under the ground surface pressing on, or flowing or seeping through:

      **(1)** Foundations, walls, floors or paved surfaces;

      **(2)** Basements, whether paved or not; or

      **(3)** Doors, windows or other openings.

**2.** We will not pay under this Additional Coverage for any flood loss to property that, at the time the loss or damage occurs, is located within the following

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

flood zones, as established by the Federal Emergency Management Agency: Zones A, A1-A30, AE, AH, AO, A99, AR, AR/AE, AR/AH, AR/AO, AR/A1-A30, AR/A, V, V1-V30, VE, or VO.

However, in the event you are eligible for and purchase coverage through the National Flood Insurance Program, and such coverage is in effect at the time the loss or damage occurs, this exclusion shall be nullified and the coverage provided by this endorsement shall apply in excess of that other coverage.

3. To the extent that a tsunami causes the overflow of tidal waters, the exclusion of earthquake, in the Earth Movement

Exclusion of the applicable Causes of Loss form, does not apply.

4. This Limited Flood Coverage endorsement does not apply to, or activate:

a. The Additional Coverage -- Limited Coverage for "Fungus" , Wet Rot, Dry Rot And Bacteria, as may be provided by the applicable Causes of Loss form; or

b. Any other Additional Coverage, Coverage Extension or endorsement contained in this policy.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

# FIRE AND SECURITY ALARM SYSTEM UPGRADE COVERAGE

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> BUILDING AND PERSONAL PROPERTY COVERAGE FORM
> BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
> BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

**A.** The following is added to **4. Additional Coverages** of section **A. Coverage**.

**Fire and Security Alarm System Upgrade Coverage**

1. In the event of direct physical loss or damage to fire alarm or security alarm systems within a covered building at the premises described in the Declarations, we will, at your option, pay for the reasonable additional costs you incur to upgrade such fire alarm or security alarm systems with alternative systems that qualify as a "fire alarm system upgrade" or a "security alarm system upgrade". The direct physical loss or damage must result from a Covered Cause of Loss.

2. We will pay for a "fire alarm system upgrade" or a "security alarm system upgrade" under this Additional Coverage only if such a "fire alarm system upgrade" or a "security alarm system upgrade" is commercially available.

3. Under this Additional Coverage, the most we will pay in any one occurrence is 25% of the amount we would otherwise pay for the direct physical loss or damage to that part of the fire alarm or security alarm system being upgraded (prior to the application of any deductible that applies), not to exceed $10,000.

This Additional Coverage is in addition to the Limits of Insurance shown in the Declarations.

**B. Business Income and Extra Expense**

The following is added to the definition of "period of restoration" in section **H. Definitions** of the Building and Personal Property Coverage Form and to section **F. Definitions** of any Business Income (And Extra Expense) Coverage Form or Business Income (Without Extra Expense) Coverage Form added to this policy by endorsement.

The "period of restoration" shall include any increased period necessary to repair or replace damaged Covered Property with a "fire alarm system upgrade" or a "security alarm system upgrade".

**C. Exclusions**

The Additional Coverage provided by this endorsement does not apply to:

1. A "fire alarm system upgrade" or "security alarm system upgrade" in any of the following property:

   **a.** New buildings under construction and buildings you acquire but have not reported to us;

   **b.** Property leased to, or rented to, you; or

2. Covered Property not insured on a replacement cost basis;

3. The enforcement of any ordinance or law:

   **a.** Regulating the construction, use or repair of any property; or

   **b.** Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion of the enforcement of any ordinance or law applies whether the loss results from:

   **(1)** An ordinance or law that is enforced even if the property has not been damaged; or

   **(2)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal

Copyright 2009 GuideOne Insurance

of its debris, following a physical loss to that property.

**D. Additional Definitions**

1. "Fire alarm system upgrade" means the replacement of an existing fire alarm system with one of the following:

   a. A system which sounds in multiple sections of the covered building or structure, if the existing system sounds in only one section of the building or structure;

   b. A system which is automatically activated, if the existing system is manually activated; or

   c. A system which includes verbal instructions for exiting the covered building or structure, if the existing system includes audible or visual alarms but no verbal instructions.

2. "Security alarm system upgrade" means the replacement of an existing security alarm system with one of the following:

   a. A system which is triggered in additional sections of a covered building or structure beyond the current number of sections of the building or structure in which the current system is triggered; or

   b. A system which sounds an alarm to a monitored system in which authorities are promptly dispatched, if the existing system sounds only a local audible alarm.

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

**FAITHGUARD**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.**, Definitions.

**A. COVERAGE**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building**, meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making additions, alterations or repairs to the building or structure;

**(6)** Signs, radio and television antennas and satellite dishes attached to the building or within 1,000 feet of the described premises;

**(7)** Walls, fences and walks.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property -- Separation Of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

   (a) Made a part of the building or structure you occupy but do not own; and

   (b) You acquired or made at your expense but cannot legally remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

   Our payment for loss of or damage to this leased property will not exceed the lesser of:

   (a) The value stated in the lease agreement; or

   (b) The replacement cost value;

(8) Personal Property of Others that is:

   (a) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises; and

   (b) Business personal property belonging to your "ministers", managerial employees, officers or directors; or personal property of others used by you for business purposes.

   However, our payment for loss of or damage to Personal Property of Others will only be for the account of the owner of the property.

**2. Property Not Covered**

   Covered Property does not include:

a. Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities, except as provided in Section **C** -- Limitations of the Causes of Loss -- Special Form. Lottery tickets held for sale are not securities;

b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

c. Automobiles held for sale;

d. Bridges, roadways, patios or other paved surfaces, except walks;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

   (1) The lowest basement floor; or

   (2) The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water or growing crops; or lawns, except as provided in the Coverage Extensions;

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not at the premises described in the Declarations;

m. Underground pipes, flues or drains;

n. Electronic Data, except as provided under Additional Coverages,

Electronic Data.   Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment.   The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.   This Paragraph **n.**, does not apply to your "stock" of prepackaged software;

**o.**  The cost to research, replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems.   Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.**  Vehicles or self-propelled machines (including aircraft or watercraft) that:

**(1)**  Are licensed for use on public roads; or

**(2)**  Are operated principally away from the described premises.

This paragraph does not apply to:

**(a)**  Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

**(b)**  Vehicles or self-propelled machines, other than autos, you hold for sale;

**(c)**  Rowboats or canoes out of water at the described premises; or

**(d)**  Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers;

**q.**  The following property while outside of buildings:

**(1)**  Grain, hay, straw or other crops;

**(2)**  Radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, except as provided in the Coverage Extensions;

**(3)**  Signs (other than signs, radio and television antennas and satellite dishes attached to buildings or within 1,000 feet of the described premises), except as provided in the Coverage Extensions; and

**(4)**  Trees, shrubs or plants (other than "stock" of trees, shrubs or plants), except as provided in the Coverage Extensions.

**r.**  "Fine arts", except as provided in the Additional Coverages.

**3.  Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4.  Additional Coverages**

**a.  Debris Removal**

**(1)**  Subject to Paragraphs **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.   The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)**  Debris Removal does not apply to costs to:

**(a)** Extract "pollutants" from land or water; or

**(b)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

**(4)** We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance

on the Covered Property that has sustained loss or damage, plus $25,000.

**(5) Examples:**

The following examples assume that there is no Coinsurance penalty.

**Example # 1**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $    500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 - $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |

($10,000 is 20% of $50,000)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example # 2**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $    500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 - $500) |
| Debris Removal Expense: | $ 40,000 |
| Debris Removal Expense Payable: | |
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 25,000 |

The basic amount payable for debris removal expense under the

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. The total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

The Additional Condition, Coinsurance, shall not apply to this Additional Coverage.

**b. Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 60 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay the actual cost of your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No deductible applies to this Additional Coverage.

**d. Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $25,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Ordinance or Law**

This Additional Coverage applies only to buildings to which the Replacement Cost coverage applies.

If a Covered Cause of Loss occurs to covered Building property, and causes the enforcement of any ordinance or law that **(a)** is in force at the time the cause of loss occurs, and **(b)** regulates the demolition, repair or reconstruction of that building, or establishes zoning or land use requirements at the described premises, we will pay:

**(1)** Up to $350,000 for the actual loss in the replacement cost value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building.

This Additional Coverage does not increase the limit applicable to the covered buildings shown in the Declarations. This is not an additional amount of insurance.

**(2)** Up to $350,000 for the amount you actually spend to demolish and clear the site of the undamaged parts of the same building, as a consequence of enforcement of an ordinance or law that requires demolition of such undamaged property.

This is an additional amount of insurance.

**(3)** Up to $250,000 for the amount you actually spend for the increased cost to repair, reconstruct, or remodel that building. Increased cost is the cost excess of that cost to:

**(a)** Repair or reconstruct the damaged or destroyed property; or

**(b)** To reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

to meet the minimum requirements of such ordinance or law, on the basis of its like kind and quality, at the time the Covered Cause of Loss occurs. If the property is repaired or reconstructed, it must be intended for a similar occupancy as the current property, unless otherwise required by zoning or land use law.

When a building is damaged or destroyed and we pay for an amount you actually spend for the increased cost to repair, reconstruct, or remodel that building, we will also pay for:

**(a)** The cost of excavations, grading, backfilling and filling;

**(b)** The foundation of the building;

**(c)** Pilings; and

**(d)** Underground pipes, flues and drains.

The items listed in Paragraphs **(3)(a)** through **(3)(d)**, immediately above, are deleted from Property Not Covered, but only with respect to the coverage described in this Additional Coverage for increased cost to repair, reconstruct or remodel the building.

This is an additional amount of insurance.

We will not pay for increased construction costs under this Coverage Part:

**(a)** Until the property is actually repaired or replaced, at the same premises or elsewhere; and

**(b)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

We will not pay more:

**(1)** If the property is repaired or replaced on the same premises, than the amount you actually spend to:

**(a)** Demolish and clear the site; and

**(b)** Repair, rebuild or reconstruct the property but not for more than property of the same height, floor

area and style on the same premises.

**(2)** If the property is not repaired or replaced on the same premises, than:

    **(a)** The amount you actually spend to demolish and clear the site of the described premises; and

    **(b)** The cost to replace, on the same premises, the damaged or destroyed property with other property:

        **(i)** Of comparable material quality;

        **(ii)** Of the same height, floor area and style; and

        **(iii)** Used for the same purpose.

The terms of this Additional Coverage shall apply separately to each covered building to which this Additional Coverage applies.

The terms of this Additional Coverage shall not apply to:

**(1)** Any property or building that is not Covered Property;

**(2)** Any covered building that has not been damaged by a Covered Cause of Loss;

**(3)** Loss due to any ordinance or law that you were required to comply with, and that you failed to comply with before the loss occurred;

**(4)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(5)** Any costs associated with the enforcement of an ordinance or

law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

The Ordinance or Law exclusion does not apply to this Additional Coverage.

**f.** **Indirect Loss -- Blanket Insurance**

The most we will pay under this Additional Coverage is $100,000 for any combination of these coverages:

**(1)** **"Business Income"**

We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration", caused by property damage from a Covered Cause of Loss to property at the locations described in the Declarations.

The amount of "Business Income" loss will be determined based on:

    **(a)** The "Net Income" of the business before the direct physical loss or damage occurred;

    **(b)** The likely "Net Income" of the business if no physical loss or damage had occurred;

    **(c)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

    **(d)** Other relevant sources of information, including:

        **(i)** Your financial records and accounting procedures;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

**(ii)** Bills, invoices and other vouchers; and

**(iii)** Deeds, liens or contracts.

Extended "Business Income": If the necessary "suspension" of your "operations" produces a "Business Income" loss payable under this policy, we will pay for the actual loss of "Business Income" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability or your "operations" are resumed; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore tenant occupancy or your "operations", with reasonable speed, to the level which would generate the "Business Income" including "Rental Value" amount that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 30 consecutive days after the date determined in **(a)** above.

**(2) "Extra Expense"**

We will pay for the expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay "Extra Expense" (other than the expense to repair or replace property) to:

**(a)** Avoid or minimize the "suspension" of business and to continue operations at the described premises

or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

**(b)** Minimize the "suspension" of business if you cannot continue "operations".

**(c)** Repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable.

The amount of "Extra Expense" will be determined based on:

**(a)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

**(i)** The salvage value that remains of any property bought for temporary use during the "period of restoration" once "operations" are resumed; and

**(ii)** Any "Extra Expense" that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(b)** Necessary expenses that reduce the "Business Income" loss that otherwise would have been incurred.

Valuable papers and records and electronic data are not covered except as elsewhere provided in this policy.

**(3) Tuition Fees**

We will pay for actual loss of "Net Income" from "Tuition Fees" plus continuing normal operating expenses that would have been earned or incurred. We will pay only when there is a loss or damage to Covered Property by a Covered Cause of Loss.

This coverage is not limited by the expiration date of this policy, but ends on the earlier of:

**(a)** The day before the opening of the next "school term" following the date when, with reasonable speed and similar quality, the property should be repaired, rebuilt or replaced; or

**(b)** The date when the "school term" is resumed at a new permanent location.

**(4) Emergency Evacuation**

We will pay the reasonable expenses you incur in the evacuation of the premises described in the Declarations as a result of an unforeseen event which places the occupants in imminent danger of direct physical harm. This Additional Coverage applies only if there is actual or threatened loss or damage to Covered Property that results from a Covered Cause of Loss.

We will not pay for expenses under this Additional Coverage arising out of:

**(a)** A strike or bomb threat, unless evacuation is ordered by a civil authority; or

**(b)** A planned evacuation drill or false alarm.

**(5) Civil Authority**

We will pay for the actual loss of "Business Income" you sustain and necessary "Extra Expense" caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for "Extra Expense" will begin immediately after the time of that action and will end:

**(a)** 3 consecutive weeks after the time of that action; or

**(b)** When your Business Income coverage ends;

whichever is later.

**(6) Alterations and New Buildings**

We will pay for the actual loss of "Business Income" you sustain and necessary "Extra Expense" you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(a)** New buildings or structures, whether complete or under construction;

**(b)** Alterations or additions to existing buildings or structures; and

**(c)** Machinery, equipment, supplies or building materials located on or within 1,000 feet of the described premises and:

**(i)** Used in the construction, alterations or additions; or

**(ii)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**(7) Violent Incident**

We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations", caused by a "violent incident" at a location described in the Declarations. But this coverage will apply only if no other coverage is provided within this coverage form or by the attachment of any endorsement to this policy, for such loss of "Business Income" from a "violent incident".

Determination of the "Business Income" loss under this Additional Coverage will be calculated only for the location where the "violent incident" occurred.

The amount of "Business Income" loss will be determined based on:

**(a)** The "Net Income" of the business before the "violent incident" occurred;

**(b)** The likely "Net Income" of the business if no "violent incident" had occurred;

**(c)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the "violent incident"; and

**(d)** Other relevant sources of information, including:

  **(i)** Your financial records and accounting procedures;

  **(ii)** Bills, invoices and other vouchers; and

  **(iii)** Deeds, liens or contracts.

This coverage begins 72 hours after the time of the "violent incident" at the described premises and ends on the earlier of:

**(a)** 90 days after the date of the "violent incident"; or

**(b)** The date you could restore your "operations", with reasonable speed, to the level which would generate the "Business Income" amount that would have existed if no "violent incident" had occurred.

This coverage is not cut short by the expiration date of this policy.

This Additional Coverage does not serve to create coverage for any loss of "Business Income" from a "violent incident" that is excluded under the terms of any terrorism exclusion, if such exclusion has been added to this Coverage Part or Policy by endorsement.

**g. Damage to Buildings from Theft, Burglary or Robbery**

When Building loss or damage (except by fire or explosion) directly resulting from theft, burglary or robbery (including attempted threat), occurs, we will pay for that part of the building, occupied by you and containing Your Business Personal Property, and to equipment therein pertaining to the service of the building but not building property or equipment, removed from designated premises, provided you are the owner of such building or equipment or are liable for such building or equipment or are liable for such damage.

Section **D.**, Deductible applies to this Additional Coverage.

**h. Sewer, Drain or Sump Backup or Overflow**

We will pay for direct physical loss of or damage to Covered Property caused by or resulting from water that backs up or overflows from a sewer, drain or sump.

The opening (of the sewer, drain or sump) from which the water backs up or overflows must be located in:

**(1)** The insured building; or

**(2)** If you are a tenant, the building you rent, lease or occupy.

Section **D.**, Deductible applies to this Additional Coverage.

This Additional Coverage is subject to the Limitations in the Causes of Loss Form.

**i. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss -- Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

**(b)** If the Causes Of Loss -- Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $5,000 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the

policy year in which the occurrence began.

**j.   Leasehold Interest and Cancelled Lease Moving Expenses**

We will pay for loss of the "lease differential costs" and "cancelled lease moving expenses" you sustain due to the cancellation of your lease. The cancellation must result from direct physical loss or damage to property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

We will pay under this Additional Coverage when the loss or damage exceeds $500 and $10,000 is the most we will pay for the sum of any combination of "lease differential costs" and "cancelled lease moving expenses" arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

This is an additional amount of insurance.

This Additional Coverage does not apply if you cancel your lease for reasons other than direct physical loss or damage to property at the premises described in the Declarations.

Our payments for loss end after 90 days of the date on which the Covered Cause of Loss occurs.

**k.   Fine Arts**

We will pay for direct physical loss or damage to your "fine arts" caused by or resulting from a Covered Cause of Loss.

Loss or damage covered under this Additional Coverage is subject to the "actual cash value" provision **a.**, and **b.** of **E.**, Loss Conditions**, 7.** Valuation.

The most we will pay for loss or damage under this Additional Coverage is $25,000 in any one occurrence.

We will not pay for loss or damage to "fine arts" under this Additional

Coverage caused by or resulting from:

**(1)** Breakage, marring, or scratching unless such loss or damage is caused by or resulting from a Covered Cause of Loss; or

**(2)** Any repairing, restoration or retouching of the "fine arts".

Section **D.**, Deductible applies to this Additional Coverage.

**l.   Refrigerated Products Loss**

We will pay for consequential loss to the contents of deep freeze or refrigeration units on the described premises resulting from power or utility failure to the described premises; damage to the generating or transmission equipment; or mechanical or electrical failure of the refrigeration system, provided the refrigeration system has been maintained in proper working condition.

We will pay under this Additional Coverage when the loss or damage exceeds $500 and $25,000 is the most we will pay in any one occurrence for the part of the loss or damage that exceeds $500.

**m.   Fire Extinguisher and Automatic Fire Suppression System Recharge -- Blanket Insurance**

The most we will pay under this Additional Coverage is $10,000 for any one of the following coverages or a combination of these coverages:

**(1)   Fire Extinguisher Recharge**

The necessary expenses incurred to recharge a portable fire extinguisher when it has been discharged to combat a fire at the described premises. No deductible applies to this coverage**.**

**(2)   Automatic Fire Suppression Recharge**

The necessary expenses incurred to recharge any

automatic fire suppression system when the loss is caused by leakage or discharge.

This coverage applies only if the leakage or discharge is caused by a Covered Cause of Loss. No deductible applies to this coverage.

**n. Earthquake Sprinkler Leakage**

We will pay for direct physical loss or damage to Covered Property at the described premises caused by sprinkler leakage resulting from an earthquake. All earthquake shocks that occur within any 168-hour period will constitute a single earthquake. The expiration of this policy will not reduce the 168-hour period.

The most we will pay under this Additional Coverage is $10,000 during each separate 12-month policy period.

The Additional Condition, Coinsurance, shall not apply to this Additional Coverage. Section **D.**, Deductible applies to this Additional Coverage.

We will not pay under this Additional Coverage for loss or damage caused directly or indirectly by:

**(1)** Tidal wave or tsunami, even if attributable to an earthquake;

**(2)** Volcanic eruption, explosion or effusion of a volcano, even if attributable to an earthquake; or

**(3)** Earthquake that begins before the inception of this insurance policy.

The Earth Movement Exclusion in the applicable Causes of Loss form does not apply to this Additional Coverage.

**o. Utility Services -- Direct Damage**

We will pay for loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from an interruption in utility service to the described premises. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss to a "Water Supply Service", "Communication Supply Service", or "Power Supply Service".

Coverage under this Additional Coverage for loss or damage to Covered Property does not apply to loss or damage to electronic data. The term electronic data has the meaning described under Property Not Covered, Electronic Data.

The most we will pay for loss or damage under this Additional Coverage, Utility Services Direct Damage is $10,000 in any one occurrence.

**p. Utility Services -- Time Element**

We will pay for the actual loss of "Business Income" you sustain and necessary "Extra Expense" you incur due to a "suspension" of "operations" at the described premises caused by an interruption in utility service to that premises. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss to a "Water Supply Service", "Communication Supply Service", or "Power Supply Service".

Coverage under this Additional Coverage does not apply to "Business Income" or "Extra Expense" related to interruption in utility service which causes loss or damage to electronic data. The term electronic data has the meaning described under Property Not Covered, Electronic Data.

The most we will pay under this Additional Coverage, Utility Services -- Time Element is $10,000 in any one occurrence.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired or Constructed Property**

   **(1) Buildings**

   If this policy covers Building, you may extend that insurance to apply to:

   **(a)** Your new buildings while being built on the described premises; and

   **(b)** Buildings you acquire at locations, other than the described premises, intended for:

   **(i)** Similar use as the building described in the Declarations; or

   **(ii)** Use as a warehouse.

   **(2) Your Business Personal Property**

   **(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

   **(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions;

   **(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

   **(iii)** Business personal property that you newly acquire, located at the described premises.

   **(b)** This Extension does not apply to:

   **(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

   **(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

   **(3) Period of Coverage**

   With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

   **(a)** This policy expires;

   **(b)** 180 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

   **(c)** You report values to us.

   We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

   Subject to Section **D.**, Deductible, the most we will pay for loss or damage under this Extension is $2,000,000 at each building.

**b. Personal Effects and Property of Others**

   **(1)** You may extend the insurance that applies to Your Business Personal Property at the premises described in the Declarations to apply to personal effects and personal property of others.

   The most we will pay for loss or damage to personal effects and personal property of others

under this Extension is $25,000 in any one occurrence. No deductible applies.

**(2)** Under this Extension, we will pay for loss or damage (except from theft or disappearance) to personal effects and personal property of others while it is away from the described premises and is being used for business purposes or during your sponsored activities when the loss or damage exceeds $250, and $2,500 is the most we will pay for loss or damage during each separate 12-month policy period.

Under this Paragraph **(2)**:

**(a)** The Coverage Territory condition does not apply; and

**(b)** Coverage applies while the personal effects and personal property of others are anywhere in the world.

But we will not pay under Paragraph **(2)** for any of the types of property described in **2.** Property Not Covered of section **A.** Coverage.

Loss or damage covered under this Extension is subject to replacement cost provisions **a., b., c., d., e.** and **f.** of Loss Condition, Valuation. The Optional Coverage, Actual Cash Value shall not apply to this Extension.

We will not pay for any loss or damage under this Extension to personal effects and personal property of others:

**(1)** At any residence premises; or

**(2)** While in transit or in the care, custody, or control of a public carrier.

Insurance under this Extension is excess of the property owner's insurance, which is primary, whether the owner can collect on it or not. Our payment for loss of or damage to personal property of others and personal effects will only

be for the account of the owner of the property.

**c.  Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to research, replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this extension does not apply to valuable papers and records which exist on electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** We will pay under this Extension to replace and restore the lost information, when the loss or damage exceeds $500 and $50,000 is the most we will pay at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**d.  Property Off-premises**

You may extend the insurance provided by this Coverage Form to apply to your Covered Property (but excluding personal property of others except as provided under Coverage Extension -- Personal Effects and Property of Others) while it is away from the described premises, if it is:

**(1)** Temporarily at a location you do not own, lease or operate;

**(2)** In storage at a location you lease, provided the lease was

executed after the beginning of the current policy term; or

**(3)** At any fair, trade show or exhibition.

This Extension also applies to Covered Property while in transit including direct loss or damage caused by collision (except contact with a roadbed), derailment, or overturn of a transporting land conveyance.

The Coverage Territory condition does not apply to this Extension; coverage applies while the Covered Property is anywhere in the world. We will pay under this Extension when the loss or damage exceeds $500, and $50,000 is the most we will pay for the part of the loss or damage that exceeds $500.

**e. Radio and Television Antennas (Including Satellite Dishes)**

You may extend the insurance provided by this Coverage Form to apply to your radio and television antennas (including satellite dishes), including debris removal expense, caused by or resulting from any Covered Cause of Loss.

We will pay under this Extension when the loss or damage exceeds $500 and $15,000 is the most we will pay in any one occurrence for the part of the loss or damage that exceeds $500.

**f. Appurtenant Buildings and Property in the Open**

You may extend the insurance that applies to Building to apply to appurtenant buildings and personal property in the appurtenant buildings located on the premises of any covered building.

This Extension applies only if loss or damage is caused by a Covered Cause of Loss, and does not include any appurtenant building or property which is used in whole or in part for mercantile, manufacturing or farming purposes.

You may also extend the insurance that applies to Building to apply to

park and playground equipment, gravestones, markers and freestanding structures built for use or ornamentation on, above or below the surface of land. The structures must be owned by you and located on the described premises.

We will pay under this Extension when the loss or damage exceeds $500, and $50,000 is the most we will pay in any one occurrence for the part of the loss or damage that exceeds $500.

**g. Trees, Shrubs, Plants and Lawns**

You may extend the insurance provided by this Coverage Form to cover your trees, shrubs, plants and lawns, including debris removal expense, at the described premises against loss by fire, lightning, theft, explosion, riot, civil commotion, vehicle damage, aircraft and vandalism. We will pay under this Extension when the loss or damage exceeds $500 and $25,000 is the most we will pay for the part of the loss or damage that exceeds $500, but not more than $2,500 on any one tree, shrub, plant or lawn.

**h. Outdoor Signs**

You may extend the insurance provided by this Coverage Form to apply to outdoor signs wherever located which are:

**(1)** Owned by you; or

**(2)** Owned by others and in your care, custody and control;

excluding only loss by wear and tear, latent defect, corrosion, rust or mechanical breakdown.

We will pay under this Extension when the loss or damage exceeds $500, and $15,000 is the most we will pay in any one occurrence for the part of the loss or damage that exceeds $500.

**i. Non-owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to

loss or damage to trailers that you do not own, provided that:

**(a)** The trailer is used in your business;

**(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

**(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

**(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

**(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**j.   Installed Locks**

You may extend the insurance provided by this Coverage Form to apply to the repair, replacement or recalibration of professionally installed interior or exterior door locks if keys are stolen during a covered theft, burglary or robbery loss. The most we will pay under this Extension is $10,000. No deductible applies to this Extension.

**k.   Information Reward**

We will pay for information which leads to a conviction for arson, theft, or vandalism in connection with a fire or explosion, theft or vandalism, or any combination of these causes of loss. The most we will pay under this Extension regardless of the number of persons involved in providing this information is the lesser of:

**(1)** $15,000; or

**(2)** The amount of loss or damage paid to you as a result of the fire, explosion, theft, vandalism, or any combination of these causes of loss in which the information leading to a conviction was provided.

No deductible applies to this Extension.

**l.   Dwelling Personal Property**

You may extend the insurance that applies to any dwelling occupied by not more than four families and described in the Declarations Page to apply to personal property in that dwelling that is owned by you for use by an employee.

The most we will pay for loss or damage to property in the dwelling under this Extension is $2,500.

**m.   Maintenance Equipment**

If our payment for direct physical loss or damage to Covered Property exhausts the Limits of Insurance for Covered Property, we will pay an additional amount for loss or damage to personal property owned by you that is used to maintain or service the building or structure on your described premises.

This is an additional amount of insurance and the most we will pay for loss or damage under this Extension is $10,000 in any one occurrence.

**n.   Automated External Defibrillator (AED)**

If our payment for direct physical loss or damage to Covered Property exhausts the Limits of Insurance for Covered Property, we will pay an additional amount for

loss or damage to automated external defibrillators.

This is an additional amount of insurance and the most we will pay for loss or damage under this Extension is $5,000 in any one occurrence.

o.  **Installation Property**

You may extend the insurance that applies to your Covered Property to apply to "installation property" while at a location where you are performing installation or fabrication of property that will be utilized in your business operations.

This Extension does not apply to:

(1) Damage to the building in which "installation property" is being installed or fabricated;

(2) Missing "installation property" where the only evidence of the loss or damage is a shortage disclosed on taking inventory or other instances where there is not physical evidence to show what happened to the property; or

(3) Trees, shrubs, or plants that are to be planted at the location where you are performing installation or fabrication.

We will pay under this Extension when the loss or damage exceeds $500 and $5,000 in any one occurrence is the most we will pay for the part of the loss or damage that exceeds $500.

p.  **Accounts Receivable**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) All amounts due from your customers that you are unable to collect;

(2) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(3) Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage; and

(4) Other reasonable expenses that you incur to re-establish your records of accounts receivable;

that result from a Covered Cause of Loss to your records of accounts receivable.

We cover your records of accounts receivable while within the interior of the described premises or while in transit between described premises. If your records of accounts receivable are in imminent danger of loss or damage from a Covered Cause of Loss at your described premises, we will also cover such records while away from your described premises at a safe place or while in transit between your described premises and the safe place.

We will not pay for any loss or damage resulting from any of the following:

(1) Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking, or withholding of money, securities or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding;

(2) Bookkeeping, accounting or billing errors or omissions;

(3) Electronic or magnetic injury, disturbance or erasure of electronic records of accounts receivable; or

(4) Loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

The most we will pay for loss or damage under this Extension is $50,000 in any one occurrence. If you cannot accurately establish the amount of accounts receivable

outstanding at the time of loss or damage, the following method will be used:

**(1)** Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately proceeding the month in which the loss or damage occurs; and

**(2)** Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

The following will be deducted from the total amount of accounts receivable, however that amount is established:

**(1)** The amount of the accounts for which there is no loss or damage;

**(2)** The amount of the accounts that you are able to re-establish or collect;

**(3)** An amount to allow for probable bad debts that you are normally unable to collect; and

**(4)** All unearned interest and services charges.

**q. Loss Data Preparation Expenses**

You may extend the insurance provided by this Coverage Form to apply to the necessary expenses that you incur at our request to prepare loss data, for purposes of assisting us in the determination of the amount of loss. This includes the cost of appraisals, taking inventories, and the preparation of other documentation required to show the extent of loss.

We will not pay for any expenses billed by or payable to insurance adjusters or attorneys or any costs as described in Paragraph **2.** Appraisal of **E.** Loss Conditions. The most we will pay under this Extension in any one occurrence is $5,000. No deductible applies to this Extension.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C. LIMITS OF INSURANCE**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

**2.** Pollutant Clean Up and Removal;

**3.** Ordinance or Law coverage for the increased cost to repair or reconstruct property and the amount actually spent to demolish and clear the site of the undamaged parts of the property;

**4.** Indirect Loss -- Blanket Insurance;

**5.** Electronic Data;

**6.** Leasehold Interest and Cancelled Lease Moving Expenses;

**7.** Fine Arts;

**8.** Fire Extinguisher & Automatic Fire Suppression System Recharge; and

**9.** Utility Service -- Time Element.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance.

**1.** Preservation of Property;

**2.** Damage to Buildings from Theft, Burglary or Robbery;

**3.** Sewer, Drain or Sump Backup or Overflow;

**4.** Ordinance or Law Coverage for the actual loss in value resulting from the

required demolition of the undamaged parts of the same property;

**5.** Refrigerated Products Loss;

**6.** Earthquake Sprinkler Leakage; and

**7.** Utility Service -- Direct Damage.

**D. DEDUCTIBLE**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Additional Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example No. 1:**

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---|
| Deductible: | $ 250 |
| Limit of Insurance -- Bldg. 1: | $ 60,000 |
| Limit of Insurance -- Bldg. 2: | $ 80,000 |
| Loss to Bldg. 1: | $ 60,100 |
| Loss to Bldg. 2: | $ 90,000 |

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

$60,100
-    250
$59,850      Loss Payable -- Bldg. 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000.

Total amount of loss payable: $59,850 + $80,000 = $139,850

**Example No. 2:**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example No. 1.

| | |
|---|---|
| Loss to Bldg. 1:<br>(exceeds Limit of Insurance plus Deductible) | $ 70,000 |
| Loss to Bldg. 2:<br>(exceeds Limit of Insurance plus Deductible) | $ 90,000 |
| Loss Payable -- Bldg. 1:<br>(Limit of Insurance) | $ 60,000 |
| Loss Payable -- Bldg. 2:<br>(Limit of Insurance) | $ 80,000 |
| Total amount of loss payable: | $ 140,000 |

**E. LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

With respect to any form which is applicable to this Coverage Part and is subject to the provisions of this Coverage Form, a reference in such form to:

Actual Cash Value Condition;
Loss Condition, Actual Cash Value;
"Actual cash value" in the Valuation Condition; or
Valuation Condition providing "actual cash value";

shall be construed as a reference to Optional Coverage, Actual Cash Value in this Coverage Form, except as provided in **g.** of **7.** Valuation.

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss,

either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

3. **Duties In The Event Of Loss Or Damage**

   **a.** You must see that the following are done in the event of loss or damage to Covered Property:

   **(1)** Notify the police if a law may have been broken.

   **(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

   **(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

   **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

   **(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

   **(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

   Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

   **(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

   **(8)** Cooperate with us in the investigation or settlement of the claim.

   **b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Loss Payment**

   **a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

   **(1)** Pay the value of lost or damaged property;

   **(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

   **(3)** Take all or any part of the property at an agreed or appraised value; or

   **(4)** Repair, rebuild or replace the property with other property of

like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all the terms of this Coverage Part and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer of Rights of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general

lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**(3)** Dwellings maintained for occupancy by a "minister" or staff member, whether paid or not, will not be considered vacant at any time.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for loss or damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At replacement cost (without deduction for depreciation), except as provided in **g., h., i.** and **j.** below.

**b.** This condition does not apply to:

**(1)** Contents of a residence;

**(2)** "Fine arts"; or

**(3)** "Stock," unless the Including "Stock" option is shown in the Declarations.

The value of covered property in **(1), (2)** and **(3)** above will be determined according to the "actual cash value" of such property at the time of loss or damage.

**c.** You may make a claim for loss or damage covered by this insurance on an "actual cash value" basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an "actual cash value" basis, you may still make a claim for the additional coverage that replacement cost coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

With respect to tenant's improvements and betterments, the following also apply:

**(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenant's improvements and betterments will be determined as a proportion of your original cost, as set forth

in the Valuation Condition **j.** of this Coverage Form; and

**(4)** We will not pay for loss or damage to tenant's improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1), (2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace, on the same premises, the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property, except as provided in the Additional Coverages.

**g.** When a form, which is applicable to this Coverage Part and is subject to the provisions of this Coverage Form, indicates it replaces subparagraphs **a.** and **b.**, or the Actual Cash Value part, of the Valuation condition, such form shall be construed as replacing subparagraphs **a., b., c., d., e.** and **f.** of this condition, except when Optional Coverage, Actual Cash Value in this Coverage Form applies.

**h.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**i.** Glass at the cost of replacement with safety glazing material if required by law.

**j.** Tenant's Improvements and Betterments at:

**(1)** "Actual cash value" of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

## F. ADDITIONAL CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

**(4)** Subtract the deductible from the figure determined in Step **(3)**.

We will pay the amount determined in Step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1 (Underinsurance):**

When:

The value of the property is:   $250,000

The Coinsurance percentage
for it is:                                      80%

The Limit of Insurance
for it is:                                $100,000

The Deductible is:                     $250

The amount of loss is:              $40,000

Step **(1)**: $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2)**: $100,000 ÷ $200,000 = .50

Step **(3)**: $40,000 x .50 =          $20,000

Step **(4)**: $20,000 - $250 =       $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

When:

The value of the property is:   $250,000

The Coinsurance percentage
for it is:                                      80%

The Limit of Insurance
for it is:                                $200,000

The Deductible is:                     $250

The amount of loss is:              $40,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:**

When:

The value of the property is:
Bldg. at Location No. 1:           $75,000
Bldg. at Location No. 2:         $100,000

Personal Property at
Location No. 2:                        $  75,000
                                               $250,000

The Coinsurance percentage
for it is:                                      90%

The Limit of Insurance for
Buildings and Personal
Property at Locations:

No. 1 and No. 2 is:                 $180,000
The Deductible is:                    $1,000

The amount of loss is:
Bldg. at Location No. 2:           $30,000

Personal Property at
Location No. 2:                         $20,000
                                                $50,000

Step **(1)**: $250,000 x 90% = $225,000

(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step **(2)**: $180,000 ÷ $225,000 = .80

Step **(3)**: $50,000 x .80 =      $40,000

Step **(4)**: $40,000 - $1,000 =    $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. OPTIONAL COVERAGES**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

With respect to a form which is applicable to this Coverage Part and is subject to the provisions of this Coverage Form, a reference in such form to:

Replacement Cost Optional Coverage; Replacement Cost Coverage Option; or Optional Coverage, Replacement Cost;

shall be construed as a reference to subparagraphs **a.**, **b.**, **c.**, **d.**, **e.** and **f.** of Loss Condition, Valuation in this Coverage Form.

**1. Agreed Value**

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will

pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)** On or after the effective date of this Optional Coverage; and

**(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Protection**

The Limit of Insurance for property to which this optional coverage applies shall automatically be adjusted in accordance with the current local cost index.

**3. Actual Cash Value**

Valuation of Covered Property will be determined at "actual cash value" regardless of whether that property has sustained partial or total loss or damage. The "actual cash value" of the lost or damaged property may be significantly less than its replacement cost.

When this optional coverage applies and a form, which is applicable to this Coverage Part and is subject to the provisions of this Coverage Form, indicates it modifies subparagraphs **a.** and **b.**, or the Actual Cash Value part, of the Valuation condition, such form shall be construed as modifying this optional coverage.

**a.** "Actual cash value" replaces replacement cost provisions **a., b., c., d., e.** and **f.** in the Loss Condition, Valuation, of this Coverage Form.

**b.** If a coinsurance percentage of 80% or more or a Value Reporting period symbol is shown in the Declarations, and the cost to repair or replace the damaged building property is $5,000 or less; we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the "actual cash value" even when attached to the building:

**(1)** Awnings of fabric construction; and

**(2)** Outdoor equipment;

whether permanently attached to the building structure or not.

**H. DEFINITIONS**

**1. "Actual Cash Value"** means loss or damage calculated as the lesser of:

**a.** The amount it would cost to repair or replace covered property with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence, however caused; or

**b.** The market value of covered property, based upon recent sales of comparable property, if available.

**2. "Business Income"** means the "Net Income" that the insured would have incurred or earned, plus continuing normal operating expenses incurred, including payroll. "Business Income" includes "Rental Value"; however, it does not include "Tuition Fees".

**3. "Cancelled Lease Moving Expenses"** means any moving expenses associated with a relocation which is necessitated by a cancellation of your lease resulting from direct physical loss or damage to property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

4. **"Communication Supply Service"** means property supplying communications services, including telephone, radio, microwave or television services to the described premises, such as:

   **a.** Communication transmission lines including optic fiber transmission lines;

   **b.** Coaxial cables; and

   **c.** Microwave radio relays except satellites.

   "Communication Supply Service" does not include overhead transmission lines.

5. **"Extra Expense"** means the excess (if any) of total cost incurred during the "period of restoration" chargeable to your operations, over and above the total cost that would have been incurred to conduct the business during the same period had no damage or destruction occurred. The salvage value of property obtained for temporary use during the "period of restoration" which remains after the resumption of normal operations shall be taken into consideration in the adjustment of any loss.

6. **"Fine Arts"** means paintings, etchings, pictures, marbles, bronzes, tapestries, rare or art glass, valuable rugs, statuary, sculptures, antique furniture, antique jewelry, bric-a-brac, porcelains, icons, torahs, and similar property of rarity, historical value, or artistic merit.

   "Fine Arts", however, does not include stained glass windows.

7. **"Fungus"** means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

8. **"Installation Property"** means materials, supplies and fixtures in which you have an interest and which will become a permanent part of your installation or fabrication project.

9. **"Lease Differential Costs"** means the difference between the actual monthly rent you pay at a premises you lease and to which you have relocated and the actual monthly rent you paid at the premises in which you most recently leased and from which you relocated.

10. **"Minister"** means a person:

    **a.** Employed by;

    **b.** Duly assigned to; or

    **c.** Duly appointed by

    you to attend to the spiritual needs of the congregation.

11. **"Net Income"** means total receipts less operating expenses.

12. **"Operations"** means:

    **a.** Your business activities occurring at the described premises; and

    **b.** The tenantability of the described premises.

13. **"Period of Restoration"** means the period of time that:

    **a.** Begins:

       **(1)** 72 hours after the time of direct physical loss or damage for "Business Income" coverage; or

       **(2)** Immediately after the time of direct physical loss or damage for "Extra Expense" coverage;

       caused by or resulting from any Covered Cause of Loss at the described premises; and

    **b.** Ends on the earlier of:

       **(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

       **(2)** The date when business is resumed at a new permanent location.

    "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

a. Regulates the construction, use or repair, or requires the tearing down of any property; or

b. Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

14. **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

15. **"Power Supply Service"** means the following types of property supplying electricity, steam or gas to the described premises:

a. Utility generating plants;

b. Switching stations;

c. Substations;

d. Transformers; and

e. Transmission lines.

"Power Supply Service" does not include overhead transmission lines.

16. **"Rental Value"** means":

a. "Net Income" that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

b. Continuing normal operating expenses incurred in connection with that premises, including:

(1) Payroll; and

(2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

17. **"School Term"** means the annual period beginning in the fall as prescribed or as would be prescribed in the school catalog.

18. **"Stock"** means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packaging or shipping.

19. **"Suspension" means:**

a. The slowdown or cessation of your business activities; or

b. That a part or all of the described premises is rendered untenantable.

20. **"Tuition fees"** means the sum of tuition, fees and other income from students, including fees from room, board, laboratories and other similar sources.

21. **"Violent incident"** means:

a. An incident of violence that is caused by an intentional criminal act or a series of related intentional criminal acts (including, but not limited to, a bombing or a shooting) that results in one or more persons, excluding the perpetrator(s), sustaining "critical injury"; or

b. Holding of persons against their will by force or threat of force by someone who threatens to inflict "critical injury", and the circumstances cause a reasonable adult to conclude that the persons being held against their will are at risk of "critical injury".

"Critical injury", as used herein, means:

(1) Death of a person; or

(2) Injury to a person involving significant damage to one or more vital organs, or other serious physical injury, if such injury results in the probability of death if aggressive medical treatment is not provided.

"Critical injury" does not include emotional or mental injury.

Any and all related acts associated with Paragraphs **a.** and **b.**

immediately above will be considered one "violent incident" regardless of the time in which the events occur or location of events. A "violent incident" with multiple events will be said to occur at the time of the first related "violent incident".

However, "violent incident" does not mean the written or verbal threat of carrying out an event as described in Paragraphs **a.** and **b.** immediately above.

22. **"Water Supply Service"** means the following types of property supplying water to the described premises:

**a.** Pumping stations; and

**b.** Water mains.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

# COMMERCIAL PROPERTY CONDITIONS

**GENERAL**

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

**1.** We cover loss or damage commencing:

    **a.** During the policy period shown in the Declarations; and

    **b.** Within the coverage territory.

**2.** The coverage territory is:

Copyright,  Insurance Services Office, Inc., 1983, 1987

**a.** The United States of America (including its territories and possessions);

**b.** Puerto Rico; and

**c.** Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment.  That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.  But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property or Covered Income.

**2.** After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

**a.** Someone insured by this insurance;

**b.** A business firm;

**(1)** Owned or controlled by you; or

**(2)** That owns or controls you; or

**c.** Your tenant.

This will not restrict your insurance.

Copyright,  Insurance  Services  Office,  Inc., 1983, 1987

# CAUSES OF LOSS -- SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.** -- Definitions.

## A. COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

**1.** Excluded in Section **B.**, Exclusions; or

**2.** Limited in Section **C.**, Limitations;

that follow.

## B. EXCLUSIONS

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance or Law**

The enforcement of any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or

**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance or Law, applies whether the loss results from:

**(a)** An ordinance or law that is enforced even if the property has not been damaged; or

**(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

**(1)** Earthquake, including any earth sinking, rising or shifting related to such event;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away for the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows from a sewer, drain or sump, except as provided in the Additional Coverages of the Building And Personal Property Coverage Form; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

  **(a)** Foundations, walls, floors or paved surfaces;

  **(b)** Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

(1) When "fungus", wet or dry rot or bacteria results from fire or lightning; or

(2) To the extent that coverage is provided in the Additional Coverage -- Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or

(2) Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

(a) Electrical current, including arcing;

(b) Electrical charge produced or conducted by a magnetic or electromagnetic field;

(c) Pulse of electromagnetic energy; or

(d) Electromagnetic waves or microwaves.

But if fire results, we will pay for loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.** (1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

(b) Changes in or extremes of temperature; or

(c) Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This Exclusion, **k.**, does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage -- Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss," we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period of Indemnity Optional Cover-age or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.,** Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your canceling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.**, Ordinance Or Law;

**(b)** Paragraph **B.1.c.**, Governmental Action;

**(c)** Paragraph **B.1.d.**, Nuclear Hazard;

**(d)** Paragraph **B.1.e.**, Utility Services; and

**(e)** Paragraph **B.1.f.**, War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit," or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage

resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit," or pay any damages, loss, expense or obligation resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property.

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under any arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. LIMITATIONS**

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

**(2)** Business Income Coverage or Extra Expense Coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**2.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**a.** Animals, and then only if they are killed or their destruction is made necessary.

**b.** Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

**(1)** Glass; or

**(2)** Containers of property held for sale.

**c.** Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

However, this limitation does not apply:

**(1)** If the property is located on or within 1,000 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

**(2)** To Business Income Coverage or to Extra Expense Coverage.

**d.** Walks.

**3.** The special limit shown for each category, **a.** through **e.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

**a.** $2,500 for furs, fur garments and garments trimmed with fur.

**b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**c.** $2,500 for patterns, dyes, molds and forms.

**d.** $1,000 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

**e.** $1,000 for money and securities. Loss or damage by theft includes the cost of stop payment orders for checks or drafts drawn by persons on their own accounts for payment of money to you as charitable contributions. The limit for this category, **e.**, does not apply to the cost of stop payment orders.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This Limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

**4.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**a.** Results in discharge of any substance from an automatic fire protection system; or

**b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. ADDITIONAL COVERAGE -- COLLAPSE**

The coverage provided under this Additional Coverage -- Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D. 7.**

**1.** For the purpose of this Additional Coverage -- Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended business purpose.

**2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

**a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**b.** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**c.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**d.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(1)** A cause of loss listed in **2.a.** or **2.b.**;

**(2)** One or more of the "specified causes of loss";

**(3)** Breakage of building glass;

**(4)** Weight of people or personal property; or

**(5)** Weight of rain that collects on a roof.

**3.** This **Additional Coverage -- Collapse** does **not** apply to:

**a.** A building or any part of a building that is in danger of falling down or caving in;

**b.** A part of a building that is standing, even if it has separated from another part of the building; or

**c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**4.** With respect to the following property:

**a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers, wharves and docks;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

**(1)** Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

**(2)** The property is Covered Property under this Coverage Form.

**5.** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse of personal property was caused by a Cause of Loss listed in **2.a.** through **2.d.** ;

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **4.** above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only

damage to that personal property caused by the collapse.

**6.** This Additional Coverage -- Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**7.** This Additional Coverage -- Collapse will not increase the Limits of Insurance provided in this Coverage Part.

**8.** The term Covered Cause of Loss includes the Additional Coverage -- Collapse as described and limited in **D.1.** through **D.7**.

**E.** **ADDITIONAL COVERAGE -- LIMITED COVERAGE FOR "FUNGUS", WET ROT, DRY ROT AND BACTERIA**

**1.** The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

**a.** A "specified cause of loss" other than fire or lightning; or

**b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

**2.** We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

**a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

**b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

**c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property

is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss Form or under the Additional Coverage -- Collapse.

6. The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage form.

a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

F. **ADDITIONAL COVERAGE EXTENSIONS**

1. **Property In Transit**

See Coverage Extension, Property Off-premises or Property in Transit in the Building And Personal Property Coverage Form.

2. **Water Damage, Other Liquids, Powder or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

3. **Glass**

a. We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

b. We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is

part of a building. This does not include removing or replacing window displays.

This Coverage Extension **F.3.**, does not increase the Limit of Insurance.

## G. DEFINITIONS

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   With respect to loss or damage to walks by vehicles, vehicles do not include vehicles you own or which are operated in the course of your business.

   a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   (1) The cost of filling sinkholes; or

   (2) Sinking or collapse of land into man-made underground cavities.

   b. Falling objects does not include loss or damage to:

   (1) Personal property in the open; or

   (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam. Water damage also means accidental overflow of a baptistery.

# EQUIPMENT BREAKDOWN COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CAUSES OF LOSS -- BASIC FORM
CAUSES OF LOSS -- BROAD FORM
CAUSES OF LOSS -- SPECIAL FORM

**A.** The following is added as Additional Coverage to the Causes of Loss -- Basic Form, Broad Form or Special Form.

**Additional Coverage -- Equipment Breakdown**

The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below.

**1.** We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

   **a.** Mechanical breakdown, including rupture or bursting caused by centrifugal force;

   **b.** Artificially generated electrical, magnetic or electromagnetic energy, including electric arcing, that damages, disturbs, disrupts or otherwise interferes with any electrical or electronic wire, device, appliance, system or network;

   **c.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

   **d.** Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

   **e.** Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

**2.** The following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance.

   **a. Expediting Expenses**

   With respect to your damaged Covered Property, we will pay, the reasonable extra cost to:

   **(1)** make temporary repairs; and

   **(2)** expedite permanent repairs or permanent replacement.

   The most we will pay for loss or expense under this coverage is $50,000.

   **b. Hazardous Substances**

   We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property.

   This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in **2.c.(1)(b)** below. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

   The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $50,000.

**c. Spoilage**

**(1)** We will pay:

**(a)** for physical damage to "perishable goods" due to spoilage;

**(b)** for physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;

**(c)** any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

**(2)** If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation condition.

The most we will pay for loss, damage or expense under this coverage is $100,000.

**d. Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore lost "data."

The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $50,000.

**e. Service Interruption**

**(1)** Any insurance provided for Business Income, Extra Expense or Spoilage is extended to apply to your loss, damage or expense caused by the interruption of utility services. The interruption must result from an "accident" to equipment, including overhead transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

**(2)** We will not pay for any loss of Business Income you sustain that results from the interruption of utility services during the first 24 hours following the "accident." However, if the "period of restoration" begins more than 24 hours after the time of the direct physical damage for Business Income, then that time period will apply instead of the 24 hours provided for in this paragraph.

**(3)** The most we will pay in any "one accident" for loss, damage or expense under this coverage is the applicable limit for Business Income, Extra Expense or Spoilage.

**f. Business Income and Extra Expense**

Any insurance provided under this coverage part for Business Income or Extra Expense is extended to the coverage provided by this endorsement. The most we will pay for loss or expense under this coverage is the applicable limit for Business Income and Extra Expense.

**g. Animals**

We will pay for loss or damage to animals, that are owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings.

The most we will pay for loss or damage under this coverage is $50,000.

**3. EXCLUSIONS**

All exclusions in the Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this Additional Coverage Equipment Breakdown.

**a.** The following exclusions are modified:

**(1)** If the Causes of Loss -- Basic Form or Causes of Loss -- Broad Form applies, the following is added to Exclusion **B.2.:**

Depletion, deterioration, corrosion, erosion, wear and tear, or other gradually developing conditions.

However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident."

**(2)** The following is added to Exclusion **B.1.g.**:

However, if electrical "covered equipment" requires drying out because of Water as described in **g.(1)** through **g.(3)** above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies.

**(3)** If the Causes of Loss -- Special Form applies, as respects this endorsement only,

**(a)** the last paragraph of Exclusion **B.2.d.** is deleted and replaced with the following:

But, if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in an "accident," we will pay for the loss, damage or expense caused by that "accident."

**(b)** the second paragraph of Exclusion **B.1.h.** is deleted

and replaced with the following:

But if "fungus", wet or dry rot or bacteria results in an "accident", we will pay for the loss or damage caused by that "accident."

**b.** The following exclusions are added:

**(1)** We will not pay for loss, damage or expense caused by or resulting from:

**(a)** your failure to use all reasonable means to protect Covered Property from damage following an "accident";

**(b)** a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment; or

**(c)** any of the following:

**(i)** defect, programming error, programming limitation, computer virus, malicious code, loss of "data", loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind; or

**(ii)** misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident."

**c.** With respect to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 2009

provided in **A.1.c.** above); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

**d.** With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:

**(1)** loss caused by your failure to use due diligence and dispatch and all reasonable means to resume business; or

**(2)** any increase in loss resulting from an agreement between you and your customer or supplier.

**e.** We will not pay for any loss or damage to land (including land on which the property is located) or lawns.

**f.** We will not pay for any loss or damage to animals (except as specifically provided in **A.2.g.** above).

**g.** If the Causes of Loss -- Special Form applies, as respects to this endorsement only, the following provisions are modified under **E. Additional Coverage -- Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria:**

**(1)** Paragraph **E.1.** is deleted and replaced by the following:

**1.** The coverage described in **E.2.** and **E.6.** only applies when the "fungus," wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

**a.** A "specified cause of loss" other than fire or lightning;

**b.** Flood, if the Flood Coverage Endorsement applies to the affected premises; or

**c.** An "accident."

**(2)** Under Paragraph **E.3.**, the phrase "occurrences of 'specified causes of loss' (other than fire or lightning) and 'Flood'" is replaced with "accidents."

**4. DEFINITIONS**

The following definitions are added as respects to coverage provided by this endorsement:

**a.** "Covered equipment"

**(1)** "Covered equipment" means Covered Property:

**(a)** that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

**(b)** which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

**(2)** None of the following is "covered equipment":

**(a)** structure, foundation, cabinet, compartment or air supported structure or building;

**(b)** insulating or refractory material;

**(c)** sewer piping, buried vessels or piping, or piping forming a part of a sprinkler or fire suppression system;

**(d)** water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

(e) "vehicle" or any equipment mounted on a "vehicle";

(f) satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

(g) dragline, excavation or construction equipment; or

(h) equipment manufactured by you for sale.

**b.** "Data" means information or instructions stored in digital code capable of being processed by machinery.

**c.** "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

**d.** "Media" means material on which "data" is recorded, such as magnetic tapes, hard disks, optical disks or floppy disks.

**e.** "One accident" means: If an initial "accident" causes other "accidents," all will be considered "one accident." All "accidents" that are the result of the same event will be considered "one accident."

**f.** "Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

**g.** "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.

However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."

**B.** The Building and Personal Property Coverage Form is modified as follows.

**1.** The definitions stated above also apply to section **B.** of this endorsement.

**2. CONDITIONS**

The following conditions are in addition to the Conditions in the Building and Personal Property Coverage Form, the Commercial Property Conditions and the Common Policy Conditions.

**a. Suspension**

Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment." This can be done by mailing or delivering a written notice of suspension to:

**(1)** your last known address; or

**(2)** the address where the "covered equipment" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment." If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

**b. Jurisdictional Inspections**

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

**c. Environmental, Safety and Efficiency Improvements**

If "covered equipment" requires replacement due to an "accident," we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

However, we will not pay more than 125% of what the cost would have been to replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations. Coverage provided under this endorsement does not provide an additional amount of insurance.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 2009

# TEXAS EQUIPMENT BREAKDOWN AMENDATORY

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

EQUIPMENT BREAKDOWN COVERAGE ENDORSEMENT

**A.** The following coverages are added:

**1. Defense**

If a claim or "suit" is brought against you alleging that you are liable for damage to property of another in your care, custody or control that was directly caused by an "accident" to "covered equipment" we will either:

**a.** Settle the claim or "suit"; or

**b.** Defend you against the claim or "suit" but keep for ourselves the right to settle it at any point.

**2. Supplementary Payments**

We will pay, with respect to any claim or "suit" we defend:

**a.** All expenses we incur;

**b.** The cost of bonds to release attachments, but only for bond amounts within the Limit of Insurance. We do not have to furnish these bonds;

**c.** All reasonable expenses incurred by you at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work;

**d.** All costs taxed against you in any "suit" we defend;

**e.** Pre-judgment interest awarded against you on that part of the judgment we pay.  If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer; and

**f.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in

court the part of the judgment that is within the Limit of Insurance shown in the Declarations.

These payments will not reduce the Limit of Insurance.

**B.** As respects to Equipment Breakdown Coverage only, the following are added:

**1. Legal Action Against Us**

No one may bring a legal action against us under this coverage section unless:

**a.** There has been full compliance with all the terms of this coverage section;

**b.** The action is brought within two years after the date of the "accident"; and

**c.** We agree in writing that you have an obligation to pay for damage to Covered Property of others or until the amount of that obligation has been determined by final judgment or arbitration award.  No one has the right under this policy to bring us into an action to determine your liability.

**2. Bankruptcy.**

The bankruptcy or insolvency of you or your estate will not relieve us of an obligation under this Coverage Part.

**C.** With respect to Equipment Breakdown Coverage only, the following Definition is added:

"Suit" means a civil proceeding and includes:

**1.** An arbitration proceeding in which damages are claimed and to which you must submit or do submit with our consent; or

**2.** Any other alternative dispute resolution proceeding in which damages are claimed and to which you submit with our consent.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

```
C O M M E R C I A L   C R I M E   C O V E R A G E   P A R T
              D E C L A R A T I O N S   P A G E
```

```
AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE       10/20/2016                    POLICY NO. 1432-879

NAMED INSURED   FIRST UNITED METHODIST CHURCH
------------------------------------------------------------------------
LOCATIONS
------------------------------------------------------------------------

   PREMISES ARE THE SAME AS SHOWN ON THE COMMERCIAL
   PROPERTY COVERAGE PART DECLARATIONS PAGE

------------------------------------------------------------------------
COVERAGES, LIMITS OF INSURANCE AND DEDUCTIBLE
------------------------------------------------------------------------

CHURCH THEFT COVERAGE FORM

                            LIMITS OF              DEDUCTIBLE
                            INSURANCE                AMOUNT

MONEY AND                    $10,000                  $250
    SECURITIES ONLY

BOND - EMPLOYEE DISHONESTY COVERAGE FORM A - BLANKET CR0001

                            LIMITS OF              DEDUCTIBLE
                            INSURANCE                AMOUNT

ALL OFFICERS AND             $20,000                  -0-
    EMPLOYEES - HONESTY


FORM PCR2611/0396
CHURCH THEFT COVERAGE FORM
        EFFECTIVE  10/20/2016

                  SCHEDULE

CLASSES OF PROPERTY                      LIMIT OF
                                         INSURANCE
   A. BLANKET (INCLUDING MONEY *AND SECURITIES)  $
   B. BLANKET (EXCLUDING MONEY AND SECURITIES)   $
   C. MONEY *AND SECURITIES                       $10,000
   D. SPECIFIC ARTICLES                           $

   _____         $
   _____         $
   _____         $


N*SPECIAL LIMIT OF INSURANCE:  THIS SPECIAL LIMIT OF
  INSURANCE FOR "LOSS" OF MONEY SHALL BE TWICE THE
```

CONTINUED ON THE NEXT PAGE

```
03/29/2017            FILE COPY              PCR 76 00 07 89
```

GDECO186

```
       C O M M E R C I A L   C R I M E   C O V E R A G E   P A R T
                    D E C L A R A T I O N S   P A G E
AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE       10/20/2016
                                                POLICY NO. 1432-879

NAMED INSURED   FIRST UNITED METHODIST CHURCH
-----------------------------------------------------------------------
SCHEDULES
-----------------------------------------------------------------------

FORM PCR2611/0396
CHURCH THEFT COVERAGE FORM
            EFFECTIVE   10/20/2016

   LIMIT OF INSURANCE SHOWN IN THIS SCHEDULE FOR THE
   FOUR DAYS OF YOUR CHOICE, INDICATED BELOW, AND THE
   FOUR CALENDAR DAYS IMMEDIATELY PRECEDING AND FOLLOWING
   THOSE DAYS.

   CHOICE OF FIRST DAY (WILL BE EASTER IF NO ENTRY):

   CHOICE OF SECOND DAY (WILL BE THANKSGIVING IF NO ENTRY):

   CHOICE OF THIRD DAY (WILL BE CHRISTMAS IF NO ENTRY):

   CHOICE OF FOURTH DAY (NO COVERAGE IF NO ENTRY):


   THIS SPECIAL LIMIT OF INSURANCE APPLIES ONLY TO A CLASS OF
   PROPERTY FOR WHICH MONEY IS COVERED PROPERTY.
```

# EMPLOYEE DISHONESTY COVERAGE FORM
## (Coverage Form A — Blanket)

**A. COVERAGE**

We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss.

1. **Covered Property**: "Money," "securities," and "property other than money and securities."

2. **Covered Cause of Loss**: "Employee dishonesty."

3. **Coverage Extension**

   **Employees Temporarily Outside Coverage Territory**: We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory General Condition for a period not more than 90 days.

**B. LIMIT OF INSURANCE**

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

**C. DEDUCTIBLE**

1. We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

2. You must:

   a. Give us notice as soon as possible of any loss of the type insured under this Coverage Form even though it falls entirely within the Deductible Amount.

   b. Upon our request, give us a statement describing the loss.

**D. ADDITIONAL EXCLUSIONS, CONDITION AND DEFINITIONS**: In addition to the provisions in the Crime General Provisions Form, this Coverage Form is subject to the following:

1. **Additional Exclusions**: We will not pay for loss as specified below:

   a. **Employee Cancelled Under Prior Insurance**: loss caused by any "employee" of yours, or predecessor in interest of yours, for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation.

   b. **Inventory Shortages**: loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

      (1) An inventory computation; or

      (2) A profit and loss computation.

2. **Additional Condition**

   **Cancellation As To Any Employee**: This insurance is cancelled as to any "employee:"

   a. Immediately upon discovery by:

      (1) You; or

      (2) Any of your partners, officers or directors not in collusion with the "employee;"

   of any dishonest act committed by that "employee" whether before or after becoming employed by you.

   b. On the date specified in a notice mailed to you. That date will be at least 30 days after the date of mailing.

   The mailing of notice to you at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

Copyright, Surety Association of America, 1990

**3. Additional Definitions**

**a. "Employee Dishonesty"** in paragraph A.2. means only dishonest acts committed by an "employee," whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:

**(1)** Cause you to sustain loss; and also

**(2)** Obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:

**(a)** The "employee;" or

**(b)** Any person or organization intended by the "employee" to receive that benefit.

**b. "Occurrence"** means all loss caused by or involving, one or more "employees," whether the result of a single act or series of acts.

Copyright, Surety Association of America, 1990

# TEXAS CHANGES

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE PART

The following is added to the Valuation-Settlement provisions of this policy:

In the event arbitration is utilized, each party will select a competent and impartial arbitrator.  The two arbitrators will select an umpire.  If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction.  The arbitrators will state separately the value of the property and amount of loss.  If they fail to agree, they will submit their difference to the umpire.  A decision agreed to by any two will be binding.  Each party will:

**1.** Pay its chosen arbitrator; and

**2.** Bear the other expenses of the arbitration and umpire equally.

If we submit to an arbitration, we will still retain our right to deny the claim.

Copyright,  Insurance Services Office, Inc., 1987

CR 01 11 03 87
Page 1 of 1

# CHURCH THEFT COVERAGE FORM

**CORNERSTONE PLUS**

## SCHEDULE

(The information required below may be shown on a separate schedule or supplemental Declarations.)

| Location | Classes of Property | Limit of Insurance |
|---|---|---|
| | (a)  Blanket (including money *and securities) | $ |
| | (b)  Blanket (excluding money and securities) | $ |
| | (c)  Money *and securities | $ |
| | (d)  Specific articles | |
| | _____ | $ |
| | _____ | $ |
| | _____ | $ |

**\*Special Limit of Insurance**:  This special limit of insurance for "loss"  of **money** shall be twice the limit of insurance shown in this schedule for the four days of your choice, indicated below, and the four calendar days immediately preceding and following those days.

Choice of first day (will be Easter if no entry): _____

Choice of second day (will be Thanksgiving if no entry): _____

Choice of third day (will be Christmas if no entry): _____

Choice of fourth day (no coverage if no entry): _____

This special limit of insurance applies only to a class of property for which money is covered property.

## A.  COVERAGE

We will pay for "loss" of covered property only at those locations as indicated by a specific limit of insurance, resulting from the Covered Cause of Loss.

**1.  Covered Property**:  "Money," "securities," and "property other than money and securities."

   **a.**  within the "premises,"

   **b.**  within a night depository safe provided by a bank or trust company on its premises for the use of its customers, or

   **c.**  while in the care or custody of a person duly authorized by you to have such care or custody thereof.

**2.**  Covered Cause of Loss:   Actual or attempted "theft."

**3.  Coverage Extension**

   **Premises Damage**:  We will pay for "loss"  from damage to the "premises" resulting directly from the Covered Causes of Loss. if you are the owner of the property or are liable for damage to it.

## B.  LIMIT OF INSURANCE

The most we will pay for "loss"  in any one "occurrence" is the applicable Limit of Insurance shown in the Schedule.

## C.  DEDUCTIBLE

We will not pay for "loss"  in any one "occurrence" unless the amount of "loss" exceeds the Deductible Amount shown in the Declarations.  We will then pay the amount of "loss"

in excess of the Deductible Amount, up to the Limit of Insurance.  The provision of this deductible shall apply to specific articles.

**D. ADDITIONAL EXCLUSIONS, CONDITIONS AND DEFINITIONS** :

In addition to the provisions in the Crime General Provisions Form this Coverage Form is subject to the following:

**1. Additional Exclusions**:  We will not pay for "loss" as specified below:

**a. Acts of Employees, Directors, Trustees or Representatives**: "Loss" resulting from any fraudulent, dishonest or criminal act by any of your "employees," directors, trustees or authorized representatives:

**(1)** Acting alone or in collusion with other persons; or

**(2)** While performing services for you or otherwise.

**b. Property Not Covered**:  "Loss" to property not owned by you from within the premises unless such property was located therein for use by you.

**c. Records**:  "Loss" of manuscripts, books of account or records.

**2. Additional Conditions**:  As respects property specifically described in the

Schedule, the amount per article specified therein is the agreed value of the article for the purpose of this insurance.

**3. Additional Definitions**:

**a. "Loss"** includes damage.

**b. "Occurrence"** means all loss whether:

**(1)** Caused by one or more persons; or

**(2)** Involving a single act or series of related acts.

**c. "Premises"** means the interior of:

**(1)** The church at a location scheduled in the endorsement;

**(2)** That portion of any other building which is owned by or leased to you and is used exclusively for conducting the religious, educational, recreational, building maintenance or social activities of its congregation therein; and

**(3)** Any residence occupied by the minister; but does not include a chapel or mission which is not located at or adjacent to the location designated in the Declarations, or any other building used in connection therewith.

**d. "Theft"** means any act of stealing.

# CRIME GENERAL PROVISIONS

**GENERAL**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the DECLARATIONS. The words "we," "us" and "our" refer to the Company providing this insurance.

Words and phrases in quotation marks are defined in the policy.

Unless stated otherwise in any Crime Coverage Form, DECLARATIONS or endorsement, the following General Exclusions, General Conditions and General Definitions apply to all Crime Coverage Forms forming part of this policy.

**A. GENERAL EXCLUSIONS**:  We will not pay for loss as specified below:

   **1. Acts Committed by You or Your Partners**:  Loss resulting from any dishonest or criminal act committed by you or any of your partners whether acting alone or in collusion with other persons.

   **2. Governmental Action**:  Loss resulting from seizure or destruction of property by order of governmental authority.

   **3. Indirect Loss**:  Loss that is an indirect result of any act or "occurrence" covered by this insurance including, but not limited to, loss resulting from:

   **a.** Your inability to realize income that you would have realized had there been no loss of, or loss from damage to, Covered Property.

   **b.** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance.

   **c.** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

   **4. Legal Expenses**:  Expenses related to any legal action.

   **5. Nuclear**:  Loss resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident.

   **6. War and Similar Actions**:  Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

**B. GENERAL CONDITIONS**

   **1. Consolidation — Merger**:  If through consolidation or merger with, or purchase of assets of, some other entity:

   **a.** Any additional persons become "employees";  or

   **b.** You acquire the use and control of any additional "premises";

   any insurance afforded for "employees" or "premises" also applies to those additional "employees" and "premises," but only if you:

   **a.** Give us written notice within 30 days thereafter; and

   **b.** Pay us an additional premium.

   **2. Coverage Extensions**:  Unless stated otherwise in the Coverage Form, our liability under any Coverage Extension is part of, not in addition to, the Limit of Insurance applying to the Coverage or Coverage Section.

   **3. Discovery Period for Loss**:  We will pay only for covered loss discovered no later than one year from the end of the policy period.

   **4. Duties in the Event of Loss**:  After you discover a loss or a situation that may result in loss of, or loss from damage to, Covered Property you must:

   **a.** Notify us as soon as possible.

**b.** Submit to examination under oath at our request and give us a signed statement of your answers.

**c.** Give us a detailed, sworn proof of loss within 120 days.

**d.** Cooperate with us in the investigation and settlement of any claim.

**5. Joint Insured**

**a.** If more than one Insured is named in the DECLARATIONS, the first Named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**b.** If any Insured or partner or officer of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

**c.** An "employee" of any Insured is considered to be an "employee" of every Insured.

**d.** If this insurance or any of its coverages is cancelled or terminated as to any Insured, loss sustained by that Insured is covered only if discovered no later than one year from the date of that cancellation or termination.

**e.** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all the loss had been sustained by one Insured.

**6. Legal Action Against Us**: You may not bring any legal action against us involving loss:

**a.** Unless you have complied with all the terms of this insurance; and

**b.** Until 90 days after you have filed proof of loss with us; and

**c.** Unless brought within 2 years from the date you discover the loss.

**7. Loss Covered Under More Than One Coverage of This Insurance**: If two or more coverages of this insurance apply to the same loss, we will pay the lesser of:

**a.** The actual amount of loss; or

**b.** The sum of the Limits of Insurance applicable to those coverages.

**8. Loss Sustained During Prior Insurance**

**a.** If you, or any predecessor in interest, sustained loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance, provided:

**(1)** This insurance became effective at the time of cancellation or termination of the prior insurance; and

**(2)** The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.

**b.** The insurance under this Condition is part of, not in addition to, the Limits of Insurance applying to this insurance and is limited to the lesser of the amount recoverable under:

**(1)** This insurance as of its effective date; or

**(2)** The prior insurance had it remained in effect.

**9. Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate**: If any loss is covered:

**a.** Partly by this insurance; and

**b.** Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

**10. Non-Cumulation of Limit of Insurance**: Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance

cumulates from year to year or period to period.

**11. Other Insurance**: This insurance does not apply to loss recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this insurance will apply to that part of the loss, other than that falling within any Deductible Amount, not recoverable or recovered under the other insurance. However, this insurance will not apply to the amount of loss that is more than the applicable Limit of Insurance shown in the DECLARATIONS.

**12. Ownership of Property; Interests Covered**: The property covered under this insurance is limited to property:

**a.** That you own or hold; or

**b.** For which you are legally liable.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization.

**13. Policy Period**

**a.** The Policy Period is shown in the DECLARATIONS.

**b.** Subject to the Loss Sustained During Prior Insurance condition, we will pay only for loss that you sustain through acts committed or events occurring during the Policy Period.

**14. Records**: You must keep records of all Covered Property so we can verify the amount of any loss.

**15. Recoveries**

**a.** Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this insurance will be distributed as follows:

**(1)** To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Insurance and the Deductible Amount, if any;

**(2)** Then to us, until we are reimbursed for the settlement made;

**(3)** Then to you, until you are reimbursed for that part of the loss equal to the Deductible Amount, if any.

**b.** Recoveries do not include any recovery:

**(1)** From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

**(2)** Of original "securities" after duplicates of them have been issued.

**16. Territory**: This insurance covers only acts committed or events occurring within the United States of America, U.S. Virgin Islands, Puerto Rico, Canal Zone or Canada.

**17. Transfer of Your Rights of Recovery Against Others to Us**: You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**18. :Valuation — Settlement**

**a.** Subject to the applicable Limit of Insurance provision we will pay for:

**(1)** Loss of "money" but only up to and including its face value. We may, at our option, pay for loss of "money" issued by any country other than the United States of America:

**(a)** At face value in the "money" issued by that country; or

**(b)** In the United States of America dollar equivalent determined by the rate of exchange on the day the loss was discovered.

**(2)** Loss of "securities" but only up to and including their value at the close of business on the day the loss was discovered. We may, at our option:

**(a)** Pay the value of such "securities" or replace them in kind, in which event you must assign to us all your rights,

title and interest in and to those "securities";

**(b)** Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities." However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

**(i)** Value of the "securities" at the close of business on the day the loss was discovered; or

**(ii)** Limit of Insurance.

**(3)** Loss of, or loss from damage to, "property other than money and securities" or loss from damage to the "premises" for not more than the:

**(a)** Actual cash value of the property on the day the loss was discovered;

**(b)** Cost of repairing the property or "premises"; or

**(c)** Cost of replacing the property with property of like kind and quality.

We may, at our option, pay the actual cash value of the property or repair or replace it.

If we cannot agree with you upon the actual cash value or the cost of repair or replacement, the value or cost will be determined by arbitration.

**b.** We may, at our option, pay for loss of, or loss from damage to, property other than "money":

**(1)** In the "money" of the country in which the loss occurred; or

**(2)** In the United States of America dollar equivalent of the "money" of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered.

**c.** Any property that we pay for or replace becomes our property.

**C. GENERAL DEFINITIONS**

**1. "Employee"** means:

**a.** Any natural person:

**(1)** While in your service (and for 30 days after termination of service); and

**(2)** Whom you compensate directly by salary, wages or commissions; and

**(3)** Whom you have the right to direct and control while performing services for you; or

**b.** Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care and custody of property outside the "premises."

**c.** Any minister (person duly assigned, appointed or employed to attend to the spiritual needs of others), council member, deacon, elder, officer, member of the Board of Education, Board of Governors or Board of Trustees, Sunday school superintendent, Sunday school teacher, vestry member, warden or volunteer, duly appointed or elected by you, whether or not compensated, but only while acting in the scope of his or her duty as such in relation to you.

But "employee" does not mean any:

**(1)** Agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character.

**2. "Money"** means:

**a.** Currency, coins and bank notes in current use and having a face value; and

**b.** Travelers checks, register checks and money orders held for sale to the public.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 1996 GuideOne Insurance

3. **"Property Other Than Money and Securities"** means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property listed in any Crime Coverage Form as Property Not Covered.

4. **"Securities"** means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money."

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 1996 GuideOne Insurance

```
                C O M M E R C I A L   I N L A N D   M A R I N E
              C O V E R A G E   P A R T   D E C L A R A T I O N S   P A G E

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE        10/20/2016                          POLICY NO. 1432-879

NAMED INSURED   FIRST UNITED METHODIST CHURCH
-------------------------------------------------------------------------------
LOCATIONS
-------------------------------------------------------------------------------


    PREMISES ARE THE SAME AS SHOWN ON THE COMMERCIAL
    PROPERTY COVERAGE PART DECLARATIONS PAGE
-------------------------------------------------------------------------------

COVERAGES, LIMITS OF INSURANCE AND DEDUCTIBLE
-------------------------------------------------------------------------------


                                  COVERAGE                   DEDUCTIBLE
                                   AMOUNT                      AMOUNT
COVERAGE


MUSICAL INSTRUMENTS                 $30,000                    $250
SEE SCHEDULE



           -------------------------------------------------------------------

SCHEDULES
-------------------------------------------------------------------------------


FORM IM664/0787
COMMERCIAL ARTICLES COVERAGE
        EFFECTIVE  10/20/2016

                                         COVERAGE AMOUNT  $    30,000.00
                                SCHEDULE
    CLASS OF          DESCRIBED ITEM
    PROPERTY
M001  HANDBELLS                                           $    30,000.00
```

GDEC0120

# CERTIFIED TERRORISM LOSS

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

1. The following definitions are added.

   a. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:

      1) to be an act of terrorism;

      2) to be a violent act or an act that is dangerous to human life, property, or infrastructure;

      3) to have resulted in damage:

         a) within the United States; or

         b) to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

      4) to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and

      5) to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

   b. "Certified terrorism loss" means loss that results from a "certified act of terrorism".

2. The "terms" of any terrorism exclusion that is part of or that is attached to this Coverage Part are amended by the following provision:

   This exclusion does not apply to "certified terrorism loss".

3. The following provision is added.

   If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

4. The following provisions are added.

   a. Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

      1) exclusions that address war, military action, or nuclear hazard; or

      2) any other exclusion; and

   b. the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this Coverage Part under:

      1) exclusions that address war, military action, or nuclear hazard; or

      2) any other exclusion.

Copyright, American Association of Insurance Services, Inc., 2015

# INLAND MARINE GENERAL TERMS

**PLEASE READ THIS ENTIRE POLICY CAREFULLY.  IT IS A LEGAL CONTRACT.**

### AGREEMENT

In return for **your** payment of the required premium, **we** provide the Inland Marine coverage described in this policy during the policy period subject to the:

1. Inland Marine General **Terms**.

2. Inland Marine coverage **terms**.

3. policy **terms** that relate to cancellation, changes made to the policy, examination of books and records, inspections and surveys, and assignment or transfer of rights or duties.

### DEFINITIONS

1. The words **you** and **your** mean the person, persons or organization named on the declarations.

2. The words **we**, **us** and **our** mean the company providing this insurance.

3. **Insured** means **you**.  With respect to covered property that is not used for **business**, the word **insured** also means:

    a. **your** spouse;

    b. **your** relatives if residents of **your** household;

    c. persons under the age of 21 in **your** care or the care of **your** resident relatives; or

    d. **your** legal representative if **you** die while insured by this policy.  (This person is an **insured** only for the covered property.)

4. **Business** means a trade, profession or occupation whether full or part time.  This includes:

    a. the rental of property to others; and

    b. farming.

5. **Described premises** means that part of the building and grounds which **you** occupy at the location shown.

6. **Terms** means the conditions, definitions, exclusions, limitations and provisions used in this policy.

### PERILS EXCLUDED

**We** do not pay for a loss if one or more of the following excluded perils apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as or after the excluded peril.  **We** do not pay for a loss that results from:

1. wear and tear to covered property.

2. gradual deterioration of covered property.

3. a fault or weakness that is intrinsic to the property which causes it to break, spoil, become defective or destroy itself.

4. insects or vermin damage to covered property.

5. delay, loss of market, loss of use, or **business** interruption.

6. obsolescence or depreciation of covered property.

7. war.  This means:

    a. declared war, undeclared war, civil war, insurrection, rebellion or revolution;

    b. a warlike act by a military force or by military personnel;

Copyright   AAIS, Inc., 1984

**c.** the destruction, seizure or use of the property for a military purpose; or

**d.** the discharge of a nuclear weapon even if it is accidental.

**8.** civil authority. This means:

**a.** seizure or destruction under quarantine or customs regulations;

**b.** confiscation or destruction by order of a government or public authority; or

**c.** risks of contraband or illegal transportation or trade.

**9.** nuclear hazard. This means nuclear reaction, nuclear radiation or radioactive contamination:

**a.** whether controlled or uncontrolled; or

**b.** caused by, contributed to or aggravated by a peril covered by this policy. A loss caused by nuclear hazard will not be considered to be a loss caused by fire, explosion or smoke. If fire is covered by this policy, **we** do cover the loss caused by a fire that results from the nuclear hazard.

**10.** other perils that are not covered. These are listed for each coverage.

**We** do not pay for such excluded loss even if the following contribute to, aggravate or cause the loss:

**1.** the act or decision of a person, group, organization or governmental body. This includes the failure to act or decide.

**2.** a fault, defect or error, negligent or not, in:

**a.** planning, zoning, surveying, siting, grading, compacting, land use, or development of property.

**b.** the design, blueprint, specification, workmanship, construction, renovation, remodeling or repair of property. This includes the materials needed to construct, remodel or repair the property.

**c.** maintenance of property.

These apply whether or not the property is covered by this policy.

**3.** a condition of the weather.

**4.** the collapse of a building or structure.

**WHAT MUST BE DONE IN CASE OF LOSS**

**1. Protect the Property**. The **insured** must take all reasonable steps to protect or recover the covered property after a loss has occurred.

**2. Notice**. The **insured** must promptly notify **us** or **our** agent, in writing if requested.

**3. Notice To Police**. The **insured** must promptly notify the police if the loss results from a violation of the law.

**4. Proof of Loss**. The **insured** must send **us** a statement of loss, under oath if requested, within 90 days after the loss occurs. The following information must be included:

**a.** the date, time, place and details of the loss.

**b.** other insurance that may cover the loss.

**c.** **your** interest and the interest of all others in the property involved in the loss. This includes all mortgages and liens.

**d.** changes in the title to the covered property during the policy period.

**e.** detailed estimates for the repair or replacement of the covered property.

**f.** an inventory of lost, damaged and all remaining covered property. This must show in detail the quantity, description, cost and actual cash value of the property and the amount of the loss. Copies of all bills, receipts and related documents that substantiate the inventory must be attached.

**5. Additional Duties**. As often as **we** may reasonably request, an **insured** must:

**a.** submit to an examination under oath.

**b.** assist **us** in obtaining the attendance of employees for examination under oath.

**c.** exhibit damaged and undamaged property.

Copyright   AAIS, Inc., 1984

    d.  produce all records that relate to value, loss and cost, and permit copies and abstracts to be made from them.

6. **Cooperation**. The **insured** must cooperate with **us** in performing all acts that are required by this Inland Marine coverage.

7. **Volunteer Payments**. The **insured** may not voluntarily make payments, assume obligations, pay or offer rewards or incur other expenses, except at the **insured's** own expense.

8. **Abandonment**. The **insured** may not abandon the property to **us** without our written consent.

## HOW MUCH WE PAY

1. **Actual Cash Value**. Actual cash value includes a deduction for depreciation, however caused.

2. **Valuation**. Valuation is based on the actual cash value of the property at the time of loss.

3. **The Amount We Pay**. The smallest of the amounts shown below is the most that **we** will pay for a loss:

    a.  the amount determined under "Valuation."

    b.  the cost to repair, replace or rebuild the property with material of like kind and quality.

    c.  the amount of **your** interest in the property.

    d.  the coverage amount shown.

This amount will be adjusted by the deductible amount, coinsurance penalty or other limitation which may apply.

4. **Loss To Pairs Or Sets**. If there is a loss to an item that is part of a pair or set, at **your** option **we** will pay the full actual cash value up to the coverage amount shown for the pair or set. **You** will give **us** the remainder of the pair or set. If **you** do not choose this option, **we** will pay only for a reasonable part of the actual cash value of the pair or set.

5. **Loss To Parts**. If there is a loss to a part of an item that consists of several parts, **we** will pay only for the loss to that part. A loss to a part is not considered to be a loss to the whole item.

6. **Insurance Under More Than One Policy**. If there is other collectible insurance that applies to a covered loss, or would have applied in the absence of this Inland Marine coverage, **we** will pay for the loss only after the full amount from the other insurance has been paid.

7. **Insurance Under More Than One Coverage**. If more than one coverage applies to the same loss, **we** will pay no more than the actual amount of the loss.

8. **Losses Paid By Others**. **We** will not pay for that part of a loss that has been paid by someone else.

9. **Restoring the Coverage Amount**. The payment of a claim will not reduce the coverage amount. If **we** pay a loss for items that are separately listed and the coverage amount that applies to these items is reduced at **your** request, **we** will return the unearned premium for these items to **you**.

## LOSS PAYMENT

1. **Our Options**. **We** may:

    a.  pay the loss in money; or

    b.  repair, replace or rebuild the property. **We** must give the **insured** notice of **our** intent to do so within 30 days after **we** have received a satisfactory proof of loss.

**We** may take all or a part of the damaged property at the agreed or appraised value. Property that **we** have paid for or replaced will become **our** property.

2. **Your Property**. **We** will adjust all losses with **you**. Payment will be made to **you** unless a loss payee is named with respect to this Inland Marine coverage.

3. **Property of Others**. Loss to property of others may be adjusted with **you**. **We** reserve the right to adjust the loss with the owner. **Our** payment to the owner will satisfy **our** obligation to **you** for loss to this property. At **our** option, without cost to **you**, **we** may choose to defend **you** from suits

Copyright   AAIS, Inc., 1984

which result from a covered loss to the property of others.

4. **When We Pay.** **We** will pay for a loss within 30 days after a satisfactory proof of loss is received and the amount of the loss has been agreed to in writing.

## CLAIMS AGAINST OTHERS

1. **Subrogation**. If **we** pay for a loss, **we** may require the **insured** to assign to **us** the right of recovery against others. **We** will not pay for a loss if the **insured** impairs this right to recover. The **insured's** right to recover from others may be waived in writing before a loss occurs.

2. **Loan Receipts**. When **we** believe that a loss can be recovered from others:

   a. **we** may make an advance payment to **you** in the form of a loan.

   b. at **our** expense, **we** will be allowed to bring suit in the **insured's** name against those who are responsible for the loss.

   c. the loan will be repaid from the amount recovered.

3. **Recoveries**. The **insured** must notify **us** or **we** must notify the **insured** promptly if either receives a recovery for a loss which **we** have paid. The costs that are incurred by either party in making the recovery are to be reimbursed first. **We** are entitled to the surplus up to the amount that **we** have paid for the loss. The **insured** may then keep any excess.

## DISAGREEMENTS

1. **Appraisal**. If **you** and **we** do not agree on the amount of the loss, the actual cash value of the property or the cost to repair or replace the property, either party may demand that these amounts be determined by appraisal.

   If either party makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days after the receipt of the written demand. The two appraisers will select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15

days, **you** or **we** can ask a judge of a court in the state where the appraisal is pending to select an umpire.

The appraisers will determine:

a. the amount of the loss;

b. the actual cash value of the property; and

c. the cost to repair or replace the property.

Each amount will be stated separately.

If the appraisers submit a written report of an agreement to **us**, the agreement will establish these amounts. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. A written agreement by any two of these three will establish the amounts stated above.

Each appraiser will be paid by the party selecting that appraiser. The compensation of the umpire and other expenses of the appraisal will be shared equally by **you** and **us**.

2. **Suit Against Us**. No suit to recover for a loss may be brought against **us** unless:

   a. all the **terms** of this Inland Marine coverage have been complied with; and

   b. the suit is commenced within one year after the loss.

## OTHER POLICY CONDITIONS

1. **Conformity With Statutes**. The **terms** of this Inland Marine coverage in conflict with statutes of the state where this policy is issued are changed to conform to those statutes.

2. **Continuous Policies**. If this policy is issued on a continuous basis (with no specific date of expiration), **we** may substitute or **we** may add at each anniversary date the forms and endorsements then authorized for use with this Inland Marine coverage.

3. **Liberalization**. If a revision of a form or endorsement which would broaden coverage without an additional premium is adopted during the policy period, or within 6 months before the Inland Marine coverage

Copyright   AAIS, Inc., 1984

is effective, the broadened coverage will apply.

**4. Misrepresentation, Concealment or Fraud**. This Inland Marine coverage is void if before or after a loss:

**a.** the **insured** has concealed or misrepresented:

**(1)** a material fact or circumstance that relates to this insurance or the subject thereof; or

**(2)** an **insured's** interest herein.

**b.** there has been fraud or false swearing by an **insured** with regard to a matter that relates to this insurance or the subject thereof.

**5. No Benefit To Bailee**. This Inland Marine coverage will not benefit those who are paid to assume custody of the covered property.

**6. Reporting Terms Only**. This Inland Marine coverage may be subject to reporting **terms**. If it is cancelled, **you** must report the required amounts as of the cancellation date.

Copyright   AAIS, Inc., 1984

# COMMERCIAL ARTICLES COVERAGE
## (TEXAS)

**THIS INLAND MARINE COVERAGE IS SUBJECT TO THE TERMS SHOWN BELOW.  THE INLAND MARINE GENERAL TERMS ALSO APPLY.  PLEASE READ THIS CAREFULLY.**

(The information required below may be shown on a separate schedule or supplemental Declarations.)

Each item that is covered must be described on a schedule that is a part of this policy.  A coverage amount must be shown for each item.  This is the most that **we** will pay for a loss to that item.  The coverage amounts shown below are the most that **we** will pay for all items of each class of property that is covered.

### CLASS OF PROPERTY

**1.**  Musical instruments and their related equipment ............ $ _____

**2.**  Photographic equipment.  This means cameras, projectors and related equipment ............ $ _____

**3.** ............ $ _____

**4.** ............ $ _____

**5.** ............ $ _____

### DEDUCTIBLE

The following deductible amounts will apply to each loss after all other adjustments have been made.

**1.**  Musical instruments ............ $ _____

**2.**  Photographic equipment ............ $ _____

**3.** ............ $ _____

**4.** ............ $ _____

**5.** ............ $ _____

### PROPERTY COVERED

**We** cover only those described items for which a coverage amount is shown.

### EXTENSION OF COVERAGE

**We** cover musical instruments and photographic equipment acquired during the policy period.  **We** cover these items for a period up to 30 days after they are acquired.  **You** must provide **us** with a complete description of each item within this 30-day period and pay the additional premium.

**We** cover these items for their actual cash value.  The most that **we** will pay for all such items will be the smaller of the following:

**1.**  25 percent of the coverage amount shown for the class of property that the item belongs to; or

**2.**  $10,000.

This coverage will end at the earliest of the following:

**1.**  when the newly acquired items are reported to **us.**

Copyright   AAIS, Inc., 1984

IM 664 07 87
Page 1 of 2

**2.** the end of the reporting period that applies.

**3.** the expiration date of this coverage.

### PERILS COVERED

**We** cover direct physical loss to covered property unless the loss is caused by a peril that is excluded.  The loss must be due to an external cause.

### PERILS EXCLUDED

**We** do not pay for loss that results from:

**1.** **your** voluntary parting with title to or possession of covered property if **you** are induced to do so by a trick, scheme, fraud, device or false pretense.

**2.** unauthorized instructions to transfer property to a person or place.

There are other perils that are not covered. These are listed in the Inland Marine General Terms.

### TERRITORY WHERE COVERAGE APPLIES

Coverage applies while the property is anywhere in the world.

Copyright   AAIS, Inc., 1984

# INLAND MARINE REPLACEMENT VALUATION

**GENERAL**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

INLAND MARINE COVERAGE PART

Any actual cash value (with deduction for depreciation) provision applicable to covered property is deleted and replaced by the following, only when the value of Your Business Personal Property covered in a Building and Personal Property Coverage Form applicable to the Commercial Property Coverage Part of this policy is to be determined at replacement cost (without deduction for depreciation), in return for the payment of the premium:

Replacement Cost.  The value of covered property will be based on the replacement cost at the time of loss without any deduction for depreciation.

The replacement cost is limited to the cost of repair or replacement with similar property and used for the same purpose.  "Our" payment for loss shall not exceed the amount spent that is necessary to repair or replace the damaged or destroyed property.

This replacement cost provision does not apply to any valuation provision that is not an actual cash value provision.

Copyright  1996 GuideOne Insurance

```
            C O M M E R C I A L   G E N E R A L   L I A B I L I T Y
            C O V E R A G E   P A R T   D E C L A R A T I O N S   P A G E
```

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE        10/20/2016                    POLICY NO. 1432-879

NAMED INSURED   FIRST UNITED METHODIST CHURCH
--------------------------------------------------------------------------------
LIMITS OF INSURANCE
--------------------------------------------------------------------------------

```
GENERAL AGGREGATE LIMIT                              $  5,000,000
(OTHER THAN PRODUCTS-COMPLETED OPERATIONS)
PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT       $  5,000,000
PERSONAL & ADVERTISING INJURY LIMIT                 $  1,000,000
EACH OCCURRENCE LIMIT                                $  1,000,000
DAMAGE TO PREMISES RENTED TO YOU LIMIT ANY ONE PREMISES $ 1,000,000
MEDICAL EXPENSE LIMIT               ANY ONE PERSON   $     15,000
```
--------------------------------------------------------------------------------
FORM OF BUSINESS:  ORGANIZATION (OTHER THAN PARTNERSHIP OR JOINT VENTURE)
--------------------------------------------------------------------------------
LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:
--------------------------------------------------------------------------------

    PREMISES ARE THE SAME AS SHOWN ON THE COMMERCIAL
    PROPERTY COVERAGE PART DECLARATIONS PAGE
--------------------------------------------------------------------------------
CLASSIFICATIONS
--------------------------------------------------------------------------------

| CLASSIFICATION | CODE NO. | PREMIUM BASIS | EXPOSURE |
|---|---|---|---|
| CHURCH ATHLETIC ACTIVITIES | 49992 | C | |
| LOSS OF LIFE | 49998 | C | |
| CHURCHES OR OTHER HOUSES OF WORSHIP | 41650 | A | 42,413 |
| PARSONAGE | 63009 | U | 1 |
| EMPLOYMENT PRACTICES LIABILITY - EPL | 49973 | U | 11 |
| SEXUAL MISCONDUCT LIABILITY | 49990 | C | |
| DIRECTORS AND OFFICERS LIABILITY - OCCURRENCE | 49999 | C | |

PREMIUM BASIS: A-AREA  C-TOTAL COST  M-ADMISSIONS
               P-PAYROLL  S-GROSS SALES  U-UNITS OR EACH

CONTINUED ON THE NEXT PAGE

03/29/2017                    FILE COPY                    PCG 75 00 04 09

```
          C O M M E R C I A L   G E N E R A L   L I A B I L I T Y
          C O V E R A G E   P A R T   D E C L A R A T I O N S   P A G E
```

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE        10/20/2016                    POLICY NO. 1432-879

NAMED INSURED   FIRST UNITED METHODIST CHURCH
------------------------------------------------------------------------
ENDORSEMENT SCHEDULES
------------------------------------------------------------------------


FORM GCG0404/0115
VIOLENT INCIDENT RESPONSE COVERAGE
          EFFECTIVE  10/20/2016

                    SCHEDULE

$   300,000   VIOLENT INCIDENT AGGREGATE LIMIT

$     2,500   INDIVIDUAL COUNSELING EXPENSES EACH PERSON LIMIT

$    50,000   MEDICAL EXPENSES EACH PERSON LIMIT

$   200,000   INDIVIDUAL EXPENSES AGGREGATE LIMIT

$   100,000   ORGANIZATIONAL EXPENSES AGGREGATE LIMIT

FORM GCG2810/0409
LEGAL EXPENSE REIMBURSEMENT COVERAGE
          EFFECTIVE  10/20/2016

                    SCHEDULE

$    15,000   EACH INCIDENT LIMIT

$    45,000   AGGREGATE LIMIT

$     1,000   DEDUCTIBLE

FORM GCG7410/0409
SEXUAL MISCONDUCT LIABILITY COVERAGE
          EFFECTIVE  10/20/2016

                    SCHEDULE

$500,000        EACH CLAIM LIMIT

$1,000,000      AGGREGATE LIMIT

$  10,000       MEDICAL EXPENSE LIMIT



                    CONTINUED ON THE NEXT PAGE
```

```
C O M M E R C I A L   G E N E R A L   L I A B I L I T Y
C O V E R A G E   P A R T   D E C L A R A T I O N S   P A G E
```

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE          10/20/2016                    POLICY NO. 1432-879

NAMED INSURED    FIRST UNITED METHODIST CHURCH
------------------------------------------------------------------------
ENDORSEMENT SCHEDULES
------------------------------------------------------------------------


FORM PCG7543/0203
DIRECTOR AND OFFICER LIABILITY
        EFFECTIVE  10/20/2016

                    SCHEDULE

$1,000,000         EACH CLAIM LIMIT

$1,000,000         AGGREGATE LIMIT

$    2,500         DEDUCTIBLE

FORM PCG7577/0298
EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM
        EFFECTIVE  10/20/2016

                    SCHEDULE


$ 500,000          OCCURRENCE/AGGREGATE LIMIT FOR EPL

$5000              RETENTION
RETROACTIVE DATE:  10/20/2015

FORM PMAN502
AMENDED DEFINITION OF DAMAGES
        EFFECTIVE  10/20/2016


THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY.
PLEASE READ IT CAREFULLY.

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE
FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PROFESSIONAL LIABILITY COVERAGE
EMPLOYEE BENEFITS LIABILITY COVERAGE
COUNSELORS LIABILITY COVERAGE
```

CONTINUED ON THE NEXT PAGE

```
C O M M E R C I A L   G E N E R A L   L I A B I L I T Y
C O V E R A G E   P A R T   D E C L A R A T I O N S   P A G E
```

AMENDED DECLARATIONS NO.   3 EFFECTIVE 03/13/2017
POLICY EFFECTIVE       10/20/2016                    POLICY NO. 1432-879

NAMED INSURED   FIRST UNITED METHODIST CHURCH
-----------------------------------------------------------------------------
ENDORSEMENT SCHEDULES
-----------------------------------------------------------------------------


FORM PMAN502
AMENDED DEFINITION OF DAMAGES
        EFFECTIVE  10/20/2016

THE DEFINITION OF "DAMAGES" IS REPLACED BY THE FOLLOWING:
"DAMAGES" MEAN ONLY THOSE TORT DAMAGES ALLOWED BY LAW.

```

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **q.** of Paragraph **2. Exclusions** of Section **I -- Coverage A -- Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B.** Exclusion **p.** of Paragraph **2. Exclusions** of Section **I -- Coverage B -- Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

# TEXAS CHANGES

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** With regard to liability for Bodily Injury, Property Damage and Personal And Advertising Injury, unless we are prejudiced by the insured's or your failure to comply with the requirement, no provision of this Coverage Part requiring you or any insured to give notice of "occurrence" , claim or "suit",  or forward demands, notices, summonses or legal papers in connection with a claim or "suit"  will bar coverage under this Coverage Part.

# FUNGI OR BACTERIA EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I -- Coverage A -- Bodily Injury And Property Damage Liability**:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I -- Coverage B -- Personal And Advertising Injury Liability**:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

® ISO Properties, Inc., 2003

CG 21 67 12 04
Page 1 of 1

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2015

# EXCLUSION OF PUNITIVE DAMAGES
# RELATED TO A CERTIFIED ACT OF TERRORISM

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2015

# VIOLENT INCIDENT RESPONSE COVERAGE

**COVERAGE VR VIOLENT INCIDENT RESPONSE COVERAGE**

Various provisions in this document restrict coverage.  Read this document and the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this document the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured within Section **II** - Who Is An Insured - Coverage **VR**.  The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured - Coverage **VR**.

Other words and phrases that appear in quotation marks have special meaning.  Refer to the **Definitions** section of the Commercial General Liability Coverage Form, any definitions added or modified by endorsement, and the other definitions provided herein which are unique and specific to Coverage **VR**.

**SECTION I - COVERAGES**

Coverage **VR** is merged within and is a comprised part of the Commercial General Liability Coverage Form.  The coverage provided by Coverage **VR** is distinct and separate from any other coverage provided by or within Section **I** - Coverages of the Commercial General Liability Coverage Form.

**COVERAGE VR - VIOLENT INCIDENT RESPONSE COVERAGE**

**1.   Insuring Agreement**

    **a.**   At your request, we will pay those Covered Expenses described in Paragraph **b.** immediately below, that result from a "violent incident" that occurs during your "sponsored activity".  We will pay such Covered Expenses under Coverage **VR** only if:

        **(1)**   The "violent incident" takes place in the "coverage territory" and during the policy period; and

        **(2)**   Covered Expenses resulting from the "violent incident" are incurred and reported as soon as practicable.

    However, the amount we pay for Covered Expenses is limited in Section **III** - Limits of Insurance - Coverage **VR**.

    **b.**   **Covered Expenses**

        **(1)**   Subject to the Individual Expenses Aggregate Limit under Section **III** - Limits of Insurance, Covered Expenses for any one person include:

            **(a)**   Medical expenses up to $50,000 per person for medical expenses that would otherwise be covered under Section **I** - Coverage **C** - Medical Payments of this policy.  However, we will not pay for any funeral expenses under Coverage **VR**.

            Medical expenses for a "violent incident" must be incurred and reported to us within one year of the "violent incident".

            Medical payments made under Coverage **VR** are excess over any other medical coverage that is available or payable under this policy, or any other policy, issued by us; and

**(b)** Individual counseling expenses incurred within 6 months after the "violent incident", for any "victim", "immediate family member" of a "victim", or any "witness", up to $2,500 for each person.

**(2)** Subject to the Organizational Expenses Aggregate Limit under Section **III** - Limits of Insurance, Covered Expenses include:

**(a)** Group counseling services to meet with "employees" or members of your organization;

**(b)** Additional security guard services to guard your facility against further incidents of violence; and

**(c)** Any independent public relations services that you hire, and related media and communication costs.

Covered Expenses must be incurred within 60 days after the "violent incident", or within 30 days before or 30 days after the first anniversary of the "violent incident".

**2.   Exclusions**

The following Exclusions are unique to Coverage **VR**. For purposes of Coverage **VR**, none of Paragraph **2.** Exclusions of Coverage **C** - Medical Payments of the Commercial General Liability Coverage Form is incorporated by reference and shall not be relied upon in determining the exclusions applicable to Coverage **VR**.

This insurance does not apply to:

**a.   Biological Or Chemical Materials**

The dispersal, release or application of pathogenic, poisonous, biological, or chemical materials.

**b.   Expected Or Intended Injury**

Any expected or intended injury except:

**(1)** From the standpoint of the perpetrator;

**(2)** In self-defense; or

**(3)** In defense of another person who is not the perpetrator.

**c.   Government Services**

The cost of any services provided by a governmental entity.

**d.   Nuclear Materials**

The use, release or escape of nuclear materials that, directly or indirectly, results in a nuclear reaction, radiation, or radioactive contamination.

**e.   Perpetrator**

Expenses incurred by any perpetrator of, or any person participating in the planning or execution of, any "violent incident".

**f.   Sexual Misconduct**

Any expenses incurred by any person arising out of or resulting from any actual or alleged "sexual misconduct or sexual molestation".

**g. War Or Civil Commotion**

Any expenses arising out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents;

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; or

**(4)** Any act or condition incidental to an activity or event described in Paragraphs **(1)** through **(3)** immediately above.

**h. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**i. Employer's Liability**

"Bodily injury" to an "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business.

**SECTION II - WHO IS AN INSURED - COVERAGE VR**

For purposes of Coverage **VR**, Section **II** - Who Is An Insured of the Commercial General Liability Coverage Form, and any insureds added by endorsement to the Commercial General Liability Coverage Form, are incorporated by reference.

**SECTION III - LIMITS OF INSURANCE - COVERAGE VR**

The following Limits of Insurance provisions are unique to Coverage **VR**.  For purposes of Coverage **VR**, none of Section **III** - Limits of Insurance of the Commercial General Liability Coverage Form is incorporated by reference and shall not be relied upon in determining the limits of available coverage under Coverage **VR**.

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay for the sum of all Covered Expenses that arise out of a "violent incident", regardless of the number of:

**a.** Insureds;

**b.** Claims made;

**c.** Persons or organizations making claims;

**d.** Perpetrators; or

**e.** Policy periods over which the "violent incident" occurs.  If the "violent incident" occurs over more than one policy period, the Limits of Insurance applicable when the "violent incident" first began will apply.

**2.** The Violent Incident Aggregate Limit shown in the Declarations is the most we will pay for the sum of all Covered Expenses arising out of all "violent incidents".

3. Subject to Paragraph **2.** above, the Organizational Expenses Aggregate Limit shown in the Declarations is the most we will pay for the sum of all Covered Expenses described in Paragraphs **(2)(a)** through **(2)(c)** of **1.b.** Covered Expenses (Section **I**) and arising out of a "violent inci   t".

4. Subject to Paragraph **2.** above, the Individual  Expenses Aggregate Limit shown in the Declarations is the most we will pay for the sum of all Individual Expenses described in Paragraphs **(1)(a)** and **(1)(b)** of **1.b.** Covered Expenses (Section **I**) and arising out of a "violent incident".

5. Covered Expenses will be paid in the order that they are received by us until the applicable per person limit, Individual Expenses Aggregate, Organizational Expenses Aggregate or Violent Incident Aggregate is reached, at which time payment will cease.

6. If two or more policies or Coverages issued by us apply to the same insured and these policies or Coverages also apply to the same Covered Expenses, the maximum amount we will pay as damages under all of the policies or Coverages will not exceed the highest applicable Limit of Insurance that applies to any one of the policies or Coverages.

   This Paragraph **6.** does not apply to any insurance that was purchased specifically to apply in excess of the applicable Limits of Insurance shown in the Declarations.

The Limits of Insurance of Coverage **VR** apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months.  In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV - CONDITIONS - COVERAGE VR**

The following conditions are unique to Coverage **VR**.  The remainder of Section **IV** - Conditions of the Commercial General Liability Coverage Form is incorporated by reference.  The conditions and duties provided herein will supersede those contained in Paragraphs **2.** and **4.** of Section **IV** - Conditions of the Commercial General Liability Coverage Form.

1. **Duties In The Event Of A Violent Incident**

   a. You must notify us as soon as practicable of any "violent incident" which may result in payment of Covered Expenses.  To the extent possible, notice should include:

      (1) How, when and where the "violent incident" took place;

      (2) The names and addresses of any "victims",  "witnesses"  or other persons of interest; and

      (3) The nature and location of any injury or damage arising out of the "violent incident".

   b. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

2. **Other Insurance**

   If other valid and collectible insurance is available to the insured for a loss we cover under Coverage **VR**, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary except when Paragraph **b.** below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

   b. **Excess Insurance**

      (1) This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:

      **(a)** That is medical payments coverage; or

      **(b)** That provides "violent incident" or similar coverage.

  **(2)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

      **(a)** The total amount that all such other insurance would pay for the loss in absence of Coverage **VR**; and

      **(b)** The total of all deductible and self-insured amounts under all that other insurance.

  **(3)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the applicable Limits of Insurance shown in the Declarations.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## SECTION V - DEFINITIONS - COVERAGE VR

The following words or phrases have a specific and unique meaning to Coverage **VR**. The remainder of the **Definitions** section of the Commercial General Liability Coverage Form and any definitions added or modified by endorsement are incorporated by reference. Certain definitions contained elsewhere within the Commercial General Liability Coverage Part may be reproduced for ease of reference in this document. The definitions provided herein will supersede the corresponding definitions contained elsewhere within the Commercial General Liability Coverage Part.

Where set forth in quotation marks in this document, the following words or phrases, whether used in the singular or plural, shall have the meanings specified below.

**1.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

  **a.** The act resulted in aggregate losses in excess of $5 million in the aggregate; attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

  **b.** The act is a violent act or an act that is dangerous to human life, property or infra-structure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**2.** "Critical injury" means:

  **a.** Death of a person;

  **b.** Injury to a person involving significant damage to one or more vital organs; or

  **c.** Other serious physical injury, if such injury results in the probability of death if aggressive medical treatment is not provided.

"Critical injury" does not include emotional or mental injury.

3. "Coverage territory" means the United States of America (including its territories and possessions), Puerto Rico and Canada.

4. "Hostage situation" means a situation in which persons are held captive and restrained by someone who threatens to inflict "critical injury", and the circumstances cause a reasonable adult to conclude the captives are at risk of "critical injury".

5. "Immediate family member" means a legal spouse, parent, child, sibling, grandparent, or other family member residing in the home of the "victim". Foster parents, foster children or other persons related by marriage or legal adoption are also included in immediate family.

6. "Sponsored activity" means any activity or event, organized physically or financially by you.

7. "Victim" means any person upon whom a "critical injury" is inflicted, or who is held in a "hostage situation", arising from a "violent incident".

8. "Violent incident" means:

   a. An incident of violence that is caused by an intentional criminal act or a series of related intentional criminal acts (including, but not limited to, a bombing or a shooting) that results in one or more persons, excluding the perpetrator(s), sustaining "critical injury"; or

   b. A "hostage situation".

   Any and all related acts associated with Paragraphs **a.** and **b.** immediately above will be considered one "violent incident" regardless of the time in which the events occur or the location of events. A "violent incident" with multiple events shall be deemed to occur at the time of the first related "violent incident".

   However, "violent incident" does not mean:

   (i) The written or verbal threat of carrying out an event described in Paragraphs **a.** and **b.** immediately above; or
   (ii) A "certified act of terrorism".

9. "Witness" means any person who is at the physical location of, and personally observes, a "violent incident".

# GENERAL AGGREGATE LIMIT AMENDMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to **2.** under **SECTION III -- LIMITS OF INSURANCE:**

**2.  d.**  Damages under COVERAGE D.

Copyright 2003 GuideOne Insurance

# EXCLUSION -- RELIGIOUS DISAFFILIATION OR SCHISM

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

DIRECTOR AND OFFICER LIABILITY COVERAGE FORM

**A.** The following is added to paragraph **b.** under **1. Insuring Agreement**:

We will have no duty to defend any insured against any "suit" arising out of any actual or alleged "wrongful act" that results from or is related in any manner to an actual or attempted disaffiliation or schism between or among religious institutions.

**B.** The following is added to **2. Exclusions**:

This insurance does not apply to:

Any actual or alleged "wrongful act" that results from or is related in any manner to an actual or attempted disaffiliation or schism between or among religious institutions.  This exclusion applies regardless of:

**(1)** When such "wrongful act" occurred or when the claim or "suit" is brought;

**(2)** The nature of the damages claimed or relief sought; and

**(3)** Whether the claim or "suit" is based upon contract or tort.

# LEGAL EXPENSE REIMBURSEMENT COVERAGE

**COVERAGE LR LEGAL EXPENSE REIMBURSEMENT COVERAGE**

Various provisions in Coverage **LR** restrict coverage. Read this document and the entire policy carefully to determine your rights, duties and what is and is not covered.

Throughout this document, the words "you" and "your", whether appearing in quotation marks or not, refer strictly to the Named Insured shown in the Declarations and any other person or organization qualifying or designated as a Named Insured within Section **II** -- Who Is An Insured -- Coverage **LR**. The words "we", "us" and "our" refer to the Company providing this coverage.

The word "insured" is limited and means any person or organization qualifying as such under Section **II** -- Who Is An Insured -- Coverage **LR**.

Other words and phrases that appear in quotation marks have special meaning. Refer to both Section **V** -- Definitions of the Commercial General Liability Coverage Form, and the other definitions provided herein which are unique and specific to Coverage **LR**.

## SECTION I -- COVERAGES -- COVERAGE LR

Coverage **LR** is merged within and is a comprised part of the Commercial General Liability Coverage Form. The coverage provided by Coverage **LR** is distinct and separate from any other coverage provided under the Commercial General Liability Coverage Form.

**COVERAGE LR LEGAL EXPENSE REIMBURSEMENT COVERAGE**

1. **Insuring Agreement**

    a. We will reimburse those "legal expenses" incurred by the insured that arise out of a "suit" to which this insurance applies.

    b. Our obligation is limited to paying "legal expenses" only if you or any affected insured are named as defendants in a "suit";

    provided that:

    (1) The "suit" results from a "reimbursable incident" that occurs in the "coverage territory" and during the policy period; and

    (2) The "legal expenses" are incurred and reported within one year of the date of the "reimbursable incident".

2. **Exclusions**

    a. We will not reimburse any "legal expenses", regardless of when incurred:

    (1) If the "legal expenses" are paid or are obligated to be paid under any other contract of insurance.

    This provision applies whether or not the defense, being undertaken under a contract of insurance, is subject to a Reservation of Rights or a Non-waiver Agreement or is being done gratuitously.

    (2) If the "legal expenses" are paid or are obligated to be paid by any person, association of persons, or entity, including but not limited to any legal services plan or benefit.

    b. We will not reimburse any "legal expenses" arising out of or attributable to:

    (1) Any "suit" or dispute between any insured and us.

    (2) Any dispute between insureds.

    (3) "Sexual misconduct or molestation" or "sexual harassment".

    (4) The rendering of, or failure to render, any professional services.

## SECTION II -- WHO IS AN INSURED -- COVERAGE LR

Section **II** -- Who Is An Insured of the Commercial General Liability Coverage Form is incorporated by reference.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

**SECTION III -- LIMITS OF INSURANCE AND DEDUCTIBLE -- COVERAGE LR**

The following Limits of Insurance provisions are unique to Coverage **LR**.  For purposes of this Coverage, none of Section **III** -- Limits Of Insurance of the Commercial General Liability Coverage Form is incorporated by reference and shall not be relied upon in determining the limits of available coverage.

1.  The Limits of Insurance shown in the Declarations for Coverage **LR** and the rules below fix the most we will pay regardless of the number of:

    a.  Insureds;

    b.  "Suits" brought;

    c.  Persons or organizations bringing "suits" ; or

    d.  Policies involved.

2.  The Legal Expense Reimbursement Aggregate Limit is the most we will pay as reimbursement of the sum of all "legal expenses" incurred as a result of all "suits" brought or filed against an insured within the policy period, regardless of when such "suits" are actually concluded.

3.  Subject to Paragraph **2.** above, the Legal Expense Reimbursement Each Incident Limit is the most we will pay as reimbursement of the sum of all "legal expenses" incurred as a result of all "suits" brought or filed against any insured for any one "reimbursable incident".

4.  **Deductible**

    Our obligation for the reimbursement of "legal expenses", as described in Paragraphs **1.**, **2.** and **3.** immediately above, applies only to the amount of "legal expenses" in excess of the applicable deductible for each "suit" , shown in the Declarations.  In the event no deductible amount is shown in the Declarations, the deductible is $1,000 for each "suit".  The limits of insurance shall not be reduced by the amount of this deductible.

5.  No person shall be entitled to receive duplicate payments for the insurance granted in Coverage **LR** and any other Coverage form or endorsement issued by us or any other organization.

The Limits of Insurance of Coverage **LR** apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months.  In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV -- CONDITIONS -- COVERAGE LR**

The following conditions are unique to Coverage **LR**.  The remainder of Section **IV** -- Conditions of the Commercial General Liability Coverage Form is incorporated by reference.  The conditions and duties described in Paragraph **2.** herein will supersede those contained in Paragraph **2.** of Section **IV** -- Conditions of the Commercial General Liability Coverage Form.

1.  **Duty To Investigate Or Defend**

    We have no duty or right to investigate or defend any "suit" brought against you to which this coverage applies.

2.  **Duties In The Event Of A Reimbursable Incident Or Suit**

    a.  You must see to it that we are notified as soon as practicable of your becoming aware of any "reimbursable incident" that may result in a "suit" to which this coverage applies.  To the extent possible, notice should include:

        (1) The nature of the "reimbursable incident"; and

        (2) How, when and where the "reimbursable incident" took place.

    b.  If "suit" is brought against the insured, you must:

        (1) Notify us as soon as practicable of the "suit" brought against the insured and provide us with all documents related to the incident.

        (2) As soon as practicable, provide us written notice of the "suit".  This notice should include the nature of the "suit" and how, when and where the "reimbursable incident" took place.

(3) Provide us the name, address and other information sufficient to identify the attorney or firm who will be defending you in the "suit".

**3. Attorney Selection**

We have no duty or right to choose an attorney for you. You have the duty and right to choose your own attorney. However, your attorney must be licensed to provide legal services. We have no duties, rights or responsibilities regarding the attorney you choose.

**4. Two or More Policies**

If two or more policies issued by us include Coverage **LR** that applies to the same insured and these policies also apply to the same "defensible incident", the maximum amount we will pay as reimbursement of "legal expenses" under all the policies will not exceed the highest applicable Limit of Insurance for Coverage **LR** that applies to any one of the policies.

**SECTION V -- DEFINITIONS -- COVERAGE LR**

The following words or phrases have a specific and unique meaning to Coverage **LR**. The remainder of Section **V** -- Definitions of the Commercial General Liability Coverage Form is incorporated by reference. Certain definitions contained within Section **V** -- Definitions of the Commercial General Liability Coverage Form may be reproduced for ease of reference in this document. The definitions provided herein will supersede the corresponding definitions contained in Section **V** -- Definitions of the Commercial General Liability Coverage Form.

**1.** "Alternative dispute resolution" includes, but is not limited to:  negotiation, mediation, arbitration, or summary jury trials.

**2.** "Coverage territory" means the United States of America (including its territories and possessions), Puerto Rico and Canada.

**3.** "Damages" means compensatory tort or punitive damages allowed by law.

**4.** "Legal expenses" means and is limited to reasonable and necessary attorney fees, expenses, court costs and the cost of appeal bonds that are directly related to defending "suits" against the insured or any affected insured.  "Legal expenses" do not include the amounts of any "damages".  "Legal expenses" do not include any retainer fees.

**5.** "Reimbursable incident" means a single or series of interrelated continuing actual or alleged:  acts, errors or omissions of the insured; all of which together constitute a single reimbursable incident.  However, "reimbursable incident" does not include any deliberate acts, errors or omissions for purposes of causing a "suit" to be initiated or filed against you.

**6.** "Suit" means any:

  **a.** Proceeding in a civil court to recover "damages" or other equitable relief to which this coverage applies;

  **b.** Proceeding any insured must attend as a result of an administrative agency action; or

  **c.** "Alternative dispute resolution".

All "suits", counterclaims, countersuits, amended complaints or similar proceedings related to the same "reimbursable incident" shall be considered one "suit".

# TEXAS CHANGES

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **8.** of Section **III** -- Limits of Insurance is replaced by the following.

**8.** When two or more coverages or policies are issued by us:

  **a.** If the liability coverage provided by the Commercial General Liability Coverage Part of this policy, and any endorsement or other Coverage Part of this policy, provides liability coverage for the same "occurrence" or offense, the maximum liability under all coverages shall not exceed the limits of liability as provided by the Commercial General Liability Coverage Part of this policy.

But condition **a.** above does not apply to any policy issued by us or any affiliate company specifically to apply as excess insurance over this policy.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

# TEXAS CHANGES

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

      VIOLENT INCIDENT RESPONSE COVERAGE
      CRISIS MANAGEMENT COVERAGE
      COUNSELORS LIABILITY COVERAGE

Paragraph **6.** of Section **III** -- Limits of Insurance is deleted in its entirety.

# TEXAS CHANGES

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> LEGAL EXPENSE REIMBURSEMENT COVERAGE

Paragraph **4.** of Section **IV** -- Conditions is deleted in its entirety.

# TEXAS CHANGES

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

SEXUAL MISCONDUCT LIABILITY COVERAGE

Paragraph **4.** of Section **III** -- Limits of Insurance is deleted in its entirety.

# SEXUAL MISCONDUCT LIABILITY COVERAGE

## COVERAGE SL SEXUAL MISCONDUCT LIABILITY AND COVERAGE SP MEDICAL PAYMENTS

Various provisions in Coverages **SL** and **SP** restrict coverage. Read this document and the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this document the words "you" and "your" refer strictly to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured within Section **II** -- Who Is An Insured -- Coverages **SL** and **SP**. The words "we", "us" and "our" refer to the company providing this Coverage.

The word "insured" is limited and means any person or organization qualifying as such under Section **II** -- Who Is An Insured -- Coverages **SL** and **SP**.

Other words and phrases that appear in quotation marks have special meaning. Refer to both Section **V** -- Definitions of the Commercial General Liability Coverage Form, and the other definitions provided herein which are unique and specific to Coverages **SL** and **SP**.

**SECTION I -- COVERAGES**

Coverages **SL** and **SP** are merged within and are a comprised part of the Commercial General Liability Coverage Form. The coverages provided by Coverages **SL** and **SP** are distinct and separate from any other coverage provided by or within Section **I** -- Coverages of the Commercial General Liability Coverage Form.

**COVERAGE SL SEXUAL MISCONDUCT LIABILITY**

**1. INSURING AGREEMENT**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "injury" arising out of or resulting from a "sexual misconduct occurrence" to which Coverage **SL** applies. We will have the right and duty to defend the insured against any "suit" seeking those "damages". However, we will have no duty to defend the insured against any "suit" seeking "damages" to which Coverage **SL** does not apply. We may, at our discretion, investigate any "sexual misconduct occurrence" and settle any claim or "suit" that may result. But:

        **(1)** The amount we will pay for "damages" is limited as described in Section **III** -- Limits Of Insurance -- Coverages **SL** and **SP**; and

        **(2)** Our duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage **SL**.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **3.** Supplementary Payments.

    **b.** This Coverage applies to "injury" only if:

        **(1)** The "injury" is caused by a "sexual misconduct occurrence" that takes place in the "coverage territory"; and

        **(2)** The first act of a "sexual misconduct occurrence" first commences during the policy period.

    **c.** Coverage **SL** does not apply to claims made or "suits" brought against any person who actually or personally participates in, directs or knowingly allows to take place any act of "sexual misconduct or sexual molestation". We shall have no obligation or duty to investigate, defend, settle or pay judgments on behalf of any such person as described in this paragraph.

**2. EXCLUSIONS**

The insurance granted by this Coverage shall not apply to:

    **a. Participation In Sexual Misconduct Or Sexual Molestation**

    Any person who actually or personally participated in, directed, or knowingly allowed any act of "sexual misconduct or sexual molestation". We shall have no duty to investigate, defend or settle any claim or "suit" brought against any such person as described in this paragraph.

Copyright 2009 GuideOne Insurance

**b.   Criminal Or Penal Regulation Or Statute**

The cost of defense of, or the cost of paying any fines for, any person resulting from any actual or alleged violation of any criminal or penal regulation or statute.

**c.   Breach Of Contract**

Any claim arising out of a breach of contract.

**d.   Contractual Liability**

Any claim for which the insured is obligated to pay "damages" because of the assumption of the tort liability of another party in a contract or agreement. This exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement.

**e.   Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**f.   Employer's Liability**

Any "injury" to:

**(1)** An "employee" of the insured arising out of or in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share "damages" with or repay someone else who must pay "damages" because of the "injury".

**g.   Exemplary Or Punitive Damages**

Any exemplary or punitive damages, multiplied damages, fines or penalties.

**h.   Ecclesiastical Liability**

Any claim or "suit" based upon, attributable to, or arising out of any ecclesiastical law, statute, canon, rule, or regulation.

**i.   Acts Occurring Between Family Members**

Any claim arising out of "sexual misconduct or sexual molestation" occurring between "family members".

**3.   SUPPLEMENTARY PAYMENTS**

The following supplementary payments are unique to Coverage **SL**. For purposes of Coverage **SL**, none of Section **I** -- Supplementary Payments -- Coverages **A** and **B** of the Commercial General Liability Coverage Form is incorporated by reference and shall not be relied upon in determining the supplementary payments made under Coverage **SL**.

We will pay, with respect to any claim we investigate or settle or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

**c.** All court costs taxed against the insured in a "suit". However, these payments do not include plaintiff attorneys' fees or plaintiff attorneys' expenses taxed against the insured.

**d.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance under Coverage **SL**.

Copyright 2009 GuideOne Insurance

**COVERAGE SP MEDICAL PAYMENTS**

**1. INSURING AGREEMENT**

    **a.** We will pay medical and counseling expenses because of "injury" arising out of a "sexual misconduct occurrence" to which this insurance applies provided that:

        **(1)** The "injury" is caused by a "sexual misconduct occurrence" that "first commences" in the "coverage territory" and during the policy period;

        **(2)** The expenses are incurred and reported to us within one year from the date of "injury"; and

        **(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

    **b.** We will pay reasonable expenses for necessary professional services for treatment of "injury" resulting from a "sexual misconduct occurrence", regardless of fault. These payments will not exceed the Sexual Misconduct Medical Payments limit of insurance.

    The payment of such expenses is not an admission of liability under this policy.

**2. EXCLUSIONS**

    We will not pay medical and counseling expenses for "injury" which is excluded under Paragraph **2.** Exclusions of Coverage SL Sexual Misconduct Liability.

**SECTION II -- WHO IS AN INSURED -- COVERAGES SL AND SP**

The following provisions are unique to Coverages **SL** and **SP**. For purposes of Coverages **SL** and **SP**, Paragraph **1.** of Section **II** -- Who Is An Insured of the Commercial General Liability Coverage Form is incorporated by reference. None of the remaining provisions of Section **II** -- Who Is An Insured of the Commercial General Liability Coverage Form apply to Coverages **SL** and **SP** and shall not be relied upon in determining who is an insured under Coverages **SL** and **SP**.

For purposes unique to Coverages **SL** and **SP**:

**1.** Your "volunteer workers" only while performing duties related to the conduct of your business or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company) are also an insured, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for "sexual misconduct or sexual molestation" that results in "injury":

    **a.** To you, to your partners or members of a joint venture (if you are a partnership or joint venture), to your members of a limited liability company (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or while performing duties related to the conduct of your business;

    **b.** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **1.a.** above; or

    **c.** For which there is any obligation to share "damages" with or repay someone else who must pay "damages" because of the "injury" described in Paragraphs **1.a.** or **1.b.** above.

**2.** Regardless of any provision to the contrary, the following is not an insured:

    **a.** Any person who actually or personally participated in, directed, or knowingly allowed any act of "sexual misconduct or sexual molestation". Furthermore, we shall have no duty to investigate, defend or settle any claim or "suit" brought against any such person as described in this paragraph.

    **b.** Any person or organization with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III -- LIMITS OF INSURANCE -- COVERAGES SL AND SP**

The following Limits of Insurance provisions are unique to Coverages **SL** and **SP**. For purposes of Coverages **SL** and **SP**, none of Section **III** --

Limits Of Insurance of the Commercial General Liability Coverage Form is incorporated by reference and shall not be relied upon in determining the limits of available coverage under Coverages **SL** and **SP**.

1.  Our obligation to pay "damages" for any one "sexual misconduct occurrence" is the Sexual Misconduct Liability Each Claim Limit shown in the Declarations. All claims for "damages" because of "injury" arising out of a "sexual misconduct occurrence" including "damages" claimed by all persons or organizations for care, loss of services, or death resulting at any time from the "sexual misconduct occurrence", shall be considered one "sexual misconduct occurrence".

    Our total obligation for all "damages" covered by Coverage **SL** is the Sexual Misconduct Liability Aggregate Limit shown in the Declarations regardless the number of:

    a.  Insureds;

    b.  Claims made or "suits" brought;

    c.  Persons or organizations making claims or bringing "suits";

    d.  Policies involved; or

    e.  "Sexual misconduct occurrences".

2.  The Sexual Misconduct Medical Expense Limit shown in the Declarations is the most we will pay for all medical and counseling expenses because of "injury" arising out of a "sexual misconduct occurrence", regardless of:

    a.  The number of claims, claimants, persons acted upon, or injured persons;

    b.  The number of incidents or locations involved;

    c.  The period of time during which the acts of "sexual misconduct or sexual molestation" took place; or

    d.  When "damages" are sustained.

    The Sexual Misconduct Medical Expense Limit available is the Sexual Misconduct Medical Expense Limit in force at the time the first act of "sexual misconduct or sexual molestation" first commences.

3.  When we have used up the limits described herein by paying settlements or judgments,

we will have no further duty to defend any claims or "suits", whether pending at that time or started afterwards.

4.  If two or more policies or Coverages issued by us apply to the same insured and these policies or Coverages also apply to the same claim or "suit", the maximum amount we will pay as "damages" under all of the policies or Coverages will not exceed the highest applicable Limit of Insurance that applies to any one of the policies or Coverages.

    This condition does not apply to any insurance that was purchased specifically to apply in excess of the applicable Limits of Insurance shown in the Declarations.

## SECTION IV -- CONDITIONS -- COVERAGE SL

The following conditions are unique to Coverage **SL**. The remainder of Section **IV** -- Conditions of the Commercial General Liability Coverage Form is incorporated by reference. The conditions and duties provided herein will supersede those contained in Paragraphs **2.** and **4.** of Section **IV** -- Conditions of the Commercial General Liability Coverage Form.

1.  **Duties In The Event Of An Occurrence, Claim Or Suit**

    Consistent with the Insuring Agreement contained within Coverage **SL**:

    a.  **Occurrence Or Incident Reporting**

        You must see to it that we are notified, by the means and methods determined by us, within thirty (30) days of the date you become aware of any "sexual misconduct occurrence", incident or circumstance which may reasonably be expected to result in a claim. To the extent possible, notice should include:

        (1) How, when and where the "sexual misconduct occurrence", incident or circumstance took place; and

        (2) The names and addresses of any injured persons and witnesses.

    b.  **Claim Reporting**

        If a claim or "suit" is received by any insured, you must:

        (1) Immediately record the specifics of the claim or "suit" and the date received; and

Copyright 2009 GuideOne Insurance

**(2)** Promptly notify us.

You must see to it that we receive prompt written notice of the claim or "suit".

**c.  Other Duties**

You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, settlement or defense of the "sexual misconduct occurrence", claim or "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of "injury" or "damages" to which this insurance may also apply.

**d.  No Voluntary Payments**

No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**2.  Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverage **SL**, our obligations are limited as follows:

**a.  Primary Insurance**

This insurance is primary except when stated to apply in excess of, or contingent upon the absence of other insurance and **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b.  Excess Insurance**

When this insurance is excess, we will have no duty to defend any claim or "suit" that any other insurer has a duty to

defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that was not bought specifically to apply in excess of the applicable Limits of Liability shown in the Declarations.

**c.  Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or until none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**SECTION V -- DEFINITIONS -- COVERAGES SL AND SP**

The following words or phrases have a specific and unique meaning to Coverages **SL** and **SP**. The remainder of Section **V** -- Definitions of the Commercial General Liability Coverage Form is incorporated by reference. Certain definitions contained within Section **V** -- Definitions of the Commercial General Liability Coverage Form may be reproduced for ease of reference in this document. The definitions provided herein will supersede the corresponding definitions contained in Section **V** of the Commercial General Liability Coverage Form.

**1.**  "Coverage territory" means anywhere in the world provided that the claim is made, and any "suit" that may arise therefrom is filed, within the United States of America (including

its territories and possessions), Puerto Rico or Canada.

2. "Damages" mean only those compensatory tort damages allowed by law.

3. "Family members" means persons who are:

   a. Legally married to each other; or

   b. Related by blood or legal adoption, limited to the following kindred: parents, children, siblings, grandparents and grandchildren.

   "Family members" includes wards or foster children of persons described in **a.** or **b.** above.

4. "Injury" means "bodily injury", sickness or disease, including death resulting from any of these at any time, mental anguish or emotional distress.

5. "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature when such conduct:

   a. Is linked implicitly or explicitly with a decision affecting a term or condition of any individual's employment;

   b. Interferes with any individual's job performance;

   c. Creates an intimidating, hostile or offensive working environment for any individual; or

   d. Arises out of or is related to an unlawful employment practice as codified at 42 U.S.C.A. § 2000e-2(a), or any pendant State, municipal or local code, regulation or ordinance.

6. "Sexual misconduct occurrence" means a single act, or multiple, continuous, repeated, sporadic or related acts of "sexual misconduct or sexual molestation" by one person, or two or more persons acting together, or any breach of duty causing or contributing to such acts, or any defamation or slander arising out of or resulting from any actual or alleged act of "sexual misconduct or sexual molestation".

In determining our liability under Coverage **SL**, all acts of "sexual misconduct or sexual molestation" by one person, or two or more persons acting together, or any breach of duty causing or contributing to such acts, or any defamation or slander arising out of or resulting from any actual or alleged act of "sexual misconduct or sexual molestation" will be deemed and construed as one "sexual misconduct occurrence" and one claim, regardless of:

   a. The number of claims, claimants, persons acted upon, or injured persons;

   b. The number of incidents or locations involved;

   c. The period of time during which the acts of "sexual misconduct or sexual molestation" took place; or

   d. When "damages" are sustained.

7. "Sexual misconduct or sexual molestation" means any activity which is sexual in nature (whether permitted or not permitted); and includes, but is not limited to: sexual assault, sexual battery, sexual relations, sexual acts, sexual activity, sexual handling, sexual massage, sexual exploitation, sexual exhibition, sexual stimulation, fondling, intimacy, exposure of sexual organs, lewd or lascivious behavior or indecent exposure, fornication, unauthorized touching, or the photographic, video or other reproduction of sexual activity.

   However, "sexual misconduct or sexual molestation" does not include "sexual harassment".

8. "Suit" means a civil proceeding in which "damages" because of "sexual misconduct or sexual molestation" to which Coverage **SL** applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such "damages" are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent.

# COMMERCIAL GENERAL LIABILITY
# COVERAGE FORM

**FAITHGUARD**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer strictly to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** -- Who Is An Insured.

The word "damages", whether appearing in quotation marks or not, shall have the special meaning described in Section **V** -- Definitions.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** -- Definitions.

## SECTION I -- COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those "damages". However, we will have no duty to defend the insured against any "suit" seeking "damages" for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      **(1)** The amount we will pay for "damages" is limited as described in Section **III** -- Limits Of Insurance; and

      **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments -- Coverages **A** and **B**.

   **b.** This insurance applies to "bodily injury" and "property damage" only if:

      **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

      **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** -- Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   **c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** -- Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   **d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** -- Who Is An Insured or any "employee" authorized by you to give or

receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for "damages" because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** "Damages" because of "bodily injury" include "damages" claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**f.** "Damages" because of "bodily injury" includes incidental medical malpractice "damages" sustained because of the administration of or failure to administer first aid including the use of automated external defibrillators.

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay "damages" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "damages":

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the

purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be "damages" because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which "damages" to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any

insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location

with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for "damages" because of "property damage" that the insured would have in the absence of such request, demand,

order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g.   Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to or hired by any insured. Use includes operation and "loading or unloading".   Hired includes any contract to furnish transportation of pupils to and from school.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Any length; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or

financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage"

arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire, explosion, smoke or leaks from automatic fire protective systems) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III -- Limits Of Insurance.**

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

"Damages" claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

"Damages" arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data

processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**r. Additional Exclusions**

"Bodily injury" or "property damage" excluded under Additional Exclusions -- Coverages **A**, **B** and **C**.

Exclusions **c.** through **n.** do not apply to damage to premises while rented to you or temporarily occupied by you with permission of the owner, when such damage is caused by fire, explosion, smoke or leaks from automatic fire protective systems. A separate limit of insurance applies to this coverage as described in Section **III --** Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those "damages". However, we will have no duty to defend the insured against any "suit" seeking "damages" for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for "damages" is limited as described in Section **III --** Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments -- Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

## 2. Exclusions

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion

does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods -- Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **a., b.** and **c.** of "personal and advertising injury" under the Definition Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting. This exclusion does not apply to publishing, broadcasting or telecasting that is incidental to your business.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom, blog or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or "suit" by or on behalf of a governmental authority for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**q. Workers' Compensation And Similar Laws**

"Personal and advertising injury" arising out of any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**r. Employer's Liability**

"Personal and advertising injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a

consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**s. Additional Exclusions**

"Personal and advertising injury" excluded under Additional Exclusions -- Coverages **A**, **B** and **C**.

## COVERAGE C MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**c.** When the "bodily injury" is caused by an accident that results from practicing, instructing or participating in any physical exercises or games, sports or athletic contests, whether on a formal or informal basis, we will pay medical expenses on an excess payment basis. Our obligations for payment under excess insurance are explained in Paragraph **4.b.(1)(c)** Other Insurance under Section **IV --** Commercial General Liability Conditions**.**

**d.** When a covered "bodily injury" to a claimant results in loss of life within one year from the date of the accident, at your option, we will pay up to $10,000 per person. We will pay this amount in addition to any payments under Paragraphs **a., b.** and **c.** of this Insuring Agreement.

Our obligation for payment shall be to:

**(1)** The parent or guardian if the deceased was a minor;

**(2)** The surviving spouse, if any; or

**(3)** A person authorized by law, or legally entitled, to receive such payment.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers" and any persons designated as an insured under Paragraph **4.** of Section **II --** Who Is An Insured.

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies. However, this exclusion does not apply to a person injured while engaged in a church sponsored activity authorized by you.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**f. Coverage A Exclusions**

Excluded under Coverage **A**.

**g. Students**

To any student, with respect to the operation of any college or school (except Sunday school) by you or on your behalf.

**h. Day Nursery**

To any person being cared for at any Day Nursery owned and operated by you or on your behalf (except Day Nurseries for the care of children while their parents are attending church activities including parent day out or equivalent programs which are conducted for one day or less per week).

**i. Additional Exclusions**

Excluded under Additional Exclusions -- Coverages **A**, **B** and **C**.

**ADDITIONAL EXCLUSIONS -- COVERAGES A, B AND C**

This insurance does not apply to:

**1. Employment Related Practices**

Any liability arising out of any "employment related practices".

**2. Hospital Liability**

Acts, errors or omissions by any insured as proprietor, superintendent, or "executive officer" of any hospital, sanitarium, medical clinic with bed and board facilities, laboratory, or to acts or omissions arising out of any other similar medical trade, business, employment or profession.

**3. Counseling Activities**

Any "bodily injury", "property damage", "personal and advertising injury" or mental or emotional pain or anguish, sustained by any person arising out of, or resulting from:

**a.** Professional activities conducted by a psychiatrist or psychologist;

**b.** Professional activities conducted by a licensed mental health care practitioner or licensed counseling practitioner. However, if your "minister" is a licensed mental health care practitioner or licensed counseling practitioner, this exclusion does not apply to such professional activities that attend to the spiritual needs of a person if conducted for you or on your behalf; or

**c.** Counseling or guidance of a person in exchange for a payment or fee.

**4. Professional Board**

Acts, errors or omissions by any insured as a member of a formal accreditation or similar professional board of directors, of any educational, medical, professional or religious institution.

**5. Violation Of Any Statute Or Regulation**

Any liability arising out of the willful or intentional violation of any statute or regulation including but not limited to the fines and penalties assessed by a court or regulatory authority.

**6. Misconduct, Molestation Or Harassment**

Any "bodily injury", "personal and advertising injury", mental or emotional pain or anguish, or any defamation or slander, sustained by any person arising out of or resulting from any actual or alleged act of "sexual misconduct or sexual molestation" or "sexual harassment" of any kind. We have no right or duty to investigate, settle, defend or pay any claim or "suit" asserting any act of "sexual misconduct or sexual molestation", "sexual harassment" or any breach of duty contributing to or arising from such act.

**7. Health Services**

"Bodily injury", "property damage" or "personal and advertising injury" caused by:

**a.** The rendering or failure to render:

**(1)** Medical, surgical, dental, x-ray or nursing service, treatment, advice or instruction or the related furnishing of food or beverages;

**(2)** Any health or therapeutic service, treatment, advice or instruction; or

**(3)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

**b.** The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances; or

**c.** The handling or treatment of dead bodies, including autopsies, organ donation or other procedures;

if any college or school is operated by you or on your behalf, and that college or school owns or operates an infirmary with facilities for lodging and treatment or a public clinic or hospital.

This exclusion applies to persons whose professions involve the activities described in Paragraphs **a.**, **b.** and **c.** above. However, this exclusion does not apply to your school nurse while acting within the scope of their duties as directed by you.

**8. Corporal Punishment**

"Bodily injury", "property damage" or "personal and advertising injury" to any student arising out of any corporal punishment administered by or at the direction of any insured.

**SUPPLEMENTARY PAYMENTS -- COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $1,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include plaintiff attorneys' fees or plaintiff attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

**h.** Up to $1,000 for "property damage" to personal property of others while in the temporary care, custody or control of an insured and caused by any person participating in your organized activities. For purposes of this supplementary payment, "property damage" does not include disappearance, wrongful abstraction or loss of use. This supplementary payment shall only be paid on or for the account of the owner and only when other coverage or insurance is unavailable.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks "damages" for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I -- Coverage A -- Bodily Injury And Property Damage Liability**, such payments will not be deemed to be "damages" for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## ADDITIONAL SUPPLEMENTARY PAYMENTS

### Product Recall Expenses

We will reimburse you for "product recall expenses" that you incur because of a "product recall" of "your product". The most we will pay for all "product recall expenses" initiated during the policy period is $25,000. The policy period under which "product recall expenses" will be paid shall be determined by the policy that is in effect when the "product recall" was first initiated.

A complete accounting of "product recall expenses" must be provided upon our request, including receipts for all expenses that you incur. We will reimburse "product recall expenses" only if the expenses are incurred and reported to us within one year of the date the "product recall" was initiated.

Our obligation under this Additional Supplementary Payment shall only apply if the "product recall expenses" are initiated in the "coverage territory" during the policy period because:

**1.** You determine that the "product recall" is necessary; or

**2.** An authorized government entity has ordered you to conduct a "product recall".

However, this Additional Supplementary Payment does not apply to "product recall expenses" arising out of the product expiration or shelf life, a defect known by you prior to the time "your product" leaves your control or possession, or the defense of a claim or "suit" against you for liability arising out of a "product recall".

## SECTION II -- WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer

worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury described in Paragraphs **(1)(a)** or **(b)** above.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** All hierarchical governing bodies concerned with the adoption and enforcement of needful laws and regulations, doctrine and worship for the established denomination of which you are a member, but only with respect to liability arising out of the ownership, maintenance and use of the property by you at the locations designated in the Commercial General Liability Coverage Part Declarations and operations necessary and incidental thereto. But we shall not be liable under this policy to make payment to any such hierarchical body for loss in connection with any claim which is insured by another policy, except any amounts excess of all valid and collectible payments under such other policies.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or

limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only when the newly acquired or formed organization operates or conducts the same or similar business as you;

**b.** Coverage under this provision is afforded only until the 365th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**c.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**d.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

**4.** The following persons or organizations are also insureds:

**a.** Any of your members, but only with respect to their liability for your activities or activities they perform on your behalf, at your direction and within the scope of their duties.

**b.** Any trustee or official; member of any board, council, deaconry, or vestry; "minister", Sunday school superintendent and any Sunday school teachers; or any student teachers teaching as part of their educational requirements; but only with respect to their duties as such.

**c.** Any church organization authorized and controlled by you.

**5.** The following person(s) or organization(s) are an additional insured when you have agreed, in a written contract, that such person or organization be added as an additional insured on your policy, provided the written contract is initiated prior to an "occurrence" resulting in "damages".

A person or organization is an additional insured under this provision only for that period of time required by the written contract.

However, no such person or organization is an insured under this provision if such person or organization is included as an insured by an endorsement issued by us and made a part of this Coverage Form.

**a.** Any person or organization from whom you lease land but only with respect to liability arising out of the ownership, maintenance or use of that part of the land leased to you.

With respect to the insurance afforded to these additional insureds, this insurance does not apply to:

**(1)** Any "occurrence" which takes place after you cease to lease that land; or

**(2)** Structural alterations, new construction or demolition operations performed by or on behalf of the additional insured.

**b.** Any state or political subdivision, but only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

With respect to the insurance afforded these additional insureds, this insurance does not apply to:

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality; or

**(2)** "Bodily Injury" or "property damage" included within the "products-completed operations hazard".

**c.** Any person or organization but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you.

The insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**d.** Any person or organization but only with respect to their liability as co-owner of the premises.

**6.** The following is not an insured:

**a.** Any person or organization with respect to the conduct of any current or past partnership, joint venture, limited liability

company, that is not shown as a Named Insured in the Declarations.

**b.** Any person who is a professional health care services provider with respect to his or her rendering or failure to render professional health care services, except your school nurses (other than nurse practitioners) and student nurses while acting within the scope of their duties as directed by you.

## SECTION III -- LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

  **a.** Insureds;

  **b.** Claims made or "suits" brought;

  **c.** Persons or organizations making claims or bringing "suits"; or

  **d.** Policies involved.

**2.** The General Aggregate Limit is the most we will pay for the sum of:

  **a.** Medical expenses under Coverage **C**;

  **b.** "Damages" under Coverage **A**, except "damages" because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

  **c.** "Damages" under Coverage **B**.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for "damages" because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all "damages" because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

  **a.** "Damages" under Coverage **A**; and

  **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for "damages" because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, explosion, smoke or leaks from automatic fire protective systems, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

**8.** When two or more coverages or policies are issued by us:

  **a.** If the liability coverage provided by the Commercial General Liability Coverage Part of this policy, and any endorsement or other Coverage Part of this policy, provides liability coverage for the same "occurrence" or offense, the maximum liability under all coverages shall not exceed the limits of liability as provided by the Commercial General Liability Coverage Part of this policy.

  **b.** If this policy and any other policy issued to you by us or any Company affiliated with us apply to the same "occurrence" or offense, the maximum liability under all such policies shall not exceed the highest applicable limit of liability under any one policy.

  But conditions **a.** and **b.** above do not apply to any policy issued by us or any affiliate company specifically to apply as excess insurance over this policy.

The Limits of Insurance of this Coverage Form apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV -- COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Form.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Form and all endorsed coverages:

**a.** To join us as a party or otherwise bring us into a "suit" asking for "damages" from an insured; or

**b.** To sue us on this Coverage Form and all endorsed coverages unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for "damages" that are not payable under the terms of this Coverage Form and all endorsed coverages or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under any of the coverages provided within this Coverage Form, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I -- Coverage A --** Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for "damages" arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(c)** Any other primary insurance available covering athletics activities.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is

not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.  Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5.  Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured.  If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6.  Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, including all Coverages that may be added by endorsement, those rights are transferred or assigned to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V -- DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purposes of this definition:

   **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   **b.** Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   **a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads,

including any attached machinery or equipment; or

   **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

   **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

   **c.** All other parts of the world if the injury or damage arises out of:

      **(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

      **(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

      **(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay "damages" is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Damages" mean only those compensatory tort damages allowed by law.

6. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

7. "Employment related practices" mean:

   **a.** The refusal to employ;

**b.** Termination of employment, or a breach of any express or implied covenants of employment; or

**c.** Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, or other practices, policies, acts or omissions, related to employment.

**8.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**9.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**10.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**11.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**b.** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**12.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**13.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**14.** "Minister" means a person:

**a.** Employed by;

**b.** Duly assigned to; or

**c.** Duly appointed by

you to attend to the spiritual needs of the congregation.

**15.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

　**(1)** Power cranes, shovels, loaders, diggers or drills; or

　**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a.,** **b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

　**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

　**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a.,** **b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

　**(1)** Equipment designed primarily for:

　　**(a)** Snow removal;

　　**(b)** Road maintenance, but not construction or resurfacing; or

　　**(c)** Street cleaning;

　**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

　**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**17.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement";

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement";

**h.** Wrongful acts, errors or omissions resulting from counseling services:

**(1)** That attend to the spiritual needs of a person, and are performed by:

**(a)** A "minister" employed by you, but only for counseling services that are within the scope of his or her duties for you;

**(b)** Your "employee" or "volunteer worker", but only if acting under the direction and control of your employed "minister" and within the scope of his or her duties as your "employee" or "volunteer worker"; or

**(c)** A person in training to become a licensed or non-licensed counselor, but only if acting:

**a.** Under the direction and control of your employed "minister" or your principal (if you operate a school); and

**b.** Within the scope of his or her duties as a counselor in training.

**(2)** That are performed by a school counselor employed by you, if you operate a college or school, but only while acting within the scope of his or her duties as your "employee" and while providing to your students counseling or academic guidance, other than the creation, implementation and maintenance of an educational program.

However, "personal and advertising injury" does not include any injury arising from "sexual misconduct or sexual molestation", "sexual harassment", or counseling services that provide advice or assistance regarding charitable contributions, finance, insurance, investment, law, real estate or tax.

**18.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**19.** "Product recall" means the recall or withdrawal of "your product" from the market or from use by any other person or organization because of a known or suspected defect in "your product" which has caused or is reasonably expected to cause "bodily injury" or physical injury to tangible property other than "your product".

**20.** "Product recall expenses" mean those reasonable and necessary expenses paid and directly related to a "product recall".

**21.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or

replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

   **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

   **(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**22.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**23.** "Sexual misconduct or sexual molestation" means any activity which is sexual in nature (whether permitted or not permitted); and includes, but is not limited to: sexual assault, sexual battery, sexual relations, sexual acts, sexual activity, sexual handling, sexual massage, sexual exploitation, sexual exhibition, sexual stimulation, fondling intimacy, exposure of sexual organs, lewd or lascivious behavior or indecent exposure, fornication, unauthorized touching, or the

photographic, video or other reproduction of sexual activity.

However, "sexual misconduct or sexual molestation" does not include employment-related "sexual harassment".

**24.** "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature when such conduct:

**a.** Is linked implicitly or explicitly with a decision affecting a term or condition of any individual's employment;

**b.** Interferes with any individual's job performance;

**c.** Creates an intimidating, hostile or offensive working environment for any individual; or

**d.** Arises out of or is related to an unlawful employment practice as codified at 42 U.S.C.A. § 2000e-2(a), or any pendant State, municipal or local code, regulation or ordinance.

**25.** "Suit" means a civil proceeding in which "damages" because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such "damages" are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent.

**26.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**27.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**28.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    **(a)** You;

    **(b)** Others trading under your name; or

    **(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**29.** "Your work":

**a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)** The providing of or failure to provide warnings or instructions.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 2009 GuideOne Insurance

# DIRECTOR AND OFFICER LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This **Coverage D** is merged within and is a comprised part of the Commercial General Liability Coverage Form.  The coverage provided by this coverage part is distinct and separate from that provided under **Coverage A**, **Coverage B**, and **Coverage C**.

Words and phrases that appear in quotation marks have special meaning.  Refer to both **SECTION V -- DEFINITIONS** and the other definitions provided herein which are unique and specific to this coverage part.

**COVERAGE D. DIRECTOR AND OFFICER LIABILITY** is added to **SECTION I -- COVERAGES** as follows:

**COVERAGE D. DIRECTOR AND OFFICER LIABILITY**

1. **Insuring Agreement**

   a. **Indemnification For You and Your "Directors or Officers"**

      We will pay only those sums that you or your "directors or officers" become legally obligated to pay as "damages" because of a "wrongful act" to which this coverage part applies.  This coverage part applies only if:

      **(1)** The "wrongful act" takes place within the "coverage territory", and

      **(2)** The "wrongful act" must have its first commission during the policy period.

      However, the amount we pay for "damages" is limited in **SECTION III -- LIMITS OF INSURANCE**.

   b. **Defense Obligation**

      We have the right and duty to defend any insured against any "suit" seeking those "damages" to which this coverage part applies.  We have no duty to defend any insured against any "suit" seeking "damages" to which this coverage does not apply.  We may, at our discretion, investigate any "wrongful act" and settle any claim or "suit" that may result.  However, our duty to defend ends when we have used up the applicable limit of coverage in the payment of judgments or settlements.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS - - Coverage D**.

2. **Exclusions**

   This coverage part does not apply to:

   a. Any "Wrongful Act" arising out of or in any way related to, directly or indirectly to:

      i. "Bodily Injury";

      ii. "Property Damage";

      iii. "Personal and Advertising Injury";

      iv. "Sexual Misconduct" or "Sexual Molestation";

   b. Liability assumed in any contract;

   c. Any liability imposed by the Employers Retirement Income Security Act of 1974 (ERISA) or any amendments thereto, or similar provisions of any State or local statute or regulation;

   d. The failure or omission to procure, renew, or maintain insurance or bonds;

   e. Any claim, notification, or "suit" arising out of:

      **(1)** An actual, alleged, or threatened discharge, dispersal, release or escape of "pollutants";  or

      **(2)** Any governmental direction, order or request that you or any insured test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize "pollutants";

**f.** Any claim or "suit" arising out of "employment-related practices";

**g.** Any claim, action, administrative proceeding, "suit", or hearing brought by or on behalf of any regulatory or administrative agency, including, but not limited to, any right the agency may have as a receiver, liquidator, conservator, or otherwise;

**h.** Any claim or "suit" involving title to any real property;

**i.** Any claim or "suit" pertaining to ecclesiastical law, statute, canon, rule, or regulation;

**j.** Profits made from the purchase or sale of any security within the meaning of § 16(b) of the Securities Exchange Act of 1934 and any subsequent amendments thereto, or similar provisions of any State, municipal, or local statute, regulation, or ordinance;

**k.** Any adjudicated: fraudulent, dishonest, willful, or malicious "wrongful act";

**l.** Any claim or "suit" asserted or made against any "director or officer" by you, any insured, or any other "director or officer";

**m.** Personal profits or advantages which you or your "directors or officers" are not legally entitled; and

**n.** Any liability arising out of the Civil Rights Act codified at 42 U.S.C. § § 1983 - 1988 or any similar State or local code, regulation or ordinance.

**SUPPLEMENTARY PAYMENTS -- Coverage D**

We will pay, in addition to the Limit of Insurance, with respect to any claim we investigate or settle, or any "suit" we defend:

**a.** All expenses we incur;

**b.** The costs awarded the prevailing party, excluding attorney fees, taxed against an insured in any "suit" we defend;

**c.** All interest which accrues after the entry of the judgment and before we have paid, tendered or deposited in court either the amount of judgment or the remaining limit of liability, whichever is less; and

**d.** All reasonable expenses incurred at our request, including actual loss of earnings up to $250 per day for missed work.

**SECTION II -- WHO IS AN INSURED**

**Section II** is incorporated by reference.

**SECTION III -- LIMITS OF INSURANCE**

**1.** The Limits of Insurance, specific to this coverage, as designated in the Declarations determines the most we will pay regardless of the number of: claims, "suits", "wrongful acts", insureds or "directors or officers."

**2.** Deductible

From each claim or "suit" which results in payment for:

**(1)** "Damages", or

**(2)** Any expense, costs, or interest under the Supplementary Payments provisions of this coverage,

An amount of $2,500 shall be first deducted. We may pay any part or all of the deductible to effectuate a settlement. You agree to promptly reimburse us for such payment.

**SECTION IV -- CONDITIONS COVERAGE D**

The following duties have been added and are unique to this coverage part. The remainder of **SECTION IV** is incorporated by reference. Where there is a conflict the conditions and duties provided herein will supercede those contained in **SECTION IV**.

**1. Duties in the Event of a "Wrongful Act", Claim, or "suit"**

**a.** You agree to give us written notice within thirty (30) days from the date you become aware of any "wrongful act" which may result in a claim or "suit" covered by this coverage. This notice shall contain all information available to you with respect to the time, place and circumstances of the "wrongful act" including the names and addresses of all persons involved and witnesses.

**b.** If a claim is made or a "suit" is brought against any insured, you must see to it that we receive prompt written notice of the claim or "suit."

**c.** You and any other involved "insured" must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, settlement or defense of the "wrongful act", claim, or "suit";

**(4)** Assist us in the enforcement of any right against any person or organization which may be liable to you or any insured because of "damages" to which this coverage part applies;

**d.** No insured will, except at their own cost, make any payment, assume any obligation, or incur any expense without our consent.

**2. Other Insurance**

When other coverage or insurance is available our obligations are limited as follows:

**a.** Primary Insurance

This coverage is primary except when designated in the Declarations as excess and then **b.** below applies. If there is other primary coverage, we will share with all other insurance by method outlined in **c.** below.

**b.** Excess Insurance

When this coverage is designated as excess our duty to defend is subordinate and secondary to all other insurers. If no other insurer defends, we will defend. However, we will be entitled to the insured's rights against those other insurers.

When this insurance is excess over other insurance, we will pay only our share, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the "wrongful act" in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts.

**c.** Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method. Accordingly each insurer contributes equal amounts until it has paid its applicable limit.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Consequently, each insurer's share is based on the ratio of its applicable limit to the total applicable limits of all insurers.

**SECTION V -- DEFINITIONS -- Coverage D**

The following words or phrases have a specific and unique meaning to this coverage. The remainder of **SECTION V** is incorporated by reference. Where there is a conflict, the definitions provided herein will supercede those contained in **SECTION V**.

**a.** "Alternative dispute resolution" includes, but is not limited to: negotiation, mediation, binding or non-binding arbitration, or summary jury trials.

**b.** "Damages" means only those compensatory damages allowed by law. "Damages" does not include attorney fees, costs or expenses, or punitive or exemplary damages.

**c.** "Director or officer" or "directors or officers" mean those insureds that are appointed or elected and authorized with the responsibility to manage and/or direct your affairs, while acting solely and exclusively in their capacity for you.

**d.** "Employment-related practices" mean:

**(1)** Any act or failure to act, by an insured, in connection with your business; or

**(2)** Any of your policies, or your failure to have a policy

Which directly or indirectly affects a person's employment status or condition with you or prospective employment by you.

**e.** "Sexual Misconduct or Sexual Molestation": is any activity which is sexual in nature whether permitted or unpermitted, including but not limited to, sexual assault, sexual battery, sexual

relations, sexual acts, sexual activity, sexual handling, sexual massage, sexual exploitation, sexual exhibition, photographic, video or other reproduction of sexual activity, sexual stimulation, fondling, intimacy, exposure of sexual organs, lewd or lascivious behavior or indecent exposure, fornication, undue familiarity, or unauthorized touching.

**f.** "Suit" means any proceeding in a civil court to recover "damages" to which this coverage applies. "Suit" includes an "alternative dispute resolution" proceeding in which "damages" are claimed and to which an insured must submit or does submit with our consent.

**g.** "Wrongful act" means a single or a series of interrelated continuing negligent: acts, errors, omissions, misrepresentations, or breaches of duty initiated or ratified by you or one or more of your "directors or officers" acting individually or in concert.

Copyright 2003 GuideOne Insurance

# EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

**THIS IS A CLAIMS MADE COVERAGE FORM.  PLEASE READ IT CAREFULLY.**

## A.  INSURING AGREEMENT

1.  We will pay those sums the insured becomes legally obligated to pay as damages resulting from an "injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages because of an "injury" to which this insurance does not apply. We may, at our discretion, investigate any incident that may result in "injury."  But:

    a.  The amount we will pay for damages and "defense expenses" is limited as described in Limits of Insurance;

    b.  The coverage and duty to defend provided by this Coverage Form will end when we have used up the applicable limit of insurance for "defense expenses" or the payment of judgments or settlements.

    No other obligation or liability to pay sums, such as civil or criminal fines, imposed on you or any other insured, or to perform acts or services is covered unless explicitly provided for under Supplementary Payments.

2.  This insurance applies to "injury" only if:

    a.  The "injury" is caused by "your employment-related practices" that take place in the "coverage territory";

    b.  The "injury" did not commence before the Retroactive Date, if any, shown on the Endorsement Schedule in the Declarations or after the end of the policy period; and

    c.  A "claim" because of the "injury" is first made against any insured, in accordance with paragraph **3.** below, during the policy period or the

Extended Reporting Period, if provided.

3.  A "claim" will be deemed to have been made at the earlier of the following times:

    a.  When notice of such "claim" is received and recorded by any insured and reported to us in writing; or

    b.  When a "claim" against an insured is made directly to us in writing.

    A "claim" received by the insured during the policy period and reported to us within 90 days after the end of the policy period will be considered to have been reported within the policy period.  However, this 90 day grace period does not apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such "claims."

4.  All "claims" arising out of an "injury" to the same person, including damages claimed by any person for care, loss of services or death resulting at any time from the "injury," will be deemed to have been made at the time the first of such "claims" is made, regardless of the number of "claims" subsequently made.

## B.  EXCLUSIONS

This insurance does not apply to:

1.  Liability arising out of an insured's criminal, fraudulent or malicious acts or omissions, or arising out of an insured's instruction, direction, or approval given to another insured for such acts or omissions.

    This exclusion does not affect our duty to defend, in accordance with paragraph **1.a.** above, the insured prior to determining, through the appropriate legal processes, that the insured is responsible for

Includes copyrighted  material  of Insurance Services Office, Inc., with  its permission.
Copyright  1997 GuideOne Insurance

a criminal, fraudulent or malicious act or omission or has instructed, directed or provided approval for another insured to be responsible for such an act or omission.

2. "Injury" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.   This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

3. Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

4. "Injury" arising out of your failure to comply with any of the accommodations for the disabled required of you by the Americans With Disabilities Act.

5. "Injury" arising out of a violation of your responsibilities or duties required by any federal, state or local statutes, rules or regulations, including but not limited to, the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, and any rules or regulations promulgated therefor or amendments thereto.

6. "Injury" to any striking or locked-out "employee," or to an "employee" who has been temporarily or permanently replaced in connection with any labor dispute.

7. Bodily injury (except for mental anguish and emotional distress) or property damage.

8. Liability of the insured who commits or knowingly allows a "sexual harassment" offense.

   This exclusion does not affect our duty to defend the insured prior to determining, through the appropriate legal processes, that the insured has committed a "sexual harassment" offense, other than an assault or battery.

9. "Injury" arising out of termination of employment, job relocation or reassignment, if the action is taken because:

   a. You have filed for bankruptcy protection, or you are placed in receivership or liquidation;

   b. You have merged with or been acquired by another business entity;

   c. You have closed an operation or a business location, in its entirety or in part; or

   d. Your business location is partly closed or the size of an operation must be reduced because of fire or other disasters beyond your control.

10. "Injury" arising out of any act or omission of the insured if such act or omission is intended by the insured to cause "injury" to a person.

11. Liability arising out of an insured's retaliatory action against a person because the person has:

   a. Declined to perform an illegal or unethical act;

   b. Filed a complaint with a governmental authority or a "suit" against you or any other insured concerning "your employment-related practices";

   c. Testified against you or any other insured at a legal proceeding; or

   d. Notified a proper authority of any aspect of your business operation which is illegal.

12. Punitive or exemplary damages.

13. Injury that arises out of:

   a. An act of "sexual misconduct or sexual molestation."

14. Any costs incurred by or imposed upon the insured in the course of complying with or implementing any equitable order or relief from any court or administrative agency.

C. RETENTION

We will not pay for any "injury" until the amount of "injury" exceeds the retention shown on the Endorsement Schedule in the

Declarations. We will then pay the amount of "injury" in excess of the retention, up to the applicable Limit of Insurance.

### D. SUPPLEMENTARY PAYMENTS

We will pay, with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend:

**1.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**2.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

These payments will not reduce the Limits of Insurance.

### E. WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

    **a.** An individual, you and your spouse are insureds.

    **b.** A partnership or joint venture, you are an insured. Your partners or members are also insureds.

    **c.** A limited liability company, you are an insured. Your members and managers are also insureds.

    **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are also insureds.

**2.** Any of your other "employees" who hold managerial or supervisory positions are also insureds, but only with respect to such managerial or supervisory duties.

**3.** Any volunteer or member of the named insured, but only while acting within the scope of their duties as a volunteer or member, on behalf of the named insured, but only with respect to managerial or supervisory duties, and as properly authorized by the named insured, any

officer or director or "employee" of the named insured.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

### F. LIMITS OF INSURANCE

**1.** The Limits of Insurance shown on the Endorsement Schedule in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a.** Insureds;

    **b.** "Claims" made or "suits" brought; or

    **c.** Persons, organizations or government agencies making "claims" or bringing "suits."

**2.** The Aggregate Limit is the most we will pay for the sum of:

    **a.** All damages; and

    **b.** All "defense expenses"

because of "claims" first made against an insured during the policy period.

**3.** Subject to **2.** above, the Per Person Limit is the most we will pay for the sum of all damages sustained by any one person and all related "defense expenses."

The Limits of Insurance of this Coverage Form available at the time a "claim" is first made shall be the only limits available for such "claim," regardless of the number of policy periods over which an "injury" took place.

Regardless of the period of time over which such acts occur or when damages are sustained, all acts by one person, or two or more persons acting together, or any breach of duty causing or contributing to such acts, will be considered one occurrence in determining our liability under this section.

### G. CONDITIONS

    **1. Bankruptcy**

    Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Form.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 1997 GuideOne Insurance

2. **Duties in the Event of a "Claim" or an Incident that may Result in "Injury"**

   a. If a "claim" is received by any insured, you must:

      (1) Immediately record the specifics of the "claim" and the date received; and

      (2) Notify us, in writing, as soon as practicable.

   b. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

      (2) Authorize us to obtain records and other information; and

      (3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit."

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "injury" or damage to which this insurance may also apply.

   c. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our written consent.

   d. If you have knowledge of an incident which may result in "injury" and for which a "claim" has not yet been received, you must notify us, in writing, as soon as practicable.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Form:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Form unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Form or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**

   If other valid and collectible insurance is available to the insured for a loss we cover, our obligations are limited as follows:

   a. Primary Insurance

      This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

   b. Excess Insurance

      This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis.

      When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

      When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

      (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown on the Endorsement Schedule in the Declarations.

**c.** Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Form in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements on the Endorsement Schedule in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Form to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom "claim" is made.

**8. Transfer of Rights of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Form, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. Transfer of Duties When Limit of Insurance is Used Up**

**a.** If we conclude that, based on "claims" which have been reported to us and to which this insurance may apply, the limit of insurance is likely to be used up in the payment of judgments or settlements for damages or the payment of "defense expenses," we will notify the first Named Insured, in writing, to that effect.

**b.** When the limit of insurance has actually been used up in the payment of judgments or settlements for damages and the payment of "defense expenses," we will:

**(1)** Notify the first Named Insured in writing, as soon as practicable, that such a limit has actually been used up and that our duty to

defend the insured against "suits" seeking damages subject to that limit has also ended;

**(2)** Initiate, and cooperate in, the transfer of control, to any appropriate insured, of all "suits" for which the duty to defend has ended for the reason described in **b.(1)** above and which are reported to us before that duty to defend ended; and

**(3)** Take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

**c.** When **b.(1)** above has occurred, the first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must:

**(1)** Cooperate in the transfer of control of "suits";  and

**(2)** Arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us.  Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

**d.** We will take no action with respect to defense for any "claim" if such "claim" is reported to us after the applicable limit of insurance has been used up.  It becomes the responsibility of the first Named Insured, and any other insured involved in such a "claim," to arrange defense for such "claim."

**e.** The first Named Insured will reimburse us as soon as practicable for expenses we incur in taking those steps we deem appropriate in accordance with paragraph **b.** above.

**f.** The exhaustion of the applicable limit of insurance and the resulting end of our duty to defend will not be affected by our failure to comply with any of the provisions of this Condition.

**10. When We Do Not Renew**

If we decide not to renew this Coverage Form, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal at least 30 days before the end of the policy period, or as required by the state law or regulation controlling the application of this Coverage Part.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**H. EXTENDED REPORTING PERIOD**

**1.** An Extended Reporting Period will be offered if the policy is cancelled or nonrenewed for any reason other than nonpayment of premium.

**2. Extended Reporting Period**

**a.** An Extended Reporting Period of three years is available, but only by endorsement and for an additional charge.

**b.** The Extended Reporting Period starts with the end of the policy period.  It does not extend the policy period or change the scope of coverage provided.  It applies only to "claims" for "injury" that occur before the end of the policy period but not before the Retroactive Date, if any, shown on the Endorsement Schedule in the Declarations.

**c.** You must give us a written request for the Extended Reporting Period endorsement within thirty (30) days after the end of the policy period or the effective date of cancellation, whichever comes first.

**d.** The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due and any premium you owe us.  Once in effect, the Extended Reporting Period may not be cancelled.

**e.** When the Extended Reporting Period endorsement is in effect, we will provide a Supplemental Aggregate Limit for any "claim" first made during the Extended Reporting Period.

The Supplemental Aggregate Limit will be equal to the dollar amount shown on the Endorsement Schedule in the Declarations in effect at the end of the policy period.

Paragraph **2.** of Limits of Insurance will be amended accordingly. The Per Person Limit shown on the Endorsement Schedule in the Declarations will then continue to apply, as set forth in paragraph **3.** of this Section

**f.** We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

   **1.** The exposures insured;

   **2.** Previous types and amounts of insurance;

   **3.** Limit of Insurance available under this Coverage Form for future payment of damages; and

   **4.** Other related factors.

The additional premium will not exceed 200% of the annual premium for this Coverage Form.

**I. DEFINITIONS**

**1.** "Claim" means a "suit" or demand made by or for the injured person for damages because of alleged "injury."

**2.** "Coverage territory" means:

   **a.** The United States of America (including its territories or possessions) and Puerto Rico; or

   **b.** All parts of the world if the insured's responsibility to pay damages is determined in a "suit" on the merits is brought in the territory described in **a.** above or in a settlement we agree to.

**3.** "Defense expenses" means payments allocated to a specific "claim" we investigate, settle or defend, for its investigation, settlement or defense, including:

   **a.** Fees and salaries of attorneys and paralegals we retain, including attor-

neys and paralegals who are our "employees."

   **b.** All other litigation or administrative hearing expenses, including fees or expenses of expert witnesses hired either by us or by the defense attorney retained by an insured.

   **c.** Reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim," including actual loss of earnings up to $250 a day because of time off from work.

   **d.** Costs taxed against the insured in the "suit."

"Defense expenses" does not include salaries and expenses of our "employees" or the insured's "employees" (other than those described in **a.** and **c.** above).

**4.** "Discrimination" means violation of a person's civil rights with respect to such person's race, color, national origin, religion, gender, marital status, age, sexual orientation or physical or mental condition.

**5.** "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Injury" means injury to a person arising out of:

   **a.** Refusal to employ the person, termination of the person's employment, including actual or constructive discharge, demotion, evaluation, reassignment, discipline, defamation or humiliation of the person based on "discrimination" or other unjust reasons directed at that person by an insured;

   **b.** Coercion of the person by an insured to do something unlawful or unethical; or

   **c.** "Sexual harassment" of other work-related verbal, physical, mental or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright 1997 GuideOne Insurance

emotional abuse directed at the person by an insured.

8. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

9. "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature when such conduct:

   a. Is linked implicitly or explicitly with a decision affecting a term or condition of an individual's employment;

   b. Interferes with an individual's job performance; or

   c. Creates an intimidating, hostile or offensive working environment for an individual.

10. "Sexual Misconduct or Sexual Molestation" is any activity which is sexual in nature whether permitted or unpermitted, including but not limited to, sexual assault, sexual battery, sexual relations, sexual acts, sexual activity, sexual handling, sexual massage, sexual exploitation, sexual exhibition, photographic, video or other reproduction of sexual activity, sexual stimulation, fondling, intimacy, exposure of sexual organs, lewd or lascivious behavior or indecent exposure, fornication, undue familiarity, or unauthorized touching.

11. "Suit" means a civil proceeding in which damages because of "injury" to which this insurance applies are alleged, including:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

   c. Any administrative proceeding or hearing conducted by a governmental agency (federal, state or local) having the proper legal authority over the matter of a personal complaint on "your employment-related practices."

12. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

13. "Your employment-related practices" means:

   a. Any act or failure to act, by an insured, in connection with your business; or

   b. Any of your policies, or your failure to have a policy.

   which directly or indirectly affects a person's employment status or condition with you or prospective employment by you.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright  1997 GuideOne Insurance

# TEXAS CHANGES

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

> EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

Exclusion **8.** of **B.** EXCLUSIONS is deleted in its entirety.

# AMENDED DEFINITION OF DAMAGES

**THIS DOCUMENT IS AN ENDORSEMENT THAT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

      COMMERCIAL GENERAL LIABILITY COVERAGE FORM
      PROFESSIONAL LIABILITY COVERAGE
      EMPLOYEE BENEFITS LIABILITY COVERAGE
      COUNSELORS LIABILITY COVERAGE

The definition of "damages"  is replaced by the following:

"Damages"  mean only those tort damages allowed by law.

EXHIBIT 2

| From: | admin@claims-usa.com |
|---|---|
| To: | Gross-Bryant, Sharon |
| Cc: | Public Claim Adjusters Inc |
| Subject: | Re: AA090974 First United Methodist Church |
| Date: | Wednesday, January 24, 2018 1:59:35 PM |

Sharon

Sorry for the delay, we have a new PA assigned and handling the file who's
working with the church and contractor.  I will send over their contact
info on who's the rep now handling the case directly.

I will have an update soon for you on the direction of the claim and repairs.

Thanks

> Hello,
>  I'm following up on the repair status for this loss, please advise.
> Thanks,
>
> SHARON GROSS-BRYANT | GUIDEONE INSURANCE
> PROPERTY ADJUSTER
> P.O. Box 14543 l West Des Moines, IA 50306
> P: 888-748-4326, ext. 6309 |E: SGross-Bryant@guideone.com l F:
> 800-676-4457
> GUIDEONE.COMl FACEBOOKl TWITTERl SAFECHURCH
>
>

**EXHIBIT 3**

| | |
|---|---|
| **From:** | admin@claims-usa.com |
| **To:** | Gross-Bryant, Sharon |
| **Cc:** | Public Claim Adjusters Inc |
| **Subject:** | Re: AA090974 First United Methodist Church |
| **Date:** | Friday, February 2, 2018 3:24:01 PM |

Sharon,

No repairs have or will be starting anytime,  probably for the next 3-4 months.

We are working with the insured and contractor on price and scope errors on the adjusters estimate and will be in touch soon.

Also,  I will be sending over next week the new public adjusters info assigned to the file now.

Thanks and have a great weekend.

> Hello,
>  I'm following up regarding the repair status for this loss, please
> advise. Should there be any questions, please feel free to call or email
> me.
> Thanks,
>
>
> SHARON GROSS-BRYANT | GUIDEONE INSURANCE
> PROPERTY ADJUSTER
> P.O. Box 14543 l West Des Moines, IA 50306
> P: 888-748-4326, ext. 6309 |E: SGross-Bryant@guideone.com l F:
> 800-676-4457
> GUIDEONE.COMl FACEBOOKl TWITTERl SAFECHURCH
>
>



| | |
|---|---|
| **From:** | ADMIN-Public Claims Adjusters USA |
| **To:** | Gross-Bryant, Sharon; ADMIN-Public Claims Adjusters USA |
| **Subject:** | Re: AA090974 First United Methodist Church |
| **Date:** | Wednesday, March 28, 2018 3:37:49 PM |

Sharon,

The contractor Trigg Construction sent you an estimate back in Sept 2017 for roughly $ 550,000 and you didn't pay it.   Would you like to settle the clam with a global release in the range of $ 600,000 - 700,000 to close this out?

There's a lot of missing items that are associated with this massive repair to the entire complex.  Just the OSHA, Cranes, mobilities, supervision and Federal Safety requirements alone is a significant amount of money, let alone the missing overhead and profit not included in the estimate(s).

These two items represent a fraction of repairs missing and needed on this claim.

Let me know your thoughts so we can figure this out quickly, if not we genuinely have a large disagreement on the scope and total amount of the claim.


On Fri, Mar 23, 2018 at 10:28 AM, Gross-Bryant, Sharon <SGross-Bryant@guideone.com> wrote:

> Per your request.
>
>
>
>
> **SHARON  GROSS-BRYANT** I GUIDEONE INSURANCE
> PROPERTY ADJUSTER
> P.O. Box 14543 I West Des Moines, IA 50306
> P: 888-748-4326, ext. 6309 I E: SGross-Bryant@guideone.com I F: 800-676-4457
> GUIDEONE.COM | FACEBOOK | TWITTER | SAFECHURCH
>
> **From:** ADMIN-Public Claims Adjusters USA [mailto:admin@claims-usa.com]
> **Sent:** Thursday, March 22, 2018 6:46 PM
> **To:** Gross-Bryant, Sharon; admin@claims-usa.com
>
>
> **Subject:** Re: AA090974 First United Methodist Church
>
>
>
> Sharon,
>
>
>
> Would you be so kind to forward an electronic copy of the policy via email for our records?
>
>
>
> On Thu, Jan 25, 2018 at 12:13 PM, Gross-Bryant, Sharon <SGross-Bryant@guideone.com>

wrote:

Ok, Thanks for responding.

SHARON GROSS-BRYANT | GUIDEONE INSURANCE
PROPERTY ADJUSTER
P.O. Box 14543 l West Des Moines, IA 50306
P: 888-748-4326, ext. 6309 |E: SGross-Bryant@guideone.com l F: 800-676-4457
GUIDEONE.COMl FACEBOOKl TWITTERl SAFECHURCH

-----Original Message-----
From: admin@claims-usa.com [mailto:admin@claims-usa.com]
Sent: Wednesday, January 24, 2018 2:59 PM
To: Gross-Bryant, Sharon
Cc: Public Claim Adjusters Inc
Subject: Re: AA090974 First United Methodist Church

Sharon

Sorry for the delay, we have a new PA assigned and handling the file who's working with
the church and contractor.  I will send over their contact info on who's the rep now handling
the case directly.

I will have an update soon for you on the direction of the claim and repairs.

Thanks

> Hello,
>  I'm following up on the repair status for this loss, please advise.
> Thanks,
>
> SHARON GROSS-BRYANT | GUIDEONE INSURANCE PROPERTY ADJUSTER
P.O. Box
> 14543 l West Des Moines, IA 50306
> P: 888-748-4326, ext. 6309 |E: SGross-Bryant@guideone.com l F:
> 800-676-4457
> GUIDEONE.COMl FACEBOOKl TWITTERl SAFECHURCH
>
>

--

Kindest Regards,

Customer Support Team


Public Claims Adjusters of America Inc.

1717 McKinney Ave, Ste 700

Dallas, TX 75020

800.624.1678

www.claims-usa.com

admin@claims-usa.com





CONFIDENTIALITY NOTICE:
The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.


--
Kindest Regards,

Customer Support Team

Public Claims Adjusters of America Inc.
1717 McKinney Ave, Ste 700
Dallas, TX 75020
800.624.1678
www.claims-usa.com
admin@claims-usa.com



CONFIDENTIALITY NOTICE:

The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.



# TODD HURD & ASSOCIATES
## ATTORNEYS AT LAW

**Fort Worth Area**
P.O. Box 1741
Burleson, Texas 76097

TODD HURD  JD, MBA
t.hurd@texasattorneylaw.com
Licensed in Texas, New Mexico and Minnesota

| EXHIBIT |
| 5 |

(817) 426-4LAW (4529)
(817) 426-8159 (Fax)

April 6, 2018

*Via* **Email Only:** tbstormrider@gmail.com

Mr. Todd Bilbrey
P.O. Box 189
Eldorado, Texas 76936

Re:    **Umpire Appointment: First United Methodist Church of Hereford**
       **Cause:**      **Order- 222nd Judicial District Court, Deaf Smith County, Texas**
       **Policy:**      **1432-879**
       **Claim:**      **AA090974**
       **Location:**   **511 Main Street, Hereford, Texas 79045**
       **Date of Loss: 4/14/2017**

Dear Mr. Bilbrey,

      I have attached a Deaf Smith County District Court Order that was signed and filed in the above referenced dispute appointing you as the Umpire. The contact information for the appraiser and insurer associated with this dispute is as follows:

      **Appraiser for First United Methodist Church of Hereford**:

      Eric Hoffman, Hoffman Appraisals
      Phone: (817) 653-8332
      Email: hoffman.appraisal@gmail.com

      **No Appraiser was appointed by insurer despite requests to do so.**
      **Information for Insurer Guide One Insurance**:

      Sharon Gross-Bryant
      Phone:  (888) 748-4326 x6309
      Email:  sgross-bryant@guideone.com



**LIFE MEMBER**
**MILLION DOLLAR ADVOCATES FORUM**
**MULTI-MILLION DOLLAR ADVOCATES FORUM**
The Top Trial Lawyers In America™

Bilbrey Umpire Letter:
First United Methodist Church of Hereford
Page 2

_____

The insurer has been unresponsive to my client's request for appointment of an appraiser. Please advise if you require any additional information.

With kindest regards, I am

Respectfully,

Todd M. Hurd

Enclosure: Order Appointing Umpire

cc:    *Via* Email: sgross-bryant@guideone.com
       Sharon Gross-Bryant
       Guide One Property Adjuster

       *Via* Email: hoffman.appraisal@gmail.com
       Eric Hoffman, Hoffman Appraisals

       *Via* Email: chris@pulshaney.com
       Chris Lyster

NO. _____

| | | |
|---|---|---|
| IN RE: POLICY OF INSURANCE | § | IN THE DISTRICT COURT OF |
| NO. 1432-879 BY AND BETWEEN | § | |
| GUIDEONE INSURANCE, | § | |
| INSURER AND FIRST UNITED | § | DEAF SMITH COUNTY, TEXAS |
| METHODIST CHURCH OF | § | |
| HEREFORD, INSURED | § | 222ND JUDICIAL DISTRICT |

## ORDER APPOINTING UMPIRE

Came on for consideration the Application of First United Methodist Church of Hereford for an appointment of an umpire. The Court finds that the application is well taken and should be granted.

IT IS HEREBY ORDERED, ADJUDGED AN DECREED that _Todd D. Bilbrey_ is appointed as the Umpire, pursuant to the insurance policy referenced in the Application to perform the duties assigned to an Umpire pursuant to the Appraisal provisions of the insurance policy attached to the Application.

SO ORDERED this ___3___ day of ___April___, 2018.

_____
JUDGE PRESIDING

FILED in the 222nd District Court
under the case/file number as
indicated and on the date and time
stamped.

ELAINE GERBER
District Clerk, Deaf Smith County, TX
By_____Deputy

04-03-18P04:48  FILE

## Appraisal Of Insurance Claim – Award Form

Name of Insured: First United Methodist Church
Claim number: AA090974
Policy Number:        001432879
Date of Loss: 4/14/2017
Risk Location: 511 Main St., Hereford TX 79045

### TO THE ABOVE REFERENCED PARTIES AT INTEREST:

We, the undersigned, pursuant to our appointment, HEREBY CERTIFY that we have truly and conscientiously performed the duties assigned to us and have investigated and considered all the material facts and information provided pertaining to this claim and have determined the appraisal award as described below.

| Coverage | RC Amount of Loss | ACV Amount of Loss |
|---|---|---|
| A – Building | $731,640.25 ** | $678,029.14 |

\*\*Per Attached Estimate which is an integral part of this award document.

\*\*\*Before application any deductibles, prior payments, limitations, exclusions, co-insurance or other applicable provisions.

This Award includes our determination as to the TOTAL DOLLAR VALUE of the loss as it pertains to the property, item or category of damage. The loss to property has been determined to be the amount as of the date of this award.

**Amounts awarded and payment of same are subject to reduction for amounts previously paid, any applicable deductibles, policy limitations, and/or exclusionary provisions.**

This appraisal award does not make any determination as to coverage under the policy or the insurer's obligation for the amount of damages. This appraisal award does not make any determination as to dates of loss, related prior losses or other related factors and serves as a depiction of the cost of repairs for damages observed.

The undersigned appraiser(s) hereby represent that they have been conferred by the requisite authority by their respective clients to act as an appraiser to determine the amount of the loss for which coverage has been conceded and agree with the foregoing determinations.

All executed copies shall be considered as counterpart originals.

Appraiser for the Insurer:                                    Date:

Appraiser for the Insured:    _Eric Hoffman_          Date:    7-19-2018

*Bilbrey Enterprises, LLC. P.O. Box 189, Eldorado TX 76936, 325.812.6322,* tbstormrider@gmail.com
*Adjusting, Appraisal, Disaster Recovery Consulting, Estimating, and Umpire Services*

Neutral Umpire: *Todd Bilbrey*                    Date:   7/18/2018

**BILLING**

| | EXHIBIT |
|---|---|
| | **7** |

**Bilbrey Enterprises, LLC**
**Bilbrey Enterprises, LLC**
PO Box 189
Eldorado, TX 76936
325.812.6322
tbstormrider@gmail.com

Ins Company:

Attention:     FUMC & Carrier

Approval Document for Services from Our Office          Date:          7/18/2018

| Policy: | 001432879 | Invoice No.: | 1750 |
|---|---|---|---|
| Ins. Claim #: | AA090974 | Adjuster: | Todd  Bilbrey |
| Insured: | First United Methodist Church | Adjuster #: | |
| Loss: | 4/14/2017 | Adjuster's File No.: | |
| Catastrophe No. : | | RCV Loss | $731,640.25 |
| | | Net Payment | $678,029.14 |

**SERVICES:**

      **PROPERTY APPRAISAL SERVICE**

           1.25%  of  $731,640.25                                          $9,145.50

    Administrative Fee                                                      $175.00

                         **TOTAL SERVICES:**                               $9,320.50

**EXPENSES:**

                         **TOTAL EXPENSES:**                                $0.00

                       **STATE & LOCAL TAX:**                              $0.00

              **TOTAL SERVICES AND EXPENSES:**               $9,320.50

**EXPLANATION OF CHARGES:**

<u>**Umpire Fee**</u>

Final invoice amount subject to 50/50 split.
50% due from insured and /or their representation ($4,660.25)
50% due from Insurance Company and/or their representation. ($4,660.25)

Invoice due upon receipt. A finance charge of 1.5% per month will be added to all overdue invoices, beginning 31 days from issuance.

**Form W-9**
(Rev. November 2017)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send it to the IRS.**

Print or type. See **Specific Instructions** on page 3.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Todd D Bilbrey

**2** Business name/disregarded entity name, if different from above

Bilbrey Enterprises, LLC

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☑ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ **P**

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

102 W. Redwood St.

**6** City, state, and ZIP code

Eldorado, TX 76936

Requester's name and address (optional)

**7** List account number(s) here (optional)

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

**or**

Employer identification number

| 2 | 7 | – | 2 | 4 | 1 | 0 | 1 | 3 | 8 |

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

Signature of U.S. person ▶  *Todd Bilbrey*

Date ▶ 5/23/2018

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Form W-9 (Rev. 11-2017)                                                                                                                  Page **2**

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting,* later, for further information.

**Note:** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the instructions for Part II for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code,* later, and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships,* earlier.

## What is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code,* later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

Form W-9 (Rev. 11-2017)

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

## Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note: ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C corporation, or S corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

## Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

## Line 3

Check the appropriate box on line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3.

| IF the entity/person on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

## Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

Form W-9 (Rev. 11-2017)

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note:** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

## Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

## Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note:** See *What Name and Number To Give the Requester,* later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/Businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code,* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

Form W-9 (Rev. 11-2017)                                                                                      Page **5**

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i) (A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |

| For this type of account: | Give name and EIN of: |
|---|---|
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships,* earlier.

**\*Note:** The grantor also must provide a Form W-9 to trustee of trust.

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:
• Protect your SSN,
• Ensure your employer is protecting your SSN, and
• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at *spam@uce.gov* or report them at *www.ftc.gov/complaint*. You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Visit *www.irs.gov/IdentityTheft* to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

Michelle Brisendine                                                                    Pages 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2                    AMARILLO DIVISION

3   GUIDEONE MUTUAL INSURANCE      )
    COMPANY,                       )
4   Plaintiff/Counter-Defendant    )
                                   )    CIVIL ACTION NO.
5   VS.                            )    2:18-cv-00140-D
                                   )
6   FIRST UNITED METHODIST CHURCH  )
    OF HEREFORD,                   )
7   Defendant/Counter-Plaintiff    )

8   --------------------------------------------------------

9              ORAL AND VIDEOTAPED DEPOSITION OF

10                 MICHELLE BRISENDINE

11                   October 8th, 2019

12  --------------------------------------------------------

13       ORAL AND VIDEOTAPED DEPOSITION OF MICHELLE BRISENDINE,

14  produced as a witness at the instance of the PLAINTIFF, and

15  duly sworn, was taken in the above-styled and numbered cause on

16  the 8th day of October, 2019, from 1:05 p.m. to 1:46 p.m.,

17  before AMY DUCKETT TAYLOR, CSR, in and for the State of Texas,

18  reported by machine shorthand, at First United Methodist Church

19  of Hereford, 501 Main Street, Hereford, Texas 79045, pursuant

20  to the Federal Rules of Civil Procedure and the provisions stated

21  on the record or attached hereto.

22

23

24

25

┌─────────────┐
│   EXHIBIT   │
│      8      │
└─────────────┘

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         Mr. Paul Miller
           Germer Beaman & Brown, PLLC
 5         301 Congress Avenue, Suite 1700
           Austin, Texas 78701
 6         Phone: (512) 472-0288

 7

      FOR THE DEFENDANT:
 8
           Mr. Chris Lyster
 9         Puls Haney Lyster, PLLC
           301 Commerce Street, Suite 2900
10         Fort Worth, Texas 76102

11

      ALSO PRESENT:
12         Mr. Chuck Alexander - videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                              INDEX

2                                                                  PAGE

3    Appearances----------------------------------------     2

4    MICHELLE BRISENDINE

5          Examination by Mr. Miller--------------------     4

6    Signature and Changes-----------------------------    32

7    Reporter's Certificate----------------------------    34

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE VIDEOGRAPHER:  Today is Tuesday, October
 2  8th, 2019,  this is the videotaped deposition of Michelle
 3  Brisendine, in the case of Guideone Mutual Insurance Company
 4  versus First United Methodist Church of Hereford, versus Sunni
 5  Boenker, et al.  Will counsel please state their appearances
 6  for the record?
 7                    MR. LYSTER:  Yes, Chris Lyster on behalf of
 8  First United Methodist Church of Hereford.
 9                    MR. MILLER:  Paul Miller for Guideone Mutual
10  Insurance Company.
11                    THE VIDEOGRAPHER:  The time is 1:05 p.m. And
12  we're on the record.  Will the court reporter please swear in
13  the witness?
14                         MICHELLE BRISENDINE,
15  having been first duly sworn, testified as follows:
16                           EXAMINATION
17  BY MR. MILLER:
18      Q.  Ms. Brisendine, would you please state your name for
19  the record?
20      A.  Yes.  Michelle Brisendine.
21      Q.  Do you live here in Hereford?
22      A.  No.  When I retired about a year and a half ago, we
23  moved to Canyon, Texas.
24      Q.  Okay.  All right.  Are you still employed with the
25  church?
```



1      A.    I do not.

2      Q.    He also testified that a company called TRIGG

3  Construction came by some time after the hail event, and asked

4  the church for permission to get on the roof, and see if it had

5  been damaged?

6      A.    Yes, sir.

7      Q.    Were you involved in that, in any way?

8      A.    Yes, sir.

9      Q.    Tell me about your involvement with that.

10     A.    I was in my office, and I was the first person that

11  TRIGG spoke to.  That was part of my typical job

12  responsibility, was to greet salesmen.  And -- very nice people

13  came in, introduced themselves, explained briefly what they

14  did, and who they were, and asked if we would mind them getting

15  on our roof to see if we had any damages.

16     Q.    Do you recall who you -- who stopped by to meet with

17  you, on that first occasion?

18     A.    His first name was Tyler.  I do remember that.  He is

19  the -- the first one that I met, I believe.  I don't remember

20  his last name.

21     Q.    And then there was another person that you met, with

22  TRIGG, after that some time?

23     A.    I believe, over the course of the balance of that

24  year, I met at least two other individuals, possibly more.  I

25  can't remember, specifically.



1  sorry.  But I always typed them up, as well, and filed them

2  away.

3      Q.   You typed them up like on your computer?

4      A.   Yes, sir.

5      Q.   When you would type them up on your computer, as I

6  understand it, you would print them out and then save a hard

7  copy?

8      A.   Yes, sir.

9      Q.   Did you also save an electronic copy?

10      A.   If I did, I'm not sure that we have those any longer.

11  There's been a change in staff positions and computers since I

12  was here.  I can't verify that.

13      Q.   Back when you were the business manager, where would

14  you save your electronic copies?

15      A.   On my computer.

16      Q.   Like, is there a specific folder on your computer, or

17  specific location, that you can recall?

18      A.   I'm afraid I was not so organized. Typically, under

19  documents.

20      Q.   Okay.  Okay.  So, take me back to May, roughly, of

21  2017, when you met TRIGG for the first time.

22      A.   Yes, sir.

23      Q.   They come in, they explain to you that they're

24  contractors and roofers, and they would like to inspect the

25  church for damage?



1    A.   Yes, sir.

2    Q.   Do they inspect it the same day?

3    A.   I believe so.

4    Q.   And did they come report back to you at some point

5  after that, their findings?

6    A.   I believe it was that same day, he told me that there

7  was damage on the roof.

8    Q.   Okay.  And was this from Tyler?

9    A.   Yes, sir.

10   Q.   Do you know if Tyler had, you know, a group of gals

11 with him or gals with him, or was he by himself?

12   A.   I believe that my pastor and Tyler and one other

13 person went onto the roof that day.

14   Q.   All right.  When Tyler found the damage, what did he

15 tell the church, or tell you, specifically, he could do for

16 you?

17   A.   We could, if we so desired, enter into a contract

18 with their company for roof repairs.

19   Q.   And my understanding is, that ultimately, the church,

20 with approval of the church council, entered into a contract

21 with TRIGG Construction?

22   A.   Yes.

23   Q.   And TRIGG Construction was going to repair the roof,

24 replace the roof, whatever?

25   A.   Yes.



1      Q.   Based on whatever scope and amount of money the

2   insurance company would give.  Is that generally the terms of

3   the agreement?

4      A.   Yes.

5      Q.   Do you understand it any -- any other way?  Have I

6   left something out?

7      A.   A little bit different than some of our former

8   roofers, perhaps, is that they would represent us well, and if

9   they felt that the insurance company did not cover all

10  necessary expenses, they would work to try and be sure they

11  were covered.  That was where their expertise came in, so to

12  speak.

13     Q.   Is that something TRIGG Construction, when the church

14  and you and whoever else first met with them --

15     A.   Uh-huh.

16     Q.   -- before the contract was signed, was that something

17  they expressed to you and -- and other church personnel that

18  they had experienced in insurance claims, and they would help

19  the church get the money from the insurance company to make the

20  repairs?

21     A.   Yes.

22     Q.   Do you know what TRIGG Construction did, throughout

23  that process with Guideone, in order to get the money necessary

24  to make the repairs?

25     A.   I know that I referred all correspondence that I



1      A.   I don't know.

2      Q.   Okay.  Do you know whether or not TRIGG ever provided

3  their own estimate for the cost and scope of repair, to

4  Guideone?

5      A.   I don't know.

6      Q.   Do you believe that if TRIGG truly disagreed with

7  Guideone's cost and scope of repair, that they should have

8  provided their own cost and scope of repair to Guideone, for

9  consideration?

10          MR. LYSTER:  Objection, form.

11     A.   I'm not sure I'm qualified to answer that.  I don't

12 know how that business would regularly be done.

13     Q.   Well, let's just think about it, you know, in a -- in

14 a reasonable person context.  If you and I have got a

15 disagreement about something, don't you think it would be best

16 that we talk about that disagreement, to see if we can come to

17 some sort of resolution?

18          MR. LYSTER:  Objection, form.

19     A.   I assume they were.

20     Q.   Okay.  And that's fine.  And I understand that you

21 weren't having those conversations, right?

22     A.   Yes, sir.

23     Q.   But it was your assumption, and the church's

24 assumption, that TRIGG was doing whatever was necessary to

25 inform Guideone of the cost and scope of repairs, so the church



1   Q.   And I guess, based on that answer, as I understand

2   your responses, your history with Guideone has been good,

3   however, this particular claim, you would like to see some sort

4   of a resolution to it?

5   A.   Certainly.

6   Q.   But, what happened, you know, why the claim hasn't

7   been resolved, as I understood your testimony, is really

8   outside of your personal knowledge, because it was -- what was

9   really happened is TRIGG was working with Guideone, outside of

10  the church?

11  A.   Yes, sir.

12  Q.   Okay.

13  A.   Or not outside the church, but on the church's

14  behalf.

15  Q.   Gotcha.  You mentioned that the church always, you

16  know, filled out whatever forms, and provided whatever

17  information to the insurance company as requested, right?

18  A.   Yes, sir.

19  Q.   Do you know whether Guideone requested a sworn proof

20  of loss in this case?

21  A.   No.

22  Q.   Okay.  If Guideone had requested a sworn proof of

23  loss, and you had been here, and involved, would that have been

24  something you would have prepared, if requested?

25          MR. LYSTER:  Objection, form.



```
 1      A.   I -- I always tried to do anything and everything I
 2  needed to do to expedite anything.
 3      Q.   Ma'am, I appreciate your time.
 4           MR. MILLER:  Pass the witness.
 5           MR. LYSTER:  Reserve my questions.
 6           THE WITNESS:  Thank you.
 7           THE VIDEOGRAPHER:  This concludes the video
 8  deposition.  Off record 1:46 p.m.
 9           (Off the record, 1:46 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CHANGES AND SIGNATURE

DEPOSITION OF MICHELLE BRISENDINE

October 8th, 2019

PAGE/LINE          CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



```
1        I, MICHELLE BRISENDINE, have read the foregoing deposition
  and hereby affix my signature that same is true and correct,
2 except as noted above.

3

4
                         _____
5                        MICHELLE BRISENDINE

6

7 THE STATE OF _____)

8 COUNTY OF _____)

9

10      Before me, _____, on this day

11 personally appeared MICHELLE BRISENDINE, known to me (or proved

12 to me under oath or through _____)

13 (description of identity card or other document) to be the

14 person whose name is subscribed to the foregoing instrument and

15 acknowledged to me that they executed the same for the purposes

16 and consideration therein expressed.

17      Given under my hand and seal of office this _____ day of

18 _____, 2019.

19

20

21                       _____
                         NOTARY PUBLIC IN AND FOR
22                       THE STATE OF _____
                         COMMISSION EXPIRES: _____
23

24

25
```



```
  1                    IN THE UNITED STATES DISTRICT COURT
  2                   FOR THE NORTHERN DISTRICT OF TEXAS
                              AMARILLO DIVISION
  3
     GUIDEONE MUTUAL INSURANCE           )
  4  COMPANY,                            )
     Plaintiff/Counter-Defendant        )
  5                                      )   CIVIL ACTION NO.
     VS.                                 )   2:18-cv-00140-D
  6                                      )
     FIRST UNITED METHODIST CHURCH       )
  7  OF HEREFORD,                        )
     Defendant/Counter-Plaintiff        )
  8

  9                       REPORTER'S CERTIFICATION
                     DEPOSITION OF MICHELLE BRISENDINE
 10                        OCTOBER 8TH, 2019

 11

 12         I, AMY DUCKETT TAYLOR, Certified Shorthand Reporter in and

 13  for the State of Texas, hereby certify to the following:

 14         That the witness, MICHELLE BRISENDINE, was duly sworn by

 15  the deposition officer and that the transcript of the oral

 16  deposition is a true record of the testimony given by the

 17  witness;

 18         That the deposition transcript was submitted on

 19  _____ to the witness or to the attorney for

 20  the witness for examination, signature and return to me by

 21  _____;

 22         That the amount of time used by each party at the

 23  deposition is as follows:

 24         Mr. Paul Miller - 00 HOURS:41 MINUTES
            Mr. Chris Lyster - 00 HOURS:00 MINUTES
 25
```

1      That pursuant to information given to the deposition

2   officer at the time said testimony was taken, the following

3   includes counsel for all parties of record:

4      Mr. Paul Miller, Attorney for Plaintiff
       Mr. Chris Lyster, Attorney for Defendant

5

6      I further certify that I am neither counsel for, related

7   to, nor employed by any of the parties or attorneys in the

8   action in which this proceeding was taken, and further that I

9   am not financially or otherwise interested in the outcome of

10  the action.

11     Further certification requirements pursuant to Rule 203 of

12  the TRCP will be certified to after they have occurred.

13     Certified to by me this 28th day of

14  October, 2019.

15

16                                   *Amy Duckett Taylor*

17                          _____
                            AMY DUCKETT TAYLOR, Texas CSR #3783
18                          Expiration Date:  12/31/19

19

20

21

22

23

24

25



```
1          FURTHER CERTIFICATION UNDER RULE 203 TRCP

2       The original deposition was/was not returned to the

3  deposition officer on _____;

4       If returned, the attached Changes and Signature page

5  contains any changes and the reasons therefor;

6       If returned, the original deposition was delivered to

7  _____, Custodial Attorney;

8       That $_____ is the deposition officer's charges

9  to the Plaintiff for preparing the original deposition

10 transcript and any copies of exhibits;

11      That the deposition was delivered in accordance with Rule

12 203.3, and that a copy of this certificate was served on all

13 parties shown herein on and filed with the Clerk.

14      Certified to by me this _____ day of

15 _____, 2019.

16

17

18                         _____
                           AMY DUCKETT TAYLOR,Texas CSR #3783
19                         Expiration Date:  12/31/19

20

21

22

23

24

25
```

**$**

**$221,000** 18:24

**1**

**1988** 5:6,18
**1:05** 4:11
**1:46** 31:8,9

**2**

**2017** 9:12 12:16,21 13:21 15:21
19:11 26:2,6,7 27:17 29:7
**2018** 5:7,18 26:10,21
**2019** 4:2

**3**

**30** 12:3 26:16 28:24,25 29:4
**31** 5:7 26:21

**8**

**8th** 4:2

**A**

**Absolutely** 26:14
**ac** 7:22
**acceptable** 13:5
**access** 19:14
**accessible** 20:24
**accounted** 19:7
**accounts** 5:15
**accumulating** 8:9
**addition** 5:8 18:23
**additional** 20:5
**address** 14:11
**adjuster** 18:2,4 19:11,14 20:17,19
**afraid** 15:18
**agree** 23:25
**agreement** 17:3 29:20

**air** 7:14
**alley** 28:5
**allocate** 8:16
**Amarillo** 12:6
**amount** 8:17 17:1 18:25 20:1
**amounts** 20:5
**appearances** 4:5
**appraisal** 25:9,11
**approach** 11:15
**approval** 16:20
**approximately** 5:4 26:4
**April** 9:12 11:9 12:16,21 13:21 26:6
29:7
**area** 5:19 12:6 27:15,20 28:6,9
**areas** 28:8,12
**asleep** 25:21
**assist** 7:1
**assume** 13:15 24:19 27:12
**assumption** 24:23,24
**August** 20:8
**awake** 25:17
**aware** 22:20 27:17 28:13 29:9

**B**

**back** 7:7,25 8:24 12:25 13:12,19
15:13,20 16:4 20:22 27:17
**balance** 10:23
**Banker** 29:18
**based** 11:12 17:1 25:25 29:13 30:1
**basically** 11:14
**basis** 20:23
**beat** 14:20
**behalf** 4:7 30:14
**believed** 23:13
**bell** 18:7
**bills** 5:16
**bit** 17:7 19:16 28:7
**blanked** 9:17
**Bless** 14:18,19
**board** 6:12

**Boenker** 4:5
**bookkeeper** 5:25
**bookkeeping** 5:15
**break** 19:16
**briefly** 10:13
**Brisendine** 4:3,14,18,20 29:13
**budget** 8:7,16,21
**building** 7:2,8 28:16 29:2
**buildings** 7:13
**Bushart** 9:18,19
**business** 6:1 9:15 13:16 14:13
15:13 24:12

**C**

**cabinet** 9:6
**call** 7:15,23
**called** 7:15,17 8:6 10:2 29:19
**calls** 19:12 23:1
**Canyon** 4:23 5:22
**capital** 8:9
**case** 4:3 22:4 25:4 26:1 30:20
**certainty** 29:19
**change** 15:11
**Chris** 4:7
**church** 4:4,8,25 5:2,5,8,25 6:7,9,16,
25 7:6,11,19,25 8:1,6,14,21 10:4 11:6
12:1 14:2,4 15:25 16:15,19,20 17:13,
17,19 18:24 19:4 20:12 22:8,10,12,
14,16 23:18,20 24:25 26:22 28:6,13
29:9 30:10,13,15
**church's** 24:23 30:13
**claim** 21:11 26:1,7,12,13,15,25 27:3,
9 29:16 30:3,6
**claims** 12:22 13:20,22 14:8 17:18
20:15
**close** 28:17
**commercial** 25:14
**committee** 6:14
**committees** 6:6,9,11,19,24
**common** 7:23
**commonly** 6:1
**communications** 22:16

**companies** 7:13

**company** 4:3,10 7:15 10:2 11:22 12:23 16:18 17:2,9,19 21:18 23:23 29:21 30:17

**compile** 6:23 7:8

**complaints** 29:14

**computer** 15:3,5,15,16

**computers** 15:11

**concerned** 22:8

**concludes** 31:7

**conditioner** 7:14

**consideration** 24:9

**construction** 10:3 11:6,22 16:21, 23 17:13,22 19:5

**contact** 29:17

**context** 24:14

**contract** 16:17,20 17:16

**contracted** 22:5,9

**contractor** 29:10

**contractors** 15:24

**contracts** 23:4

**contributions** 5:16

**conversations** 24:21

**copies** 15:14

**copy** 14:16 15:7,9

**correct** 11:13 27:12

**correspond** 21:12

**correspondence** 17:25 21:14 23:8

**cost** 18:21 23:13 24:3,7,8,25

**council** 6:8,10,16 14:2,5,10 16:20 27:7

**counsel** 4:5

**court** 4:12 14:21

**courteous** 21:15

**cover** 17:9

**coverage** 29:21

**covered** 17:11 28:9

**criticisms** 29:15

---

## D

**damage** 12:22 15:25 16:7,14

**damaged** 10:5

**damages** 10:15 18:21 19:6,7

**Dan** 11:3 20:20 21:19

**date** 5:4 9:21 26:3,24

**dates** 20:10

**day** 9:23 11:5 16:2,6,13 18:6

**dealing** 21:22

**dealings** 21:5

**dealt** 6:23

**decisions** 7:3,4,12

**departure** 26:10

**deposited** 5:16

**deposition** 4:2 31:8

**deposits** 5:16

**description** 11:13

**desired** 16:17

**determine** 13:7

**difference** 14:4

**disagreed** 24:6

**disagreement** 24:15,16

**discussed** 12:10

**document** 23:16

**documentation** 7:17

**documents** 15:19 20:8

**door** 11:14

**doze** 25:19

**duly** 4:15

---

## E

**e-mails** 21:6

**earlier** 12:11 14:1

**early** 26:15

**east** 5:22

**efforts** 29:9

**electrical** 7:16,22

**electrician** 12:2

---

**electronic** 15:9,14

**electronically** 27:11

**employed** 4:24 5:2,5 26:21

**employee** 5:11

**employment** 5:25

**encouraged** 19:10

**end** 28:17

**endowment** 8:8

**enlist** 11:24 19:10,13

**enter** 16:17

**entered** 16:20

**entrance** 28:5

**envision** 11:12

**estimate** 18:19,22,23 19:3,8,9 20:1, 5 23:13 24:3

**estimates** 19:8,18,20 20:11 23:9, 10,18,19,25 27:3

**et al** 4:5

**event** 9:13,22 10:3 18:17

**exact** 9:21 18:25

**EXAMINATION** 4:16

**exception** 14:12

**exchanged** 21:6

**expected** 22:9

**expedite** 31:2

**expense** 8:9

**expenses** 8:17 17:10

**experience** 21:22 22:2

**experienced** 17:18

**expertise** 17:11

**explain** 15:23

**explained** 10:13 11:17

**expressed** 17:17

**extent** 28:2

**extra** 9:8

---

## F

**fact** 18:23

**fails** 12:24

**fair** 27:6 29:3



Michelle Brisendine    s-index familiar - learned

**familiar** 11:23 25:11 26:3 28:5,14

**fell** 9:23

**felt** 17:9

**file** 7:6,14 8:4,6,11 9:9 12:10 13:13 21:5,10 25:25

**filed** 8:2,17 14:16 15:1

**files** 13:19,21 14:17

**filing** 9:6

**fill** 29:23

**filled** 30:16

**filling** 29:22

**finally** 20:17

**finance** 6:7,14

**financial** 6:25

**find** 12:9 21:14

**findings** 16:5

**fine** 24:20

**fixed** 25:1

**flashings** 28:17

**flat** 28:6,17

**folder** 7:5 9:7 15:16

**follow** 7:3 29:24

**form** 24:10,18 30:25

**forms** 29:23 30:16

**found** 16:14 19:6

**free** 25:23

**function** 5:13

**fund** 8:9

**funds** 8:9

### G

**gals** 16:10,11

**general** 9:22

**generally** 17:2

**girls** 29:18

**give** 5:4 17:2

**good** 21:17 22:3,4 25:22 30:2

**Gotcha** 30:15

**greet** 10:12

**group** 16:10

**guess** 11:14 13:10 30:1

**guideline** 29:24

**Guideone** 4:3,9 17:23 18:1,2,4,13 19:3,5,6,12,22 20:13,23 21:1,5,6,14, 16,23 22:2,6,10,16,25 23:9,22,24,25 24:4,8,25 29:14,17 30:2,9,19,22

**Guideone's** 23:19 24:7

**guy** 18:6,15

### H

**hail** 9:13,22,23 10:3 12:22 26:12,13, 15,25 27:2,9

**half** 4:22

**hand** 22:2

**handle** 14:12

**handled** 5:15 29:15

**handling** 26:25

**hands** 22:7

**handwritten** 14:24

**happened** 11:9,12 26:6 30:6,9

**happening** 27:14

**hard** 15:6

**head** 25:21

**helpful** 21:15

**Hereford** 4:4,8,21 5:19 14:22

**hey** 7:14

**hired** 18:12

**hiring** 29:10

**history** 30:2

**hoping** 19:14

**hurricane** 19:11

**husband** 25:20

### I

**identify** 29:4

**inaccessible** 20:16

**incident** 12:16

**including** 6:7

**individuals** 10:24 11:1

**inform** 19:5 23:24 24:25

**information** 13:23 21:2 30:17

**initially** 21:11

**inspect** 15:24 16:2 18:13

**inspected** 18:3,18 19:2

**insufficient** 23:19

**insurance** 4:3,10 12:23 13:20,22 14:8 17:2,9,18,19 21:17 22:13 25:4,5, 9 29:18,21 30:17

**introduced** 10:13

**invoice** 12:9

**invoices** 7:24

**involved** 10:7 26:12 30:23

**involvement** 10:9 26:24 29:14

**involves** 9:12

**issue** 29:25

**issued** 20:1,4,11

**issues** 14:7 26:13

**item** 8:7,14,18,21

**items** 23:16

### J

**January** 5:7,18 26:10,21

**job** 5:13,14 10:11 12:7

**July** 20:8

**June** 26:1,7

### K

**kind** 7:17 28:18

**knocks** 11:14

**knowledge** 19:4 21:24 23:22 30:8

### L

**large** 8:10

**lead** 26:15

**leak** 28:4 29:5

**leaks** 27:14,17,20,22 28:1,13,15,19, 20,25

**learned** 23:6



**learning** 21:24

**left** 8:6 12:13 17:6 22:6

**lengthy** 29:22

**list** 7:9

**listing** 23:16

**live** 4:21 5:18

**locally** 11:25

**location** 15:17

**log** 7:21

**long** 18:6

**longer** 15:10 26:21

**loss** 30:20,23

**lot** 7:13

**lunch** 25:22

**Lyster** 4:7 9:18 14:18 24:10,18
  25:16 26:16 30:25 31:5

**M**

**made** 5:15 8:8 12:22 13:21 22:20
  26:1,7 27:3 29:20

**main** 14:17

**maintain** 7:19

**maintenance** 7:2,5,9,20,25 8:6,14,
  17,21,23 9:10 12:14 27:8

**make** 7:2,12,19 17:19,24 19:5,15
  29:10

**manager** 6:1 9:15 15:13

**manager's** 13:16

**manual** 9:7 13:22,24

**marked** 14:1

**meet** 10:16 14:12 18:4

**meeting** 7:8 14:23 27:7,8,10

**meetings** 14:25

**member** 5:9

**memory** 12:24

**mention** 23:15

**mentioned** 8:13,14 13:25 18:15
  19:18 28:4 30:15

**met** 10:19,21,24 11:6 15:21 17:14

**Methodist** 4:4,8

**Michelle** 4:2,14,20

**Miller** 4:9,17 14:19 25:18,22,25 31:4

**mind** 10:14

**minor** 7:10

**minutes** 7:8 13:25 14:1,4,5,9,10,14,
  23,24,25 27:7,8,10

**missing** 28:2

**money** 5:15,17 8:9,23 9:2 17:1,19,
  23 19:1,3 20:2,5,11 23:18

**monies** 6:23

**month** 11:10

**morning** 9:19 27:13

**move** 19:15

**moved** 4:23 5:21

**Mutual** 4:3,9

**N**

**named** 11:3

**names** 11:4

**needed** 31:2

**nice** 10:12 18:6,15 29:18

**normal** 8:17

**noted** 14:8

**notes** 14:25

**number** 7:23

**O**

**Objection** 24:10,18 30:25

**occasion** 10:17

**occurred** 9:22

**October** 4:1

**office** 8:2 9:6 10:10 11:14,16 13:13,
  16 14:17 18:5

**official** 23:16

**operating** 8:17

**opinion** 23:19

**opportunity** 13:18

**opposed** 27:10

**order** 17:23 19:5

**organized** 15:18

**overloaded** 20:14

**overlooking** 7:1

**P**

**p.m.** 4:11 31:8,9

**paid** 5:16

**parking** 28:10

**part** 10:11

**pass** 25:23 31:4

**past** 8:18 12:1,6,9

**pastor** 6:5 9:19 16:12 27:13 28:12

**Paul** 4:9

**people** 7:22 10:12

**period** 13:25

**permanent** 8:8

**permission** 10:4

**person** 6:20,22 7:23 10:10,21 16:13
  20:18 24:14

**personal** 21:4,23 30:8

**personally** 21:13 29:13

**personnel** 17:17

**pertained** 9:8

**pertaining** 7:2

**physically** 27:9

**places** 13:17

**plumber** 7:22 12:1

**point** 16:4 19:10,13 20:6 21:10
  22:17 28:24

**policy** 25:4,5,9

**positions** 15:11

**possibly** 10:24 11:11 28:16

**premiums** 29:22

**prepared** 23:12,17,25 27:3 30:24

**present** 7:10 27:23 28:23

**presents** 28:7

**pretty** 28:19

**primarily** 5:17

**primary** 5:14

**print** 15:6

**prior** 12:20 13:21 14:8 27:23 28:23

**problem** 21:1 28:7

**problems** 7:16

**process** 17:23 25:11

**project** 8:11 9:8 19:15

**projects** 8:12 11:23

**Prompt** 29:22

**proof** 30:19,22

**properties** 23:3

**provided** 21:2 24:2,8 30:16

**provisions** 25:8

**public** 19:10,13 20:17,19

**purpose** 26:6

**pushed** 26:17

**put** 13:22,23

**Q**

**qualified** 24:11

**question** 11:5 13:7 29:4

**questions** 31:5

**quick** 21:4

**R**

**rages** 5:4

**reaching** 21:1

**read** 27:9

**readily** 19:14

**real** 21:4 26:3

**reason** 26:5,7

**reasonable** 24:14

**recall** 10:16 11:1,5 12:14,22 15:17 21:9

**receipt** 8:24 12:9

**receipts** 8:18 9:4,10

**received** 18:1,22,24

**recognize** 13:17

**recollect** 23:11

**recollection** 19:9 20:6,7 26:2 27:25

**recommended** 20:17

**recommending** 20:19

**reconcile** 8:24

**record** 4:6,12,19 31:8,9

**records** 12:25 13:12,14

**refer** 7:7 12:24

**referencing** 28:20

**referred** 17:25

**referring** 8:15 9:9

**regularly** 24:12

**related** 25:9 27:8

**relying** 22:12

**remember** 10:18,19,25 11:4 12:17 20:10 26:8 27:5 28:15

**renovation** 8:10,11

**repair** 16:23 18:19 23:14,20 24:3,7,8

**repaired** 22:10,14

**repairmen** 7:18

**repairs** 7:19 8:8 16:18 17:20,24 24:25 29:11

**replace** 16:24

**report** 6:2 16:4

**reporter** 4:12 14:21

**reports** 6:24

**represent** 17:8

**requested** 29:23 30:17,19,22,24

**Reserve** 31:5

**resolution** 24:17 30:4

**resolved** 30:7

**respect** 6:21,25 7:6,24 13:20 21:13, 19,22 23:9

**respects** 11:20

**responded** 19:12 22:20

**responding** 23:1

**responses** 22:23 30:2

**responsibilities** 6:18

**responsibility** 5:14 10:12

**responsive** 21:15

**retired** 4:22 5:7

**retirement** 5:21 26:15

**reviewed** 23:8 25:4,8 26:1

**ring** 18:7

**riveting** 25:13

**role** 5:24 6:21

**Ron** 18:7,8,17 19:20

**roof** 10:4,15 13:20 14:8 16:7,13,18, 23,24 18:2,13,18 19:3 25:1 27:4,8,9 28:6 29:11

**roofer** 11:25

**roofers** 11:23 12:5,8 15:24 17:8 27:2

**roofing** 11:21,22 12:15 13:23

**roofs** 28:18

**roughly** 15:20

**S**

**salesmen** 10:12

**save** 15:6,9,14

**scope** 17:1 18:19 23:14 24:3,7,8,25

**search** 27:11

**season** 19:12

**secretary** 11:15

**secretary's** 14:17

**selected** 21:11

**sense** 22:12

**separate** 8:11

**September** 20:9

**served** 6:6,11,12,14,16

**serves** 20:7

**serviced** 7:15

**serving** 6:5

**shortly** 5:23

**showed** 11:6

**signed** 17:16

**simply** 20:15

**sir** 5:1,3,10,12,17,20,23 6:3,11,13, 15,17,20 8:3,22 9:1,3,11,14,16,20,24 10:6,8 11:8,16 14:3,6 15:4,8,22 16:1, 9 18:22 19:1,17,19 20:3,6 21:3,21 22:11,15 23:2,5,7,11 24:22 25:7,10 26:11 27:1,5 28:6,11 29:8,12 30:11, 18

**Sitting** 12:14

**size** 12:7



**small** 28:19

**sneeze** 14:19

**Sorrenson** 18:7,8,18 19:2,6,21 23:17

**sort** 24:17 30:3

**sorts** 8:5

**sounds** 7:20 26:4

**speak** 17:12

**speaking** 7:20

**special** 9:7,8

**specific** 8:7 9:7,9 11:5,25 15:16,17 29:16

**specifically** 8:15 9:5 10:25 12:17 16:15 20:22 21:9

**spent** 8:23

**spoke** 9:17 10:11

**spot** 28:12

**staff** 6:20,22 15:11

**stairwell** 28:16

**state** 4:5,18 20:15

**stated** 28:13

**status** 6:25

**steps** 23:22,24

**stopped** 10:16

**storm** 12:22 26:6 27:23,24 28:23 29:7

**strike** 12:19 23:23

**stuff** 25:13

**suggested** 19:13

**suit** 9:12

**Sunni** 4:4

**suspect** 25:3

**swear** 4:12

**sworn** 4:15 30:19,22

**sync** 26:2 27:24

---

**T**

**talk** 24:16

**talked** 12:1 13:13

**talking** 14:23 19:20 20:18 23:23 27:13

**telling** 14:7 22:25

**term** 6:1

**terms** 17:2

**testified** 4:15 10:2 27:22

**testimony** 20:23 30:7

**Texas** 4:23 5:19

**things** 7:1,10,25 8:5 23:10,15 28:3

**thought** 18:21

**thrown** 12:12

**tied** 28:18

**tiles** 28:2

**time** 4:11 6:6 7:9 9:15 10:3,22 11:7 15:21 23:5 26:9 27:21 28:1,2 31:3

**timeframe** 20:9 22:25

**title** 5:24

**today** 4:1 12:14 19:1

**told** 9:21 16:6 27:14

**top** 26:17

**totally** 13:5

**touch** 20:13

**town** 12:6

**tracked** 5:16

**Traditionally** 29:17

**TRIGG** 10:2,11,22 11:5 15:21 16:21, 23 17:13,22 18:1,2 19:4,10 20:12 21:1,2,19,20,25 22:5,6,9,13,18 23:3, 8,12,18,24 24:2,6,24 30:9

**TRIGG's** 19:12 22:24

**trouble** 20:13

**true** 22:1 23:21 25:2 26:23

**trustee** 7:7 13:25 14:1,5,9,14,23,25 27:8

**trustees** 6:7,12,25

**trutees** 14:10

**Tuesday** 4:1

**turn** 25:20

**Tyler** 10:18 11:2 16:8,10,12,14 20:19,21 21:20

**type** 15:5

**typed** 14:24 15:1,3

**typical** 10:11

**typically** 7:8,22 11:15 12:6 14:11, 16 15:18 28:7

---

**U**

**Uh-huh** 11:18 17:15 18:10,20 20:25 21:7,21 27:16

**ultimately** 6:7 16:19 18:24 22:6

**underneath** 28:9

**understand** 9:12 15:6 17:5 18:17 24:20 30:1

**understanding** 9:23 16:19 19:25 22:5 23:17

**understood** 20:12 30:7

**unfair** 29:3

**United** 4:4,8

**update** 6:24

**updated** 7:10

**upstairs** 28:16

**utilize** 8:10

---

**V**

**vendors** 7:18

**verify** 15:12

**versus** 4:4

**video** 31:7

**voting** 6:18

---

**W**

**waited** 20:16

**wanted** 27:6

**work** 5:6,8 12:8,10,15 17:10 22:6,9 29:20

**working** 30:9

**workload** 22:24

**worse** 27:24

**wrong** 11:13 23:23

---

**Y**

**year** 4:22 8:16 10:24 12:15 19:11

**years** 7:23 12:3,20,21 21:17 26:16 28:24,25 29:4





Roy Carlson

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                    AMARILLO DIVISION

 3   GUIDEONE MUTUAL INSURANCE        )
     COMPANY,                         )
 4   Plaintiff/Counter-Defendant      )
                                      )   CIVIL ACTION NO.
 5   VS.                              )   2:18-cv-00140-D
                                      )
 6   FIRST UNITED METHODIST CHURCH    )
     OF HEREFORD,                     )
 7   Defendant/Counter-Plaintiff      )

 8   -----------------------------------------------------------

 9
                ORAL AND VIDEOTAPED DEPOSITION OF
10
                        ROY CARLSON
11
                      October 8th, 2019
12
     -----------------------------------------------------------
13

14        ORAL AND VIDEOTAPED DEPOSITION OF ROY CARLSON, produced as

15   a witness at the instance of the PLAINTIFF, and duly sworn, was

16   taken in the above-styled and numbered cause on the 8th day of

17   October, 2019, from time ^ a.m. ^ p.m. to time ^ a.m. ^ p.m.,

18   before AMY DUCKETT TAYLOR, CSR, in and for the State of Texas,

19   reported by machine shorthand, at First United Methodist Church

20   of Hereford, 501 Main Street, Hereford, Texas 79045, pursuant

21   to the Federal Rules of Civil Procedure and the provisions stated

22   on the record or attached hereto.

23

24

25
```

**EXHIBIT 9**

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4         Mr. Paul Miller
           Germer Beaman & Brown, PLLC
 5         301 Congress Avenue, Suite 1700
           Austin, Texas 78701
 6         Phone: (512) 472-0288

 7

     FOR THE DEFENDANT:
 8
           Mr. Chris Lyster
 9         Puls Haney Lyster, PLLC
           301 Commerce Street, Suite 2900
10         Fort Worth, Texas 76102

11

     ALSO PRESENT:
12         Mr. Chuck Alexander - videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                        INDEX

 2                                                      PAGE

 3  Appearances----------------------------------      2

 4  [!WIT]

 5       Examination by Mr. Miller--------------------  4

 6  Signature and Changes----------------------------  24

 7  Reporter's Certificate---------------------------  26

 8

 9                      EXHIBITS

10  NO.  DESCRIPTION                              PAGE

11   8      Trustees report------------------------  16
     9      Trustees minutes 10/19/17--------------  17
12  10      Trustees minutes 11/12/17--------------  17
    11      Trustees minutes 3/13/18---------------  18
13  12      Trustees minutes 5/14/18---------------  18

14

15

16

17

18

19

20

21

22

23

24

25
```

LEXITAS

1          THE VIDEOGRAPHER:  Today is Tuesday October 8th,

2    2019, this is the videotaped deposition of Roy Carlson, in the

3    case of Guideone Mutual Insurance Company, versus First United

4    Methodist Church of Hereford, versus Sunni Boneker, et Al.

5    Will counsel please state their appearances for the record?

6          MR. LYSTER:  Yes.  Chris Lyster on behalf of

7    First United Methodist Church of Hereford.

8          MR. MILLER:  Paul Miller for Guideone Mutual

9    Insurance Company.

10          THE VIDEOGRAPHER:  The time is 2:39 p.m. And

11    we're on the record.  Will the court reporter please swear the

12    witness?

13                    ROY CARLSON,

14    having been first duly sworn, testified as follows:

15                    EXAMINATION

16    BY MR. MILLER:

17      Q.   Good afternoon, sir.  Would you please state your

18    name?

19      A.   Roy Carlson.

20      Q.   Mr. Carlson, have you ever given a deposition like

21    this before?

22      A.   Yes.

23      Q.   How long ago was that deposition?

24      A.   Approximately four years ago.

25      Q.   Okay.



1     A.    Not related to this matter.

2     Q.    Sure.  So you kind of understand the process?

3     A.    Briefly.

4     Q.    Sure.  I'm going to ask you questions, and you'll

5  allow me to completely ask my question before you give your

6  response, do you understand?

7     A.    Okay.

8     Q.    Can we have that agreement?

9     A.    Yes.

10    Q.    And the reason for that is, it's very hard for the

11 court reporter to take down my question and your answer, if you

12 and I are talking at the same time.

13    A.    Okay.

14    Q.    If I ask a bad question, just say, hey, Paul, can you

15 ask me another one, or rephrase that one?  All right?

16    A.    Okay.

17    Q.    Make sure you give verbal answers, as opposed to

18 shakes of the head, because it's - the court reporter can't

19 take down the shakes of the head, all right?

20    A.    Okay.

21    Q.    All right.  Tell me your role here at the church.

22    A.    I've been chairman of the trustees.

23    Q.    For how long?

24    A.    Well, I think, approximately, seven years,

25 approximately.



1    Q.   Are you a member here at the church?

2    A.   Yes.

3    Q.   How long have you been a member?

4    A.   Since about 1988.

5    Q.   How long have you been here in Hereford?

6    A.   I grew up in Hereford.

7    Q.   Okay.

8    A.   72 years.

9    Q.   Did you go to Hereford High School?

10   A.   Yes.

11   Q.   We'll talk after this deposition, but my dad went to

12   -- was born and raised here in Hereford, so -- and he is about

13   your age, I think.

14           All right.  So tell me, as the chairman of the

15   trustees, what's your -- what's your job duties and job

16   responsibilities?

17   A.   Primarily, we would look after church property.

18   Q.   And when you say you, look after church property,

19   what do you mean by that?

20   A.   There's been a sale or two, hadn't been any

21   purchases; maintenance, air conditioning, heating.

22   Q.   Would any claims associated with damage to the roof,

23   for example, resulting from a storm or hail, would that fall

24   within the jurisdiction of the chairman of trustees, as well?

25   A.   Yes.  The committee.



1       Q.   All right.  And so, I -- I talked with the pastor

2   earlier today, as well as with Michelle Brisendine, and they

3   kind of gave me a little bit of an understanding about that.

4   But how many people make up the chair of the trustees?

5       A.   Well, there is approximately seven.

6       Q.   And seven members of the church who are elected?

7       A.   Yes.

8       Q.   And you're kind of the head person of that committee?

9       A.   Yes.

10      Q.   Were you also the chairman back in April of 2017?

11      A.   Yes.

12      Q.   And have you been the chairman since when?

13      A.   Well, I think I've been chairman, approximately,

14   seven years.

15      Q.   Okay.  And I think I asked you that earlier, so I

16   apologize for that.

17      A.   Yeah.

18      Q.   Did you have any involvement in handling, on behalf

19   of the church, the hail claim with Guideone Insurance Company?

20      A.   Mostly we got TRIGG to look, and we depended on their

21   expertise.

22      Q.   And that's kind of what I've heard from the pastor,

23   as well as Michelle, is that, after the claim was made, and

24   TRIGG was hired, the church kind of relied on TRIGG to be the

25   go between with the insurance company, is that --



1    A.    That's true.

2    Q.    All right.  My understanding, based on some previous

3  testimony, is that the claim was made with the insurance

4  company in June of 2017.  Assuming that's true --

5    A.    Yes.

6    Q.    -- do you know anything about the reasoning, if any,

7  behind why there was a delay between the day of the storm, in

8  April, and the day the claim was made, in June?

9    A.    Primarily, just the time of getting everyone

10  together.

11    Q.    And by that, do you mean getting everybody together

12  to come to an agreement as to whether or not to hire TRIGG and

13  make that decision, those sorts of things?

14    A.    True.

15    Q.    My understanding is that, in early May, TRIGG just

16  happened to come by the church and meet with Michelle, and that

17  was kind of the church's introduction to TRIGG; is that your

18  understanding?

19    A.    That's my understanding.

20    Q.    All right.  And eventually, the board of trustees

21  approved to hire TRIGG?

22    A.    Yes, they did.

23    Q.    And then that went up to the church council, that

24  decision?

25    A.    That's true.



1    Q.   And then, I guess, at that point, the church council

2  approved the decision?

3    A.   That's true.

4    Q.   And you were the one to sign the contract with TRIGG

5  Construction?

6    A.   Yes.

7    Q.   We can look at the contract, you know, I've got a

8  copy, if you want to see it.  But just, in general, kind of

9  tell me when your understanding of what TRIGG was supposed to

10  do for the church?

11    A.   Well, my understanding they were going to examine for

12  damage, and report to us and they would be contacting our

13  insurance company.

14    Q.   Okay.  The prior deposition that you gave, did it

15  have anything to do with the church or church business?

16    A.   Repeat your question.

17    Q.   Sure.  You mentioned that you gave a deposition about

18  four years ago.  Did that have anything to do with this church?

19    A.   Nothing whatsoever.

20    Q.   Do you have any information or knowledge about what

21  Guideone did, or did not do, with respect to evaluating or

22  investigating the damage to the church?

23    A.   Not for sure.

24    Q.   Okay.  Would all -- any information that you know

25  about what Guideone did or did not do, would that all be



1    information that you learned through TRIGG?

2        A.   Yes.  We -- yes.

3        Q.   And I'm not making a comment one way or the other

4    about that, I just -- I'm trying -- what I'm trying to

5    understand is what the church knew and kind of how they were

6    involved with Guideone, or whether everything was really just

7    left up to TRIGG.

8        A.   We were going on TRIGG's examination of damage.

9        Q.   Okay.  And with respect to the examination of damage,

10   do you know whether TRIGG ever performed one?

11       A.   Performed --

12       Q.   Yeah, and -- and let me clarify that.  Do you know

13   whether TRIGG went on the roof, prepared a scope of repair, and

14   an estimate for the repair?

15       A.   Yes.  They -- they were on the roof, and --

16       Q.   And do you know whether they came up with a cost

17   estimate?  That is, TRIGG came up with a cost estimate for what

18   it would take to repair or fix the roof?

19       A.   I don't remember those exact figures.  They just -- I

20   remember being damage.

21       Q.   Sure.  And -- and the reason I'm asking this question

22   is for this reason, and that's because Guideone sent somebody

23   out here, shortly after the claim was made, and they

24   investigated the roof, and they came up with the repair

25   estimate.  And Guideone then later sent $221,000, in total, to



1   the church, for what it believed to be the cost of repair.

2   And, I'm just wondering if you have any knowledge as to whether

3   or not TRIGG, if they disagreed with that amount, did they go

4   out and do their own estimate, and say, no, here is what the

5   cost of repair is?

6        A.   I just remember TRIGG saying it would be more than

7   that.

8        Q.   Okay.  And beyond that, beyond TRIGG just saying,

9   it's going to be more than that, do you know anything that

10  TRIGG did to, you know, verify that the cost of repair would be

11  more than what Guideone said it would be?

12       A.   All I remember them saying is there was more damage.

13       Q.   Sure.  Did you ever -- did TRIGG ever show you a cost

14  of repair estimate that it prepared that differed from what

15  Guideone said?

16       A.   I -- I don't recall that --

17       Q.   Sure.

18       A.   -- seeing it.

19       Q.   If Guideone disagreed -- or excuse me.  If TRIGG the

20  -- Construction, if they disagreed with the scope and the cost

21  of repair, that Guideone had submitted, do you think TRIGG

22  should have submitted their own?

23            MR. LYSTER:  Objection, form.

24       A.   Well, I can recall TRIGG submitting their own cost

25  analysis, but I don't know what that was, exactly.  I couldn't



Roy Carlson

Pages 12

```
 1  quote you the figure.
 2       Q.   Sure.  Okay.  Is that something that you have
 3  actually seen?  You have actually seen the cost analysis that
 4  TRIGG submitted?
 5       A.   I just remember him saying it was more, and detailed
 6  analysis, I don't remember all the detailed analysis.
 7       Q.   Okay.  All right.  And so, what I hear you saying, is
 8  that TRIGG made some comments about the Guideone cost and scope
 9  of repair, and said, no, it's going to be more than that.  But,
10  do you actually remember seeing any cost and scope of repair
11  that TRIGG actually prepared, on paper?
12       A.   Don't recall seeing it on a paper.  It was possibly
13  verbal.
14       Q.   And, if it was given to you, if you did hear it,
15  verbally, from TRIGG, you wouldn't remember what that figure --
16       A.   Not exactly, no.
17       Q.   Okay.  Can you ballpark what they told you?  And if
18  you can't, that's totally fine.  If you can't, no big deal.
19       A.   Seems like they were talking a half a million.
20       Q.   Do you know if TRIGG ever communicated that figure,
21  in any form or fashion, to Guideone Insurance Company?
22       A.   Don't know that for sure.
23       Q.   If TRIGG Construction disagreed with Guideone
24  Insurance Company's estimate and scope of repair, and thought
25  the figure was more like half a million dollars, as you said,
```

Lexitas

1   don't you think TRIGG should have told Guideone that?

2             MR. LYSTER:  Objection, form.

3        Q.  I mean, I'm not trying to be difficult.  I'm just

4   asking if -- if Guideone came out and said, hey, this is what

5   we think the cost of repair is, if TRIGG disagreed, and said,

6   no, we think it's this, TRIGG should have said something to

7   Guideone.  I mean, you would agreed with that, right?

8             MR. LYSTER:  Objection, form.

9        Q.  On behalf of the church?

10       A.  We were depending on TRIGG to be communicating with

11  United One.

12       Q.  Guideone?

13       A.  Guideone.

14       Q.  Right.  And so if you were dependent on TRIGG doing

15  that, if TRIGG had something to say about cost and scope of

16  repair, the church was depending on TRIGG to communicate that

17  to Guideone?

18       A.  Yes.

19       Q.  Do you have any information or knowledge about

20  whether or not Guideone was reaching out to the church, or

21  reaching out to TRIGG, in order to get TRIGG's cost of repair?

22       A.  I don't have access to that information.  I did not

23  have access to that information.

24       Q.  Did you personally have any interaction,

25  correspondence, or meetings with TRIGG?



1     A.   Their representative came over a time or so, and met

2  with the entire board, entire trustee committee.

3     Q.   And this maybe -- I assume maybe if -- if, whenever

4  that happened, there would have been some meeting minute notes

5  or something like that taken?

6     A.   It was a called meeting, so I'm not sure.

7     Q.   So you don't know one way or the other?

8     A.   Not sure.

9     Q.   When you say, a called meeting, is that different

10  from another sort of meeting?

11     A.   It wasn't -- most trustees meetings are called.  It's

12  called for business attention.

13     Q.   And, what's the protocol?  Is it standard for meeting

14  minutes to be taken at those called meetings?

15     A.   Usually.

16     Q.   Would that be something that Michelle did back then?

17     A.   Yes.

18     Q.   Did you go back and review any of the trustee meeting

19  minutes?  Is that something you would typically do?

20     A.   The major event with TRIGG was just the hiring and

21  their agreement.  We refreshed or memory on that, and that's

22  about it.

23     Q.   So, with respect to TRIGG, and their involvement with

24  the church, after the trustees agreed and recommended to hire

25  TRIGG, there was no additional involvement with the board of



1  trustees?

2      A.   We were informed later on that our -- the amount that

3  was gonna be settled for was challenged.   That what thought we

4  were going to get settled for was challenged.

5      Q.   Okay.   Who were you informed of that?

6      A.   Well TRIGG let the pastor and the secretary --

7  Michelle could have been gone by then.

8      Q.   Yeah, she testified --

9      A.   She was gone.

10      Q.   She -- she testified she left in January of 2018; is

11  that your memory, as well?

12      A.   Beg your pardon?

13      Q.   Is that what you believe?

14      A.   Yes.

15      Q.   All right.   And TRIGG told the trustees that what had

16  -- what exactly had been challenged?

17      A.   The amount, which I remember being around the half a

18  million was -- we were -- at first, I remember that it had been

19  -- that they had -- they were going to pay that, and then some

20  time later, we received word that we had been challenged in

21  court.

22      Q.   And do you have any understanding as to what the

23  basis for the challenge is?

24      A.   At that time, we didn't know why they were

25  challenging it, when we thought it was settled.



1    Q.   Do --

2    A.   We thought it was settled, and we were surprised to

3  hear it was challenged.

4    Q.   And did you ever learn as -- as to the basis of the

5  challenge?

6    A.   I don't know the exact reason.

7    Q.   Okay.  These trustee report minutes were given to me

8  just a few minutes ago, so I haven't really reviewed them.  You

9  don't have a copy in front of you, these are some new ones.

10    A.   Okay.

11    Q.   I've marked the first one as Exhibit Number 8.

12         (Deposition Exhibit No. 8 marked for

13          identification.)

14    Q.   And I'll hand it to you so you can see it.  The

15  second paragraph here, and I'll show it to you, talks about

16  hiring TRIGG, and how they'll not only serve as your roofer or

17  contractor, but also serve as your representative, with respect

18  to the insurer, was that the -- was that the board of trustees'

19  understanding?

20    A.   That was -- that's the understanding that I remember.

21    Q.   Why don't you take a look at that.  Also, in that

22  second paragraph, it talks about calling around TRIGG's, you

23  know, kind of following up with them to see if they have good

24  history, and such like that.  Were you involved in -- in

25  checking TRIGG out before a decision was made to hire them?



```
 1        A.    Sorry about that.

 2        Q.    That's all right.  If that's something you need to

 3   take, we can take a break.

 4        A.    It's not.

 5        Q.    Okay.  Based on how I have interpreted your

 6   testimony, and based on the prior testimony from some other

 7   folks in this case, everybody has been consistent in saying

 8   that once TRIGG got hired, the church kind of put everything in

 9   TRIGG's hands to handle the claim on the church's behalf with

10   Guideone, right?

11        A.    That's true.

12        Q.    Okay.  Are you personally aware of anything that

13   Guideone Insurance Company, you know, failed to do, with

14   respect to this particular claim?

15        A.    We were depending on TRIGG -- TRIGG to handle our

16   claim.

17        Q.    And -- and based on that answer that you gave me, I

18   would assume then, that you were not personally aware of

19   anything Guideone failed to do, with respect to the claim,

20   simply because the church was relying on TRIGG to handle it?

21        A.    That's true.

22        Q.    Okay.  Sir, I appreciate your time, and I'll pass the

23   witness.

24              MR. LYSTER:  Reserve my questions until time of

25   trial.
```



Roy Carlson

Pages 23

```
 1                    MR. MILLER:  That's it.

 2                    THE VIDEOGRAPHER:  This concludes the

 3   deposition.  Off record 3:09 p.m.

 4                    (Off the record, 3:09 p.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LEXITAS

Roy Carlson
Pages 24

```
 1                    CHANGES AND SIGNATURE

 2                  DEPOSITION OF ROY CARLSON

 3                     October 8th, 2019

 4   PAGE/LINE        CHANGE              REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```



1      I, ROY CARLSON, have read the foregoing deposition and
hereby affix my signature that same is true and correct, except
2  as noted above.

3

4

5                                        _____
                                         ROY CARLSON

6

7  THE STATE OF _____)

8  COUNTY OF _____)

9

10     Before me, _____, on this day

11  personally appeared ROY CARLSON, known to me (or proved to me

12  under oath or through _____) (description

13  of identity card or other document) to be the person whose name

14  is subscribed to the foregoing instrument and acknowledged to

15  me that they executed the same for the purposes and

16  consideration therein expressed.

17     Given under my hand and seal of office this _____ day of

18  _____, 2019.

19

20

21                                       _____
                                         NOTARY PUBLIC IN AND FOR
22                                       THE STATE OF _____
                                         COMMISSION EXPIRES: _____
23

24

25



```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                         AMARILLO DIVISION

 3   GUIDEONE MUTUAL INSURANCE       )
     COMPANY,                        )
 4   Plaintiff/Counter-Defendant     )
                                     )    CIVIL ACTION NO.
 5   VS.                             )    2:18-cv-00140-D
                                     )
 6   FIRST UNITED METHODIST CHURCH   )
     OF HEREFORD,                    )
 7   Defendant/Counter-Plaintiff     )

 8
                        REPORTER'S CERTIFICATION
 9                      DEPOSITION OF ROY CARLSON
                          OCTOBER 8TH, 2019
10

11        I, AMY DUCKETT TAYLOR, Certified Shorthand Reporter in and

12   for the State of Texas, hereby certify to the following:

13        That the witness, ROY CARLSON, was duly sworn by the

14   deposition officer and that the transcript of the oral

15   deposition is a true record of the testimony given by the

16   witness;

17        That the deposition transcript was submitted on

18   _____ to the witness or to the attorney for

19   the witness for examination, signature and return to me by

20   _____;

21        That the amount of time used by each party at the

22   deposition is as follows:

23        Mr. Paul Miller - 00 HOURS:30 MINUTES
          Mr. Chris Lyster - 00 HOURS:00 MINUTES
24

25        That pursuant to information given to the deposition
```

Lexitas

1  officer at the time said testimony was taken, the following

2  includes counsel for all parties of record:

3       Mr. Paul Miller, Attorney for Plaintiff
        Mr. Chris Lyster, Attorney for Defendant
4

5       I further certify that I am neither counsel for, related

6  to, nor employed by any of the parties or attorneys in the

7  action in which this proceeding was taken, and further that I

8  am not financially or otherwise interested in the outcome of

9  the action.

10      Further certification requirements pursuant to Rule 203 of

11 the TRCP will be certified to after they have occurred.

12      Certified to by me this 28th day of

13 October, 2019.

14

15                        *Amy Duckett Taylor*

16                        _____
                          AMY DUCKETT TAYLOR, Texas CSR #3783
17                        Expiration Date:  12/31/19

18

19

20

21

22

23

24

25

```
 1              FURTHER CERTIFICATION UNDER RULE 203 TRCP

 2         The original deposition was/was not returned to the

 3  deposition officer on _____;

 4         If returned, the attached Changes and Signature page

 5  contains any changes and the reasons therefor;

 6         If returned, the original deposition was delivered to

 7  _____, Custodial Attorney;

 8         That $_____ is the deposition officer's charges

 9  to the Plaintiff for preparing the original deposition

10  transcript and any copies of exhibits;

11         That the deposition was delivered in accordance with Rule

12  203.3, and that a copy of this certificate was served on all

13  parties shown herein on and filed with the Clerk.

14         Certified to by me this _____ day of

15  _____, 2019.

16

17

18  _____
                                        AMY DUCKETT TAYLOR,Texas CSR #3783
19                                      Expiration Date:  12/31/19

20

21

22

23

24

25
```



## Exhibits

**Exh 008** 16:11,12
**Exh 009** 17:13
**Exh 010** 17:16
**Exh 011** 17:20
**Exh 012** 18:16

## $

**$221,000** 10:25

## 1

**10** 17:16,17
**11** 17:20 18:13
**12** 18:13,16
**12th** 17:15
**13th** 17:19
**14th** 18:16
**17** 21:20
**19** 17:13
**1988** 6:4

## 2

**2017** 7:10 8:4 17:13,15 18:20 19:1 21:19
**2018** 15:10 17:19 18:16 21:19
**2019** 4:2
**2:39** 4:10

## 3

**3:09** 23:3,4

## 7

**72** 6:8

## 8

**8** 16:11,12
**8th** 4:1

## 9

**9** 17:13,17

## A

**access** 13:22,23
**additional** 14:25 19:25
**adjuster** 21:13,15,22
**Adjusters** 20:21,22
**adjusting** 20:19,20
**afternoon** 4:17
**age** 6:13
**agree** 19:2
**agreed** 13:7 14:24
**agreement** 5:8 8:12 14:21
**air** 6:21
**alley** 19:5
**America** 20:21
**amount** 11:3 15:2,17
**analysis** 11:25 12:3,6 19:3
**answers** 5:17
**apologize** 7:16
**appearances** 4:5
**approved** 8:21 9:2
**approximately** 4:24 5:24,25 7:5, 13 21:16
**April** 7:10 8:8 18:20 19:1
**area** 18:22 19:5,12
**areas** 18:22
**assume** 14:3 22:18
**assuming** 8:4 17:7
**attention** 14:12 19:10
**aware** 19:17,19,25 20:25 21:3,6,8 22:12,18

## B

**back** 7:10 14:16,18
**bad** 5:14
**ballpark** 12:17

**based** 8:2 22:5,6,17
**basis** 15:23 16:4
**Beg** 15:12
**beginning** 18:2
**behalf** 4:6 7:18 13:9 22:9
**believed** 11:1
**big** 12:18
**bit** 7:3
**board** 8:20 14:2,25 16:18 18:1 20:9
**Boneker** 4:4
**born** 6:12
**break** 22:3
**Briefly** 5:3
**Brisendine** 7:2
**brought** 19:9
**building** 18:19
**business** 9:15 14:12

## C

**call** 17:21
**called** 14:6,9,11,12,14 20:13
**calling** 16:22
**Carlson** 4:2,13,19,20
**carpet** 19:24
**case** 4:3 22:7
**ceiling** 19:23
**chair** 7:4 20:9
**chairman** 5:22 6:14,24 7:10,12,13
**challenge** 15:23 16:5
**challenged** 15:3,4,16,20 16:3
**challenging** 15:25
**chance** 21:21
**checking** 16:25
**Chris** 4:6
**church** 4:4,7 5:21 6:1,17,18 7:6,19, 24 8:16,23 9:1,10,15,18,22 10:5 11:1 13:9,16,20 14:24 22:8,20
**church's** 8:17 22:9
**churches** 17:2
**claim** 7:19,23 8:3,8 10:23 20:8 22:9,



14,16,19

**claims** 6:22 20:16,21 21:6

**clarify** 10:12

**clients** 17:2

**comment** 10:3

**comments** 12:8

**committee** 6:25 7:8 14:2 21:5

**communicate** 13:16

**communicated** 12:20

**communicating** 13:10

**company** 4:3,9 7:19,25 8:4 9:13 12:21 20:3,23 21:23 22:13

**Company's** 12:24

**completely** 5:5

**concludes** 23:2

**conditioning** 6:21

**conference** 17:21

**consistent** 22:7

**Construction** 9:5 11:20 12:23

**contact** 17:7

**contacting** 9:12

**contract** 9:4,7

**contractor** 16:17

**copy** 9:8 16:9

**correspondence** 13:25

**cost** 10:16,17 11:1,5,10,13,20,24 12:3,8,10 13:5,15,21

**council** 8:23 9:1

**counsel** 4:5

**court** 4:11 5:11,18 15:21

**covered** 19:12

### D

**dad** 6:11

**damage** 6:22 9:12,22 10:8,9,20 11:12 19:23,25 21:10

**Dan** 18:4

**day** 8:7,8

**deal** 12:18

**dealt** 18:6 20:2

**decision** 8:13,24 9:2 16:25 20:18

**delay** 8:7

**depended** 7:20

**dependent** 13:14

**depending** 13:10,16 17:1 22:15

**deposition** 4:2,20,23 6:11 9:14,17 16:12 17:17 18:13 23:3

**detailed** 12:5,6

**differed** 11:14

**difficult** 13:3

**disagreed** 11:3,19,20 12:23 13:5

**dollars** 12:25

**duly** 4:14

**duties** 6:15

### E

**earlier** 7:2,15 18:18

**early** 8:15

**efforts** 19:20

**elected** 7:6

**entire** 14:2

**entrance** 19:4

**estimate** 10:14,17,25 11:4,14 12:24 21:21

**estimator** 21:13

**evaluating** 9:21

**event** 14:20

**eventually** 8:20

**exacerbated** 18:21

**exact** 10:19 16:6

**examination** 4:15 10:8,9

**examine** 9:11

**excuse** 11:19

**Exhibit** 16:11,12 17:13,16,17,20 18:13,16

**existed** 18:19

**expertise** 7:21

**exterior** 19:11

### F

**failed** 22:13,19

**fall** 6:23

**familiar** 17:21 18:5,23 19:5,13 20:22

**fashion** 12:21

**figure** 12:1,15,20,25

**figures** 10:19

**Finally** 19:11

**fine** 12:18

**firm** 20:19,20

**fix** 10:18

**folks** 22:7

**form** 11:23 12:21 13:2,8

**front** 16:9

**funeral** 19:13

### G

**gave** 7:3 9:14,17 17:3 22:17

**general** 9:8

**give** 5:5,17

**good** 4:17 16:23 17:3

**Gotcha** 21:6

**grew** 6:6

**guess** 9:1

**Guideone** 4:3,8 7:19 9:21,25 10:6, 22,25 11:11,15,19,21 12:8,21,23 13:1,4,7,12,13,17,20 20:3 21:22 22:10,13,19

### H

**hail** 6:23 7:19 20:8

**half** 12:19,25 15:17

**hand** 16:14

**handle** 22:9,15,20

**handling** 7:18

**hands** 22:9

**happen** 17:9

**happened** 8:16 14:4 21:4



**hard** 5:10
**head** 5:18,19 7:8
**hear** 12:7,14 16:3
**heard** 7:22
**hearse** 19:12
**heating** 6:21
**helped** 20:16
**Hereford** 4:4,7 6:5,6,9,12
**hey** 5:14 13:4
**High** 6:9
**hire** 8:12,21 14:24 16:25 20:16,18
**hired** 7:24 20:16,19 22:8
**hiring** 14:20 16:16
**history** 16:24

---

### I

**identification** 16:13 17:18 18:14
**identify** 17:11
**information** 9:20,24 10:1 13:19,22, 23
**informed** 15:2,5
**inquire** 17:1
**inside** 18:19
**inspected** 21:10
**insulation** 19:25
**insurance** 4:3,9 7:19,25 8:3 9:13 12:21,24 20:3 21:6,22 22:13
**insurer** 16:18
**interaction** 13:24
**interpreted** 22:5
**introduction** 8:17
**investigated** 10:24
**investigating** 9:22
**involved** 10:6 16:24 20:11,18
**involvement** 7:18 14:23,25 20:8

---

### J

**January** 15:10
**job** 6:15

**June** 8:4,8
**jurisdiction** 6:24

---

### K

**Kennedy** 18:10
**Kevin** 21:11,17
**kind** 5:2 7:3,8,22,24 8:17 9:8 10:5 16:23 20:11 21:4 22:8
**knew** 10:5
**knowledge** 9:20 11:2 13:19 17:5 19:9,20

---

### L

**leak** 19:4,11
**leaks** 18:19,23 19:21
**learn** 16:4
**learned** 10:1
**left** 10:7 15:10
**leg** 20:14,17
**long** 4:23 5:23 6:3,5 17:9
**looked** 21:10,11
**Lyster** 4:6 11:23 13:2,8 22:24

---

### M

**made** 7:23 8:3,8 10:23 12:8 16:25 18:21 19:17,19 21:7
**maintenance** 6:21 20:25
**major** 14:20
**make** 5:17 7:4 8:13
**making** 10:3 17:4
**March** 17:19
**marked** 16:11,12 17:17 18:13
**marking** 17:12
**matter** 5:1
**meet** 8:16 17:24
**meeting** 14:4,6,9,10,13,18 17:14, 16,19 18:1,16
**meetings** 13:25 14:11,14
**member** 6:1,3
**members** 7:6

**memory** 14:21 15:11 18:11
**mentioned** 9:17 19:4,11
**mentions** 17:20
**met** 14:1
**Methodist** 4:4,7
**Michelle** 7:2,23 8:16 14:16 15:7 17:1 20:13
**Miller** 4:8,16 17:21 23:1
**million** 12:19,25 15:18
**minor** 17:5
**minute** 14:4
**minutes** 14:14,19 16:7,8 17:14,16, 19 18:16
**months** 17:10
**moved** 18:8
**Mutual** 4:3,8 20:3

---

### N

**Nos** 17:17 18:13
**notes** 14:4
**November** 17:15
**Number** 16:11 17:13,16,20 18:16

---

### O

**Objection** 11:23 13:2,8
**occurred** 21:1
**October** 4:1 17:13
**opposed** 5:17
**order** 13:21

---

### P

**p.m.** 4:10 23:3,4
**paper** 12:11,12
**paragraph** 16:15,22
**pardon** 15:12
**parks** 19:12
**parkway** 19:12
**pass** 22:22
**pastor** 7:1,22 15:6 18:18,21,25



**Paul** 4:8 5:14

**pay** 15:19

**people** 7:4

**performed** 10:10,11

**person** 7:8 18:8

**personally** 13:24 20:2 22:12,18

**phone** 17:20

**point** 9:1

**position** 18:9

**possibly** 12:12

**prepared** 10:13 11:14 12:11 21:22

**pretty** 18:2

**previous** 8:2

**Primarily** 6:17 8:9

**prior** 9:14 19:7 21:1,2,6,7 22:6

**process** 5:2

**property** 6:17,18

**protocol** 14:13

**public** 20:19,20,21

**purchases** 6:21

**put** 22:8

---

### Q

**question** 5:5,11,14 9:16 10:21

**questions** 5:4 17:14 18:17 22:24

**quote** 12:1

---

### R

**raised** 6:12

**reaching** 13:20,21

**reason** 5:10 10:21,22 16:6

**reasoning** 8:6

**recall** 11:16,24 12:12 18:3 20:7 21:16

**received** 15:20

**recently** 17:6

**recommended** 14:24

**record** 4:5,11 17:12 18:15 23:3,4

**refresh** 18:11

**refreshed** 14:21

**related** 5:1 21:7

**relied** 7:24

**relying** 22:20

**remember** 10:19,20 11:6,12 12:5,6, 10,15 15:17,18 16:20

**rep** 17:8

**repair** 10:13,14,18,24 11:1,5,10,14, 21 12:9,10,24 13:5,16,21 19:20 21:3

**repairs** 17:4 20:25

**Repeat** 9:16

**rephrase** 5:15

**report** 9:12 16:7

**reporter** 4:11 5:11,18

**reports** 17:3

**representative** 14:1 16:17

**representatives** 17:25

**Reserve** 22:24

**respect** 9:21 10:9 14:23 16:17 22:14,19

**response** 5:6

**responsibilities** 6:16

**result** 20:8

**resulting** 6:23

**review** 14:18 21:21,24

**reviewed** 16:8

**Rob** 18:10

**role** 5:21 20:12

**roof** 6:22 10:13,15,18,24 17:4,6 21:1,7,9

**roofer** 16:16

**Roy** 4:2,13,19

---

### S

**sale** 6:20

**School** 6:9

**scope** 10:13 11:20 12:8,10,24 13:15

**secretary** 15:6

**serve** 16:16,17

**settled** 15:3,4,25 16:2

---

**shakes** 5:18,19

**shortly** 10:23

**show** 11:13 16:15

**sign** 9:4

**simply** 22:20

**sir** 4:17 22:22

**size** 20:1

**sort** 14:10

**sorts** 8:13

**sound** 18:4

**spot** 17:6

**stained** 19:23

**staining** 19:24

**standard** 14:13

**start** 17:4

**state** 4:5,17

**storm** 6:23 8:7 18:20,21 19:1,2,8,21 21:1,2,7

**stuff** 21:12

**submitted** 11:21,22 12:4

**submitting** 11:24

**Sunni** 4:4

**supposed** 9:9

**surprised** 16:2

**swear** 4:11

**sworn** 4:14

---

### T

**talk** 6:11

**talked** 7:1 18:18,19 20:3,7

**talking** 5:12 12:19

**talks** 16:15,22

**tarped** 17:6

**testified** 4:14 15:8,10 18:25

**testimony** 8:3 22:6

**things** 8:13

**thought** 12:24 15:3,25 16:2

**tiles** 19:24

**time** 4:10 5:12 8:9 14:1 15:20,24 18:1 21:11,18 22:22,24



Roy Carlson

Index: today..years

**today** 4:1 7:2 18:18

**told** 12:17 13:1 15:15 18:21 19:23

**total** 10:25

**totally** 12:18

**track** 17:13

**trial** 22:25

**TRIGG** 7:20,24 8:12,15,17,21 9:4,9 10:1,7,10,13,17 11:3,6,8,10,13,19,21, 24 12:4,8,11,15,20,23 13:1,5,6,10,14, 15,16,21,25 14:20,23,25 15:6,15 16:16,25 17:4,7,23,24 18:9 20:16,19 21:17 22:8,15,20

**TRIGG's** 10:8 13:21 16:22 22:9

**true** 8:1,4,14,25 9:3 20:4,13 22:11,21

**trustee** 14:2,18 16:7 18:15 21:4

**trustees** 5:22 6:15,24 7:4 8:20 14:11,24 15:1,15 17:14,16,20 20:9

**trustees'** 16:18

**Tuesday** 4:1

**Tyler** 17:21,22,23 18:2,6

**typically** 14:19

---

### U

**understand** 5:2,6 10:5

**understanding** 7:3 8:2,15,18,19 9:9,11 15:22 16:19,20

**United** 4:3,7 13:11

---

### V

**verbal** 5:17 12:13

**verbally** 12:15

**verify** 11:10

**versus** 4:3,4

---

### W

**wet** 19:24

**whatsoever** 9:19

**wondering** 11:2

**word** 15:20

**work** 20:14,17

**worse** 18:21 19:1

---

### Y

**years** 4:24 5:24 6:8 7:14 9:18 19:10, 15 21:2



1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS

2             AMARILLO DIVISION

**EXHIBIT 10**

3 GUIDEONE MUTUAL INSURANCE   )
  COMPANY,              )

4 Plaintiff/Counter-Defendant  )
                      )

5 VS.                 )  CIVIL ACTION NO.
                    )  2:18-cv-00140-D

6 FIRST UNITED METHODIST CHURCH )
  OF HEREFORD,          )

7 Defendant/Counter-Plaintiff  )

8

  ---------------------------------------------------------------

9

          ORAL AND VIDEOTAPED DEPOSITION OF

10

               KEVIN BUSHART

11

            October 8th, 2019

12

  ---------------------------------------------------------------

13

14    ORAL AND VIDEOTAPED DEPOSITION OF KEVIN BUSHART, produced

15 as a witness at the instance of the PLAINTIFF, and duly sworn,

16 was taken in the above-styled and numbered cause on the 8th day

17 of October, 2019, from 9:09 a.m. to 10:38 a.m., before AMY

18 DUCKETT TAYLOR, CSR, in and for the State of Texas, reported by

19 machine shorthand, at First United Methodist Church of

20 Hereford, 501 Main Street, Hereford, Texas 79045, pursuant to

21 the Federal Rules of Civil Procedure and the provisions stated on

22 the record or attached hereto.

23

24

25



```
 1                   A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         Mr. Paul Miller
           Germer Beaman & Brown, PLLC
 5         301 Congress Avenue, Suite 1700
           Austin, Texas 78701
 6         Phone: (512) 472-0288

 7

      FOR THE DEFENDANT:
 8
           Mr. Chris Lyster
 9         Puls Haney Lyster, PLLC
           301 Commerce Street, Suite 2900
10         Fort Worth, Texas 76102

11

      ALSO PRESENT:
12         Mr. Chuck Alexander - videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                            INDEX

 2                                                      PAGE

 3  Appearances----------------------------------         2

 4  KEVIN BUSHART

 5         Examination by Mr. Miller---------------         4

 6  Signature and Changes---------------------------        57

 7  Reporter's Certificate-------------------------        59

 8

 9                          EXHIBITS

10  NO.  DESCRIPTION                              PAGE

11  1    Deposition Notice-----------------------     5
    2    Counter Complaint-----------------------    35
12  3    Photo of aerial view of property--------    46
    4    Church meeting minutes 5/11/17----------    55
13  5    Church meeting minutes 6/15/17----------    55
    6    Church meeting minutes 9/14/17----------    55
14  7    Church meeting minutes 6/14/18----------    55

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE VIDEOGRAPHER:  Today is Tuesday October 8th,

 2   2019.  This is the videotaped deposition of Kevin Bushart in

 3   the case of Guideone Mutual Insurance Company versus First

 4   United Methodist Church of Hereford versus Sunni Boenker, et

 5   al.  Will counsel please state their appearances for the

 6   record?

 7              MR. LYSTER:  Yes.  Chris Lyster here on behalf

 8   of First United Methodist Church of Hereford.

 9              MR. MILLER:  Paul Miller for Guideone Mutual

10   Insurance Company.

11              THE VIDEOGRAPHER:  The time is 9:09 a.m., and

12   we're on the record.  Will the court reporter please swear in

13   the witness?

14                        KEVIN BUSHART,

15   having been first duly sworn, testified as follows:

16                          EXAMINATION

17   BY MR. MILLER:

18      Q.   Sir, good morning.  Would you please state your name?

19      A.   Kevin Bushart.

20      Q.   Would you spell the last name?

21      A.   B-U-S-H-A-R-T.

22      Q.   You understand you're here to give deposition

23   testimony regarding a hail claim?

24      A.   Yes.

25      Q.   Okay.  Were you involved, or present, at the church,
```



1    when the hail event occurred, back in 2017?

2         A.   Yes.

3         Q.   Okay.  How are you currently involved with the

4    church?

5         A.   I'm the pastor.

6         Q.   How long have you been the pastor?

7         A.   Ten years.

8         Q.   You understand that you have been identified as

9    somebody who will be providing testimony on behalf of the

10   church itself, right?

11        A.   Yes.

12        Q.   Okay.  Have you seen what I'm going to mark as

13   Exhibit Number 1, which is a Notice of Deposition for a

14   corporate representative for First United Methodist Church of

15   Hereford?

16             (Deposition Exhibit No. 1 marked for

17             identification.)

18        A.   Yes.

19        Q.   Okay.  If you'll turn to pages 3 and 4, the last two

20   pages, have you had an opportunity to review these areas of

21   discussion, and familiarize yourself with those topics?

22        A.   Yes, to the best of my ability.

23        Q.   Okay.  If you would, please give me a general

24   understanding of what you have done in order to familiarize

25   yourself with the topics here listed in Exhibit Number 1?



1  that.  By law, they have to have a public adjuster to look at

2  it, to complete the -- complete the appraisal.  They're not

3  allowed to do that themselves.

4       Q.   Is that something TRIGG told the church?

5       A.   As I understand the law --

6       Q.   Well --

7       A.   -- they had to have an adjuster to come in and look

8  at it.

9       Q.   They had to have a -- as you understand it, they had

10 to have a public adjuster --

11      A.   Yes.

12      Q.   -- come in and adjust the damage.  They -- TRIGG

13 themselves couldn't do it?

14      A.   Correct.

15      Q.   And your understanding of that comes from where?

16      A.   From TRIGG.

17      Q.   And what, specifically, was TRIGG unable to do, that

18 the public adjuster was able to do?

19      A.   To make the actual appraisal.

20      Q.   Well, earlier, when I was asking you about TRIGG

21 getting up and making an estimate for repair?

22      A.   Uh-huh.

23      Q.   Is that something different than what you're talking

24 about now?

25      A.   As I understand it, yes.



1    Q.    Okay.  Do you think the reasonable thing to do would

2    have been to let Guideone know that the church was going to the

3    District Judge here to get an umpire appointed?

4              MR. LYSTER:  Objection, form.

5    A.    I can't answer that.

6    Q.    Did the church ever submit a sworn proof of loss to

7    Guideone, following the storm event?

8    A.    Not to my knowledge.

9    Q.    Why not?

10   A.    Don't believe it was required.

11   Q.    Was a sworn proof of loss requested?

12   A.    I believe it was.

13   Q.    And what's the basis for you saying it wasn't

14   required?

15   A.    Our policy, statements in our policy.

16   Q.    Is there a statement in the policy that says a sworn

17   proof of loss does not have to be provided, if requested?

18   A.    I can't answer that.

19   Q.    What portion of the policy are you referring to say

20   that it's not required under the policy?

21   A.    I believe the statement in the policy is just that if

22   we have a disagreement, we can express that disagreement, and

23   that's sufficient.

24   Q.    And you're talking about the appraisal provision?

25   A.    Yes.



1    Q.   Okay.  And I'm talking about the -- the requirement

2    that the church has to cooperate under the policy, and what the

3    church is supposed to do when a sworn proof of loss is

4    requested.

5              And so, let me ask my question again.  Is there

6    a certain provision in the policy, with respect to the sworn

7    proof of loss, that says the church does not have to submit one

8    if it's requested?

9    A.   I -- I -- I don't know the answer to that.

10   Q.   As you sit here today, your understanding of the

11   reason why a sworn proof of loss was not submitted, after it

12   was requested, is because the church invoked the appraisal

13   clause?

14   A.   That's as clear as I can understand it.

15   Q.   Have you reviewed the church's countersuit against

16   Guideone in this case?

17   A.   I don't remember.  I've read many documents, or

18   looked them over.

19   Q.   Sure.

20              (Deposition Exhibit No. 2 marked for

21              identification.)

22   Q.   Let me mark that as Exhibit Number 2, and we can talk

23   about it.  Take a -- just a quick look at that, and let me know

24   if this is something that you've ever reviewed.  This is

25   Exhibit Number 2.  It's the church's complaint and original

1      A.   I would think that would be fair.

2      Q.   Okay.  And it -- it sounds like to me your job and

3  every person associated with the church is to run the church

4  and to do the things that they're supposed to do here at the

5  church?

6      A.   That's correct.

7      Q.   You hired TRIGG, who came in and inspected your roof

8  and found some damages, right?

9      A.   Correct.

10     Q.   You put your claim, so to speak, in their hands, and

11  did what they suggested you do?

12     A.   That would be correct.

13          MR. MILLER:  Time for a break?

14          MR. LYSTER:  Sure.

15          THE VIDEOGRAPHER:  Off record, 10:01 a.m.

16          (Break taken from 10:01 a.m. to 10:16 a.m.)

17          THE VIDEOGRAPHER:  On record, 10:16 a.m.

18     Q.   Sir, we're back from a break, are you ready to

19  continue?

20     A.   Yes, sir.

21     Q.   Okay.  I want to kind of give you an opportunity to

22  kind of summarize, for me, the church's complaints, problems,

23  with respect to Guideone, okay?

24          From what I understood our conversation earlier,

25  the church is upset and felt like they were not treated fairly



 1  nature, has the church taken any other steps to prevent any

 2  additional damage associated with those leaks?

 3      A.   No.

 4      Q.   What damages, from your perspective, from the

 5  church's perspective, have occurred as a result of those leaks?

 6      A.   Ceiling tiles broken out, insulation soaked.  I don't

 7  know what's up inside the suspended ceiling, so I don't know

 8  what damage there is though the structure up there.  And water

 9  stains on the carpets.

10      Q.   Has the church had anybody, TRIGG, roofer, anybody,

11  maybe one of its members up here at the church get up in there

12  to inspect to see if anything needs to be done, at least in the

13  short term, to prevent additional damage?

14      A.   No.

15      Q.   And as I understand your testimony, on behalf of the

16  church, sir, the church's real complaint, with respect to

17  Guideone, is them not paying what the umpire said the scope of

18  repair and damages were?

19      A.   That's correct.

20      Q.   Okay.  Anything else, besides that?

21      A.   No.

22           MR. MILLER:  Passes the witness.

23           MR. LYSTER:  Reserve my questions.

24           THE VIDEOGRAPHER:  This concludes the video

25  deposition.  Off record at 10:36 a.m.



```
 1                  (Discussion off the record.)

 2                  THE VIDEOGRAPHER:  On video record, 10:36 a.m.

 3       Q.   (By Mr. Miller) Sir, I prematurely ended without

 4  marking these exhibits.  I'm going to mark them Exhibits, 4

 5  through 7.  These are church council meeting minutes that were

 6  provided to me.

 7                  (Deposition Exhibit Nos. 4-7 marked for

 8                    identification.)

 9       Q.   Can you tell me what efforts were made to go through

10  and find church council meeting minutes that may be relevant to

11  the claims in this case?

12       A.   Pretty simple, I just went to the file cabinet and

13  pulled out the meeting minutes from 2017, 2018, and made

14  copies.

15       Q.   So all the minutes that I have here in front of me,

16  are all of the meeting minutes that happened in 2017 and 2018?

17                  MR. LYSTER:  No, they're the --

18       A.   No.

19                  MR. LYSTER:  They're the ones that refer to --

20       A.   They're the onces that refer to the --

21                  MR. LYSTER:  Refer to the claim or dealing with

22  TRIGG, or dealing with the hail, or things of that nature.

23       Q.   These are kept -- these are physical files?

24       A.   Yes.

25       Q.   You went through and read all the meeting minutes to
```

1   identify ones that had to do with the claim?

2      A.   Correct.

3      Q.   How often are these meetings -- how often do the

4   meetings occur with the church council?

5      A.   It's about -- it's approximately once a month.  But,

6   you know, like at Christmas time, or something, we skip

7   meetings; about ten times out of the year.

8                  MR. MILLER:  Appreciate your time, sir, pass the

9   witness.

10                 MR. LYSTER:  Still reserve our questions.

11                 THE VIDEOGRAPHER:  This concludes the

12  deposition, off record 10:38 a.m.

13                 (Off the record, 10:38 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25



1                        CHANGES AND SIGNATURE

2                   DEPOSITION OF KEVIN BUSHART

3                        October 8th, 2019

4     PAGE/LINE          CHANGE                  REASON

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____



```
 1        I, KEVIN BUSHART, have read the foregoing deposition and
    hereby affix my signature that same is true and correct, except
 2  as noted above.

 3

 4                        _____

 5                        KEVIN BUSHART

 6

 7  THE STATE OF _____)

 8  COUNTY OF _____)

 9

10      Before me, _____, on this day

11  personally appeared KEVIN BUSHART, known to me (or proved to me

12  under oath or through _____) (description

13  of identity card or other document) to be the person whose name

14  is subscribed to the foregoing instrument and acknowledged to

15  me that they executed the same for the purposes and

16  consideration therein expressed.

17      Given under my hand and seal of office this _____ day of

18  _____, 2019.

19

20

21                        _____

22                        NOTARY PUBLIC IN AND FOR
                          THE STATE OF _____
23                        COMMISSION EXPIRES: _____

24

25
```



```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                      AMARILLO DIVISION

3   GUIDEONE MUTUAL INSURANCE        )
    COMPANY,                         )
4   Plaintiff/Counter-Defendant     )
                                     )   CIVIL ACTION NO.
5   VS.                             )   2:18-CV-00140-D
                                     )
6   FIRST UNITED METHODIST CHURCH    )
    OF HEREFORD,                     )
7   Defendant/Counter-Plaintiff     )

8
                      REPORTER'S CERTIFICATION
9                 DEPOSITION OF KEVIN BUSHART
                       OCTOBER 8TH, 2019
10

11       I, AMY DUCKETT TAYLOR, Certified Shorthand Reporter in and

12  for the State of Texas, hereby certify to the following:

13       That the witness, KEVIN BUSHART, was duly sworn by the

14  deposition officer and that the transcript of the oral

15  deposition is a true record of the testimony given by the

16  witness;

17       That the deposition transcript was submitted on

18  _____ to the witness or to the attorney for

19  the witness for examination, signature and return to me by

20  _____;

21       That the amount of time used by each party at the

22  deposition is as follows:

23       Mr. Paul Miller - 01 HOUR:14 MINUTES
         Mr. Chris Lyster - 00 HOURS:00 MINUTES
24

25       That pursuant to information given to the deposition
```



1  officer at the time said testimony was taken, the following

2  includes counsel for all parties of record:

3       Mr. Paul Miller, Attorney for Plaintiff
        Mr. Chris Lyster, Attorney for Defendant

4

5       I further certify that I am neither counsel for, related

6  to, nor employed by any of the parties or attorneys in the

7  action in which this proceeding was taken, and further that I

8  am not financially or otherwise interested in the outcome of

9  the action.

10      Further certification requirements pursuant to Rule 203 of

11  the TRCP will be certified to after they have occurred.

12      Certified to by me this 28th day of

13  October, 2019.

14

15                    *Amy Duckett Taylor*

16                    _____
                      AMY DUCKETT TAYLOR, Texas CSR #3783
17                    Expiration Date:  12/31/19

18

19

20

21

22

23

24

25



1      FURTHER CERTIFICATION UNDER RULE 203 TRCP

2         The original deposition was/was not returned to the

3  deposition officer on _____;

4         If returned, the attached Changes and Signature page

5  contains any changes and the reasons therefor;

6         If returned, the original deposition was delivered to

7  _____, Custodial Attorney;

8         That $_____ is the deposition officer's charges to

9  the Plaintiff for preparing the original deposition transcript

10 and any copies of exhibits;

11        That the deposition was delivered in accordance with Rule

12 203.3, and that a copy of this certificate was served on all

13 parties shown herein on and filed with the Clerk.

14        Certified to by me this _____ day of

15 _____, 2019.

16

17                        *Amy Duckett Taylor*

18         _____
                  AMY DUCKETT TAYLOR,Texas CSR #3783
19                Expiration Date:  12/31/19

20

21

22

23

24

25



### Exhibits

**Exh 001** 5:13,16,25
**Exh 002** 35:20,22,25
**Exh 003** 46:23
**Exh 004**
**Exh 005**
**Exh 006**
**Exh 007**

---

### $

**$221,000** 12:7 29:13
**$700,000** 26:17,19

---

### 1

**1** 5:13,16,25
**10** 21:15 36:9
**10:01** 42:15,16
**10:16** 42:16,17
**10:36** 54:25 55:2
**10:38** 56:12,13
**12** 21:16
**14th** 7:13
**16** 37:16
**17th** 7:11,13
**1992** 14:13
**1995** 14:10

---

### 2

**2** 35:20,22,25
**2017** 5:1 7:6 8:4,22 9:20 10:20 11:22
12:3 15:14 22:20 25:22 36:13 46:10
49:25 50:21 52:3 55:13,16
**2018** 55:13,16
**2019** 4:2
**20th** 7:13

---

### 3

**3** 5:19 36:7 46:23

---

### 4

**4** 5:19 36:8 55:4
**4-7** 55:7

---

### 5

**5** 37:15
**5th** 49:21

---

### 7

**7** 55:5

---

### 8

**8th** 4:1

---

### 9

**9:09** 4:11

---

### A

**a.m.** 4:11 42:15,16,17 54:25 55:2
56:12,13
**ability** 5:22
**accept** 22:1
**account** 12:12
**accurate** 11:6 21:24 25:23 47:3
**acted** 31:10 43:5
**actions** 37:24 38:2
**acts** 38:20
**actual** 7:8 27:19 44:19
**additional** 54:2,13
**additionals** 21:9
**address** 11:19,21 12:3,13
**adjacent** 49:21
**adjust** 27:12
**adjuster** 22:15 24:6,9 27:1,7,10,18
28:11,25 29:9,20 30:4 52:2
**Adjusters** 26:24
**adjusting** 26:24

---

**advanced** 51:24
**advice** 37:10
**advise** 26:22
**advised** 16:6,7,25 17:5 25:14
**aerial** 46:24
**affirmed** 53:1
**agent** 16:20 36:10
**agree** 32:4 39:25 44:23 45:15
**agreed** 7:23
**agricultural** 38:15
**air** 15:24 24:22,23 53:7,13,15
**allegedly** 52:3
**alley** 9:5,12 10:17,23 11:5 49:14
**allowed** 27:3 28:6,12
**amount** 36:13,20
**and/or** 36:10
**apologies** 50:6
**apologize** 9:23 10:1 37:20 47:2
**apparent** 12:22
**appearances** 4:5
**appointed** 33:15,23 34:3
**appraisal** 16:24 17:3,5,8,12 22:12
23:11,19 27:2,19 28:3 30:8,11,16,19,
23 32:16,23 33:5 34:24 35:12 36:25
38:5,6 40:22 43:7 45:18,23 46:5,6
**appraiser** 24:1,13 28:5 30:3 33:21
41:7,10,11
**appraisers** 30:3
**approved** 22:8
**approximately** 21:15 56:5
**April** 7:6,11,13,25 8:3,22 9:20 10:19
11:22 12:3 15:14 22:20 25:25 36:13
49:25 50:21
**area** 8:9 16:21 47:24 49:6,21 53:12
**areas** 5:20 10:20 48:25 49:6,11,16,
17,24 50:23
**arose** 36:11,18
**assume** 44:17
**attempted** 11:18,21 12:2 43:7
**attorney** 6:2 51:6
**attorneys** 11:17
**August** 30:5 46:10



**Austin** 36:4

**award** 37:23

**aware** 7:18 8:22 14:18,20 15:23 22:17 24:21 50:2

---

**B**

**B-U-S-H-A-R-T** 4:21

**back** 5:1 7:6 9:5,6,12 10:16,23 11:5 19:7,22 22:2 30:5 36:24 41:21 42:18 47:11 49:14 51:3

**backed** 46:19 51:22

**background** 13:21 36:8

**bad** 10:5 37:24 38:2,13,17,18,25 39:3,4 40:13 43:5

**band-aid** 12:4

**Baptist** 22:23 23:1

**based** 40:1 41:13 45:19

**basis** 34:13

**began** 37:9,25

**begins** 37:16

**behalf** 4:7 5:9 28:18 29:2 30:13 51:15 54:15

**believed** 25:6

**believes** 32:12,15 36:21

**bid** 30:23 31:17 36:24

**Bilbrey** 53:22

**bit** 9:24 13:21

**Bless** 11:24,25

**board** 17:16,18 18:1,4,10 19:1,13,17 20:8,10,15 21:19 22:7

**Boenker** 4:4 16:18,19

**born** 14:5

**break** 13:16 42:13,16,18

**Brisendine** 15:5 25:11

**broken** 54:6

**bucket** 53:25

**buckets** 12:24

**building** 15:16,17 47:6,11,12,13,14 48:1,2,6,11,21,23 49:21

**buildings** 47:10,16,22 48:20,22

**Bushart** 4:2,14,19

**business** 15:5,7 16:15 31:13 45:5

**businesses** 22:18

---

**C**

**cabinet** 55:12

**call** 15:25 37:4 41:3 47:11,14 53:14

**called** 30:3 47:7 48:1 52:14,18,24

**campus** 47:21

**capacity** 15:9

**care** 37:11

**Carlson** 52:10

**carpets** 54:9

**cars** 50:17

**case** 4:3 16:23 26:14 32:13 35:16 37:13 47:5 55:11

**ceiling** 13:18,19 54:6,7

**center** 9:4,9 10:16,23 11:5 49:10,12

**chairman** 52:11

**chairpersons** 21:5

**checked** 25:12 52:22

**choose** 19:23

**chooses** 40:5

**chose** 25:17

**chosen** 17:20 39:13

**Chris** 4:7

**Christmas** 56:6

**church** 4:4,8,25 5:4,10,14 6:17 7:18,19 8:14,18,22 12:7,10,19 14:12, 17,21,22 15:11,14 16:3,13 17:7,23 18:5,7,25 19:10,17,18,19,21,23,25 20:1,12,14,18 21:1,4,13,23,25 22:8, 23,24 23:16 26:22 27:4 29:13,15,19 30:6,7,13,15,18 31:8,14,16 32:1,9,16, 22 33:3,7,9,14 34:2,6 35:2,3,7,12 36:11,14,19,21,23,25 37:2,22,25 38:3,14,19,25 39:6 40:13,18 41:14,15 42:3,5,25 43:4,5,7,10,12,17,18 44:2, 20 45:8,9,19,22 46:18,24 47:17,21 51:16 52:18 53:5 54:1,10,11,16 55:5, 10 56:4

**church's** 8:21 17:2 30:14 31:2 35:15,25 36:9 38:24 39:4 42:22 46:13,16 54:5,16

**churches** 22:17 25:13 52:22,24

**circle** 48:25

**circled** 49:15 50:1

**claim** 4:23 6:18,24 7:3,5 12:4 14:22 16:11,14 22:5 23:2 25:15,19,21,25 26:23 36:10,17 38:5,23,25 39:5,8 40:8,9,14 42:10 43:6 44:4 46:16 51:15 55:21 56:1

**claims** 14:18 15:1,4 16:16 26:24 36:1 46:15 51:25 55:11

**classes** 17:24 48:4

**clause** 16:24 17:3,12 30:16,19,23 35:13 36:25 43:7 45:19,23 46:5,7

**clean** 13:20

**clear** 8:16 19:3 33:3 35:14

**coils** 16:1

**collapsed** 13:19

**Comfort** 24:22 53:7,15

**committee** 19:19,22,24 20:20,21 21:10

**committees** 19:18 20:23 21:6,9 26:3

**communicated** 16:17 43:13

**communicating** 10:8

**communication** 6:6 17:8 45:9

**communications** 16:10 44:13

**community** 22:18 38:15

**company** 4:3,10 14:22 24:20,21 26:24 36:11 51:24

**compensated** 39:19,21 40:1

**competing** 30:18,22

**complaint** 35:25 54:16

**complaints** 42:22 43:4

**complete** 26:5 27:2 41:16

**completed** 23:8 26:19

**completely** 10:11 28:4

**complied** 32:9

**complies** 49:4

**comprises** 21:1

**concerns** 43:11

**concludes** 54:24 56:11

**conclusion** 29:23

**condenser** 15:25

**conditioning** 15:24 24:23 53:13



**confirm** 46:24

**congregation** 21:3 38:11

**construction** 14:14 23:23 25:2,18 26:21 28:7 30:22 31:16 45:4,20 46:18

**Construction's** 26:16 31:17 40:20 46:9

**contact** 16:14 53:5

**contacts** 52:14

**continue** 42:19

**contractor** 6:11 22:10 31:3

**contractors** 6:3,7 7:21

**conversation** 42:24 44:3

**conversed** 41:8

**cooperate** 35:2

**copies** 55:14

**copy** 18:22,23 36:2

**corporate** 5:14 43:16

**correct** 12:8,9 13:24 19:12,15 20:16 22:3,9 23:25 27:14 29:3 42:6,9,12 43:3 44:5 47:25 48:3,8,15,18 54:19 56:2

**corrected** 38:11

**correctly** 6:8 12:6 28:4 41:16

**correspondence** 51:3 52:1 53:20

**cost** 28:8 29:4,9,16,20 30:2,9,15,23 31:4,15,19 33:10 36:23 40:21 41:4 44:6,9,19

**costs** 43:21

**council** 18:25 19:11,17,19,21,23,25 20:18 21:1,4,6,14,23,25 22:8 55:5,10 56:4

**counsel** 4:5

**countersuit** 35:15

**County** 33:16

**couple** 52:4

**court** 4:12 12:1

**courthouse** 33:23

**cover** 29:13

### D

**Dallas** 16:21

**damage** 7:24 8:14 11:14,22 16:1 20:14 22:19 24:20 25:7 27:12 53:11,
16 54:2,8,13

**damaged** 15:25 47:17,19

**damages** 8:22 15:13,21 16:4 23:24 29:10,16,17 30:7 31:15 33:10 36:12, 20 39:22 40:1,8 41:14 42:8 43:2 47:5 54:4,18

**date** 7:8,10,16 12:21

**day** 9:18

**Deaf** 33:15

**dealing** 55:21,22

**decided** 37:24 39:8

**decision** 17:3,14,15,17 19:20 21:19,22 22:4 45:18 52:16

**decisions** 17:11

**defendant** 36:1

**definitive** 47:18

**delay** 25:25

**depends** 18:16

**deposition** 4:2,22 5:13,16 35:20 46:21 54:25 55:7 56:12

**describe** 13:12,17 15:13

**designated** 16:14

**determination** 29:19

**determine** 22:1

**difference** 19:16 28:2

**difficult** 20:4

**Dimmitt** 22:24 23:7

**direct** 41:25 51:25

**direction** 25:17

**directly** 43:13 53:21

**disagree** 30:8,9

**disagreed** 31:17 32:22

**disagreement** 29:15 30:2,12,14 34:22 44:7 45:13

**disagrees** 31:25

**disconnect** 40:17

**discussed** 17:14

**discussion** 5:21 55:1

**discussions** 26:4

**dispute** 16:23 36:11,18,19,22 37:2, 3 45:10

**disputed** 37:4

**District** 33:15 34:3

**divets** 15:15,21

**documentation** 6:1 7:15 51:6

**documented** 29:24

**documents** 6:12 26:14 35:17 51:7

**drive** 50:11,17

**drug** 38:12

**Duff** 24:25

**duly** 4:15

**dying** 38:14

### E

**e-mails** 7:2,3

**earlier** 11:7 27:20 42:24 44:3 48:19

**education** 47:12 48:1

**effort** 7:2

**efforts** 14:25 16:3 55:9

**elect** 17:24

**elected** 17:20,23,24 18:7 21:2

**electronic** 6:21

**electronically** 18:21

**ended** 55:3

**engage** 37:24 38:2

**ensure** 37:11

**entrance** 9:5,13 10:17,24 11:5 49:14

**Eric** 53:20

**estimate** 26:5,8,10,13,16,19 27:21 28:5,8,12,17 29:9 30:19 32:23 36:23 37:4 40:20 43:20 52:2 53:15

**estimates** 47:4 52:4

**event** 5:1 7:6,9,16,18,25 9:20 10:19, 24 11:4 12:14,17,20 13:2 14:23 15:14 16:4 20:14 22:20 34:7

**Everything's** 53:6

**exact** 26:18

**EXAMINATION** 4:16

**exasperated** 11:2

**excellent** 25:13

**excuse** 13:1 15:16 33:8

**Exhibit** 5:13,16,25 35:20,22,25 46:21,23 55:7



**exhibits** 55:4

**exoffico** 18:2

**expansion** 48:12

**experience** 14:14

**explain** 19:3,16 38:11 45:22 46:18

**explained** 46:1

**express** 34:22

**extent** 29:16

**extra** 36:2

**eyes** 53:18

---

**F**

**fact** 8:24 49:18

**facts** 36:7

**fair** 10:22 12:25 41:4,9 42:1

**fairly** 42:25

**faith** 31:10 37:24 38:2,17 39:3,4 40:13 43:5

**faithfully** 38:4

**familiar** 25:1 53:13

**familiarize** 5:21,24

**feel** 10:5

**Fellowship** 48:5

**felt** 38:13 42:25

**figure** 30:6

**file** 22:5 55:12

**filed** 16:16 18:20 32:6 36:18 39:5

**files** 6:17,19,21,23,24 39:5 55:23

**filing** 36:9 37:25 38:21

**final** 17:17

**finance** 20:21,23

**financial** 40:2,9 41:22

**find** 55:10

**finds** 40:1

**fix** 12:5 16:3 40:21

**fixed** 12:6 40:15,19

**flat** 48:7

**folks** 17:20 21:4

**footwork** 25:11

**forgot** 10:1

**form** 31:6,9,20 32:2,11,18 34:4 37:5 38:13,18 40:3,10,24 41:6,23 43:8,24 44:11,21 45:3,16

**forward** 23:9 25:9

**found** 39:22 41:13 42:8

**front** 21:18 26:18 38:10 49:6 51:1 55:15

**function** 20:10

**funerals** 50:11

**furniture** 47:15 48:9

**fuss** 20:3

**fussing** 31:11

**future** 48:12

---

**G**

**gather** 6:14,15

**gathering** 6:12

**general** 5:23 31:13 48:25

**generally** 15:13 18:17

**give** 4:22 5:23 20:4 22:22 31:17 33:7,9 42:21 44:9

**Glanced** 51:11

**GOMIC** 36:10

**good** 4:18 31:10

**Googlemaps** 46:23

**grounds** 20:11 21:20 46:24

**group** 48:4

**guess** 13:6 21:11 40:17

**Guideone** 4:3,9 6:2,6 12:8 16:7,10, 14 24:1,7,13 25:22 26:14 28:18,22 29:8,12,16,20 30:1,6,7,19,23 31:4,13, 25 32:8,12,15 33:4,7,9,18,20 34:2,7 35:16 36:1,10,12,18 37:3,23 38:2,18, 19,24 39:4,5 40:20 41:2,7,11,21 42:23 43:1,5,11,13,17,20 44:6,8,18 45:2,13 46:5 51:4 52:2,3,7 54:17

**Guideone's** 6:13 30:14 32:13,21 33:24 36:22 39:2

**guys** 31:18

---

**H**

**hail** 4:23 5:1 7:6,8,16,18,24,25 8:14 11:4 14:18 16:1,4 20:13 22:19 55:22

**hail-related** 25:7

**hailstorm** 8:8 10:19 20:14,24 47:17

**hall** 48:5

**handle** 53:13

**handled** 20:15

**handling** 20:24 46:15 51:15,25

**hands** 42:10 44:4

**happened** 10:19 13:17 19:24 23:5 33:18 51:20 55:16

**happening** 33:4

**happy** 13:14

**hard** 6:19,23 18:21,23

**hear** 6:7

**heard** 21:8

**Hearing** 40:12

**hearse** 50:12

**helped** 6:14

**Hereford** 4:4,8 5:15 13:7 14:1,17,21 15:1 22:24

**hey** 8:8 31:18

**hire** 25:17 41:21 52:16

**hired** 25:10,18 42:7

**hiring** 22:10,15

**Hoffman** 53:20

**hold** 53:6

**holding** 12:12

**honest** 52:25 53:3

**honesty** 25:14

**hundred** 23:18 24:15

---

**I**

**idea** 23:3 39:17 46:11,14

**identification** 5:17 35:21 46:22 55:8

**identified** 5:8 9:20 10:16 12:20 25:6

**identify** 14:25 43:17 56:1

**improperly** 32:16

**incentive** 40:2,9 41:22

**including** 19:18 36:13



**individuals** 21:2

**information** 6:13 15:4 17:2 28:14 45:2

**initially** 15:20 16:16 51:19

**inside** 54:7

**inspect** 8:1,9,21 9:8,12 15:19 24:20 25:6 54:12

**inspected** 23:23 42:7

**inspecting** 8:13 9:16

**inspection** 11:15 24:2,7

**instances** 43:17

**insulation** 13:19 54:6

**insurance** 4:3,10 14:22 16:20,24 22:5 25:15,19 26:23 36:11 51:10,12

**integrity** 25:14

**invoke** 17:3,12 33:5 43:7 45:18,23 46:4,6

**invoked** 16:25 30:24 32:16 35:12

**invoking** 22:12 30:8,11,16,19 32:23 36:25 40:22

**involved** 4:25 5:3 6:12 17:11 20:23 23:14,19 25:3,10 26:22,24

**involvement** 53:9,10

**involving** 6:23

**issue** 20:13

**issues** 12:3,14 13:10

---

### J

**job** 41:16 42:2

**Judge** 33:15 34:3

**July** 30:5 46:10

**June** 25:22,25 30:5 46:10

---

### K

**keeping** 6:18 17:5

**Kevin** 4:2,14,19 18:24

**kind** 16:13 19:25 20:15 42:21,22 44:3 46:3,24 48:25

**knew** 53:9

**knowing** 33:19

**knowledge** 6:22 8:14,15,17 15:6 17:4 30:21,25 33:24 34:8 41:1,12

44:12 46:1 50:2,22 53:10

---

### L

**lack** 19:21 47:12

**laid** 53:18

**law** 27:1,5 28:6 37:23

**lawsuit** 23:14,21 31:25 32:6 38:21 39:5

**lawyer** 37:11,12 45:4

**lawyers** 6:25 11:13 37:12

**leak** 50:19,21

**leakage** 9:6

**leaking** 9:14 50:8,23

**leaks** 8:24 9:3,4,9,10,12,19,21 10:15,20,21,22 11:4,8,14,19 12:19 13:2,10 15:16,23 40:16 48:19,25 49:12,24 50:25 53:24 54:2,5

**legitimate** 28:13 38:5,23 39:8

**letter** 33:4,11 41:3

**light** 36:4

**list** 52:21

**listed** 5:25

**local** 22:18

**locally** 23:16

**long** 5:6 7:25 14:11

**longer** 15:7

**looked** 7:24 9:2 15:20 32:14 35:18 39:7,9 41:10 51:6

**lose** 38:7

**loss** 34:6,11,17 35:3,7,11 36:13

**lot** 45:9

**Lyster** 4:7 11:25 13:13,15 18:24 24:9 29:5 31:6,9,20 32:2,11,18 34:4 36:2,5 37:5 40:3,10,24 41:6,23 42:14 43:8,24 44:11,21,24 45:3,16 54:23 55:17,19,21 56:10

---

### M

**made** 7:18 11:18,21 12:2 14:18 15:1,4 22:7 25:21 26:1 29:19 30:15 44:12 52:16 55:9,13

**main** 47:13 48:23

**major** 49:16

**make** 7:2,4 10:3,7 14:22,25 19:3,20 21:6 27:19

**maker** 17:14,15

**makes** 17:17 19:7 20:4 21:19 40:8

**making** 25:18 27:21 38:23,25

**man** 51:19

**management** 20:1

**manager** 15:6,7 16:15

**mark** 5:12 35:22 46:23 50:5 55:4

**marked** 5:16 35:20 46:21 49:5,6 55:7

**marker** 48:24

**marking** 55:4

**materials** 6:16 15:22

**matter** 53:6

**meant** 24:10

**meeting** 18:9,11 19:10 26:3 55:5, 10,13,16,25

**meetings** 17:13 19:24 26:4 56:3,4,7

**member** 15:11

**members** 18:5 21:25 54:11

**memory** 45:24

**mentioned** 6:6 52:14 53:7

**mess** 13:20

**messing** 38:14,19

**met** 33:13

**Methodist** 4:4,8 5:14 14:17 22:24 23:7 52:23

**Michelle** 15:5 16:15 17:10 25:11 51:4 52:20

**Miller** 4:9,17 11:24 19:2 24:12 36:3 42:13 54:22 55:3 56:8

**mind** 39:2 40:4,6

**mine** 36:3

**minor** 9:10,14 10:21,25 11:8 50:25

**minute** 44:17

**minutes** 18:10,11,14,17,18,25 19:10,23 55:5,10,13,15,16,25

**missed** 31:5,18

**missing** 9:7,17,18 15:16,22,24 49:18,19,22

**money** 12:10,13,16 16:8 40:8

---



**month** 8:2 56:5

**months** 45:24

**morning** 4:18 10:2 18:9

**move** 14:7 45:25

**moving** 23:8 25:16

**multiple** 37:24

**Mutual** 4:3,9 14:22 36:10

**N**

**named** 51:19

**names** 21:18 47:10

**nature** 54:1 55:22

**Nazarene** 22:24 23:16

**necessarily** 40:11

**needed** 33:12 45:23

**neighborhood** 26:17

**night** 38:8

**No.3** 46:21

**nominated** 17:20

**nominations** 20:20,22

**north** 47:13,14

**Nos** 55:7

**noted** 9:18

**Notice** 5:13

**number** 5:13,25 26:18 35:22,25 46:23

**numbers** 52:5

**O**

**object** 33:12

**objection** 31:6,9,20 32:2,11,18 34:4 37:5 40:3,10,24 41:6,23 43:8,24 44:11,21,24 45:3,16

**occur** 56:4

**occurred** 5:1 7:6,9,16,19 54:5

**occurring** 9:4 10:23,24 49:1 53:24

**occurs** 18:13

**October** 4:1

**Odessa** 14:2

**office** 18:20

**official** 19:17

**onces** 55:20

**operate** 19:19

**operates** 45:9

**operation** 20:1

**opinion** 41:19,20

**opportunity** 5:20 42:21

**order** 5:24 6:15

**organization** 19:1

**organizations** 20:17 22:18

**original** 35:25

**outcome** 41:22

**overarching** 19:25

**owed** 37:22

**owns** 20:12

**P**

**pages** 5:19,20

**paid** 21:6 36:23 38:4 41:14,15

**paragraph** 36:9 37:16

**pardon** 18:24

**parks** 50:12

**part** 16:23 36:15 38:17 50:15

**pass** 11:17 56:8

**Passes** 54:22

**past** 13:22 14:25 15:4

**pastor** 5:5,6 13:22,25 14:3,11

**pastors** 22:25

**Paul** 4:9 18:24 36:2

**pay** 43:1 44:19

**paying** 37:22 54:17

**pending** 46:16

**people** 21:13 24:17 37:14

**percent** 23:18 24:15 40:1

**percentage** 39:22

**perform** 24:2

**permanent** 48:24

**person** 40:7 42:3 51:17

**personally** 31:12

**personnel** 20:20,22

**perspective** 31:2 36:22 38:3 39:3, 4 54:4,5

**phone** 37:3 41:2

**photographs** 11:13

**photos** 11:16

**physical** 55:23

**pick** 37:3

**Plainview** 52:24

**pleadings** 32:19 36:8,9,17

**point** 16:14 47:7

**pointing** 47:1 49:20

**policy** 16:24 17:6 32:10 33:12 34:15,16,19,20,21 35:2,6 37:23 51:10,13

**portico** 50:8,10

**portion** 34:19 41:15

**position** 32:21 38:24 40:18 52:12

**possession** 11:16

**post** 53:9

**preach** 38:7

**prematurely** 55:3

**premiums** 38:4

**preparation** 51:5

**prepares** 28:8

**present** 4:25 9:21 17:13 50:21

**Pretty** 55:12

**prevent** 54:1,13

**primarily** 18:23

**primary** 47:22

**prior** 8:13,20 9:8,11,15,20 10:19,24 13:25 14:18,22 25:18 30:8,19,23 32:23 33:3,11 36:24 40:21,22 50:21

**problem** 12:5

**problems** 42:22

**process** 23:11 25:9,15,16 26:3,23 28:7 46:2

**produced** 26:13

**proof** 34:6,11,17 35:3,7,11

**proper** 43:21 45:14

**properly** 16:8,25



**property** 20:11 21:22 23:24 36:14 47:17

**provide** 40:19 53:15

**provided** 11:13 18:9 28:14 34:17 43:23 44:25 52:20,21 55:6

**providing** 5:9

**provision** 17:8 22:13 30:8 32:16,23 34:24 35:6

**public** 22:15 24:6,9 26:23,24 27:1, 10,18 28:11 30:4 52:2

**pulled** 55:13

**purchased** 48:12

**purely** 30:15

**put** 12:4,24 42:10 44:3

---

**Q**

**question** 8:20 10:3,12,15 19:5 20:4 31:21,22 35:5 37:1 41:24 44:1

**questions** 40:12 41:25 43:11,18 54:23 56:10

**quick** 35:23

---

**R**

**rain** 13:8,9

**rained** 12:23

**raining** 13:7

**rains** 13:20 15:17,18

**raised** 14:5

**ratified** 19:21

**re-ask** 8:20

**read** 32:13 35:17 55:25

**ready** 42:18

**real** 54:16

**realize** 12:19

**reason** 7:12 35:11 45:1 53:2

**reasonable** 31:1,3,7 34:1 40:7 44:22

**reasoning** 25:24 26:2

**reasons** 39:1

**recall** 7:14 51:7,12 52:18

**received** 12:7 16:8 36:24 41:2

**receiving** 12:11

**recent** 14:9

**recently** 13:7

**recognized** 24:4

**recommendation** 22:2

**recommendations** 45:19

**recommended** 53:14

**record** 4:6,12 42:15,17 54:25 55:1,2 56:12,13

**refer** 55:19,20,21

**references** 25:12 52:15,18

**referring** 34:19

**reflect** 19:24

**regularly** 38:4

**related** 7:3

**relevant** 55:10

**remember** 16:3 28:19,21 35:17 46:8 52:20

**repair** 16:4,9 26:6,9 27:21 28:4,9,17 29:10,17,21 30:15,23 31:5,16,18 33:10 36:23,24 40:20 41:4 43:2,21 44:7 45:14 46:13 53:16 54:18

**repaired** 23:4 46:2

**repairs** 11:18,21 12:2 23:8 29:13 30:2,10

**rephrase** 10:5

**replaced** 23:17

**reported** 43:6

**reporter** 4:12 12:1

**representative** 5:14 8:18 43:16 44:2

**reputable** 52:25 53:3

**reputation** 25:13

**request** 6:13 24:24

**requested** 34:11,17 35:4,8,12 43:20

**requests** 43:18

**required** 34:10,14,20 43:25

**requirement** 33:13 35:1

**requirements** 32:9

**reserve** 54:23 56:10

**resolve** 45:10

**resolved** 40:14 44:4

**respect** 6:23 9:15,19 10:15 12:25 16:11 21:20 22:4,10,12,15 23:1 35:6 40:12 42:23 45:18 52:19 53:24 54:16

**response** 12:25 20:4 40:12

**responsible** 20:11

**responsive** 6:13 43:11,18

**result** 54:5

**resulting** 36:14

**retired** 15:10

**review** 5:20 28:17 51:10

**reviewed** 6:1 21:22 35:15,24 51:3, 8,13 52:1

**Ron** 24:4

**roof** 7:22,23,24 8:1,9,13,21 9:1,9,12, 16 15:19 23:17 25:6 26:5 28:4 40:15, 19 41:10 42:7 46:2 48:7

**roofed** 50:15

**roofer** 54:10

**roofing** 14:15 15:22 24:25

**rotate** 17:25

**roughly** 29:12

**Roy** 52:10

**run** 42:3

---

**S**

**Sanctuary** 47:6,24 49:21

**school** 48:4

**scope** 29:20 30:2,9,14 31:4,14,17 36:24 40:20 41:4 43:1,21 44:7,9,19 45:14 53:15 54:17

**search** 7:2

**section** 36:8

**sections** 51:12

**send** 22:2,3 37:4 41:11

**sending** 33:11

**sense** 10:3,25 19:7 40:13

**sentence** 37:16,18

**separate** 47:20 49:11

**September** 46:10 52:3

**serve** 15:9 17:18,24 18:1,4,7



serving 14:11 21:13

settle 12:4 38:12

settled 16:6 38:6 53:6

severe 50:24

shingles 9:7,15,17 15:15,22,24 49:19,22

short 54:13

show 13:13,14

sides 30:4

simple 55:12

simply 37:22

sir 4:18 10:14 13:22 30:17 33:6 40:15 41:20 42:18,20 49:10 51:18 54:16 55:3 56:8

sit 35:10 53:2

sitting 31:2

situation 40:7

skip 56:6

sleep 38:7

small 38:3,14,19

Smith 33:15

soaked 13:18 54:6

Sorrenson 24:4

sort 12:24 48:5

sounds 42:2

speak 39:2 40:4,6 42:10

speaking 45:8

specific 7:10,14,16 12:21 38:20 43:9 51:17

specifically 18:19 27:17 28:21 51:7

specifics 22:22

spell 4:20

staff 21:6

stains 54:9

stand 38:10

start 10:12 29:7

started 10:2

state 4:5,18 9:22 14:6 32:12 36:9,17 39:2 40:4,6

stated 30:9

statement 34:16,21

statements 34:15

stating 30:11,12

status 23:2

step 46:1,4

steps 54:1

sticking 53:25

stopping 9:8,11,16

store 47:15 48:9

stored 18:18,21

storm 7:20 8:23 9:20 10:24 11:11,22 12:3,14,17,20,23 13:2 14:23 15:14 34:7 36:13,14 49:25 50:21 53:9

storm-related 14:18 22:19 36:12

street 22:23 49:21

structure 54:8

structures 47:16,20

subcommittees 20:6

submit 26:25 31:3 34:6 35:7

submitted 28:17 30:18,22 35:11 36:23 44:6

subsequent 49:25

sued 38:25

suffered 22:19 36:13

sufficient 34:23

suggested 42:11

suing 39:1

suit 32:13 37:25

summarize 42:22

Sunday 48:4

Sunni 4:4 16:17,19

supposed 18:16 35:3 39:18 42:4

suspended 54:7

swear 4:12

sworn 4:15 34:6,11,16 35:3,6,11

systems 53:14

---

**T**

takes 26:4

talk 10:10 25:2 35:22 37:7 52:7

talked 48:19

talking 7:5 10:13 27:23 33:22 34:24 35:1 36:19 38:20

telling 11:3

ten 5:7 13:22 56:7

term 17:25 19:21 47:12 54:13

testified 4:15 25:5

testimony 4:23 5:9 8:7 30:13 54:15

Texas 13:7 14:2,7 37:23 38:4,14,19

thing 10:1 12:24 31:1,3,7,25 34:1 44:22 48:5

things 42:4 45:25 53:25 55:22

thinking 31:12

thought 28:23 29:4,9 33:8,10 41:3 43:21 44:6 45:14,22

three-year 17:25

tile 13:18

tiles 13:19 54:6

time 4:11 7:20,21 8:2 10:13 12:23 14:8,9 15:18 16:15 17:9 18:13 26:4 38:12 42:13 43:6 46:16 56:6,8

timeframe 25:20 30:6

times 45:9 56:7

today 4:1 11:9 15:9 30:14 31:24 32:6 35:10 51:5 53:2

Todd 53:22

told 27:4 30:1 32:22 45:13

topics 5:21,25

torn 15:15

track 6:18

travel 36:4

treated 42:25

TRIGG 6:2,7,10,11 7:20,25 8:3,8,13, 21 9:8,11,16 11:15,16 15:20 16:8 17:5,8 22:10 23:23 25:2,18 26:5,16, 21,25 27:4,12,16,17,20 28:7,15 29:22 30:1,22 31:16,17 37:7,10,12 40:19 41:3,8,9,18,25 42:7 43:20,21,22 44:7, 8,10,18,20 45:1,12,20,22 46:9,18 51:4,15 52:2,6,8,15,19 53:3,5,11 54:10 55:22

TRIGG's 24:23 41:19,20 43:25 44:4

true 8:11 24:2 25:19 40:11 41:14

trust 44:4



trustee  19:19

trustees  17:16 18:1,4,10 19:1,14,20
20:8,10,15 21:19 22:7 52:11

**Tuesday**  4:1

turn  5:19 36:7 37:15

turned  6:24

**Tyler**  51:19,20,22

**Typically**  18:10,12

### U

**Uh-huh**  10:18 17:21 21:21 22:6
25:4 27:22 36:16 50:16 52:17 53:8

ultimately  17:16

umpire  32:24 33:3,15,22 34:3 39:7,
9,12,15,18,21,25 40:23 41:21 43:1
54:17

**umpire's**  37:23 40:4

unable  27:17

unbiased  39:16,23

underneath  50:9 53:25

understand  4:22 5:8 7:5 8:7,17
11:3 16:23 19:13 23:23 24:6,12
26:22,25 27:5,9,25 28:1,7,22 29:8
30:17 31:11 32:1,5,7,8,15,21 33:2,12,
14,18 35:14 36:5 45:6 54:15

understanding  5:24 25:5,21
27:15 35:10 44:2 47:4

understood  33:20 42:24 48:20

United  4:4,8 5:14 14:17,21 15:1
52:23

units  15:24 24:23 53:11,13

upset  42:25

### V

varies  17:19

vein  29:12

versus  4:3,4

video  54:24 55:2

voice  18:2 21:7

vote  18:3 21:7,14,15 22:1

### W

**Wait**  29:5

**Waiting**  12:4

wanted  37:15 40:19

wanting  25:6

water  9:9 13:5,18 54:8

week  13:8,9

weekends  13:20

**West**  38:3,14,19

withhold  45:2

work  17:22 19:22 52:21,22

worked  37:10

working  26:2 29:22 30:6 37:9

workload  46:9

worries  50:7

worse  11:5,10,11 12:20

worsened  13:2

worship  21:10 47:23

wrong  29:20 43:6 44:18

### Y

year  17:23 45:24 56:7

years  5:7 13:23 38:12,13

**York**  14:6

youth  47:6 48:4



```
 1              UNITED STATES DISTRICT COURT        ┌─────────┐
 2              NORTHERN DISTRICT OF TEXAS          │ EXHIBIT │
 3                   AMARILLO DIVISION              │   10    │
 4                                                  └─────────┘
 5     GUIDEONE MUTUAL INSURANCE      *
       COMPANY                        *
 6      PLAINTIFF/                    *
        COUNTER-DEFENDANT             *
 7                                    *
       VS.                            *  NO. 2:18-CV-00140-D
 8                                    *
       FIRST UNITED METHODIST         *
 9     CHURCH OF HEREFORD             *
        DEFENDANT/                    *
10      COUNTER-PLAINTIFF             *
                                      *
11     VS.                            *
                                      *
12     SUNNI DENISE BOENKER,          *
       INDIVIDUALLY, AND AS D/B/A     *
13     BOENKER & WHEELWRIGHT          *
       INSURANCE; AND GUIDEONE        *
14     MUTUAL INSURANCE COMPANY       *
        DEFENDANTS.                   *
15
16
17
18              -----------------------------
                ORAL AND VIDEOTAPED DEPOSITION OF
19                    RONALD V. SORENSON
                      NOVEMBER 8, 2019
20              -----------------------------
21
22
23
24
25
                                                       Page 1
```

1              ANSWERS AND DEPOSITION OF RONALD V.

2      SORENSON, a witness produced at the instance of

3      the Plaintiff/Counter-Defendant, taken in the

4      above styled and numbered cause, on the 8th day

5      of November, 2019 from 11:07 a.m. to 12:46 p.m.,

6      before Gail Spurgeon, a Certified Court Reporter

7      in and for the State of Texas, at the offices of

8      Veritext Legal Solutions, 600 North Pearl

9      Street, Suite 2230, City of Dallas, County of

10     Dallas, and State of Texas, pursuant to the

11     Federal Rules of Civil Procedure.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page  2

```
 1                  A P P E A R A N C E S

 2

 3          MR. W. PAUL MILLER
            Germer Beaman & Brown
 4          301 Congress Avenue
            Suite 1700
 5          Austin, Texas  78701
            pmiller@germer-austin.com
 6              APPEARING FOR THE
                PLAINTIFF/COUNTER-DEFENDANT
 7

 8          MR. CHRISTOPHER LYSTER
            Puls Haney Lyster
 9          301 Commerce Street
            Suite 2900
10          Fort Worth, Texas  76097
            chris@pulshaney.com
11              APPEARING FOR THE
                DEFENDANT/COUNTER-PLAINTIFF
12

13          ALSO PRESENT:
                Don Harris, Videographer
14

15

16

17

18

19

20

21

22

23

24

25

                                          Page  3
```

```
                              INDEX
                                                    PAGE
     Appearances...............................................  3

     Changes and Signature....................................  90

     Reporter's Certificate...................................  92

     RONALD V. SORENSON

           EXAMINATION BY MR. MILLER...........................  5
           EXAMINATION BY MR. LYSTER........................... 54
           EXAMINATION BY MR. MILLER........................... 85

                            EXHIBITS

     EXHIBITS        DESCRIPTION                         PAGE

     Exhibit 13     7/12/17 First Report.......................  11

     Exhibit 14     Preliminary Estimate.......................  11

     Exhibit 15     Photographs................................  11

     Exhibit 16     8/20/17 Second Report......................  28

     Exhibit 17     Second Xactimate estimate .................  28

     Exhibit 18     Statement of Loss..........................  28

     Exhibit 19     8/7/17 Email...............................  34

     Exhibit 20     9/3/17 Email...............................  35

     Exhibit 21     11/7/17 Email..............................  36

     Exhibit 22     9/12/19 Email..............................  39

     Exhibit 23     11/13/17 Conversation with Tyler @ Trig.....  40

     Exhibit 24     12/17/18 Email.............................  47

     Exhibit 25     1/16/18 Email..............................  49

     Exhibit 26     2/27/18 Email..............................  49

     Exhibit 27     3/2818 Email...............................  50

     Exhibit 28     3/28/18 Email..............................  51
```

Page 4

```
 1                    P R O C E E D I N G S
 2                    THE VIDEOGRAPHER:  On the
 3          record at 11:10 a.m.  My name is Don
 4          Harris, representing Veritext.  The
 5          date today is November 8th, 2019.
 6          This deposition is being held at
 7          Veritext Dallas in Dallas, Texas.
 8          The name of the witness is Ronald V.
 9          Sorenson.
10               Attorneys, please state your
11          appearance.
12                    MR. LYSTER:  Chris Lyster
13          on behalf of First United Methodist
14          Church of Hereford.
15                    MR. MILLER:  Paul Miller
16          for Guideone Mutual Insurance
17          Company.
18                    THE VIDEOGRAPHER:  The
19          court reporter will now swear in the
20          witness.
21               RONALD V. SORENSON,
22     having been first duly sworn, testified as
23     follows:
24
25
                                        Page 5
```

```
 1                    EXAMINATION
 2    BY MR. MILLER:
 3         Q.   Sir, would you please state your name
 4    for the record?
 5         A.   Ronald Vaughn Sorenson.
 6         Q.   Mr. Sorenson, my name is Paul Miller.
 7    You understand that I'm a lawyer, and I
 8    represent Guideone Mutual Insurance Company in
 9    this case?
10         A.   Yes.
11         Q.   Okay.  What I would like to do is
12    have you just kind of introduce yourself --
13    yourself to the jury and tell them your
14    connection with this particular case.
15         A.   My name is Ronald Sorenson.  I'm an
16    insurance adjuster licensed by the State of
17    Texas, hired through Professional Adjusting
18    Services by Guideone Insurance to handle claims.
19         Q.   And -- and specifically, we're here
20    to talk about the First United Methodist Church
21    of Hereford.  You understand that?
22         A.   Yes.
23         Q.   And do you understand that there was
24    a hail event that occurred at the church in
25    April of 2017?
```

Page 6

```
 1              Q.    In the typical course of these sorts

 2      of inspection and adjusting of hail-related

 3      claims, when there's a contractor involved, you

 4      typically get those sorts of estimates from the

 5      contractor, right?

 6              A.    Probably about 70 percent, yes.

 7              Q.    And then you work with the contractor

 8      and come up with an agreed price and scope of

 9      repairs, so that the building can ultimately be

10      repaired?

11              A.    Correct.

12              Q.    Okay.  Looking at your photos of

13      Exhibit No. 15, I see a -- of the three

14      buildings, it looks like there's a shingled

15      portion to the sanctuary as well as a flat roof,

16      and then a -- a flat roof on the fellowship

17      hall, and a metal roof on the youth building; is

18      that right?

19              A.    Actually, no.  It's -- the church

20      was -- the sanctuary was a couple of shingled

21      roofs and a flat roof, the youth building was a

22      flat roof, and the fellowship hall was the

23      metal -- two metal roofs.

24              Q.    Okay.  And were any of the roofs out

25      there a gravel ballast roof?
```

Page 32

```
 1                    A.    No.
 2                    Q.    Okay.  So if there's a repair
 3          estimate out there that -- that shows repair to
 4          a gravel ballast roof, that would not be any
 5          roofs that you inspected out there at the First
 6          United Methodist Church?
 7                    A.    I don't recall any gravel ballast
 8          roof at that location.
 9                    Q.    And in your photographs do you see
10          any photographs of a gravel ballast roof?
11                    A.    No, I do not.
12                    Q.    Did you make any attempts to get a
13          repair estimate from Trigg?
14                    A.    Yes.
15                    Q.    Tell the ladies and gentlemen of the
16          jury generally what you tried to do in this
17          particular case to get an estimate from Trigg,
18          to try to push this thing over the line.
19                    A.    Multiple phone calls, emails, and
20          probably a few text messages.
21                    Q.    Okay.  And -- and in your efforts,
22          what sorts of feedback or information were you
23          getting back from Trigg about their repair
24          estimate?
25                    A.    The few times that I actually spoke
```

Page 33

```
 1                    (Exhibit No. 25 marked.)
 2          Q    (BY MR. MILLER)  I'll mark Exhibit
 3     No. 25.
 4               I want to direct your attention to
 5     the email in the middle of the page there from
 6     you to Sharon Gross-Bryant, dated January
 7     the 12th, 2018.  Do you see that?
 8          A.   Yes.
 9          Q.   Take a look at that email, and let me
10     know when you're ready to discuss it.
11          A.    Okay.
12          Q.   What are you relaying to Sharon
13     Gross-Bryant in January of 2018 with respect to
14     the status of the Hereford project?
15          A.    Basically, that I haven't heard back
16     from either the PA or the contractor, and I had
17     asked her if she'd ever received a contract or
18     letter of rep from the PA, in hopes that I could
19     find some better contact information.
20                    (Exhibit No. 26 marked.)
21          Q    (BY MR. MILLER)  I'm marking Exhibit
22     No. 26.
23               Mr. Sorenson, this is an email from
24     you to Sharon Gross-Bryant on February the 27th,
25     2018, true?
```

Page 49

1          A.    Uh-huh.

2          Q.    Is that --

3          A.    Yes.

4          Q.    -- a yes?

5          A.    Yes.

6          Q.    Okay.  And -- and what are you

7     telling Sharon here in February of 2018 about

8     this particular case?

9          A.    Just confirming that we had had a

10    phone conversation earlier, discussing the

11    status, and that we were going to leave the file

12    open until we received a reinspection request

13    and some kind of response from the PA.

14         Q.    Okay.  So as of February 27, 2018, to

15    your knowledge there had not been a response

16    with a new estimate or a supplemental estimate

17    from the public adjuster?

18         A.    Correct.

19             (Exhibit No. 27 marked.)

20         Q    (BY MR. MILLER)  I'll mark Exhibit

21    No. 27.

22             Mr. Sorenson, this is an email from

23    you to Sharon Gross-Bryant, dated March 28th,

24    2018; is that true?

25         A.    Yes.

Page 50

1          Q.   And what are you relaying to

2     Ms. Sharon Gross-Bryant in March of 2018 about

3     this particular file?

4          A.   That we're still trying to contact

5     and schedule a reinspection with the PA.

6          Q.   Okay.  So as of March 2018 you still

7     had not received anything from the PA with

8     respect to an estimate or a scope of repair?

9          A.   Correct.

10              (Exhibit No. 28 marked.)

11         Q    (BY MR. MILLER)  I'll mark Exhibit

12    No. 28.

13         A.   Okay.

14         Q.   I want to draw your attention to the

15    top email from the public adjusting firm to

16    Sharon Gross-Bryant, dated March 28, 2018.  You

17    see that?

18         A.   Yes.

19         Q.   Here the public adjuster tells Sharon

20    the contractor, Trigg Construction, sent you an

21    estimate back in September 2017 for roughly

22    $550,000, and you didn't pay it.  You see that?

23         A.   Yes.

24         Q.   Did you ever see an estimate from

25    Trigg Construction in September of 2017 or at

                                        Page 51

1    any other time?

2         A.   I had not until this week seen

3    Trigg's estimate.

4         Q.   Okay.  Back in -- and -- and you

5    received that from my office?

6         A.   Correct.

7         Q.   Okay.  And that was sometime in

8    November 2019?

9         A.   Correct.

10        Q.   Back when you were involved in

11   adjusting this claim, however, not once did you

12   receive an estimate from Trigg?

13        A.   That is correct.

14        Q.   And, in fact, we looked at various

15   emails between you and Trigg today, postdating

16   September 17th, where they've advised that

17   they've just been backed up and they haven't had

18   time to get you one?

19        A.   That's correct.

20        Q.   Let me ask you a few questions about

21   Guideone Insurance Company.  Have you -- outside

22   of this Hereford case, had you been hired by

23   Guideone Mutual Insurance Company to adjust

24   claims in the past?

25        A.   Multiple times.

1    Construction?

2          A.   He was there.  I wasn't there with

3    him the complete time period, but yes.

4          Q.   When you say you weren't there with

5    him the complete time period, were you --

6          A.   We didn't both arrive at the same

7    time in the same vehicle.  He -- we came in

8    separate vehicles, and I believe he was there

9    after I was or before I was, I don't recall.

10         Q.   But at least as it relates to

11   physically being on the roofs and -- and going

12   around and doing the inspections, did you --

13   were you with Mr. Miller during that time

14   period?

15         A.   For the most part, yes.

16         Q.   Okay.  What -- what time periods were

17   you not?

18         A.   I believe I walked around the

19   property after we completed our inspection, just

20   to, again, visualize everything and complete in

21   my mind what I was looking at.

22         Q.   Okay.  When you saw the estimate from

23   Trigg Construction, the one that was for

24   approximately $550,000, did you review it at all

25   and compare it to any of your estimates?

Page 76

```
 1              A.    I briefly looked at it.
 2              Q.    Okay.  And -- and how did you come
 3       across that document?
 4              A.    It was provided by the attorney from
 5       Guideone.
 6              Q.    By Guideone's lawyers?
 7              A.    Yes.
 8              Q.    Okay.  And -- and do you know why
 9       that was provided to you?
10              A.    Just for my information, I assume.
11              Q.    Okay.  Did you -- did you ask about
12       it?
13              A.    No.
14              Q.    Did you make any comments concerning
15       it?
16              A.    I reviewed it and suggested that
17       there were some inaccuracies in it, yes.
18              Q.    Okay.  And what did you suggest was
19       inaccurate in it?
20              A.    Several items.
21              Q.    Okay.  Such as?
22              A.    It references a gravel ballast roof,
23       which I do not recall being at the location.
24       There was also two metal roof structures on the
25       fellowship hall that are completely identical in
```

Page 77

1    the estimate, which is impossible because they

2    were not identical.

3           Q.    What else?

4           A.    Oh, it did include O&P on the entire

5    estimate.

6           Q.    O&P, overhead and profit?

7           A.    Yes.

8           Q.    And -- and what's your observation

9    regarding O&P on the entire project?

10          A.    It wasn't warranted, and at that

11   point in time was not approved by Guideone.

12          Q.    You said "It wasn't warranted."

13   Explain what you mean by that.

14          A.    There was no need for a general

15   contractor.  This was a roofing job.

16          Q.    And that's your -- that's your

17   opinion?

18          A.    That's an industry opinion --

19          Q.    Well --

20          A.    -- and my opinion, yes.

21          Q.    But it is your opinion, correct?

22          A.    Yes.

23          Q.    And you said that wasn't approved by

24   Guideone at the time?

25          A.    Correct.

Page 78

```
 1      which is the email between the public adjusting

 2      firm and Sharon Gross-Bryant, suggesting that an

 3      inspection was sent by Trigg --

 4                      MR. LYSTER:  Estimate, I'm

 5           sorry.

 6                      MR. MILLER:  I'm sorry?

 7                      MR. LYSTER:  You said

 8           "inspection was sent" --

 9                      MR. MILLER:  An estimate.

10                      MR. LYSTER:  -- "by

11           Trigg."

12                      MR. MILLER:  Yeah, I

13           apologize.  Let me start over.

14           Q    (BY MR. MILLER)  Exhibit No. 28, do

15      you have that in front of you, Mr. Sorenson?

16           A.   Yes.

17           Q.   That's the email from the public

18      adjusting firm to Sharon Gross-Bryant at

19      Guideone, saying that an estimate had been sent

20      back in 2017 September.  You see that?

21           A.   Yes.

22           Q.   Would you also pull up Exhibit

23      No. 22?

24           A.   Okay.

25           Q.   Exhibit No. 22 is an email from Dan
```

Page 86

1    Miller to you in November of 2017, is it not?

2           A.   Yes, it is.

3           Q.   And in this email Dan Miller of Trigg

4    Construction tells you that they have been a

5    little overwhelmed with the workload in the past

6    few months, and they had not had a chance to

7    finalize their review of your estimate.  Do

8    you --

9           A.   Correct.

10          Q.   -- see that?

11               And at no point in time did Mr. Dan

12   Miller, or anybody at Trigg Construction, ever

13   tell you that they had ever completed their own

14   estimate?

15          A.   That is correct.

16          Q.   With respect to the Trigg estimate

17   that you reviewed, you mentioned that it had two

18   metal roof sections that were of the exact same

19   size.  Do you recall that?

20          A.   Yes.

21          Q.   Which building out there at the

22   property had the metal roof?

23          A.   The fellowship hall.

24          Q.   Okay.  And my understanding is the

25   fellowship hall is kind in the shape of an L?

Page 87

```
 1              A.    Correct.

 2              Q.    And so there's two sections of the

 3      fellowship hall, and each have a metal roof?

 4              A.    Correct.

 5              Q.    However, those metal roofs are not

 6      the same size?

 7              A.    Correct.

 8              Q.    And so if you saw an estimate from

 9      Trigg that had two metal roofs of the same size,

10      it couldn't be related to the fellowship hall?

11              A.    Correct.

12              Q.    Additionally, the estimate that you

13      saw from Trigg, it referenced a gravel ballast

14      roof?

15              A.    Correct.

16              Q.    Is there a gravel ballast roof out

17      there at the Hereford project?

18              A.    Not to my knowledge.

19                      MR. MILLER:  Pass the

20              witness.

21                      MR. LYSTER:  Nothing.

22              Mr. Sorenson, thank you very

23              much for your time.

24                      MR. MILLER:  You're done,

25              sir.
```

Page 88

1                      THE VIDEOGRAPHER:  Off the

2          record at 12:46 p.m.

3          (Proceedings concluded at 12:46 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 89

```
1              CHANGES AND SIGNATURE

2    RONALD V. SORENSON              11/08/2019

3    PAGE  LINE            CHANGE          REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   Job No. TX3662088

                                        Page 90
```

```
 1              SIGNATURE BY WITNESS
 2          I, RONALD V. SORENSON, have read the
 3    foregoing deposition and hereby affix my
 4    signature that same is true and correct, except
 5    as noted above.
 6                        _____
 7                        RONALD V. SORENSON
 8
 9    THE STATE OF _____ )
10    COUNTY OF    _____ )
11          Before me, _____, on
12    this day personally appeared RONALD V. SORENSON,
13    known to me (or proved to me under oath or
14    through _____ (description of identity
15    card or other document) to be the person whose
16    name is subscribed to the foregoing instrument
17    and acknowledged to me that they executed the
18    same for the purposes and consideration therein
19    expressed.
20          Given under my hand and seal of
21    office this  _____ day of _____, 2019.
22
23                        _____
24                        NOTARY PUBLIC IN AND FOR
25                        THE STATE OF TEXAS
```

Page 91

```
1                 UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF TEXAS
3                      AMARILLO DIVISION
4
5    GUIDEONE MUTUAL INSURANCE   *
     COMPANY                     *
6     PLAINTIFF/                 *
      COUNTER-DEFENDANT          *
7                                *
     VS.                         * NO. 2:18-CV-00140-D
8                                *
     FIRST UNITED METHODIST      *
9    CHURCH OF HEREFORD          *
      DEFENDANT/                 *
10    COUNTER-PLAINTIFF          *
                                 *
11   VS.                         *
                                 *
12   SUNNI DENISE BOENKER,       *
     INDIVIDUALLY, AND AS D/B/A  *
13   BOENKER & WHEELWRIGHT       *
     INSURANCE; AND GUIDEONE     *
14   MUTUAL INSURANCE COMPANY    *
      DEFENDANTS.                *
15
16                REPORTER'S CERTIFICATION
               DEPOSITION OF RONALD V. SORENSON
17                    NOVEMBER 8, 2019
18
19              I, GAIL SPURGEON, Certified
     Shorthand Reporter in and for the State of
20   Texas, hereby certify to the following:
21              That the foregoing deposition of
     RONALD V. SORENSON was reported by me
22   stenographically at the time and place
     indicated, said witness having been placed under
23   oath by me, and that the transcript is a true
     record of the testimony given by the witness;
24
25              I further certify that pursuant to
     FRCP Rule 30(f)(1) that the signature of the
     deponent:
```

<div align="right">Page 92</div>

1              X  was requested by the deponent or
a party before the completion of the deposition
2    and is to be returned within 30 days from date
of receipt of the transcript.  If returned, the
3    attached Changes and Signature Page contains any
changes and the reasons therefor;
4              _____  was not requested by the
deponent or a party before the completion of the
5    deposition;
6              I further certify that I am neither
counsel for, related to, nor employed by any of
7    the parties or attorneys in the action in which
this proceeding was taken, and further that I am
8    not financially or otherwise interested in the
outcome of the action.
9
              Given under my hand this the
10   19th day of November, 2019.
11
12

13                  GAIL SPURGEON
                 Texas CSR 1718
14               Expiration Date: 12/31/19
                 Firm No. 571
15               Veritext Legal Solutions
                 300 Throckmorton Street, Suite 1600
16               Fort Worth, Texas  76102
                 817.336.3042
17
18
19
20
21
22
23
24
25

                                        Page 93

```
 1   Ronald V. Sorenson

 2                  November 19, 2019

 3   RE: Guideone Mutual Insurance Company v. First United Methodist
         Church Of Hereford

 4   DEPOSITION OF: Ronald V. Sorenson (# 3662088)

 5        The above-referenced witness transcript is

 6   available for read and sign.

 7        Within the applicable timeframe, the witness

 8   should read the testimony to verify its accuracy. If

 9   there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com by December 23, 2019.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                          Yours,

19                          Veritext Legal Solutions

20   cc:  All counsel

21

22

23

24

25

                                              Page 94
```

**EXHIBIT**

12



Insurance

PO Box 14543
Des Moines, IA  50306-3538
www.guideone.com

March 09, 2018

FIRST UNITED METHODIST CHURCH
501 Main St
Hereford,TX 79045-5248



PO Box 14543
Des Moines, IA 50306-3538
www.guideone.com

March 09, 2018

FIRST UNITED METHODIST CHURCH
501 Main St
Hereford, TX 79045-5248

RE:   Insured:         FIRST UNITED METHODIST CHURCH
      Policy No:       001432879
      Claim No:        AA090974
      Date of Loss:    April 14, 2017
      Peril:           Hail
      Location:        511 Main St, Hereford, TX 79045-5248

Dear Mr. Hoffman,

This letter serves as follow up regarding the hail damage claim to the church. We are in receipt of your request for a demand for an appraisal. We are not in a position to accept an appraisal until you have complied with the policy requirements for a proof of loss.

BUILDING AND PERSONAL PROPERTY COVERAGE FORM - PCP2311 (04/09) states in part:

E. LOSS CONDITIONS

2. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand of an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we still retain our right to deny the claim.

3. Duties In The Event Of Loss Or Damage

a. You must see that the following are done in the event of loss or damage to Covered Property:

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement

of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

Please complete the attached sworn statement in proof of loss form and submit it with a detailed estimates for the covered damages being claimed.

Upon receipt and review of your estimates for covered damages, we will contact you to discuss the damages and estimate for repair. If there are additional damages from the hail storm that we have not seen, we will schedule another inspection of the property.

If you have information or documentation that we may not be aware of that would cause us to reconsider our position, please contact me.


Please contact me if you have any questions.

Sincerely,

GuideOne Mutual Insurance

*Sharon Gross-Bryant*

Sharon Gross-Bryant
Property Adjuster
P: 888-748-4326 x6309
F: 800-676-4457
sgross-bryant@guideone.com

The State of Texas requires the following language be included on all claims correspondence:

"Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison."


*Enclosures:*       1. Sworn Statement in Proof of Loss

GuideOne Mutual Insurance Company • GuideOne Specialty Mutual Insurance Company • GuideOne Elite Insurance Company    CC_PP_0050_0314
GuideOne America Insurance Company • GuideOne National Insurance Company



**Claim Number :** AA090974

## SWORN STATEMENT IN PROOF OF LOSS

Policy number _____ Amount of policy at time of loss $_____

Date Issued _____ Date expires _____ Agent _____

To the:

☐ GuideOne Mutual Insurance Company

☐ GuideOne Elite Insurance Company

☐ GuideOne Specialty Mutual Insurance Company

☐ GuideOne America Insurance Company

☐ GuideOne Casualty Insurance Company

☐ GuideOne National Insurance Company

At time of loss, the following persons or legal entities were insured: (Please state the **full name** and **address** of all named insureds.)

1. **Identification of All Insured(s)**:

   1. _____

   2. _____

   3. _____

2. **Time and Origin**: A _____ loss occurred about the hour of _____ ☐ AM ☐ PM

   (State kind of loss)

   the _____ day of _____, _____. The cause and origin of the said loss were _____.

3. **Occupancy**: The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatsoever:

   _____

4. **Title and Interest**: At the time of the loss, the interest of the named insured(s) in the property described therein was _____. No other person or persons had any interest therein or encumbrance thereon, except:

   _____

5. **Changes**: Since the said policy was issued, there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except:

   _____
   _____

6. **Total Insurance**: The total amount of insurance upon the property described by this policy was at the time of the loss, $_____, as more particularly specified in the Appointment attached under Schedule "B," besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

7. **The Actual Cash Value** of said property at the time of the loss was    $ _____

8. **The Whole Loss and Damage** was    $ _____

9. **Less Amount of Deductible**    $ _____

10. **The Amount Claimed** under the above-numbered policy is    $ _____

The said loss did not originate by any act, design or procurement on the part of any named insured, or this affiant; nothing has been done by or with the consent of any named insured, the undersigned, affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed damaged at the time of said loss; no property saved in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

_____ Insured

State of _____    _____ Insured

County of _____    _____ Insured

Subscribed and sworn to me this _____ day of _____, _____

Notary Public.

The State of Texas requires the following language be included on all claims correspondence:

"Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison."

### SCHEDULE "A" – PERSONAL PROPERTY LOSS ITEMIZATION
### (Supplement to Sworn Statement in Proof of Loss)

| Item No. | Item Description (Make, Model No. and Serial No.) Processing will be delayed if this information is not provided | Owner | POLICYHOLDER MUST COMPLETE | | | | | COMPANY USE ONLY | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | How Many | Date of Purchase | Purchase price | *Place of **Purchase* | Replacement Cost per Item | Replacement Cost | Betterment | Allowance |
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |
| 5. | | | | | | | | | | |
| 6. | | | | | | | | | | |
| 7. | | | | | | | | | | |
| 8. | | | | | | | | | | |
| 9. | | | | | | | | | | |
| 10. | | | | | | | | | | |
| 11. | | | | | | | | | | |
| 12. | | | | | | | | | | |
| 13. | | | | | | | | | | |
| 14. | | | | | | | | | | |
| 15. | | | | | | | | | | |
| 16. | | | | | | | | | | |
| 17. | | | | | | | | | | |
| 18. | | | | | | | | | | |

*If the item was a gift, list the name and address of the person who gave it to you.
**Please attach all proofs of purchase, i.e., receipts, cancelled checks, warranty information or estimates to replace or repair.

NOTE: IF ADDITIONAL SPACE IS NECESSARY, PLEASE ATTACH ADDITIONAL SCHEDULES

### SCHEDULE "B" – APPOINTMENT
### (Amounts Paid or Payable By Other Insurance Companies)

| POLICY NUMBER | EXPIRES | NAME OF THE COMPANY | ITEM NO | | ITEM NO | |
|---|---|---|---|---|---|---|
| | | | INSURES | PAYS | INSURES | PAYS |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTALS : | | | | | | |

## SWORN STATEMENT IN PROOF OF LOSS

Claim # AA090974

Policy number _____          Amount of policy at time of loss $ _____

Date Issued _____   Date expires _____          Agent _____

To the:   ☒ GuideOne Mutual Insurance Company  ☐ GuideOne Elite Insurance Company  ☐ GuideOne Specialty Mutual Insurance Company   ☐
GuideOne America Insurance Company   ☐ GuideOne Lloyds Insurance Company  ☐ GuideOne Casualty Insurance Company

At time of loss, the following persons or legal entities were insured: (Please state the full name and address of all named insureds.)

1.   **Identification of All Insured**: Name          Address
    1. _____     _____
    2. _____     _____
    3. _____     _____

2.   **Time and Origin**: A _____ loss occurred about the hour of _____ o'clock ☐AM  ☐PM
             (State kind of loss)
    the _____ day of _____, _____. The cause and origin of the said loss were _____.

3.   **Occupancy**: the building described, or containing the property described, was occupied at the time of the loss as follows, and for no other
    purpose whatever: _____

4.   **Title and Interest**: At the time of the loss the interest of the named insured(s) in the property described therein was
    _____. No other person or persons has any interest therein or encumbrance
    thereon, except: _____

5.   **Changes**: Since the said policy was issued, there has been no assignment thereof, or change of interest, use, occupancy, possession,
    location or exposure of the property described, except: _____
    _____

6.   **Total Insurance**: The total amount of insurance upon the property described by this policy was at the time of the loss,
    $_____, as more particularly specified in the Appointment attached under Schedule "B", besides which there
    was no policy or other contract of insurance, written or oral, valid or invalid.

7.   **The Actual Cash Value** of said property at the time of the loss was          $ _____
8.   **The Whole Loss and Damage** was          $ _____
9.   **Less Amount of Deductible**          $ _____
10.   **The Amount Claimed** under the above-numbered policy is          $ _____

The said loss did not originate by any act, design or procurement on the part of any named insured, or this affiant; nothing has been done by or with the consent of any named insured, the undersigned, affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed damaged at the time of said loss; no property saved in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

                                  _____ Insured

State of _____          _____ Insured

County of _____          _____ Insured

Subscribed and sworn to me this _____ day of _____, _____

_____ Notary Public

## Insert State Appropriate Fraud Language

**SCHEDULE "A" – PERSONAL PROPERTY LOSS ITEMIZATION**
**(Supplement to Sworn Statement in Proof of Loss)**

| Item No. | Item Description (Make, Model No. and Serial No.) Processing will be delayed if this information is not provided | Owner | POLICYHOLDER MUST COMPLETE | | | | | COMPANY USE ONLY | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | How Many | Date of Purchase | Purchase Price | *Place of **Purchase | Replacement Cost per Item | Replacement Cost | Betterment | Allowance |
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |
| 5. | | | | | | | | | | |
| 6. | | | | | | | | | | |
| 7. | | | | | | | | | | |
| 8. | | | | | | | | | | |
| 9. | | | | | | | | | | |
| 10. | | | | | | | | | | |
| 11. | | | | | | | | | | |
| 12. | | | | | | | | | | |
| 13. | | | | | | | | | | |
| 14. | | | | | | | | | | |
| 15. | | | | | | | | | | |
| 16. | | | | | | | | | | |
| 17. | | | | | | | | | | |
| 18. | | | | | | | | | | |

*If the item was a gift, list the name and address of the person who gave it to you.
**Please attach all proofs of purchase, i.e., receipts, cancelled checks, warranty information or estimates to replace or repair.

**NOTE**: IF ADDITIONAL SPACE IS NECESSARY, PLEASE ATTACH ADDITIONAL SCHEDULES

**SCHEDULE "B" – APPOINTMENT**
**(Amounts Paid or Payable By Other Insurance Companies)**

| Policy Number | Expires | Name of Company | Item No……. | | Item No……. | |
|---|---|---|---|---|---|---|
| | | | Insures | Pays | Insures | Pays |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Totals**: | | | | | | |

**EXHIBIT 13**

| | |
|---|---|
| **From:** | Reporting |
| **To:** | Gross-Bryant, Sharon |
| **Subject:** | P22474TX Claim # AA090974 First United Methodist Church |
| **Date:** | Tuesday, December 12, 2017 7:45:29 PM |

Good Evening Sharon,

I just spoke with Dan Miller  806-553-0120 over at Trigg General Construction, Inc.  He said he wasn't really sure what was going on.  He said that that job had been passed on to someone else in his office.   He said he thought it would be Tyler Miller  817-403-0719, but wasn't sure.  I asked him what was the reason for that and he said he wasn't sure. He thought his production / estimate was slow.

He also stated that he thought there was going to be a PA involved now and they still hadn't started work yet.

He's supposed to get back to me with the correct contact person at his office.

Happy holidays and have a great day,

Ron Sorenson

Professional Adjusting Services Inc. a/k/a PASI
Our Address; 7500 Ladson Terrace * Lake Worth, FL 33467
Ph: (561) 674-0071 * Toll Free: (800) 672-1720 * Fax: (561) 994-6222
Centralized Email: Adjusting@pasi.biz * Website: www.pasi.biz

On Tue, Dec 12, 2017 at 12:02 PM, PASI Adjusting <adjusting@pasi.biz> wrote:

Respectfully,

Jessica Lopez
Office Manager

Professional Adjusting Services Inc., aka PASI
P.O.Box 541301, Greenacres FL 33454
Ph: (561) 674-0071 * Fax: (561) 994-6222 * (800) 672-1720
Centralized Email: Adjusting@pasi.biz


CONFIDENTIALITY: This communication, including attachments, is for exclusive use of the addressee(s) and may contain proprietary, confidential or privileged information. If you are not the intended recipient, any use, copying, disclosure, or distribution or the taking of any action in reliance upon this information is strictly prohibited. If you are not the intended recipient, please notify the sender immediately and delete this communication and destroy all copies.


-----Original Message-----
From: Gross-Bryant, Sharon [mailto:SGross-Bryant@guideone.com]
Sent: Monday, December 11, 2017 5:09 PM
To: PASI Adjusting <adjusting@pasi.biz>
Subject: FW: Claim # AA090974 First United Methodist Church
Importance: High

Hi Ron,
 Please see attachment and give me a call to discuss. I responded back and advised there was no letter of Rep. attached.



SHARON GROSS-BRYANT | GUIDEONE INSURANCE PROPERTY ADJUSTER P.O. Box 14543 l West Des Moines, IA 50306
P: 888-748-4326, ext. 6309 |E: SGross-Bryant@guideone.com l F: 800-676-4457 GUIDEONE.COMl FACEBOOKl TWITTERl SAFECHURCH

-----Original Message-----
From: admin@claims-usa.com [mailto:admin@claims-usa.com]
Sent: Friday, December 08, 2017 12:46 PM
To: Gross-Bryant, Sharon
Cc: admin@claims-usa.com
Subject: Claim # AA090974 First United Methodist Church

Sharon,

Good morning,  we are the public adjusting firm representing our mutual insured  First United Methodist Church related the wind/hail  damages only to the property located at  511 Main St, Hereford, TX 79045

Please REOPEN and REASSIGN claim to a new adjuster for field inspection

Note of representation agreement attached along with payee instructions for insurance benefit

Note our representation agreement is also an assignment of insurance benefits, and any and all checks or drafts in connection with the payment of this loss should include the interest of  Public Claims Adjusters Inc & Thomas Title and Escrow

Furthermore, we ask that all communications, correspondence, and payments issued be forwarded to our Texas office at 1717 McKinney Ave, Suite 700 Dallas, TX 75202

Please contact me at 800.624.1678 admin@claims-usa.com  for arrangements to schedule a reinspection

As a reminder, for their convenience, your insured has requested that payments on this claim are paid a specific way.

Enclosed you'll find a representation agreement, joint payee request.  We respectfully request that all funds associated with the claim are paid and directed to the documents signed by your insured.

90% to Named Policyholder,  Public Claims Adjusters Inc,  Thomas Title & Escrow, and mortgage holder(s)  if any and 10% Named Policyholder and Public Claims Adjusters, Inc.

Also, I request a copy of the insured's declaration page, estimate, photos of the damage if you have it prepared yet and full insurance policy for the listed property address.

Thank you for your time and consideration and I look forward to working with you

**EXHIBIT**

**14**

| | |
|---|---|
| **From:** | fumcbus@wtrt.net |
| **To:** | Gross-Bryant, Sharon |
| **Subject:** | RE: AA090974 First United Methodist Church |
| **Date:** | Wednesday, November 29, 2017 11:43:01 AM |

Thank you for remaining in touch Sharon.  Hope your holiday was good as well.  I just spoke to our construction company and they haven't finalized the claim with your adjuster.  There are still pending items they haven't come to a mutual agreement on.  I'm sure I'll hear from them when the process is completed.  Please feel free to check with me at any time.  Thanks!

Michelle Brisendine
First United Methodist Church
501 N Main
Hereford, TX  79045
806-364-0770


-----Original Message-----
From: Sharon Gross-Bryant [mailto:sgross-bryant@guideone.com]
Sent: Monday, November 27, 2017 4:31 PM
To: Michelle Brisendine <fumcbus@wtrt.net>
Subject: AA090974 First United Methodist Church

Hello Michelle,
 Hope all is well and you had a nice holiday. I'm following up with you regarding the repairs status for this loss, please advise. Should there be any questions, please feel free to call or email me.
Thanks,

SHARON GROSS-BRYANT | GUIDEONE INSURANCE PROPERTY ADJUSTER P.O. Box 14543 l West Des Moines, IA 50306
P: 888-748-4326, ext. 6309 |E: SGross-Bryant@guideone.com l F: 800-676-4457 GUIDEONE.COMl FACEBOOKl TWITTERl SAFECHURCH